Ernest B. Ford
Fed. Reg. No. 08550-007
U.S. Penitentiary, Big Sandy
P.O. Box 2068
Inez, Kentucky 41224

RECEIVED

DEC - 3 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ERNEST B. FORD, pro se                    :
             Plaintiff,
                        :
v.                                        :    Civil Action No. 07-1305 (CKK)
                        :
UNITED STATES DEPT. OF JUSTICE, et al     :
             Defendants.
                        :

_____/

## PLAINTIFF'S OPPOSITION TO DEFENDANTS MOTION

## FOR SUMMARY JUDGMENT

Having been apprised by this Court of his obligation under the Federal Rules of Civil Procedure and the local rules of this Court and, being Ordered to have his opposition filed by December 3, 2007, pursuant to Rule 56 of those same procedures; COMES NOW Plaintiff, ERNEST B. FORD, by and through himself hereby submitting Plaintiff's Opposition to Defendant's Motion for Summary Judgment.

### STANDARD of 56 Fed. Rule Civ. P.

Parties, such as Plaintiff, who are adverse to a motion for summary judgment must rebut the moving party's affidavits with other affidavits or sworn statements; simple allegations that the moving party's affidavits are incorrect are not sufficient (Fed.R.Civ.P. 56). Defendants, in support of its motion for summary judgment have submitted the declaration of Susan Bowman, Supervisory Operations Specialist, Superior Court Division, U.S. Attorney's Office for the

District of Columbia, and that of Dione Stearns, Attorney Advisor, Executive Office of United

States Attorneys (EOUSA) Freedom of Information-Privacy Acts (FOIA/PA) Section, U.S.

Department of Justice. In submitting these affidavits defendants note to Plaintiff that any factual

assertions contained [in the affidavits] in support of defendant's motion will be accepted by the

Court as true unless the plaintiff submits his own affidavits or other documentary evidence

contradicting the assertions in defendant's attachments. [Brackets added] Defendants then point

to *Neal v. Kelly*, 963 F.2d 453 (D.C. Cir. 1992), Local Rule 7.1 and Fed.R.Civ.P. 56 (e), which

provides as follows:

> "Supporting and opposing affidavits shall be made on personal knowledge,
> shall set forth such facts as would be admissible in evidence, and facts as
> would be admissible in evidence, and shall show affirmatively that the affiant
> is competent to testify to the matters stated therein. Sworn or certified
> copies of all papers or parts thereof referred to in an affidavit shall be
> attached thereto or served therewith. The court may permit affidavits to be
> supplemented or opposed by depositions, answers to interrogatories, or
> further affidavits. When a motion for summary judgment is made and
> supported as provided in this rule, an adverse party may not rest upon the
> mere allegations or denials of the adverse party's pleading, but the adverse
> party's response, by affidavits or as otherwise provided in this rule, must set
> forth specific facts showing that there is a genuine issue for trial. If the ad-
> verse party does not so respond, summary judgment, if appropriate, shall
> be entered against the adverse party. (Fed.R.Civ.P. 56(e))

Defendants then attach a memorandum in Support of [their] Motion for Summary

Judgment; a Statement of Material Facts Not in Dispute; Attachment 1 (which includes

Declaration of Dione J. Stearns and numerous other documents listed as Exhibits 1-6 [or A-F,

which is undecipherable] Plaintiff filed in attempts to have his FOIA request serviced and

complied with and; Attachment 2, which includes Declaration of Susan Bowman.

In rebutting this forest of documents defendants have supplied, Plaintiff will provide

documentation of his own; but not before paying brief visit to a few of the defendants'

submissions.

<u>Defendants are not entitled to Summary Judgment because Responsive Records Were Found.</u>

To begin, contrary to the assertion contained in Defendants Memorandum in Support of

Motion for Summary Judgment, defendants are not entitled to summary judgment. By

defendants own admission and affidavits that they have supplied, responsive records were found

in connection with Plaintiff's FOIA request claim.1   Wholly incredible is that Plaintiff is

imprisoned under a Life Sentence, presumably the result of a plea for which <u>no</u> record exists.

What documents (1 box) defendants say does exist, they would have Plaintiff "pull teeth" in

order to obtain but it constitutes responsive records.  Defendants do this after total non-

compliance with the 20-day requirement of the FOIA that records be produced, and after their

showing a lack of good faith, violating its own statement that:

> "EOUSA makes every effort to process most requests
> within a month (20 working days).  There are some
> exceptions, for example, Project Requests take approxi-
> mately nine months to process.  Requests for "all information
> about myself in criminal case files" are usually Project
> Requests.  If you have made such a request, you may
> either write us and narrow your request for specific items,
> or you may expect that the processing of your request may
> take nine months from the date of this letter."

That letter is dated October 14, 20<u>05</u> (See this filing, Plaintiff's Exhibit A), <u>not</u> October

14, 20<u>06</u>, as defendants have disingenuously and deliberately misrepresented to this Court at

Item 6 of Declaration of Dione J. Stearns.  Therefore, defendants took no action whatsoever on

Plaintiff's FOIA Request

---

<u>1</u>/ Declaration of Susan Bowman at (7) states "As a result of this [RCIS] search, I requested the
Closed Files Section in the USAO for the District of Columbia to order the closed case file from
the Federal Records Center, in Suitland, Maryland.  Upon receipt of the one box requested ...
these items were not contained in the box."

until the filing of this instant Complaint, June 12, 2007, a full 18 months after Plaintiff first

lodged his initial request which defendants themselves deemed at that time a "Project Request,"

failing to abide by their own instruction for Plaintiff to narrow his request for expedited

processing.  Plaintiff has therefore more than satisfied any administrative remedy requirement

and should instantly be provided a copy of the entire box of materials retrieved from the Federal

Records Center, and defendants motion for summary judgment should be denied.  Responsive

records <u>were</u> <u>found</u>.

### Defendants have Sought to Supplement the Administrative Record of Plaintiff's Request after Plaintiff's Request for Judicial Review.

Defendants further attempt fraud on this Court by supplementing the record of Plaintiff's

FOIA Request with a document generated after commencement of his Civil Complaint filed to

this Court for judicial action and remedy.**2**  Unquestionably this constitutes defendants again

making attempt to circumvent the law and undermine Plaintiff's entitlement to judgment in his

favor.  Defendants' actions are irregular at best and likely a violation of the Federal Rules of

Civil Procedure at worse, and Plaintiff looks to this Court for a liberal construing of his

pleadings such as are afforded a pro se litigant short of appointing Amicus counsel to assist him

in bringing criminal charges or otherwise punishing defendants with professional sanctions for

their violative acts.  Plaintiff trusts this Court will sanction defendants for their egregious

behavior and deliberate attempts to thwart the judicial process in the regards cited.

---

<u>2</u>/ Please see defendants' Exhibit 5, signed by supposed declarant Dione J. Stearns for William
B. Stewart II, Assistant Director EOUSA/FOIA/PA Section, and dated Sept. 11, 2007, 3-months
after the commencement of this action at law. (Attached to Declaration of Dione J. Stearns).

<u>Plaintiff has Exhausted His Administrative Remedies.</u>

Plaintiff has Exhausted his Administrative Remedy Requirements with respects to his

FOIA Request for the Entire Case File, F-6753-87 upon his initial request asking for "all

information about myself in criminal case files" (referencing Crim. Case No. F-6753-87) and

defendants then deeming it a "Project Request" that would be fulfilled within 9 months.

Defendants have not responded in fashion to accommodate his attempts to narrow his request.

Therefore, given the huge lapse of time that has passed and Plaintiff having been diligent (if not

supremely patient) in pursuing remedy for his request to be fulfilled to this point, it is foregone

that he has more than satisfied any requirement that he exhaust administrative remedy.

Additionally, by defendants' own admission, further attempts at administrative remedy are not

required by Plaintiff whereby, defendant Daniel J. Metcalfe, Director U.S. Dept. of Justice

Office of Information and Privacy states in his letter to Plaintiff dated Oct. 11, 2006, labeled

defendants' Exhibit 4 that,

> "As no adverse determination has yet been made,
> there is no action for this office to consider on appeal.
> In particular, the Freedom of Information Act itself
> contemplates judicial review, rather than an administra-
> tive appeal, when an agency has failed to respond to a
> request within the statutory time limits." (quoting 5 U.S.C.
> Sec. 552(a)(6)(C)(i)).

Therefore, it is unclear what administrative remedy defendants could possibly be talking about.

On this point Plaintiff rests concerning any need for him to attempt further exhaustion of

administrative remedy. He has already fulfilled this requirement and the FOIA itself

contemplates judicial review rather than administrative appeal when an agency has failed to

respond to a request within the statutory time limits. (5 U.S.C. Sec. 552(a)(6)(C)(i). Defendants

have failed to respond to Plaintiff's request for "all information about myself in criminal case file

(referencing Crim. Case No. F-6753-87)" within the statutory time limit as well as having failed

to respond to all attempts he made to narrow his request so that it could be addressed in

expedited fashion. Defendants have failed in both these respects therefore, Plaintiff is entitled to the entire case file as was first requested, and need not be made to exhaust or pursue administrative remedy that does not exist outside the framework of this present judicial context and proceeding.

<u>Defendants have not made a good faith effort to conduct a search for the Requested Records, using methods which can be reasonably expected to produce the information requested.</u> *Oglesby v. U.S. Dept. of Army,* 920 F.2d 68.

Defendants are quick to tout their having conducted what they characterize as a reasonable search for the requested records (which they would like to believe discharges and absolves them from their duties). However, defendants neglect in their argument to acknowledge the 20-working day requirement for fulfilling an FOIA request and their forcing the issue of judicial arm-twisting that has been necessary on the part of Plaintiff to get their agency(ies) to respond at all in any substantive manner. This forced judicial review has likely resulted unnecessarily in the expenditure of thousands of taxpayer dollars for which compliance with the act would have alleviated.

Plaintiff is serving a parolable Life term of imprisonment for which he has now been incarcerated 20+ years. Defendants, their agencies and offices are the entities charged with facilitating Plaintiff's incarceration and maintaining pertinent records on the process(es) that brought Plaintiff's imprisonment about, if any ever existed. Because there are strict rules which lay out just how case records pertaining to Plaintiff should be handled, retained and/or Closed, it is disingenuous for defendants to state that an adequate search has been conducted when as an agency, full of criminal practice

- 6 -

attorneys, something as fundamental as a Rule 11 Hearing Transcript would not strike them as odd in it being missing from Plaintiff's case file aong with other critical and pertinent documents. The very diligence that defendants speak of having exercised would be undermined and offended until such critical a document is located and retrieved, being that <u>without it there exists no legal basis in the record for Plaintiff to have ever been incarcerated</u>. This points critically and severely to a due process issue of major proportions concerning which, Plaintiff will be asking of this Court for legal counsel.

Attached is Plaintiff's Exhibit B, Sworn Deposition of Bonnie Lewis Gay (former Asst. Dir., U.S. Department of Justice, Executive Office for United States Attorneys Freedom of Information privacy Act Unit), a 1964 graduate of American University, Washington College of Law who has an extensive history of governemnt service dating back over 40 years, which includes having taught courses in FOIA and privacy and Nat'l. Security Information, was Justice Dept's Asst. Dir. for Office of Legal Education and spent approx. ten years as attorney in charge of the Justice Department's Freedom of Information and Privacy Act Section for the Executive Office for U.S. Attorneys, as well as extensive other significant service as a government and Justice Department Executive Attorney. Plaintiff is submitting the deposition of Bonnie L. Gay (though taken in and unrelated FOIA matter ( *Jefferson v. Reno* ) in rebutting declarations of Susan Bowman and Dione Stearns submitted by defendants. Although the deposition of Ms. Gay is extensive, Plaintiff directs this Court's attention to its highlights relevant to Plaintiff's Civil Complaint and rebuttal of defendants' declarations; attention directed particularly to page 152 of Ms. Gay's deposition which details the Department of Justice's regulations on retention of files ... that,

> "files should be retained—if you have an indictment, should be
> retained a minimum of ten years plus one, and that is for every-

> thing in which the sentence is less than ten years or not
> more than ten years and the—oh, what is it?—the parole—not
> the parole, the probation. Otherwise, the rule is the amount of
> time of the sentence plus the end of the probation plus one year,
> and if it's a death sentence of life sentence—no, life sentence,
> its to be kept 65 years."

Sixty-five (65) years.

Plaintiff is serving a Life sentence.

Plaintiff similarly directs this court to Page 155 of Bonnie L. Gay's sworn deposition (given in the same unrelated FOIA matter, Jefferson v. Reno, where is detailed the U.S. Attorneys Office's procedure to <u>close</u> a file.

Also attached to Plaintiff's opposition motion to defendants' motion for summary judgment, in rebuttal to declarations submitted by defendants (declarations of Susan Bowman and Dione Stearns), is the sworn deposition of Jeffrey S. Downing, an Assistant United States Attorney formerly in Tampa and now [at the time of his 1999 deposition] in New hampshire. Mr. Downin'g sworn deposition details at pages 28-33 the concept of obstruction of justice (Title 18, Sec. 1503) and potential for professional sanctions in the event a U.S. Attorney or her/his office destroys documents. Pages 39-47 of Mr. Downing's sworn deposition lists additional details in the closing of criminal case filles, utilizing Form USA 207 <u>Notice to close Legal Case Files</u> (for all retired case files), and page 82 references the United States Attorneys Manual as pertains to closing criminal case files. Pages 301-303 are also instructive in these same regards.

But Plaintiff seeks not to beleaguer this Court with a small forest of documents as defendants have attempted to do. He seeks simply to counter declarations submitted by defendants with sworn depositions of his own in opposition to defendants having made motion

- 8 -

for summary judgment. Plaintiff also seeks judgment in his favor whereupon he believes he has

more than stated his case based upon sound reason, sensibility, and informed, impeccable

expertise regarding the matter of defendants either producing the requested documents (which at

this point includes the entire case file) and/or explain otherwise how/why Plaintiff is being held

imprisoned  without the benefit of having undergone the proper process due under the Rules of

Court and the Due Process Clause (the Fifth Amendment) of the United States Constitution.

Respectfully submitted,

Ernest B. Ford (11/30/07)

Ernest B. Ford
Fed. Reg. No. 08550-007
U.S. Penitentiary, Big Sandy
P.O. Box 2068
Inez, Kentucky  41224

CERTIFICATE OF SERVICE

I, Ernest B. Ford, pro se, do hereby certify under penalty of perjury and pursuant to 28 USCA § 1746, that a copy of the foregoing <u>Plaintiff's Opposition to Defendants Motion for Summary Judgment</u> (and Attached Exhibits -A- and Exhibit -B-) have been mailed First-Class, U.S. Postage pre-paid this <u> 30th </u> day of November 2007, to the Clerk of the Court, United States District Court for the District of Columbia located at 333 Constitution Ave., N.W. (Washington, D.C.) 20001.

Respectfully submitted,

E. B. Ford (11/30/07)

Ernest B. Ford
Fed. Reg. No. 08550-007
U.S. Penitentiary, Big Sandy
P.O. Box 2068
Inez, Kentucky  41224

# PLAINTIFF'S

# EXHIBIT  -A-



*Executive Office for United States Attorneys*
*Freedom of Information/Privacy Act Staff*
*600 E Street, N.W., Room 7300*
*Washington, D.C. 20530*
*202-616-6757  Fax 202-616-6478*

OCT 14 2005

---

Request Number:  05-2930    Requester: ERNEST B. FORD

Subject: SELF (PUBLIC RECORDS - SPECIFIC) CR. NO. F-6753-87

The Executive Office for United States Attorneys (EOUSA) has received your Freedom of Information Act/Privacy Act (FOIA/PA) request. It has been assigned the above number. Please give us this number if you write about your request. If we need additional information, we will contact you within two weeks.

Your request will be placed in the order in which it was received for processing, unless it is a very large request (Project Request). Then, it will be placed in a separate group of Project Requests, which are also processed in the order received.

EOUSA makes every effort to process most requests within a month (20 working days). There are some exceptions, for example, Project Requests take approximately nine months to process. Requests for "all information about myself in criminal case files" are usually Project Requests. If you have made such a request, you may either write us and narrow your request for specific items, or you may expect that the processing of your request may take nine months from the date of this letter.

By making a FOIA/PA request, you have agreed to pay fees up to $25, as stated in 28 CFR § 16.3(c), unless you have requested a fee waiver. Please note that pursuant to 28 CFR § 16.11, we are required to charge fees for time used to search for the documents you have requested and for duplication of all pages released to you. Normally, search time is charged at a rate of $28 per hour after the first two hours which are free, and duplication fees are $0.10 per page after the first 100 pages which are free. Please do not send any payment at this time! If we anticipate that fees will exceed $25 or the amount you have stated in your letter (if greater than $25), we will normally notify you of our estimate of fees. After we have received your agreement to pay for the expected fees (or you have narrowed your request to reduce fees) and we have processed your request, we will require payment for the accumulated charges before we release documents to you. Without such payment, your request file will be closed without further action.

Sincerely,

Marie A. O'Rourke
Assistant Director

Form No. 001 -6/05

U.S. Department of Justice
EOUSA /FOIA/PA UNIT
BICN BLDG., RM.7300
600 E ST., N. W .
WASHINGTON, DC 20530

# LEGAL MAIL-OPEN ONLY IN PRESENCE OF INMATE

4122470206-06  8002

Ernest B. Ford
#08550-007
USP, P.O. Box 2068
Inez, KY 41224



US OFFICIAL MAIL
$300 Penalty
For Private Use

016H1660052
$00.370
10/14/2005
Mailed From  20530
US POSTAGE
Hasler

# In The Matter Of:

*WILLIE JEFFERSON    v.*
*JANET RENO et al*

---

*BONNIE LEWIS GAY*
*June 10, 1999*

---

*Beta Reporting*
*910 17th Street, N.W.*
*Suite 200*
*Washington, DC  20006*
*(202) 638-2400   or   (800) 522-2382*

Original File AAGAY.TXT, 217 Pages
Min-U-Script® File ID: 0332371270

# Word Index included with this Min-U-Script®

WILLIE JEFFERSON v.
JANET RENO et al

BONNIE LEWIS GAY
June 10, 1999

**Page 1**

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

WILLIE JEFFERSON,          :
        Plaintiff,         :
    v.                     : Civil No. 96-1284(GK)
JANET RENO et al.,         :
        Defendants.        :

Washington, D.C.
Friday, June 10, 1999

Deposition of
BONNIE LEWIS GAY
a witness, called for examination by counsel
for Plaintiff pursuant to notice and
agreement of counsel, beginning at
approximately 1:27 p.m. at the law offices of
Piper & Marbury, 1200 19th Street N.W.,
Washington, D.C., before Joan V. Cain of Beta
Reporting & Video Services, notary public in
and for the District of Columbia, when were
present on behalf of the respective parties:

**Page 2**

APPEARANCES:
On behalf of Plaintiff:
    ELIZABETH DEWEY, ESQUIRE
    Piper & Marbury
    1200 19th Street N.W.
    Washington, D.C. 20036
    (202) 861-6218
    DONNA LEE YESNER, ESQUIRE
    Pepper Hamilton, L.L.P.
    Hamilton Square
    600 14th Street N.W.
    Washington, D.C. 20005-2004
    (202) 220-1200
On behalf of Defendants:
    DAVID T. SMORODIN, ESQUIRE
    Assistant United States Attorney
    Office of the United States Attorney
    555 4th Street N.W.
    Washington, D.C. 20001
    (202) 307-0406
ALSO PRESENT:
    Willie Jefferson

**Page 3**

CONTENTS
EXAMINATION BY:               PAGE
    Counsel for Plaintiff       4
GAY DEPOSITION EXHIBITS:
No. 1 - Memorandum, Gay to Nadiak      56
No. 2 - Reply, Guzman-Michaels to Gay, 60
        Attachment
No. 3 - Letter, Gay to Jefferson    74
No. 4 - Memorandum, Gay to Downs,    89
        Attachment
No. 5 - Contact Manual Guidance Sheet    125
No. 6 - Memorandum, Anderson to All      130
        Criminal and Civil Division
        Attorneys and Support Staff
No. 7 - FOIA/Privacy Act Regulations     132

**Page 4**

[1] **PROCEEDINGS**

[2] Whereupon, [3] BONNIE LEWIS GAY
[4] was called as a witness and, having
been [5] first duly sworn, was examined
and testified [6] as follows:

[7] **EXAMINATION BY COUNSEL FOR
PLAINTIFF**

[8] **BY MS. DEWEY:**

[9] **Q:** Hello, Ms. Gay. I'm Lisa Dewey, [10]
and I'm going to be the person asking
you [11] questions today. Could you just
state your [12] full name and address for
the record?

[13] **A:** Yes. Bonnie Lewis Gay, and my [14]
address is 601 — I mean 600 E Street
N.W., [15] Room 7100, Washington, D.C.
20530.

[16] **MR. SMORODIN:** Before we get [17]

started, actually, I should say for the [18]
record my name is David Smorodin. I [19]
represent the Department of Justice and
[20] Ms. Gay in this deposition, and we're
taking [21] this deposition and making
Ms. Gay available [22] pursuant to the
court order as well as to the

**Page 5**

[1] conversations that we've had with
counsel, [2] and that by — and Ms. Gay is a
member of the [3] bar, is an attorney with
the Department of [4] Justice, and by
producing Ms. Gay here today [5] the
Department of Justice is not intending to
[6] waive any attorney-client privileges,
any [7] work-product privileges that it
may have, or [8] any other privileges that
it may have but in [9] an effort to comply
with the court's order [10] and to try to
resolve Mr. Jefferson's case [11] that is
presently pending.

[12] And I don't know that this really [13]
will come up with Ms. Gay's deposition,
but [14] in some of the others that are
scheduled [15] counsel and I have talked,
and my [16] understanding is that there is
no intent to [17] get into any information
about the underlying [18] prosecution
that led to Mr. Jefferson being [19] im-
prisoned. I don't know that Ms. Gay has
[20] any information that would really
relate to [21] that, but we're not waiving
any privileges we [22] have regarding that
information or that

**Page 6**

[1] subject area. Thank you.

[2] **BY MS. DEWEY:**

[3] **Q:** Ms. Gay, if there's a question that [4]
I ask that you don't understand or if you
[5] need to take a break, just let me know.
Have [6] you ever been deposed before?

[7] **A:** Yes.

[8] **Q:** How many times have you been [9]
deposed?

[10] **A:** Probably about four or five.

[11] **Q:** And what was the subject matter of
[12] those depositions?

[13] **A:** Well, a couple of them were [14]
divorces, other — I think there was a
case [15] in Kentucky a few years ago, and
I can't [16] remember exactly, but it seems
like there was [17] one other time.

[18] **Q:** And did the case in Kentucky
relate [19] to your position as a person
familiar with [20] FOIA or what sort of
matter was that?

[21] **A:** Yes, it did.

[22] **Q:** And then you think there was one

**Page 7**

[1] other time in addition to that?

[2] **A:** But not work-related. I think it [3]
might have been in connection with an
auto [4] case or somebody else's divorce

or whatever.

[5] **Q:** So you've only been deposed one
[6] other time that's related to your work?

[7] **A:** Related to this work, yes.

[8] **Q:** And you are represented by coun-
sel [9] today?

[10] **A:** Yes, I am.

[11] **Q:** Mr. Smorodin who's here is your
[12] counsel?

[13] **A:** Yes, he is.

[14] **Q:** Did you speak with Mr. Smorodin
[15] before you came here today?

[16] **A:** When do you mean?

[17] **Q:** Concerning this deposition.

[18] **A:** Today? No, I didn't speak to him
[19] today except on the phone, dis-
cussing what [20] time we'd arrive here.

[21] **MR. SMORODIN:** Ms. Gay followed
my [22] instructions better than I did.

**Page 8**

[1] **BY MS. DEWEY:**

[2] **Q:** Ms. Gay, I'd like to start just by [3]
learning a little bit about your back-
ground. [4] First we'll talk about your
educational [5] background, where you
went to college.

[6] **A:** American University here in [7]
Washington, D.C.

[8] **Q:** And when did you graduate from [9]
American University?

[10] **A:** 1962.

[11] **Q:** And what sort of degree did you
[12] receive?

[13] **A:** A bachelor of science in political
[14] science.

[15] **Q:** And when you graduated from
college [16] in 1962, what did you do
then?

[17] **A:** I was already in law school at the
[18] time.

[19] **Q:** You were already in law school
when [20] you graduated from college?

[21] **A:** Yes, I did a combined degree,
where [22] I did the first three years of
college, and

**Page 9**

[1] then I was accepted into law school at
[2] American University, also Washington
College [3] of Law.

[4] **Q:** That's where I went to school. And
[5] when did you graduate from law
school, then?

[6] **A:** 1964.

[7] **Q:** And now, learning a little bit [8]
about your professional experience,
once you [9] graduated from law school,
what did you do [10] professionally?

[11] **A:** I was a law clerk to a federal [12]
district court judge in Washington, D.C.,
[13] Judge Burnita Shelton Matthews.

BONNIE LEWIS GAY
June 10, 1999
Case 1:07-cv-01305-CKK    Document 20-3    Filed 12/03/2007    Page 3 of 115
WILLIE JEFFERSON v.
JANET RENO et al

[14] **Q:** And was that a two-year clerkship?

[15] **A:** Actually, it turned out to be a [16] year and a half that I worked there.

[17] **Q:** And what happened after that year [18] and a half?

[19] **A:** Well, for a year and a half I was [20] home with my daughter, who was a very [21] young [21] baby — well, a year, year and a [22] half old, for about a year and a half, and I practiced

---

**Page 10**

[1] some law on the side.

[2] **Q:** And so that takes us to [3] approximately what, 1969, maybe, 1970?

[4] **A:** That takes us to 1968.

[5] **Q:** And then what did you do?

[6] **A:** Then I began to work for a computer [7] retrieval company. We designed information [8] retrieval systems for energy law, and I [9] actually became the executive director of [10] that company. We went on to produce the [11] first word processor.

[12] **Q:** So how long did you work for that [13] company?

[14] **A:** About three years.

[15] **Q:** What's the name of the company?

[16] **A:** Computer Retrieval Systems. I know [17] you're wondering about well, it must have [18] been IBM. IBM actually stole this from [19] my boss, and he got a huge settlement.

[20] **Q:** Well, that's good. So you worked [21] for Computer Retrieval Systems until [22] approximately 1971, then, or for about three

---

**Page 11**

[1] years?

[2] **A:** Actually, till about October of [3] 1970, when I went to work for the Treasury [4] Department in the Office of General Counsel.

[5] **Q:** Were you working as an attorney [6] then, as a staff attorney?

[7] **A:** I wrote legal opinions for the [8] Secretary of the Treasury, the presidential [9] opinions that were published.

[10] **Q:** And how long did you do that?

[11] **A:** About four years.

[12] **Q:** And then what did you do?

[13] **A:** Then what did I do? Well, then I [14] actually became the FOI privacy official for [15] the Department of the Treasury.

[16] **Q:** And that was in approximately 1974?

[17] **A:** About 1974.

[18] **Q:** And how did that come about?

[19] **A:** Well, it was the — it was set up [20] under the same office that I was in, and

---

my [21] boss just said, you know, do it, so I did it. [22] Actually, the reason that I got assigned

---

**Page 12**

[1] those type of things was due to my experience [2] in computers because that tied in with the [3] privacy matters that the Congress was looking [4] into and setting up the systems of records [5] for different government agencies, and so [6] they thought that I could handle it since it [7] had computers in it somewhere.

[8] **Q:** So your title was FOIA officer, was [9] that right?

[10] **A:** Well, actually I was the appellate [11] official and the policy coordinator for the [12] Department of the Treasury. I handled all [13] the appeals in the Treasury Department from [14] all of the agencies such as IRS, Alcohol, [15] Tobacco, Firearms, and Secret Service, et [16] cetera, et cetera.

[17] **Q:** So you handled the FOIA requests [18] related to those proceedings?

[19] **A:** No, I made the determinations on [20] administrative appeals for the entire [21] Treasury Department, and I also set the [22] policy for FOIA and for privacy and wrote

---

**Page 13**

[1] regulations for both acts for Treasury.

[2] **Q:** For the Treasury Department?

[3] **A:** Yes.

[4] **Q:** Sounds like a big job.

[5] **A:** It was.

[6] **Q:** And how long did you serve in that [7] capacity at the Department of Treasury?

[8] **A:** Till January 1977.

[9] **Q:** And what happened then?

[10] **A:** I became the legal counsel for the [11] Bureau of Engraving and Printing, and [12] that's essentially the general counsel. The Bureau [13] of Engraving and Printing is under the [14] Treasury Department, so I had responsibility [15] for all of the legal matters which came [16] before the Bureau of Engraving and Printing. [17] We practiced about 34 areas of law in my [18] office.

[19] **Q:** And how long were you legal counsel [20] for the bureau?

[21] **A:** Till 1980, January of '80.

[22] **Q:** And what happened in January of

---

**Page 14**

[1] '80?

[2] **A:** I went over to the Office of [3] Revenue Sharing, also in the Treasury [4] Department, and served as a counsel over [5] there. We did discrimination cases relating [6] to the Revenue Sharing

---

Act, more than [7] discrimination but discrimination and a [8] number of other areas.

[9] **Q:** Now, during this time, were you [10] still handling FOIA regulations, or did you [11] have anything to do with FOIA?

[12] **A:** I didn't — I wasn't responsible [13] for the regulations or the policy, but I [14] handled all the FOIA matters of course for [15] the Bureau of Engraving and Printing while I [16] was there and the same for the Office of [17] Revenue Sharing while I was there.

[18] **Q:** So that duty continued throughout [19] your tenure?

[20] **A:** Mm-hmm.

[21] **Q:** So how long were you with Revenue [22] Sharing?

---

**Page 15**

[1] **A:** Till 1984, January again. This [2] seems to be a pattern.

[3] **Q:** That's your time of year. And what [4] happened in January of 1984?

[5] **A:** I went to work for the Justice [6] Department as an assistant director of the [7] Legal Education Institute, Office of Legal [8] Education, Executive Office for United States [9] Attorneys.

[10] **Q:** That's a mouthful. And what were [11] your duties there?

[12] **A:** I designed, created, got speakers [13] for, set up the curriculum for, had [14] committees from all over the government and [15] the private sector to come up with the [16] curriculum and the course materials for all [17] kinds of courses that were given to attorneys [18] throughout the federal government, including [19] those from the Department of Justice.

[20] **Q:** And during that time, did you have [21] any duties with respect to FOIA?

[22] **A:** I had duties with respect to FOIA

---

**Page 16**

[1] at work in that I did put on some courses [2] involving FOIA and privacy, and in addition [3] to that that was about the time I began to —[4] no, I guess I began teaching at University of [5] Maryland approximately 1981 through 19 —[6] well, starting into 1988, so that was about [7] seven years, eight years, altogether, where I [8] developed a course on government information [9] practices and I also taught that course.

[10] It included national security [11] information, Freedom of Information Act, [12] Privacy Act, Government and Sunshine Act, and [13] the Federal Advisory Committee Act. And I [14] they're still giving that course. I don't [15] teach it any more.

[16] **Q:** That's impressive.

---



**WILLIE JEFFERSON  v.**
**JANET RENO et al**

**BONNIE LEWIS GAY**
**June 10, 1999**

istrative officer, and [9] Mr. Downing; is that right?

[10] A: (Nodding)

[11] MR. SMORODIN: You need to say yes [12] or no.

[13] THE WITNESS: Yes.

[14] BY MS. DEWEY:

[15] Q: Who did you call first? Just start [16] at the beginning.

[17] A: I don't even know. I think I [18] called Jeff first.

[19] Q: Jeff Downing?

[20] A: Mm-hmm.

[21] Q: What did you say?

[22] A: You know, I don't recall what I

### Page 120

[1] said, but I know that I said, you know, I am [2] going to have to check into this matter, and [3] I'm going to have to send somebody down to [4] look at these materials, and I'm going to ask [5] you to be cooperative with the person and [6] help her as much as possible, and basically [7] that's it. I didn't ask him could I send [8] somebody down? I'd already made my mind up.

[9] Q: What was your reaction when you [10] first learned that Mr. Downing had purged the [11] file?

[12] A: I really thought that it was bad [13] timing.

[14] Q: Why is that?

[15] A: I thought it was bad timing because [16] of the fact that we had a FOIA matter [17] outstanding.

[18] Q: Is that the only reaction you had, [19] just bad timing?

[20] A: Well, I didn't know what he had [21] taken out of the file, so I was not — [22] obviously, I didn't know what he had taken

### Page 121

[1] out of the file, but I just would never like [2] it for somebody to have messed with their [3] files after a FOIA request. I [4] tell them [4] don't even throw a tissue out of your files, [5] if they ask me, but this was a different [6] situation.

[7] Q: Why is it so important that nobody [8] touch their files when a FOIA request is [9] pending?

[10] A: Well, it's not 100-percent [11] important. It's important for appearance. [12] Okay? I would say what would really be [13] important is that one would keep at least one [14] copy of everything in the file, but — so [15] from a legal point of view that would all [16] one would have to do. On the other hand, if [17] you start, you know, throwing stuff here and [18] there and whatever, it makes other people [19] think that you might have

taken something — [20] I mean, might not have kept a copy of [21] everything, and obviously that's what [22] everybody's thinking here. It doesn't

### Page 122

[1] necessarily mean it was so.

[2] Q: So your first reaction was to call [3] Mr. Downing and speak with him when you [4] learned that he had purged the files, right?

[5] A: Yeah.

[6] Q: And why did you decide to send [7] Stephanie Boucher down there, down to Tampa?

[8] A: Because she was the only person on [9] my — she was a very good person. John nor I [10] could go, and I knew Stephanie would do the [11] job quickly and well.

[12] Q: And what was the job, again?

[13] A: To index the documents.

[14] Q: Did you know that an index did not [15] already exist for the documents?

[16] A: Well, I probably knew that.

[17] Q: And how would you know that?

[18] A: I would have probably asked Jeff if [19] there had been an index or something. I [20] don't know that I did, though. I should say [21] I don't know.

[22] Q: So you just may have assumed that

### Page 123

[1] there would be no index for these files, and [2] in your mind it was very important to have an [3] index?

[4] A: No, in my mind I wanted to know [5] what was there.

[6] Q: And I assume you must have asked [7] Mr. Downing that, right, or not?

[8] A: Well, yeah, sure, I did. I just [9] told him I wanted to send my person down to [10] have a look.

[11] Q: Did you ask him if an index [12] existed of the files?

[13] A: I don't recall.

[14] Q: Is it normal practice for an [15] assistant United States Attorney to keep an [16] index of his or her files?

[17] A: I don't think so.

[18] MR. SMORODIN: Do you mean when a [19] FOIA request is pending or just generally?

[20] MS. DEWEY: Generally.

[21] THE WITNESS: No.

[22] BY MS. DEWEY:

### Page 124

[1] Q: No?

[2] A: I don't know. Maybe some do and [3] maybe some don't, but I haven't seen very [4] many. In my ten years here, I've probably [5] seen four or five indexes.

[6] Q: In your experience, has anyone ever [7] destroyed documents that were the subject of [8] a court proceeding before?

[9] MR. SMORODIN: In a FOIA case?

[10] MS. DEWEY: Yes.

[11] THE WITNESS: Has anyone ever in a [12] FOIA case? Not that I ever became aware of.

[13] BY MS. DEWEY:

[14] Q: So this was a case of first [15] impression, then; is that right?

[16] A: Yes.

[17] Q: So were you surprised when you [18] learned that Mr. Downing had purged the [19] file?

[20] A: I wasn't happy.

[21] Q: Can you be a little more [22] descriptive? Why weren't you happy?

[22] A: I wasn't happy because I knew it

### Page 125

[1] wasn't good news.

[2] Q: I'm sorry, can you say that again?

[3] A: I wasn't happy because to me it [4] wasn't good news.

[5] Q: Did it violate the Department of [6] Justice regulations?

[7] A: Not that I'm aware of. I don't [8] know that it would have — I mean, I really [9] don't think that it would have.

[10] MS. DEWEY: I think we're on [11] Exhibit 5. Can I have this marked as Exhibit [12] 5?

[13] (Gay Deposition Exhibit No. 5 [14] was marked for identification.)

[15] BY MS. DEWEY:

[16] Q: Ms. Gay, I'm showing you what's [17] been marked as Exhibit No. 5, and this comes [18] out of the —

[19] A: The yellow book.

[20] Q: The yellow book, thank you.

[21] A: Contact manual.

[22] Q: This is from Section XII,

### Page 126

[1] maintenance and removal of documents. It's [2] entitled "Purging United States Attorney Case [3] Files."

[4] A: Okay.

[5] Q: Would you read the sentence that's [6] in all caps?

[7] A: Yes. Oh, read it out loud? "Once [8] a FOIA request has been made, a file cannot [9] be purged."

[10] Q: Is that why you were so concerned [11] when you learned that Mr. Downing had purged [12] files?

[13] A: First of all, how are you [14] describing this piece of paper?

[15] Q: How am I describing it? Exhibit [16]

No. 5?

[17] A: Yeah, I mean, you haven't [18] identified it. You just said it came from a [19] notebook, chapter 12.

[20] Q: Right. Do you want me to get the [21] original book for you so you can see —

[22] A: Oh, no. No, I know what's in the

Page 127

[1] book. This is one of three samples of [2] information that is provided to people who [3] want to know how they should [4] purge files. [4] This doesn't have any official effect.

[5] MR. SMORODIN: Your question a [6] moment ago had asked Ms. Gay whether [7] Mr. Downing's purging of the files violated [8] any Department regulation, and I think, if I [9] can cut through it, what Ms. Gay is asking [10] you, how are you characterizing this? Not as [11] what page out of what book, but are you [12] characterizing this as a regulation, a [13] requirement, a manual, guidance? And that's [14] I think, the nature of her question.

[15] BY MS. DEWEY:

[16] Q: Maybe you could answer your own [17] question, then, and you tell me what that is.

[18] A: It is one of three — I believe [19] it's three different sheets that provide [20] guidance, and it's a course manual for the [21] FOIA contact course that occurs about every [22] 18 months.

Page 128

[1] Q: Did you have input in designing the [2] materials for that course?

[3] A: Yes.

[4] Q: Did you author this exhibit?

[5] A: No, I didn't.

[6] Q: Have you ever had any input into [7] the promulgation of Department of Justice [8] FOIA rules?

[9] A: Well, they've only sent them around [10] for review twice in the past ten years, and I [11] don't think I really had any input because I [12] don't believe we made any specific comments [13] on the regs.

[14] MR. SMORODIN: You answered with [15] regs and she asked with rules.

[16] THE WITNESS: The Department of [17] Justice — what did you say?

[18] BY MS. DEWEY:

[19] Q: I think I said Department of [20] Justice FOIA rules. I said rules.

[21] A: Okay, well, I don't know what [22] "rules" means.

Page 129

[1] Q: What effect does Exhibit No. 5 [2] have? Is it —

[3] A: It's just informal guidance.

[4] Q: And so it instructs assistant [5] United States Attorneys not to purge their [6] files once a FOIA request has been made?

[7] A: No, this is not for assistant U.S. [8] Attorneys.

[9] Q: Who's it for?

[10] A: This is for the FOIA contacts. [11] That's a course that the FOIA contacts [12] attends, and it's their course book which [13] gives — we do have a copy of various regs in [14] it, but this particular chapter, I believe, [15] gives three different policies from different [16] offices regarding purging files. It's just [17] informal.

[18] Q: Can I have that?

[19] A: Mm-hmm.

[20] MS. DEWEY: Would you mark this [21] Exhibit No. 6?

[22] (Gay Deposition Exhibit No. 6

Page 130

[1] was marked for identification.)

[2] BY MS. DEWEY:

[3] Q: I'm handing you what's been marked [4] as Exhibit No. 6. It's a memorandum that [5] came out of the same yellow binder that we [6] were referring to. It says it's to all [7] Criminal and Civil Division attorneys and [8] support staff, and if you read down in the [9] first —

[10] A: Okay, wait a minute.

[11] Q: I'm sorry.

[12] MR. SMORODIN: Wait till she asks a [13] question.

[14] THE WITNESS: Okay.

[15] BY MS. DEWEY:

[16] Q: It says that this memo sets forth [17] guidelines for the purging of files before [18] closing, and I assume that's you about the [19] third line up. It says "Bonnie."

[20] A: No, it isn't. This is not me.

[21] Q: That Bonnie is not you?

[22] A: No, it isn't. This is from one

Page 131

[1] United States Attorney's Office, and for [2] some [2] reason I think it's West Virginia, but Gene [3] S. Anderson, U.S. attorney.

[4] MS. YESNER: Oregon.

[5] THE WITNESS: Oregon?

[6] MS. YESNER: (Nodding)    That's [7] where he is now.

[8] THE WITNESS: Oh, he is now, okay. [9] I don't know where he was at this point. I [10] don't think he was in Oregon, but he might [11] have been. Anyway, this was guidance that [12] they wrote for their own U.S. Attorney's [13] Office. So this was one of the 93 offices, [14] and it was

written April 1986, which part of [15] it —

[16] BY MS. DEWEY:

[17] Q: Well, do you read this document to [18] mean that files should not be purged until [19] they're being prepared for closing?

[20] A: Well, it depends on what you mean [21] by "purged."

[22] Q: Anything thrown away from a file.

Page 132

[1] A: I purge my files on a daily basis. [2] You know, if I'm writing something for Dave [3] Smorodin and I write four or five versions or [4] it or make three or four copies, I'll throw [5] the extra ones out because they're [6] duplicates, triplicates, whatever they might [7] be. In one day I might go through as many as [8] six or eight drafts, so I purge them [9] continually.

[10] Q: Do you know if we have copies of [11] everything Mr. Downing purged?

[12] A: Of what he purged? I don't know. [13] I believe that we do, if you want my [14] opinion.

[14] MS. DEWEY: Can I have this marked [15] as Exhibit 7?

[16] (Gay Deposition Exhibit No. 7 [17] was marked for identification.)

[18] BY MS. DEWEY:

[19] Q: We were talking before about rules [20] and regulations. I'm going to hand you [21] what's been marked as Exhibit 7. These are [22] FOIA regulations, and in particular looking

Page 133

[1] at Section 16.10, the preservation of [2] records. Would you just take a moment to [3] read that?

[4] A: This was not in effect at the time [5] the purging took place. It's irrelevant.

[6] MR. SMORODIN: Well, let me make [7] the objections. Let me be the lawyer. You [8] be the witness. And we're not going to [9] object on relevance in a deposition, so [10] don't worry about relevance.

[11] THE WITNESS: Oh, okay.

[12] BY MS. DEWEY:

[13] Q: Maybe you can hand me the exhibit [14] back. What was in effect at the time [15] Mr. Downing purged files?

[16] A: There was another set of regs. I [17] don't know what was in effect about [18] different [18] provisions, but it wasn't that [19] publication of [19] regs.

[20] MS. YESNER: Could you provide us [21] with a copy of the regulations that were in [22] effect at the time?

Page 134

[1] MR. SMORODIN: Yes.

[2] MS. DEWEY: That's what we [3] re-

quested in our discovery request.

[4] THE WITNESS: I think we did.

[5] MR. SMORODIN: I was going to say I [6] think we did.

[7] THE WITNESS: We did.

[8] MR. SMORODIN: If there's a problem [9] with that —

[10] MS. YESNER: We don't have the [11] Department of Justice regulations. The-se are [12] the Department of Justice regulations that we [13] got.

[14] THE WITNESS: We did give you the [15] other version of the regs.

[16] MR. SMORODIN: I can't swear to [17] that.

[18] THE WITNESS: Well, I gave it to [19] you. I'm sorry.

[20] MR. SMORODIN: Now Ms. Gay's [21] putting this on my desk. Can I ask Ms. Gay a [22] question about that? I know it's your

---

Page 135

[1] deposition, but maybe this will help.

[2] Ms. Gay, do you recall whether the [3] regulations you supplied to me for me [4] supplying to the plaintiff's counsel were in [5] a similar version as to the Exhibit 7, that [6] is, a Federal Register publication, or was it [7] in some different form? Do you recall?

[8] THE WITNESS: Oh, what form I gave [9] it to you in?

[10] MR. SMORODIN: Was it a copy out of [11] the CFR? Was it a Federal Register?

[12] THE WITNESS: I don't remember. It [13] was probably a copy of the CFR or Federal [14] Register.

[15] MR. SMORODIN: And would the pri-or [16] FOIA regulations for the Dep-artment of [17] Justice have been con-tained, if you know? Is [18] that 28 CFR Section 16.10?

[19] MS. DEWEY: Yes.

[20] MR. SMORODIN: Would it have been [21] at the prior 28 CFR Section 1610 or et [22] cetera, or is it a different place?

---

Page 136

[1] THE WITNESS: I think it's a [2] different number.

[3] MR. SMORODIN: Great. All I can [4] say to Plaintiff's counsel is I will obtain [5] the former regulations and produce those to [6] you. I'm sorry if we didn't.

[7] What I also should tell counsel is [8] my understanding is that the prior [9] regulations are essentially the same. I [10] mean, I don't want to play games and say [11] we have these whole new regulations and you get [12] them, and while I'm certain there was a [13] reason for chang-ing the regulations, I don't [14] know. Ms. Gay may. But I don't know whether [15] any of the changes are relevant to the

kinds [16] of questions that I assume you will be [17] asking.

[18] MS. DEWEY: That is where I was [19] going to go next.

[20] MR. SMORODIN: Fair enough.

[21] THE WITNESS: Do you want me to [22] answer your question on those?

---

Page 137

[1] BY MS. DEWEY:

[2] Q: Well, do you know if the regulation [3] that was in effect at the time Mr. Downing [4] purged the files, which was in 1996, were [5] essentially —

[6] A: '97.

[7] Q: I mean '97, excuse me, were the [8] same as this regulation that has been [9] produced to us from 1998 concerning the [10] preservation the records?

[11] A: It's essentially the same. I don't [12] remember whether it's word for word. Do you [13] want me to read it?

[14] Q: Well, sure. You could read the [15] last sentence of it. That might speed things [16] up.

[17] A: Okay. 16.10, "Records will not be [18] disposed of while they are the subject of a [19] pending request, appeal, or lawsuit under the [20] FOIA."

[21] MR. SMORODIN: And the question is [22] was that in effect in 1997?

---

Page 138

[1] THE WITNESS: Essentially. I'm not [2] sure if it's word for word, but, yes, it was.

[3] BY MS. DEWEY:

[4] Q: So in your opinion, when Downing [5] purged the file, was that in violation of [6] the regulations, the FOIA regulations?

[7] A: Not necessarily. Depends on what [8] the definition of "purge" is. If purge is —

[9] Q: Go ahead.

[10] A: If "purge" is just taking [11] dup-licates out, then it's not in violation of [12] the regulation. If anything else was taken [13] out, it was.

[14] Q: So only duplicates could be taken [15] out at the time a FOIA request was pending?

[16] A: Right. Duplicates are, I would [17] say, public materials, you know, case law, [18] stuff like that.

[19] Q: We were provided, "we" being the [20] Plaintiffs or Mr. Jefferson, boxes of [21] documents that we assumed would go along with [22] Appendix A that was prepared. We've had

---

Page 139

[1] trouble with that. But when those boxes were [2] produced to us, did you discuss the contents [3] of those with Mr. Downing?

[4] A: No.

[5] Q: So did Mr. Downing review those [6] boxes to help determine what out of those [7] boxes he had purged?

[8] A: I think he did when Stephanie was [9] there.

[10] Q: You think he spoke with Ste-phanie?

[11] A: I think he did when Stephanie was [12] there, down in Florida.

[13] Q: When you said you think, what [14] exactly are you referring to?

[15] A: Well, the boxes were in Florida [16] until May of this year, April-May. Until a [17] few months ago, they were all in Florida, [18] particularly because Kathy Peluso was working [19] on the appeal. I know that when Stephanie [20] was there Mr. Downing spent a lot of time [21] with her and that they, you know, essentially [22] his — at least as far as I know from

---

Page 140

[1] hearsay, he says that nothing that was [2] original was destroyed, only dup-licates, [3] triplicates, stuff that was sent back to [4] St. Petersburg.

[5] Q: Do you remember how many boxes of [6] documents were destroyed?

[7] MR. SMORODIN: Objection.

[8] THE WITNESS: I don't know.

[9] BY MS. DEWEY:

[10] Q: Do you know how many boxes were [11] indexed by Ms. Boucher?

[12] MR. SMORODIN: Boucher.

[13] THE WITNESS: I don't know. Do we [14] have it here? I think these are box by box. [15] I don't remember exactly.

[16] BY MS. DEWEY:

[17] Q: I think it's around 12.

[18] A: Yeah, I think — that was — but [19] I'm not sure that's what it was. Anyway, it [20] was somewhere between 9 and 12.

[21] Q: And I think that approximately 14 [22] boxes were destroyed?

---

Page 141

[1] MR. SMORODIN: Off the record.

[2] (Discussion off the record.)

[3] BY MS. DEWEY:

[4] Q: What was Mr. Downing's ex-planation [5] to you when you talked to him about the fact [6] that he purged the files? Did he explain to [7] you why he did that?

[8] A: Yes, he did. It's hearsay, though.

[9] MR. SMORODIN: Well, don't worry [10] about the objections. You're not the lawyer.

[11] THE WITNESS: Okay, we're not in [12] trial.

[13] BY MS. DEWEY:

[14] Q: You're not playing lawyer right [15] now.

[16] Q: He told me that he talked with the [17] FOIA contact and asked her when he could, you [18] know —

[19] Q: Was that Ms. Brown? I'm sorry. I [20] just want to make sure.

[21] A: I don't know because I don't know [22] also who she was — who was the FOIA contact, and

---

**Page 142**

[1] this occurred evidently in June of 1997. I [2] don't know who was the person then. Okay? [3] That he asked them when he could purge the [4] files and that it was a woman, that she said [5] when the appeal was over.

[6] And so he thought, heck, the cert's [7] over. It's been, you know, past — 30 days [8] past the time in case there were — or 60 [9] days, whatever it was. I think it was 60 [10] days. That fine, he asked, it's okay. He [11] would go — because they were also moving or [12] something like that. There was another thing [13] happening. I don't recall what it was. I [14] have heard they were moving. I don't know [15] for a fact that was true.

[16] Q: When you say they were moving?

[17] A: The U.S. Attorney's office in [18] Tampa, either they were moving floors, [19] expanding, moving somewhere else, whatever. [20] And so that somebody had sent out a call, [21] please, you know, reduce the number of things [22] you have, send stuff to the records

---

**Page 143**

[1] center, whatever, whatever.

[2] In any event, that's what he told [3] me — or he told me that he thought that it [4] was okay because he asked, and she said when [5] the appeal was over. Since then I've talked [6] to Belinda, and it probably was her because [7] what she said to me is, "I meant the FOIA [8] appeal."

[9] Q: As opposed to the criminal appeal?

[10] A: The criminal. So that's what the [11] explanation is, that he really thought that [12] she had told him it was okay and that she [13] should know.

[14] Q: Assuming that Mr. Downing [15] understood Ms. Brown to be referring to [16] the criminal appeal, do you know whose criminal [17] appeal they were referring to?

[18] A: I think it was a co-defendant, and [19] I think the name was Mathis, but I'm not [20] sure.

[21] Q: Do you know why he would be focused [22] on Mathis' appeal as opposed to

---

**Page 144**

[1] Mr. Jefferson's appeal, assuming he [2] understood Ms. Brown to mean criminal appeal?

[3] A: I really don't know.

[4] Q: Did you know what the status of [5] Mr. Jefferson's case was at the time?

[6] A: No, I didn't know. I mean, I [7] wouldn't have had any reason to know.

[8] Q: Do you have any idea when [9] Mr. Jefferson petitioned for certiorari to [10] the Supreme Court?

[11] A: No.

[12] Q: Did you ask Mr. Downing what the [13] status of Mr. Jefferson's appeal was at the [14] time that you talked to him, when he [15] explained to you why he purged the files?

[16] A: I don't think I focused on that, [17] no.

[18] Q: What was your reaction to [19] Mr. Downing's explanation? Was that normal [20] procedure?

[21] A: I thought it was unfortunate [22] because I could see how it would happen, but

---

**Page 145**

[1] it was — I don't know what word to use. I [2] was very disappointed that it had happened, [3] but I could see — you know, most criminal [4] attorneys don't think of FOIA, you know. [5] They're thinking of their cases.

[6] Q: But I assume that they respond to [7] FOIA requests. I mean, they're the ones that [8] are reviewing, as you explained at the [9] beginning of the process, when Mr. Downing [10] was the one that signed off on all these [11] forms that we spoke about. It's not as [12] though it's a foreign concept to them, is it?

[13] A: It is to many of them, if they've [14] never had to deal with a FOIA request.

[15] Q: Do assistant United States [16] Attorneys receive FOIA training?

[17] A: Yes.

[18] Q: Can you tell me about that?

[19] A: Actually, I think it was this past [20] year there were 18 instances when my staff [21] gave training at the Office of Legal [22] Education in South Carolina, four trial

---

**Page 146**

[1] advocacy courses, civil, criminal, advanced, [2] and everything. They're only allowed, like, [3] 20 minutes to talk, so they give that much [4] information about FOIA and privacy.

[5] Q: So it's part of a larger training?

[6] A: Yes, a two-week training. We give [7] a little vignette.

[8] Q: And who attends that two-week [9] training that you're describing?

[10] A: Assistant U.S. Attorneys.

[11] MR. SMORODIN: Did you mean as [12]

---

teachers or as students, who attends?

[13] MS. DEWEY: Students.

[14] MR. SMORODIN: Oh, I'm sorry.

[15] BY MS. DEWEY:

[16] Q: Is every assistant United States [17] Attorney required to go to that training?

[18] A: I don't know.

[19] Q: So you don't know what the target [20] audience is?

[21] A: Oh, I know it's like — the first [22] courses are for new assistants, you know,

---

**Page 147**

[1] ones they just hired from the law firms or [2] whatever, and there's advanced, and then [3] there's civil chiefs and criminal chiefs. [4] And we do have a segment on FOIA in all of [5] those, of course.

[6] We also have a large segment that's [7] actually an hour and a half workshop in [8] courses for legal assistants, and we have a [9] program for legal secretaries. So we gave [10] — I think we counted 16 or something like [11] that — different talks last — in that [12] particular year, which was '98.

[13] Q: '98?

[14] A: Yeah.

[15] Q: But as far as you know assistant [16] United States Attorneys are not required to [17] attend a training on FOIA? Is that right?

[18] MR. SMORODIN: Objection. I think [19] she just said she didn't know.

[20] THE WITNESS: Yeah, I don't know.

[21] BY MS. DEWEY:

[22] Q: Do you know if paralegals are that

---

**Page 148**

[1] work at United States Attorney's Offices?

[2] A: I don't know. Everybody — the [3] ones who have a contact are supposed to [4] send somebody to our training every 18 [5] months, and so I do know that Pat Nadiak [6] went to the class in March of '96 and in July of '98.

[7] Q: Do you know if Belinda Brown ever [8] attended a training?

[9] A: Belinda Brown did go to the one in [10] March 1997.

[11] Q: Do you know if Mr. Downing has ever [12] attended a training on FOIA?

[13] A: I do not know.

[14] Q: The FOIA contacts, like Belinda [15] Brown in Tampa, would she be responsible for [16] reviewing files?

[17] A: What do you mean by "reviewing [18] files"?

[19] Q: To respond to a FOIA request?

[20] A: Only to the extent of complying [21] with our checklist requirements.

---

[6] A: Okay. What I'm telling you is that [7] the only documents that are at issue in a [8] FOIA litigation generally are the ones that [9] are withheld.

[10] Q: Right. Right. And aren't they [11] potential evidence the court, for example, [12] may want to see to determine whether your [13] decision was correct?

[14] A: Okay. I can tell you how long — I [15] mean —

[16] Q: I'm not talking about retention of [17] them. It's a yes-or-no question?

[18] A: Well, it doesn't get a yes-or-no [19] answer, so try it again.

[20] Q: When I say "you," obviously your [21] office. Say you've decided to withhold [22] certain documents. They're now the subject

Page 157

[1] of FOIA litigation. Aren't those documents [2] themselves, those pieces of paper, [3] potentially evidence in the FOIA litigation?

[4] A: Yes, the ones I withheld. [5] May I clarify that last question? [6] I would say one copy of all the documents I [7] withheld.

[8] Q: Ms. Gay, would you say that in this [9] case, this being the Jefferson litigation, [10] we're trying to, as you know, reconstruct the [11] files that have been purged by Mr. Downing. [12] Are you primarily responsible in assisting in [13] those efforts?

[14] A: In view of my position, I took on [15] the role of doing an inquiry as we agreed in [16] a meeting in June to find out where the [17] records that were in that file had come from [18] and where they were at, located.

[19] Q: When you say that file, you mean [20] what was purged from the 24 boxes?

[21] A: No, from the Willie Jefferson file, [22] period. I'm not talking about what was

Page 158

[1] purged. I'm talking about the core file, [2] okay?

[3] Q: What's the core file?

[4] A: I mean the one big criminal case [5] file.

[6] Q: Well, I'm pretty confused on how [7] the U.S. Attorney's Office keeps records any [8] more, so I don't know what you're talking [9] about when you say one big file.

[10] A: I don't know how they keep records [11] in Florida other than I know what the record [12] retention rules are. I mean, I don't know [13] any details, so I can't answer that.

[14] Q: Well, you can tell me what you're [15] talking about when you say one big

file.

[16] A: Okay, wait a minute. Why don't you [17] ask the question again?

[18] Q: We have a court order that's [19] instructing your office to reconstruct what [20] Mr. Downing purged.

[21] A: Right.

[22] Q: Are you the one that's doing that?

Page 159

[1] Are you the primary person?

[2] A: Yes.

[3] Q: So you had to contact Mr. Downing [4] to determine how to go about reconstructing [5] those files, right?

[6] A: Yes, I did.

[7] Q: When did you contact Mr. Downing [8] about reconstructing the files?

[9] A: I think that's in an interrogatory [10] or something because I don't recall what day [11] I called him.

[12] Q: What guidance, if any, has [13] Mr. Downing given you on how to reconstruct [14] the files?

[15] A: He was very helpful.

[16] Q: Can you explain that?

[17] A: Well, I told him what I had to do, [18] what the task was, and I said so I need to [19] know, Jeff, anybody who would have known how [20] the process took place when you purged the [21] files, and I need to know anybody who would [22] have contributed files that might have been

Page 160

[1] included at the time you purged the file. So [2] he gave me names and phone numbers of [3] everyone, at least a name and phone number to [4] start with, for every possibility, and I [5] followed through from there.

[6] Q: Are you still in contact with [7] Mr. Downing?

[8] A: Other than a general e-mail — I [9] think I've sent him — I've had one phone [10] call and one general — one or two general [11] e-mails that I sent to a number of people, [12] but I've had only one phone call with him in [13] the past three months.

[14] Q: Who did he tell you to contact to [15] try to reconstruct the files?

[16] A: Well, from my memory I can tell [17] you some of them. Belinda Brown, Kathy [18] Peluso, both of whom work for the U.S. [19] Attorney's Office. Let's see. I don't know [20] the name of the people at the DEA because he [21] told me there weren't any DEA records, and so [22] I said well, I'm going to check anyway, so you tell

Page 161

[1] me who's in charge of the office here

in [2] Tampa or that area. So he did.

[3] And then he gave me the name of the [4] FBI person who was involved, and he also gave [5] me the name of, like, the — I mean, the [6] number of the general office for that area, [7] regional office, I guess it is.

[8] Okay. He gave me Paul Cooke's [9] number and somebody named — I don't know the [10] name of the guy; I think it was Mike from the [11] FBI. That probably was just about it.

[12] Q: Has he told you what he purged so [13] you can —

[14] A: Oh, yeah.

[15] Q: What did he purge?

[16] A: He told me that he purged, like, [17] he'd have five or six copies of something [18] that he was going to use for an exhibit or [19] that they had had drafts or whatever so that [20] he threw out only duplicates and excess [21] materials.

[22] Q: Where are the originals?

Page 162

[1] A: The originals are in the 12 boxes [2] except for St. Petersburg documents.

[3] Q: So St. Petersburg is the only place [4] where we need documents in order to [5] reconstruct the entire 24 boxes th t [6] were [6] purged?

[7] MR. SMORODIN: I object. I think that [8] misstates Ms. Gay's answers. I think [9] she said that some duplicates had been [10] destroyed, so those documents wouldn't be at [11] St. Petersburg, and I think she said that the [12] documents that went other places went to [13] St. Petersburg.

[14] BY MS. DEWEY:

[15] Q: But it's your understanding that [16] St. Petersburg is the only place that you [17] need to go to reconstruct the files?

[18] A: Yes.

[19] Q: Otherwise, they're in Appendix A, [20] I assume?

[21] A: Yeah, they should be, at least in a [22] group.

Page 163

[1] Q: I need to know from you. You're [2] the person doing this. I don't know.

[3] A: I didn't do the index. Stephanie [4] did, but I trust her and I, you know, [5] attached it to a declaration. So I would [6] say those are the documents that were in the 12 [7] boxes. Those are the documents plus the [8] documents in St. Petersburg.

[9] Now, you're talking — I know —[10] well, I think I know what you're driving at, [11] like, BOP and FBI a couple of pages here and [12] there.

[13] Q: Right. Well, it sounds like [14] Mr.

WILLIE JEFFERSON  v.
JANET RENO et al

BONNIE LEWIS GAY
June 10, 1999

[22] Q: Checklist requirements on what?

Page 149

[1] A: The O-10. In other words, whatever [2] is necessary for that purpose.

[3] Q: So Belinda Brown plays a role only [4] at the beginning stages of a FOIA [5] request?

[5] A: Yes. And in this particular case, [6] there were no records, and, as we discovered [7] earlier, she wasn't the FOIA contact when the [8] O-10 was filled out but appears to have been [9] the one — okay.

[10] MR. SMORODIN: No. No, I'm not [11] saying stop. I hit my jacket here. I'm [12] trying not to coach the witness. Please [13] let the record reflect that. I'm not [14] giving signals here.

[15] THE WITNESS: In June 1997 I [16] believe it was Belinda Brown, and the reason [17] is because why would she have gone to the [18] training? You know, maybe she was doing [19] it with somebody else then. But she went to [20] the training, so I think it was her in June [21] '97, and I think it was this Ms. Guzman- [22] Michaels in '95, when we sent the form to

Page 150

[1] them.

[2] BY MS. DEWEY:

[3] Q: So we're assuming it was Belinda [4] Brown who Mr. Downing asked the question to [5] when he wanted to purge the files? Is that [6] within the scope of her responsibilities, to [7] provide Mr. Downing advice on whether he [8] should purge his files?

[9] A: Yes, with respect to a FOIA request [10] because when we send our response to the — a [11] copy of the response back to the district we [12] tell them that they are to hold the records [13] for so many days until after the — you know, [14] hold the records for this many days because [15] there may be an appeal. If there's an [16] appeal, we send them another notice that says [17] hey, folks, there's an appeal. Like, hold [18] them for another whatever day it is. I can't [19] remember exactly.

[20] Q: Before purging?

[21] A: No, just hold them. In other [22] words, don't send them out to the records

Page 151

[1] center or, yeah, I guess you could say before [2] purging. And then at our training I advised [3] them that I think it's also a good idea to [4] call us if somebody's wanting to purge a [5] particular case that a request is on just to [6] see that the thing is over, you know, that [7] it's over.

[8] Q: So Ms. Brown should have called

you [9] before she advised Mr. Downing?

[10] A: No, she told him what the rule was.

[11] Q: Really?

[12] A: Yeah, she said the appeal, when the [13] appeal is over. So when the FOIA litigation [14] was over or I guess it was in an appeal stage [15] at that point, then it could be purged.

[16] Q: So files can be purged once a FOIA [17] litigation is complete?

[18] A: Well, now, I don't think she [19] thought he was going to go down and start [20] dumping out his files, you know, the [21] duplicates and stuff, but I don't know [22] because — I don't know.

Page 152

[1] Q: Are you familiar with the [2] Department of Justice's regulations on [3] retention of files?

[4] A: Yes.

[5] Q: And what is your understanding? [6] How long should files be retained in a [7] criminal case, for example?

[8] A: Files should be retained — do you [9] want me to tell you what section says that? [10] Anyway, files should be retained — if you [11] have an indictment, should be retained a [12] minimum of ten years plus one, and that is [13] for anything in which the sentence is less [14] than ten years or not more than ten years and [15] the — oh, what is it? — the parole — not [16] the parole, the probation.

[17] Otherwise, the rule is the amount [18] of time of the sentence plus the end of the [19] probation plus one year, and if it's a death [20] sentence or life sentence — no, life [21] sentence, it's to be kept 65 years.

[22] Q: Retained?

Page 153

[1] A: Yes.

[2] Q: So why would Ms. Brown tell him [3] he could purge files when a FOIA appeal is [4] over?

[4] A: You're mixing apples and oranges.

[5] Q: Explain to me.

[6] A: Okay. You're talking about record [7] retention for criminal case files, okay? [8] That means one copy of everything sent to the [9] Federal Records Center for ever how many [10] years. Files are generally purged before you [11] send them out to the Federal Records Center [12] of all duplicates, all Kleenexes, all — [13] anything extra that isn't necessary and maybe [14] even a lot of the pleadings because the [15] pleadings also are in the court's official [16] records for the same amount of time, and [17] we're trying to save record-keeping space. [18] So that answers what the rule is for criminal [19]

case files. That is aside from FOIA. It has [20] nothing — you know, it's separate.

[21] And then with respect to FOIA we [22] have different time periods that we have to

Page 154

[1] keep our files, and if you're talking about [2] before the purging what our procedures say is [3] we don't want purging until our matters are [4] complete.

[5] Q: So I mean, because there does seem [6] to be some overlap between retention policies [7] and FOIA rules, that people like Belinda [8] Brown, who's a FOIA contact, would have to be [9] familiar with retention policies as well; is [10] that right?

[11] A: Sure.

[12] Q: And everyone in your office, I [13] assume, is as well?

[14] A: Well, I don't think that everyone [15] in my office has to be up to date on how many [16] years you keep different kinds of cases. [17] They just — well, anyway, I don't think it's [18] necessary.

[19] Q: In FOIA litigation, and maybe this [20] explains why the rules are what they are, [21] aren't the documents that are the subject of [22] the FOIA request potential evidence in the

Page 155

[1] FOIA litigation?

[2] A: Okay. There's — this is the way [3] that works. Let's see. If we close a [4] request for an administrative reason, the [5] file can be destroyed two years plus till the [6] next January. In other words, we always [7] destroy files in January. If there was a [8] denial of information in our response, all we [9] keep a copy of is what we denied — I mean, [10] all that we're required to is the information [11] that was denied, and if it was released in [12] part, obviously, we have to keep that [13] document. Those have to be kept for six [14] years plus up to the next January.

[15] Like, if it's closed in — well, [16] let's do '88, then it wouldn't be thrown out [17] until January — wait a minute — '88 and six [18] is '94, so it would be January of '95.

[19] Q: That's not exactly my question. [20] My question is more focused on the documents [21] that are the subject of a FOIA request. [22] A: That's what I'm talking about.

Page 156

[1] Q: Right. When you're in FOIA [2] litigation, wouldn't those documents [3] themselves be potential evidence that the [4] court would want to review in camera to [5] determine whether they should be released?

WILLIE JEFFERSON v.
JANET RENO et al

BONNIE LEWIS GAY
June 10, 1999

[17] A: So I had FOIA in my — shall we say [18] in my life continuously.

[19] Q: So how long were you at the [20] Department of Justice, then, as the Assistant [21] Director for Office of Legal Education?

[22] A: From 1984 through May of 1989.

---

Page 17

[1] January of '84 to May '89.

[2] Q: And where did you go in May of [3] '89?

[3] A: May, it was either the 8th, 9th, or [4] 10th of 1989, I became the attorney in charge [5] of Freedom of Information and Privacy for the [6] Executive Office for U.S. Attorneys.

[7] Q: And how did that change come about?

[8] A: How did that come about? I let it [9] be known that I would like to make a change. [10] I had had in mind that I wasn't going to be [11] teaching forever, and actually when I started [12] it I had in mind only a couple years and it [13] slid into about five. So I let the people in [14] the agency know that I wanted to make a [15] change. And another person who actually was [16] the head of the FOIA office also wanted to [17] make a change, and as it turned out we [18] literally switched jobs on the same day.

[19] Q: That's convenient.

[20] A: Yes.

[21] Q: So in May of '89 you became the [22] attorney in charge of the executive office,

---

Page 18

[1] and so can you explain what your duties were [2] as the attorney in charge there?

[3] A: Yes. I — when I first started [4] there in '89 we had about 1800 FOIA requests [5] a year. I don't remember what the backlog [6] was, but I remember when I first started [7] there were — I worked every day for, like, [8] six weeks because there was so many stuff — [9] you know, things behind. I had to get used to [10] the whole thing.

[11] But the duties — I am volunteering [12] too much. The duties of the job are to [13] supervise the processing of all Freedom of [14] Information requests throughout the United [15] States for U.S. Attorneys' offices and the [16] headquarters offices of EOUSA. We have about [17] 150 FOIA contacts, which indicates that [18] those are about the number of offices that we [19] serve.

[20] And that means if we receive a FOIA [21] request from anyone, then we have to find out [22] where the records are located. We would send

---

Page 19

[1] out to whatever district was relevant, ask [2] for the records to be sent to us at Room [3] 7100, 600 E N.W., and then the request would [4] be assigned to an analyst who is a paralegal, [5] and we have about eight to ten of those [6] usually at any one time.

[7] It's assigned to those individuals. [8] They review the documents and make a [9] determination as — I mean, make a [10] recommendation. Then it is reviewed by an [11] attorney and a determination is made, and [12] that's called an initial determination. So [13] that's the processing of the request — I [14] mean, that's a short version.

[15] The other duties that we have are [16] to serve as liaison for the government in [17] all of the administrative appeals that arise [18] from all the FOIA requests and Privacy Act [19] requests. So we work with the Office of [20] Information Privacy to provide the materials [21] they need to respond to questions or whatever [22] needs to be done in the appeal process, and

---

Page 20

[1] the other thing we do is that we handle all [2] of the declarations and responses to [3] litigation that arise from the FOIA requests.

[4] Q: If I could just ask —

[5] A: And provide advice on all this [6] stuff to the whole — all the U.S. Attorneys' [7] offices. So we provide the FOIA privacy [8] advice for all of the same offices, including [9] for the U.S. Attorneys and the managers of [10] EOUSA.

[11] Q: You mentioned there are [12] approximately 93 United States Attorney's [13] Offices in the country?

[14] A: Yes.

[15] Q: But then you mentioned there were, [16] like, 150?

[17] A: Offices?

[18] Q: Right.

[19] A: Contacts? Well, what happens is [20] that some of the U.S. Attorneys' offices has [21] branch offices, so each office has a contact, [22] and then within our headquarters office we

---

Page 21

[1] have 22 contacts. Because we have, for [2] example, the budget office, the personnel [3] office, the legal counsel, and whatever. [4] Everybody has their own contact. So that the [5] records that might be in their offices are [6] obtained for us by the contacts.

[7] Q: So the FOIA request comes in to [8] you, and then you make contacts with your [9] contact person in one of these 150 offices or [10] areas. Then you

---

Page 19

request that they send you [11] all of the documents that may be relevant to [12] the FOIA request?

[13] A: In most cases, yes. There are a [14] lot of cases where, for example, we get no [15] records response, or we get a response that [16] says we have pending litigation and it would [17] interfere with the conduct of that litigation [18] to provide the records at this time. And so [19] those types of cases — or, for example, [20] where somebody asks for third-party records, [21] they don't get them, so we send a different [22] type of response and we never look at the

---

Page 22

[1] records.

[2] Q: And it's the contact person that [3] makes that initial determination?

[4] A: No, no, that's all wrong. The [5] person who makes the determination are the [6] attorneys who review and sign off on the [7] initial determination.

[8] Q: Attorneys in your office?

[9] A: Right.

[10] Q: My question is you say your office [11] receives a FOIA request, you contact the [12] contact person out in the field, say, from a [13] United States Attorneys' Office, but is it [14] that person that tells you there's pending [15] litigation so there's nothing to send right [16] now because litigation's ongoing?

[17] A: Okay, they probably — most of this [18] is done in writing, for two reasons: One, we [19] need a written record and, two, because it [20] turns out to be faster. So we send forms [21] out, and they fill out the appropriate form, [22] or they check the appropriate box.

---

Page 23

[1] Q: "They" means the contact person?

[2] A: The contact person fills it out; [3] however, if it turns out to be a pending [4] proceeding, the assistant U.S. Attorney is [5] involved in preparing something we call a 7-A [6] checklist, and it's more than a checklist; [7] it's actually an affidavit that explains — [8] has a whole lot of questions, and it explains [9] why it would interfere with the litigation to [10] provide the records at this time. Of course, [11] that statement does not apply to anything [12] public or news clips or those things.

[13] Q: So, then, assuming there's not [14] pending litigation, the documents come back [15] to your office?

[16] A: That's correct.

[17] Q: Then one of your eight to ten [18] paralegals makes an initial review?

[19] A: Recommendation.

[20] Q: Recommendation?

---

[21] A: Mm-hmm.

[22] Q: And then are you the person that

---

Page 24

[1] reviews those recommendations or who does [2] that?

[3] A: Let's see. At all relevant times, [4] John Boseker, who is an attorney, also, and I [5] have made all the decisions regarding the [6] records.

[7] Q: And John Boseker is currently the [8] attorney in charge; is that correct?

[9] A: Well, I guess. I don't know. The [10] title moves around, so I don't know what his [11] title is now.

[12] Q: That was going to be one of my [13] questions because I understood from reading [14] your declaration in 1996 that you were the [15] attorney in charge, and you're now the [16] executive director; is that correct?

[17] A: Well, no, no. All of these kind [18] of things change because, you know, somewhere [19] along the way you hope to get a promotion, et [20] cetera, et cetera, other people come in. [21] And, in any event, John has been a senior —[22] he started as a law clerk, and he's been with

---

Page 25

[1] the office for about eight years. Then he [2] became an attorney, and then he's been in [3] charge of the litigation for some time, the [4] actual organizing what's going to be done and [5] making sure everything happened as well as [6] reviewing the requests.

[7] Q: Well, back to you. You came to the [8] office as the attorney in charge in May of [9] '89?

[10] A: Mm-hmm.

[11] Q: And did your title ever change from [12] that time until the present?

[13] A: Yes, my title did change. I became [14] the — hmm, I don't know. I'm trying to [15] remember what my titles were. I guess — no. [16] Attorney in charge until November of '96, and [17] then I became acting assistant director at [18] that time, and in November of '97 I became [19] the assistant director, and in January of [20] '99, I became senior counsel.

[21] Q: Thank you.

[22] A: You're welcome.

---

Page 26

[1] Q: And are each of these considered [2] promotions, these changes?

[3] A: Essentially.

[4] Q: Just to review, you were the [5] attorney in charge until November of '96, [6] when you became the acting assistant [7] director?

[8] A: Mm-hmm.

[9] Q: And that's a promotion from [10]

---

attorney in charge to acting assistant [11] director?

[12] A: Yes.

[13] Q: And what were you the director of?

[14] A: FOIA and Privacy Unit, EOUSA.

[15] Q: And in that position were there [16] other attorneys that worked underneath you? [17] Do you have a staff of attorneys?

[18] A: John Boseker. What date — excuse [19] me, what day are you talking about?

[20] Q: When you became the acting [21] assistant director in November of '96.

[22] A: Yes, John Boseker.

---

Page 27

[1] Q: So only one attorney?

[2] A: Yes.

[3] Q: And then, just to make sure I [4] understand the chronology correctly, then in [5] November of 1997 you became the acting [6] director, right?

[7] A: No, the assistant director.

[8] Q: I mean assistant director. I'm [9] sorry. Right.

[10] A: Yes. And actually we got another [11] attorney in April of '9 — wait a minute, no, [12] not in — well, April of '97 we did get [13] another attorney to actually put the — you [14] know, when we got another attorney.

[15] Q: And then in January of this year, [16] you became senior counsel, right?

[17] A: Yes.

[18] Q: Now, what was the difference [19] between being the assistant director, moving [20] from that to senior counsel?

[21] A: There was actually a reorganization [22] of the office, and additional people were

---

Page 28

[1] brought in.

[2] Q: How many additional people?

[3] A: Two.

[4] Q: So now is there a new assistant [5] director?

[6] A: No, there's an acting assistant [7] director.

[8] Q: And who was that?

[9] A: Douglas Frazier.

[10] Q: Is there a director?

[11] A: Yes, Donna Bucella, but not of the [12] FOIA office. She's executive office for [13] United States Attorneys.

[14] Q: So for the FOIA office the [15] assistant director is the highest position in [16] terms of a sense of hierarchy?

[17] A: Yes, it is.

[18] Q: So do you report to Frazier?

---

[19] A: Yes, I do.

[20] Q: I'm just trying to understand. So [21] when the reorganization happened in January, [22] were you demoted from being director to

---

Page 29

[1] senior counsel.

[2] A: No, I was told that they needed me [3] because there was too much work to do since [4] the requests came from 1800 — we now have [5] 4,000 a year. We have 160 cases in [6] litigation. When I first came, there were [7] 37, and, you know, essentially I have been [8] doing everything by myself. So they wanted [9] me to do the counseling attorney part and get [10] somebody else to supervise the — like, when [11] the requests come in, getting them in the [12] computer and all that kind of stuff. So they [13] divided up the duties that way.

[14] Q: Was this a voluntary change on your [15] part in January?

[16] A: Yes. Yes.

[17] Q: Now, you just said that now there [18] are approximately 4,000 requests a year. I [19] understand what you were saying in terms of a [20] paralegal making a recommendation and then [21] you review those recommendations; is that [22] right?

---

Page 30

[1] A: Yes, John Boseker and I both review [2] them — I mean, not both reviewing each case. [3] We divide the responsibility.

[4] Q: And how many on average would you [5] say a month do you review?

[6] A: Well, we close —

[7] MR. SMORODIN: Currently?

[8] THE WITNESS: Currently?

[9] BY MS. DEWEY:

[10] Q: Currently.

[11] A: Currently, it's very hard to know [12] exactly how many we review. There are about [13] 350 requests completed each month in the [14] office. Not all of those require our review. [15] There are some that don't require legal [16] determinations. For example, if the person [17] doesn't agree to pay or if there are no [18] records, et cetera. So we don't review all [19] 350. I would say approximately 100 a month.

[20] Q: That you personally review?

[21] A: No, that we review together.

[22] Q: So you may review 50, say, if you

---

Page 31

[1] split between yourself and Mr. Boseker?

[2] A: That's right. And this is [3] approximate. I mean, gee, I have no idea if [4] we

---



**WILLIE JEFFERSON   v.**
**JANET RENO et al**

actually did the numbers.

[5] **Q:** No, I understand. In two of your [6] declarations you describe your duties at [7] EOUSA; is that how you pronounce the acronym?

[8] **A:** Yes.

[9] **Q:** You said that you review the [10] search, the location of records, and the [11] preparation of responses of the office to [12] assure the determinations to withhold or [13] release records are in accordance with the [14] policies and provisions. Can you just describe exactly [15] what is meant by that in any more detail?

[16] **A:** I think I already answered that [17] question. I mean, what I do — why don't you [18] ask me for each one individually because I [19] can't keep them all in my head at once?

[20] **Q:** You said you review the search.

[21] **A:** Yes. When we do the final [22] determination, we check to be sure that the

*Page 32*

[1] search went to the right place and that kind [2] of thing. I mean, obviously, if you get the [3] records from the place the requests are asked [4] for, it's not an issue, really, but we check [5] that out. If there was a no-records, you [6] know, we check to be sure we have appropriate [7] documentation.

[8] **Q:** And then you said the location of [9] the records. In a sense is that the same [10] thing or is that just making sure you got [11] them from the right place?

[12] **A:** Sometimes we have to refer the [13] request, for example, to another agency. If [14] they belong to another agency or if somebody [15] asks for something like a — well, whatever. [16] Something that's in the antitrust office, [17] then we refer that.

[18] **Q:** And the last thing was the [19] preparation of your office's responses, you [20] review that?

[21] **A:** Oh, yeah, of course. The [22] recommendation, we review all the paperwork

*Page 33*

[1] for that and sign off all the paperwork.

[2] **Q:** So in a sense you're the person [3] that's making the final determination. After [4] the paralegal makes a recommendation you are [5] the person that says either you agree with [6] the recommendation or you disagree; is that [7] correct?

[8] **A:** Exactly, mm-hmm. Now, that I have [9] done from May 1989 to now. I have always [10] been the determination official, and I still [11] am the determination official.

[12] **Q:** Are there any other determination

[13] officials?

[14] **A:** No, I've delegated some [15] responsibility to John Boseker for all the [16] determinations that require a legal opinion, [17] and while — I'm not exactly sure what time [18] we started that, but Michael Weinstein, the [19] other attorney, and our supervisory paralegal [20] specialist have some time reviewed no- [21] records responses and [22] signed off on them. So that's not — they're

*Page 34*

[1] not really making a determination. It's [2] a factual thing.

[3] **Q:** Mr. Frazier, your supervisor, do [4] you ever go to him and ask his opinion?

[5] **A:** No. He doesn't make the [6] determinations.

[7] **Q:** What does he do?

[8] **A:** Well, what he does is whatever we [9] need for him to do, I guess, when we ask him [10] to do something.

[11] **Q:** Do you ever go to him for advice?

[12] **A:** You mean on FOIA?

[13] **Q:** Yes, on FOIA.

[14] **A:** No, he comes to me.

[15] **Q:** He's, I take it, fairly new to the [16] office?

[17] **A:** Yes.

[18] **Q:** Just to review this a little bit [19] more, who is it exactly that reviews [20] documents that to determine the impact on [21] pending litigation?

[22] **A:** The attorneys do that.

*Page 35*

[1] **Q:** In the contact office, the 150 —

[2] **A:** No. As I said before, the only [3] people who make determinations are John [4] Boseker and myself. The people who fill out [5] the checklist have to be the people who are [6] working on the cases — the criminal cases [7] or, if it's a civil enforcement, the civil [8] case in the district because sitting here in [9] Washington I don't know anything about their [10] case, but I have them certify under penalty [11] of perjury what the situation is.

[12] **Q:** So who reviews documents to [13] determine the impact of releasing those [14] documents would have on pending [15] litigation?

[16] **A:** Oh, that is the assistant U.S. [16] attorney handling the case or AUSA.

[17] **Q:** So the AUSAs make that [18] determination?

[19] **A:** Well, they make — they articulate [20] the harm, and John and I either agree with it [21] or disagree with it. If we disagree, we will [22] do whatever we need to. If they need more

*Page 36*

[1] information, if we can sort it out, which we [2] do go back to them and ask for more [3] information a lot of the time.

[4] **MR. SMORODIN:** I think Ms. Gay's [5] just having a difficulty with the use of word [6] "determination" as opposed to reviewing or [7] recommending or supplying information.

[8] **MS. DEWEY:** I understand. I'm [9] sorry.

[10] **THE WITNESS:** Now, the term [11] "initial determination" has a special meaning [12] in FOIA.

[13] **BY MS. DEWEY:**

[14] **Q:** Right.

[15] **A:** It's the final decision at the [16] first level from which a requester can [17] appeal.

[18] **Q:** You have to be patient with my [19] lack of knowledge on your terminology.

[20] **A:** Oh, that's okay.

[21] **Q:** Does your office, where you are [22] here in Washington, D.C., the executive

*Page 37*

[1] office, ever review documents to determine [2] the impact on pending litigation?

[3] **A:** Do we? We have only in litigation, [4] usually, and sometimes we might do it on [5] appeal but usually it's in litigation. In [6] other words, maybe four times a year would be [7] all, and lots of times — well, we send [8] somebody out to the field maybe once or twice [9] a year for that purpose.

[10] **Q:** So would it normally be, say, a [11] paralegal from your office who would then [12] travel there?

[13] **A:** No, it would be John or me — [14] well, actually, we have sent some paralegals [15] not — let's see. We've sent paralegals on [16] some duties to the field but on others we [17] haven't.

[18] **Q:** What exactly is meant by the term [19] "pending litigation"? How does your office [20] understand that?

[21] **A:** Well, the term "pending litigation" [22] has a meaning under the FOIA statute and the

*Page 38*

[1] interpretations the courts have given it, and [2] that means, if there is anything pending [3] which could be either criminal, civil, [4] habeas, any other type of justification or [5] question that the Defendant is trying to [6] raise about their — either their conviction, [7] their sentence, or whatever and if there's [8] something active or if, for example, between [9] the pending — let's say

there's a trial and [10] the sentence hasn't happened or the trial and [11] the time for appeal hasn't come up. It's [12] still pending until there's no further appeal [13] made or if an appeal is made, then it is [14] pending again, you know, so it's pending.

[15] Q: So when do you consider the final [16] appeal to be in a criminal case?

[17] MR. SMORODIN: Object to the [18] question as a little bit vague, but if you [19] can answer go ahead.

[20] BY MS. DEWEY:

[21] Q: Let me try to rephrase. For [22] example, a criminal case would be considered

---

Page 39

[1] pending litigation until what event?

[2] A: The Supreme Court rules on it. If [3] something is happening, the main key is, if [4] there is any way possible for the person to [5] have a new trial or for any other person to [6] have a trial, then it's pending. Actually, [7] we have one case in which it — or two cases [8] in which it has been pending for, like, 40 [9] years.

[10] One involves Jimmy Hoffa, the [11] murderer of Jimmy Hoffa, and the other [12] one involves the mafiosa in New Jersey, and the [13] appeal courts have permitted us to have [14] pending litigation exemption even if we don't [15] have a case in the books because there is [16] so much involved in the future — if something [17] happened in the future, there could easily be [18] so much interference of giving out [19] information we currently have.

[20] Q: So if a criminal defendant were to [21] file a petition for certiorari to the Supreme [22] Court that would be considered pending

---

Page 40

[1] litigation until the Supreme Court denied the [2] petition, right?

[3] A: Yes.

[4] Q: That's the last appellate stage?

[5] A: Yes.

[6] Q: Just to go back to what you do on a [7] daily basis in terms of your duties, I know [8] you've said before that you do provide advice [9] and assistance to assistant United States [10] Attorneys on FOIA or concerning FOIA. How [11] often does that happen? How often do you [12] provide advice to people out in the field on [13] FOIA?

[14] A: Probably eight to ten times a day.

[15] MR. SMORODIN: That's just to me.

[16] BY MS. DEWEY:

[17] Q: Wow. So how does that happen? Do [18] people call you?

[19] A: Yeah.

---

[20] Q: I mean, they know —

[21] A: They call me. I don't call them.

[22] Q: So mainly this advice is over the

---

Page 41

[1] phone is my point?

[2] A: Yes.

[3] Q: Do you ever provide written [4] opinions on FOIA questions?

[5] A: Very rarely. I sometimes do [6] e-mail, and then maybe four or five times a [7] year somebody wants to know something about a [8] FOIA issue and they need it for the record or [9] they want to disseminate it or whatever. For [10] example, we have had two memos in the past [11] two weeks. One was about (b)(5) and [12] deliberative process and a final decision, [13] and we wrote a memo explaining how you could [14] end up incorporating other documents in your [15] final decision and making them required to be [16] released as opposed to how it could be [17] structured so that it wouldn't be — no, that [18] it would be exempt. The, you know, appendix, [19] whatever, would be exempt, and it just be the [20] final decision, which would be available to [21] the public or a requester.

[22] Q: How often are you personally

---

Page 42

[1] required to get involved in FOIA [2] litigation?

[3] MR. SMORODIN: I guess I would [3] object only to "involved" as being vague. If [4] you know what that means, go ahead.

[5] THE WITNESS: Yeah, let's put it [6] this way. I'm responsible for the outcome of [7] every case.

[8] BY MS. DEWEY:

[9] Q: That's huge.

[10] A: I have delegated part of that [11] responsibility to John Boseker. The way it [12] works is that we — of course, he and I can't [13] do all the litigation. We have another [14] couple or more people — depending on the [15] case, we assign paralegals to the litigation, [16] and we review all their work, and he and I [17] generally are the only people who sign the [18] declarations, because we rarely have a [19] paralegal sign the declarations.

[20] So that means that we have to be [21] familiar enough with the entire file to be [22] able to swear that what's in the declaration

---

Page 43

[1] is true, and what in reality happens is if [2] it's really hard or if John doesn't want to [3] handle it or is too busy, on vacation, and he [4] has actually — he was ill last summer but [5] not this summer.

---

[6] Anyway, it gets put in my lap if [7] it's high profile, if it's — well, a lot of [8] cases get put in my lap, so I don't know how [9] many I actually do. There are very few that [10] I do everything on myself. That's only when [11] for some reason I started it at the beginning [12] or it's a — I really shouldn't say only when [13] it's a real precedent setting because all of [14] our cases are precedent-setting pretty much. [15] Our cases set the FOIA policy or [16] interpretations for the whole U.S.

[17] Q: Getting back to when you were [18] explaining how say an assistant United States [19] Attorney out in the field fills out a 7-A [20] checklist, I believe you called it, how do [21] you know whether that's correct?

[22] A: They're swearing to it under

---

Page 44

[1] penalty of perjury, a declaration, just like [2] I do when I do a declaration that gets filed [3] in court in a FOIA litigation. In other [4] words, I could use that document as an [5] attachment to my declaration.

[6] Q: Do they review an index, for [7] example, that may be provided along with the [8] declaration?

[9] A: I don't know what you're talking [10] about.

[11] Q: For example, an index of the [12] records, all of the records, that may be [13] relevant to the FOIA request.

[14] MR. SMORODIN: This is for a 7-A [15] checklist situation?

[16] MS. DEWEY: Yes.

[17] THE WITNESS: Okay, that's not [18] required for 7-A.

[19] BY MS. DEWEY:

[20] Q: So the answer's no, you don't [21] review?

[22] A: The answer's no. I'm not saying I

---

Page 45

[1] never have, particularly in litigation, but [2] that we never ask for.

[3] Maybe I should explain that a [4] little more. You probably know that that is [5] not required in a 7-A. There is no Vaughn [6] index required in 7-A litigation. There's [7] only categorical indexes required which means [8] you might develop five or ten types of [9] information that are in files that may have, [10] you know, thousands of pages but you do not [11] list the documents.

[12] Q: Even though they're category [13] descriptions? Do you review those [14] categories?

[15] A: What do you mean? Do I review [16] the descriptions?

[17] Q: Right.

[18] A: Oh, yeah, but that never happens

---

[19] till we get to litigation.

[20] **Q:** So initially that's —

[21] **A:** It's not required, no.

[22] **MR. SMORODIN:** Just to clarify, I

Page 46

[1] think when Ms. Gay says "litigation" — [2] correct me if I'm wrong, Ms. Gay — she's [3] referring to —

[4] **THE WITNESS:** I'm referring to FOIA [5] litigation.

[6] **MR. SMORODIN:** In district court?

[7] **THE WITNESS:** Right, in district [8] court.

[9] **MR. SMORODIN:** Not administrative?

[10] **THE WITNESS:** Right, yeah. No, the [11] only thing administrative would be [12] administrative appeals or our initial [13] determination.

[14] **BY MS. DEWEY:**

[15] **Q:** So does your office as a practice [16] withhold pleadings and transcripts under 7-A [17] exemption for pending litigation?

[18] **A:** No. As I told you before, there's [19] a box we usually check, and it says that [20] public information is available, which [21] includes pleadings, pleadings and news clips, [22] anything else that's public.

Page 47

[1] **Q:** And you would provide that to the [2] requester?

[3] **A:** Yes.

[4] **Q:** I think we want to move into this [5] case, this case being the Willie Jefferson [6] matter, which is why you're here.

[7] **A:** Okay.

[8] **Q:** You've had to file various [9] declarations, I think a total of three, in [10] this matter since it began and have stated in [11] all of them that you're very familiar with [12] Willie Jefferson's request in this matter.

[13] Just to get a sense on how much [14] time you have had to spend on this, is there [15] any way you can estimate the number of hours?

[16] **A:** That I've spent on this so far?

[17] **Q:** Yes.

[18] **A:** Hmm, let's see. Before the [19] litigation, probably just amount of time to [20] review the document — you know, the [21] documentation in the file. I don't remember [22] whether John signed it or I signed it. I

Page 48

[1] really don't. But if I signed it, I [2] reviewed the documentation. If he [3] signed it, he maybe — in a 7-A, it would be [4] a half hour that I would be involved, and [5] that means

that I would look at the [6] checklist, and if I had any questions I would [7] call the assistant and I would ask for more [8] explanations or whatever.

[9] At the FOIA litigation stage, in [10] the beginning, I did just a basic [11] declaration, I guess, the first one. Do you [12] know what the date of my first one was?

[13] **Q:** Your first one was in I think July [14] of '96.

[15] **A:** Oh, okay, then that was straight [16] just, you know, routine. In my first [17] declaration, I don't know whether I drafted [18] it or somebody else did. If I draft a [19] declaration, it takes about a day to do that. [20] Beginning in September of 1997, if you wanted [21] to know how many hours I've spent on this, [22] probably a couple hundred. It feels like

Page 49

[1] thousands, but it's probably only a couple [2] hundred, which means five weeks.

[3] **Q:** Have other members of your staff [4] helped you on the Willie Jefferson matter?

[5] **A:** Yes.

[6] **Q:** Who has helped you?

[7] **A:** John Boseker and Stephanie Bou- [8] cher.

[9] **Q:** And Stephanie Boucher is a [9] paralegal in your office, correct?

[10] **A:** Yes.

[11] **Q:** And how much time do you think [12] they've spent on this?

[13] **A:** How much time do I think they've [14] spent? Probably at least as much as I have, [15] more, maybe, but at least as much.

[16] **Q:** I'd like to just start at the [17] beginning on Willie Jefferson's case and [18] quickly run through the chronology just to [19] make sure I understand what your office's [20] response has been. So just be patient here. [21] It seems as though your office — tell me if [22] your memory is the same — received

Page 50

[1] Jefferson's FOIA request in September of '95.

[2] **A:** Okay, I would not remember. If [3] it's in the record, then that's what the date [4] is. Remember, we have 4,000 a year.

[5] **Q:** Right. In a letter from your [6] office dated September 25, 1995, you advised [7] Jefferson that he should identify the [8] specific United States Attorney's office [9] where he felt that these records were [10] located, and my only question with that is [11] that your office's normal practice that you [12] would respond to a requester and say —

[13] **A:** Oh, yeah, and we probably used a [14] specific form, you know, a numbered form. If [15] he had explained completely in the initial [16] request, we wouldn't have to go out and ask, [17] but if it wasn't crystal clear to us we do [18] ask the requester where to look.

[19] **Q:** And that first response has to [20] usually be done within ten days; is that [21] correct?

[22] **A:** We do it as soon as we can. I

Page 51

[1] don't know how many days it took in this [2] case. We need about at least three times as [3] many people as we have if we're going to meet [4] the deadlines.

[5] **Q:** Mr. Jefferson then responded back [6] to your office saying it's the United States [7] Attorney's Office in Tampa, Florida. Your [8] office then requested the United States [9] Attorney's Office in Florida for records [10] responsive to Mr. Jefferson's request, and [11] that happened in October of '95.

[12] And I understand that a 7-A form [13] that we've been talking about was com- [14] pleted. Would it be that in the normal course [15] of events that the United States Attorney's [16] Office in Tampa would at that time forward to [17] you all the documents relating to [18] Mr. Jefferson's request?

[19] **A:** Never. Never.

[20] **Q:** Never?

[21] **A:** Never.

[22] **Q:** Can you explain —

Page 52

[1] **A:** In a 7-A, you don't send documents [2] in on a 7-A, not to my office. I don't [3] have space enough for the ones we have to get [4] much less the ones in 7-A. Besides, how can [5] they use it if they have an ongoing case if [6] they're in my office? They can't, and they [7] probably couldn't afford to have copies made [8] — I mean the time to have copies made.

[9] **Q:** Do you know who the contact person [10] is in the United States Attor- [11] ney's Office in Tampa?

[12] **A:** Okay, the Middle District of [13] Florida has a coordinator whose name is Pat [14] Nadiak. And I do remember her name and I [15] remember at one time during the Willie [16] Jefferson — oh, I'm not supposed —

[17] **MR. SMORODIN:** No. No, I was just [18] asking to slow for the court reporter.

[19] **THE WITNESS:** Oh.

[20] **MR. SMORODIN:** That's the last [21] thing we need.

[22] **THE WITNESS:** At one time in this

Page 53

[1] request, and I don't know when the

context [2] changed in Tampa office, because, see, the [3] Tampa office would be, like, fingers under [4] Pat Nadiak, because she has, you know, [5] Orlando, Jackson or wherever and Tampa, okay. [6] That person was somebody named Gutman or [7] Terez Gutman or something like that.

[8] **BY MS. DEWEY:**

[9] Q: Who was Gutman?

[10] A: Terez or Theresa. I mean, that's [11] my recollection. I can't swear —

[12] Q: I know the court reporter's not [13] going to be able to pick this up, but Pat [14] Nadiak would be at your wrist and the fingers [15] would be going down; is that right?

[16] A: It would be like a little tree, and [17] Pat would be the main branch, and then the [18] Tampa office — and Pat's in Orlando [19] physically. She has access to the computers, [20] so she can find out what branch office has [21] whatever case.

[22] Then she gets the request and she

Page 54

[1] will send the request down to Tampa and the [2] contact there will take care of the details [3] of getting the forms filled out and all of [4] that because the records are in her office. [5] And now it's Belinda Brown.

[6] Q: In the Tampa office?

[7] A: Mm-hmm.

[8] Q: So Belinda Brown would be in [9] communication with Pat Nadiak?

[10] A: Exactly.

[11] Q: It's Pat Nadiak's responsibilities [12] to pretty much communicate with these branch [13] offices and then back to your office?

[14] A: Yeah, she's kind of like the [15] liaison, and then she handles the contact job [16] for Orlando.

[17] Q: Ms. Gay, I'd like to show you a [18] document. It's dated October of '95, and [19] it's from your office to Pat Nadiak. If you [20] could take a look at it and tell me what it [21] is?

[22] A: Yes. This is a standard — it's

Page 55

[1] the standard form we use. Where there is a [2] request for a criminal case file, we use this [3] standard form to ask the district, you know, [4] to respond to us on whether there are records [5] and how many and to send some in some cases.

[6] For example, it's addressed to the [7] FOIA contact in whatever district, and it has [8] spaces for the requester's name, the subject, [9] the number of the request, and the district; [10] and it is also a return — it's a two-way [11] document.

We send it to the district, and [12] then they are supposed to complete it and [13] send it back to us explaining whether they [14] have no records, pending investigation, [15] closed case, et cetera.

[16] Q: So is this your first communication [17] to the contact offices?

[18] A: Yes, usually, it is. Now, it would [19] be different if the request came in to Tampa [20] or to Orlando and then they sent it back up [21] to us. Then, you know, they know about the [22] request already. But, normally, if it just

Page 56

[1] came to our office, they wouldn't even know [2] there's a request until they [3] get this form.

[3] And should I explain that there's [4] two columns, you know, things you send and [5] things you don't send and stuff like that?

[6] MS. DEWEY: I'd like to have this [7] marked as Exhibit 1, if I could.

[8] (Gay Deposition Exhibit No. 1 [9] was marked for identification.)

[10] THE WITNESS: Did you want the [11] date?

[12] MR. SMORODIN: Let's go off the [13] record for a second.

[14] (Recess)

[15] BY MS. DEWEY:

[16] Q: Ms. Gay, I just want to go back [17] where we left off with what's been marked as [18] Exhibit No. 1, which is the first contact [19] that your office had with the United States [20] Attorney's Office in Tampa, and I just have a [21] couple questions for you about this form. [22] You were explaining to me the various parts

Page 57

[1] of the form.

[2] I have a question about the bottom [3] half of the form. There are two columns, a [4] column A and a column B. Now, column B in [5] particular says, "Copy and forward with this [6] page." Do you see that?

[7] A: Yes, ma'am, I do.

[8] Q: Is that column something that you [9] would check off if you wanted the —

[10] A: No, this column applies only to [11] closed cases. If you'll note, it says, "If [12] more than one box of records, call our [13] office; otherwise" — and it's after " [14] Closed [15] Case" — "proceed as follows," [16] don't send [17] these things and do send these.

[16] Q: So that's only if a case is closed [17] that you would check those columns?

[18] A: Right, and I wouldn't check them. [19] The person in the field checks them.

[20] Q: So this is a blank form that you [21]

send to the field to complete and send back [22] to you; is that correct?

Page 58

[1] A: That's correct. They're supposed [2] to complete it and sign it.

[3] Q: And that's where we're going to go [4] next. On column B here, the copy and forward [5] language, is that instructions to whoever the [6] contact person is in the field?

[7] A: Yes, but again that applies only to [8] closed cases.

[9] Q: So it's as though you're saying to [10] them copy and forward —

[11] A: Well, do you want to know why we [12] have it? Let me go back in the history. It's [13] so they get the picture of what I want them [14] to send me, you know.

[15] Q: So you would check that if the case [16] closed?

[17] A: No. No, I don't check any of it. [18] This is for them to fill out, but, see, if [19] its listed they say I'm supposed to send that [20] and I'm supposed to send that. They don't [21] call us every day and ask us what am I [22] supposed to send? So it gives them kind of a

Page 59

[1] structure.

[2] Q: So, even though it seems like what [3] you're telling them to do, they get to make [4] the decision about what they'll copy and [5] forward to you?

[6] A: Oh, no, they don't. This is the [7] only stuff they can keep.

[8] MR. SMORODIN: Column A.

[9] THE WITNESS: Column A, they send [10] everything else and in fact we say other —[11] you know, miscellaneous items, we try to [12] cover every possibility, but they are to send [13] everything. They don't make a decision about [14] what not to send.

[15] BY MS. DEWEY:

[16] Q: Again, this is with a closed case, [17] they being the people in the field, as [18] they're preparing the documents to send to [19] you, this is something they'll send down and [20] just check off what they're sending to you?

[21] A: Mm-hmm, yeah.

[22] MS. DEWEY: I'd now like to have

Page 60

[1] this marked as Exhibit 2. This is two pages [2] here.

[3] (Gay Deposition Exhibit No. 2 [4] was marked for identification.)

[5] BY MS. DEWEY:

[6] Q: Ms. Gay, this is what's been marked [7] as Exhibit No. 2, and if you could just [8] again tell me. The first page appears to

be the [9] same exact form as Exhibit 1 except that it's [10] now been completed by the United States [11] Attorney's Office in Tampa; is that correct?

[12] A: That's correct.

[13] Q: And can you tell me what was [14] checked off on the top half of the page?

[15] A: Oh, okay. Yes. Pending [16] investigation appeal, and it says "and [17] complete the pending form." So we have a [18] pending form right here.

[19] MR. SMORODIN: Which is page 2 of [20] the exhibit.

[21] THE WITNESS: Page 2.

[22] BY MS. DEWEY:

---

Page 61

[1] Q: Page 2 of Exhibit 2. Before we get [2] to the pending form, I just want to ask you [3] some questions about the first page of [4] Exhibit 2. Down there at the bottom there [5] are two signature lines, and the first one is [6] signed by — can you read that?

[7] A: These are not necessarily signature [8] lines. They are just — they ask for names, [9] checklist completed by — do you want me to [10] tell you who?

[11] Q: Who was it completed by?

[12] A: Thomasa Guzman-Michaels, so I had [13] part of her name right, and assistant U.S. [14] Attorney to contact about case, Jeff Downing, [15] Assistant U.S. Attorney, and K. Paluso for [16] appeals, and it has phone numbers there.

[17] Q: And can you tell me who that first [18] person is that completed the form?

[19] A: Thomasa Guzman-Michaels.

[20] Q: Yes. Who was that?

[21] A: She was the person who was the [22] contact — FOIA contact in Tampa before

---

Page 62

[1] Belinda Brown was.

[2] Q: So she would be the person that [3] would answer to Pat Nadiak; is that right?

[4] A: Yes.

[5] Q: So she's the person that completed [6] that form; is that correct?

[7] A: That's what it says, yeah. I [8] expect that she was.

[9] Q: And do you know what she would do [10] to prepare to complete that form?

[11] A: Oh, well, yes. We have a procedure [12] that tells the contacts, you know, like, [13] about 22 things they can do, and the first [14] one is to — I'll tell you what's on our list [15] or some of the things on the list that we [16] give everybody in every case. Depending on [17] what the person asked for, they make [18] appropriate decision. Like, if it's a civil [19] case, they don't need to look in the criminal [20]

---

area in the computer.

[21] Q: Right.

[22] A: But, going back to your specific

---

Page 63

[1] question, they would first look in the [2] computer, and that would have probably been [3] Pat Nadiak, to see if there is a case [4] involving this particular person, and if the [5] person has given like a criminal case number, [6] then that step might be skipped and they just [7] — because if they just want one case, they [8] already know where to look. So they would [9] find out who it was assigned to, what [10] assistant U.S. Attorney it was assigned to.

[11] They would be in touch with [12] probably the paralegal for that attorney and [13] say, you know, are the files here? Where are [14] they? We have a FOIA request. We need to [15] take care of it. And then would coordinate [16] the appropriate response.

[17] Q: With?

[18] A: With whoever the case — if the [19] case was ongoing or most the time if the case [20] was closed they still coordinate it with the [21] attorney who handled it.

[22] Q: And in this case that would have

---

Page 64

[1] been Mr. Downing; is that right?

[2] A: Yes, it was.

[3] Q: What do you call this form, this [4] form being what's been marked as Exhibit 1?

[5] A: We call it an O-10.

[6] Q: An O-10. This O-10, you had [7] mentioned before we took a break that this is [8] almost like an affidavit or a declaration by [9] who completed it?

[10] A: Oh, no, not the O-10 form. This [11] O-10 form, this particular version was [12] created in March of 1994, and we had used it [13] for a couple of years at the time we did [14] this.

[15] Q: But I'd asked you at one point how [16] would you know that the information that's [17] indicated on it is correct, and you said, [18] well, I would treat it like a sworn [19] declaration.

[20] A: Okay, that would only apply in the [21] case of the 7-A — well, with respect to this [22] particular case, it applies to the 7-A

---

Page 65

[1] checklist.

[2] Q: And is that what's page 2 of [3] Exhibit 2 that you have in your hand?

[4] A: Yeah. Well, it's page 2 of Exhibit [5] 2; however, it's not always returned. It's [6] only returned to us if there's a pending

---

[7] matter — pending appeal, trial, whatever.

[8] Q: And that's what was checked off?

[9] A: That's what was checked off in this [10] instance.

[11] Q: So it's the 7-A form that you [12] consider to be a declaration; is that [13] correct?

[14] A: Yes.

[15] Q: Can you tell me what the 7-A form [16] in the Jefferson matter indicates that you're [17] holding?

[18] A: Yes. Well, it starts out that, [19] " Exemption (b)(7)(A) of the FOIA authorizes [20] the withholding of investigatory records [21] compiled for law enforcement purposes if [22] their disclosure would interfere with a

---

Page 66

[1] pending or prospective law enforcement [2] proceeding. If you believe that the [3] requested records fit this description, [4] please complete this checklist as thoroughly [5] as possible." And for the first number it [6] says —

[7] Q: I'm sorry. Not to interrupt, but [8] you don't have to read the entire form.

[9] A: Okay.

[10] Q: Because we'll enter it as an [11] exhibit.

[12] A: Well, I'll summarize what it says. [13] It says that this FOIA request pertains to a [14] pending case.

[15] Q: Right.

[16] A: And it says that the questions [17] regarding closed cases are not applicable, [18] and then the next thing that's filled out [19] says, "If closed, can any public source [20] material (news clippings, court and/or public [21] documents) be easily segregated from the [22] file"? And it says no. Then it says that

---

Page 67

[1] it's a criminal proceeding and there are [2] co-defendants, 13 co-defendants.

[3] Q: And these determinations, this [4] form is completed by the paralegal, then, [5] with [5] Mr. Downing's assistance?

[6] A: I don't know who completed this [7] one, but I know Jeff Downing signed it, okay?

[8] Q: So he's the declarant, then?

[9] A: Yes. Actually, we don't have the [10] declaratory thing on this version of the [11] form, which was 11/94. We now have that. So [12] with respect —

[13] Q: And what would that be, the [14] declaratory thing?

[15] A: It just says the same thing, that I [16] declare under — something of the nature I [17] declare under penalty of perjury that this [18] information is cor-

rect or I'm signing this [19] form under penalty of perjury, whatever 18 [20] USC — whatever the number is for that.

[21] MR. SMORODIN: 1001.

[22] THE WITNESS: No, not 1001, I

---

Page 68

[1] think; 1817, maybe. Well, whatever it is.

[2] MS. DEWEY:

[3] Q: Do you know why public records [4] would not be easily segregated and provided?

[5] A: Well, sometimes they may not be. [6] You know, I don't know because I didn't [7] fill the form out. Who filled it out? Probably [8] Jeff Downing filled it out. Sometimes it [9] might be the paralegal fills it out and the [10] attorney signs it, but I don't know. I mean, [11] this doesn't say. He signed it, anyway.

[12] Q: So these forms are then completed, [13] and they're mailed back to your office, [14] right? And do you just accept them at face [15] value?

[16] A: No.

[17] Q: What happens next?

[18] A: These are reviewed by an attorney [19] regarding whether there is sufficient [20] justification for taking the pending [21] law enforcement exemption.

[22] Q: And how would you determine that?

---

Page 69

[1] A: How would I determine that?

[2] Q: Yes, if there was sufficient [3] justification.

[4] A: Well, I've been practicing law for [5] 35 years, so I would know whether it's [6] pending, and John has been practicing for [7] about 18 years, so he would know whether it's [8] pending, okay? Because it means if there's [9] something else maybe going to happen, [10] particularly if a new trial's going to come [11] about, that it's pending. And so I would [12] know that a circuit court of appeals case was [13] pending, know that that means it's pending.

[14] Q: How would you know that that records [15] were not easily segregated?

[16] A: I might not know, but it probably [17] doesn't matter because when we fill this form [18] out, if it appears that there are pleadings [19] already filed, we — the person who presents [20] the form for us to sign is supposed to check [21] the box that says public material is [22] available. That's almost every case.

---

Page 70

[1] Q: What box are you referring to?

[2] A: It's not on this form. It's on the [3] final response letter.

[4] Q: That your office sends back to the [5] requester?

[6] A: Yes, ma'am. And this does indicate [7] that there is public source material and he [8] just says it can't be easily segregated. In [9] other words, you know, it's not like he's got [10] all the pleadings in one binder and all the [11] other stuff in another one.

[12] Q: Do you have any familiarity with [13] how pleadings are supposed to be kept in the [14] United States Attorney's Office?

[15] A: I must say that after 35 years of [16] practicing law and being a law clerk that if [17] I don't know — I do know, okay?

[18] A: And so why wouldn't they not be able [19] to be segregated?

[20] A: Because people might intermix [21] things with them. That's what I do in my [22] files. I try to keep things in chronological

---

Page 71

[1] order, and I might have notes in one place [2] and, you know, then a pleading and then more [3] other stuff.

[4] Q: So in your files you've got all [5] your pleadings and correspondence and notes [6] all together as long as they're in [7] chronological order?

[8] A: Yeah, I do. I mean, keep their [9] files different ways. So Jeff Downing, [10] whatever — I don't know how he kept his [11] files, but he said they weren't [12] segregable, [12] which is pretty much irrelevant, for your [13] information.

[14] Q: Why is that?

[15] A: Because we would check the box [16] that says public things are available.

[17] Q: But you wouldn't provide them to [18] the requester?

[19] A: We would provide them if the [20] requester asked for them specifically [21] after getting the letter.

[22] Q: So the requester would get a letter

---

Page 72

[1] back from you saying these things are [2] available, so then it's up to the requester [3] to then come back and ask for them?

[4] A: Exactly. The reason we don't do — [5] I'll give you a history. This is not to be a [6] problem for the requester or anything, but we [7] used to get all the papers in, and then we [8] would send requesters, like, 500 pages of [9] pleadings and charge them, like, whatever it [10] was. I don't know. Probably — well, we [11] charge them for them, and they'd say I don't [12] want the pleadings, and I will have to tell [13] you that that happened so many times that I [14] put on this form do not send the pleadings. [15] Do not. [16] Now that doesn't mean we don't get

---

Page 73

[17] some occasionally or, you know, but at least [18] people are not required to, and in a 7-A they [19] would never be required to. They're not [20] required to send anything but this one piece [21] of paper and this paper, two pieces of paper [22] and a 7-A.

---

Page 73

[1] Q: And these are Exhibit No. 2?

[2] A: Yes, and that is it.

[3] Q: May I see that?

[4] A: Mm-hmm. And that is signed by Jeff [5] Downing, incidentally.

[6] Q: Right, both pieces of paper in [7] Exhibit 2 are?

[8] MR. SMORODIN: Objection.

[9] THE WITNESS: No, the first one's [10] not signed by Jeff.

[11] BY MS. DEWEY:

[12] Q: But it has his name on it?

[13] A: It has his name on it, yes.

[14] Q: As the contact. What happens if [15] the requester comes back and says they would [16] like the public files under FOIA?

[17] A: Then we collect them and send them [18] to them.

[19] MS. DEWEY: So this form O-10 and [20] then the checklist for pending 7-A [21] checklist, which has been marked as Exhibit No. 2, were [22] mailed back to you, it looks like, in

---

Page 74

[1] December of '95, completed in December of [2] '95, just to get back to the chronology of [3] the Willie Jefferson matter.

[4] I'd like to have this marked as [5] Exhibit 3, if you could.

[6] (Gay Deposition Exhibit No. 3 [7] was marked for identification.)

[8] BY MS. DEWEY:

[9] Q: So, then, looks like this would be [10] the form that you sent Mr. Jefferson; is that [11] correct?

[12] A: Yeah, this is a response letter, [13] and it is form number 021A; 5/95 is when it [14] was created as a form. Do you want me to —

[15] Q: And so this was your response to [16] Mr. Jefferson after you received back from [17] the contact office the O-10 and the [18] checklist?

[19] A: Yes.

[20] Q: And it's denying his FOIA request, [21] right?

[22] A: Yes, it is.

---

Page 75

[1] Q: And this was dated in December of [2] '95; is that right?

---



[3] **A:** Yes, December 29, 1995.

[4] **Q:** So up to this point, your office [5] had not reviewed any of the documents that [6] were the subject of his request; is that [7] right?

[8] **A:** That's correct. I mean, I don't [9] have the entire file here, but I don't think [10] that we had. In the ordinary course we would [11] not have.

[12] **Q:** I'm sorry, I'm going to go back to [13] Exhibit 2 just real quickly, if I could. You [14] explained to me before what was meant by the [15] word "pending litigation" or what meaning [16] that had for your office and your purposes. [17] I'd now like to ask you about what the [18] meaning of the word "closed" is.

[19] On this form, the checklist for [20] pending law enforcement proceedings, which is [21] page 2 of Exhibit 2, several of the questions [22] referred to closed, if closed, do this.

### Page 76

[1] Can you just explain to me what [2] that means, what "closed" means?

[3] **A:** Well, "closed" means the case is — [4] the particular case pertaining to the [5] particular defendant is closed.

[6] **Q:** So in Willie Jefferson's case what [7] meaning would that have?

[8] **A:** That wouldn't have any meaning [9] because it wasn't closed.

[10] **Q:** Right. When would Willie [11] Jefferson's case be closed?

[12] **A:** His case was not closed until the [13] petition for cert — was that his [14] position for cert? That was a Mathis [15] position for [15] cert?

[16] **Q:** That's right.

[17] **A:** But it would not be closed until [18] all the co-defendants were —

[19] **Q:** All the co-defendants' petitions [20] for certiorari were decided?

[21] **A:** Well, some of them probably [22] didn't have petitions for certiorari. His case

### Page 77

[1] would be closed whenever it was done with; [2] however, if there's any case open, if there's [3] any co-defendant open, it is still a pending [4] case if the assistant can swear that to give [5] the material out would cause harm to the [6] future proceeding.

[7] **Q:** Was it indicated on this form [8] anywhere that Willie Jefferson's case was [9] closed, this form being page 2 of Exhibit 2?

[10] **A:** No, but that wouldn't be relevant [11] because what he said here — it said that [12] there's a circuit court of appeals case filed [13] by Willie Jefferson on 7/29/94 and that it is [14] pending.

[15] **Q:** So pending is the opposite of [16] closed? I mean, you're either pending or [17] you're closed?

[18] **A:** Well, we have a lot of different [19] closed, but closed litigation is when [20] nothing's possibly going to happen.

[21] **Q:** So Willie Jefferson's case was not [22] closed at the time that his request was

### Page 78

[1] denied?

[2] **A:** I don't know what Willie [3] Jefferson's case was. Maybe you do, but I do [4] not know, but it is totally irrelevant. What [5] is relevant is the fact that there were 13 [6] co-defendants that the assistant U.S. [7] Attorney said materials pertaining to Willie [8] Jefferson, if released at this time, would [9] interfere with some proceedings. In fact, [10] Willie Jefferson had a pending circuit court [11] of appeals case, and I don't know but I [12] expect that he could have gotten a new trial [13] if it had turned out in his favor.

[14] **Q:** The confusion I'm having is that [15] this page 2, just to go back to that form, at [16] the top it's entitled checklist for pending [17] proceedings, but then all the —

[18] **A:** Well, it is for pending.

[19] **Q:** Then all the questions have the [20] word "closed" in them, so it's a little [21] confusing.

[22] **A:** If it's closed as to the person,

### Page 79

[1] are there co-defendants, and he said this is [2] not applicable. This form applies to every [3] single case in the United States in federal [4] courts. This little form wasn't made up for [5] Willie Jefferson. It was made up for every [6] criminal defendant in the United States in [7] federal courts. So it has to cover every [8] situation. And, actually, it's been very [9] useful and it seems to cover most every [10] situation.

[11] **Q:** If there are public documents, [12] those can still be provided to a requester [13] even though the case is not closed; is that [14] right?

[15] **A:** Of course.

[16] **Q:** So it's confusing the way the form [17] is written.

[18] **A:** Well, it's not confusing to me, and [19] I'm sorry it's confusing to you, and the [20] fact that it's confusing, how is it [21] relevant in [21] this case?

[22] **Q:** Question number 3 on the form says,

### Page 80

[1] "If closed describe the impact/harm on the [2] pending matter if documents were released," [3] and then nothing's filled out on this form?

[4] **A:** But it says not applicable in A [5] because it's open. It's in the circuit court [6] of appeals.

[7] **Q:** But then question 4 says, "If [8] closed, can any public source material be [9] easily segregated from the file," and it's [10] checked "no" rather than "not applicable"?

[11] **A:** Who's testifying?

[12] **Q:** I'm sorry. I'm just trying to [13] understand this form. I apologize if I'm [14] having trouble.

[15] **A:** Well, if —

[16] **Q:** I don't deal with these. So it [17] seems like a matter can be closed and [18] simultaneously pending, so there's not [19] really [19] a dichotomy?

[20] **A:** Pending under the federal Free- [21] dom of Information Act is one, shall we [22] say, definition, okay? And it doesn't — in order

### Page 81

[1] to reach a determination under that [2] definition, you do not look only at the [3] case pertaining to the defendant who made the [4] FOIA request.

[5] **Q:** On Exhibit 2, on this form, page 2, [6] the checklist, your office, executive [7] office, when you receive these forms back from the [8] field, how do you make the determination [9] about what the impact or harm would be as to [10] every document if it were to be released?

[11] **A:** It is not required that you make it [12] as to every single document. You group the [13] documents, and, for example, the witness [14] statements, you probably would not disagree [15] with this statement, that if there was going [16] to be a new trial, the witness statements [17] that weren't used in the first trial, if [18] they were to be given out, that would cause harm, [19] okay? It would.

[20] **Q:** But this form, this checklist, [21] doesn't break it down into categories. The [22] person that fills it out —

### Page 82

[1] **A:** Wait a minute. We'll go back and [2] I'll give you a little instruction in FOIA [3] law. Categories are not required until you [4] reach the litigation stage, period. They're [5] not required at the initial determination, [6] they're not required on appeal, they are [7] never required until you reach litigation.

[8] **Q:** Which is why they're not on the [9] form?

[10] **A:** That's exactly right.

[11] **Q:** I know, I'm sorry. I'm ignorant on [12] FOIA. Just to make sure I'm un- [13] derstanding you correctly, it's your [14] opinion that when [14] this 7-A checklist, which is page 2 of [15] Exhibit 2, is completed, they are not [16] required to

**BONNIE LEWIS GAY**
Case 1:07-cv-01305-CKK    Document 20-3    Filed 12/03/2007    Page 19 of 115
June 10, 1999
**WILLIE JEFFERSON v.**
**JANET RENO et al**

go through categorically and [17] explain what the harm would be in releasing [18] documents?

[19] **A:** No, that is not my testimony.

[20] **Q:** What is your —

[21] **A:** They are swearing or this one isn't [22] a sworn — they are signing, putting their

---

**Page 83**

[1] name, to a statement that if documents [2] in [2] this case were given out it would cause harm [3] to the proceeding.

[4] **Q:** All of the documents. They're [5] swearing that anything they would [6] release [6] would cause harm? Because we don't know from [7] reading it, like, what they're talking about?

[8] **A:** What do you mean you don't know [9] what they're talking about?

[10] **Q:** It says nothing can be released. [11] His request was denied in full.

[12] **A:** Okay, he could have had public [13] documents, okay? But at this stage the [14] attorney only — I mean, okay, you have a [15] major case with 13 defendants. You do not [16] have to look at every single piece of paper [17] at that time. You just know, okay, you just [18] know the witness statements, if they were [19] given out and you haven't finished all the [20] trials, that it would cause harm.

[21] You just know you can't give out [22] the FBI 302s, if there are any. You know you

---

**Page 84**

[1] can't give out other things that, you know, [2] have not been put into the public domain. I [3] don't know it but the assistant who's [4] handling the case does.

[5] **Q:** And at this stage they're not [6] required to break it down into categories?

[7] **A:** No. No.

[8] **Q:** That's only if it's in litigation?

[9] **A:** Only during litigation, that's [10] correct.

[11] **Q:** Exhibit No. 3 we've already briefly [12] talked about, and this was the denial [13] to Mr. Jefferson of his request?

[14] **A:** Mm-hmm.

[15] **Q:** And that occurred in December of [16] '95. I think I probably already asked this, [17] but just to confirm up to this point, when [18] this denial occurred in December of '95, your [19] office had not reviewed any documents; is [20] that correct?

[21] **A:** That's correct. More than likely. [22] I mean, I'm sure we didn't.

---

**Page 85**

[1] **Q:** On Exhibit 3, this is the denial of [2]

---

Mr. Jefferson's request again, and it's [3] signed by you, right?

[4] **A:** That's me.

[5] **Q:** Page 2?

[6] **A:** Mm-hmm.

[7] **Q:** It looks as though nothing has been [8] filled out.

[9] **A:** Yeah, we filled out that it was a [10] full denial, we filled out Willie Jefferson's [11] name, we filled out that the subject was [12] self, we filled out the request number, we [13] filled out the exemption we're using under [14] the FOIA and the one under the Privacy Act, [15] and I signed it.

[16] **Q:** There's nothing indicating that he [17] could request the public records; is that [18] right?

[19] **A:** This should have been checked.

[20] **Q:** And that's at the bottom of page 1 [21] of Exhibit 3?

[22] **A:** Yes.

---

**Page 86**

[1] **Q:** But it was not?

[2] **A:** It was not checked.

[3] **Q:** Do you know why you didn't check [4] it?

[5] **MR. SMORODIN:** Objection. I think [6] that goes well beyond the scope of this [7] deposition and gets into Ms. Gay's work [8] product, attorney-client privilege, perhaps, [9] and certainly into the deliberative process [10] that she engaged in. This deposition is [11] supposed to be about facts and circumstances [12] surrounding matters that we haven't even [13] reached yet, and as to why certain actions [14] were taken that have no relation to those [15] facts, I'm going to object and instruct [16] Ms. Gay not to answer those questions.

[17] **MS. DEWEY:** Just for the record, I [18] mean, even based on the status conference we [19] had this morning, part of the purpose of the [20] deposition is to understand the process so we [21] can figure out where things went wrong.

[22] **MR. SMORODIN:** And I have not

---

**Page 87**

[1] objected because I understood that the [2] purpose of the deposition was to understand [3] the process, and I have not objected or [4] instructed Ms. Gay not to answer questions [5] regarding the process, but when we get into [6] specific questions about why specific [7] activities were done, why specific actions [8] were taken that don't relate to the purging [9] of the files and to the reconstruction of the [10] files, the areas that Judge Kessler has [11] directed us to engage in discovery about, I [12] think I do have to object, and I do have to [13]

---

instruct Ms. Gay not to answer specific [14] questions.

[15] Now, I think if you wanted to ask [16] questions about generally why would a box be [17] checked or why would a box not be checked, I [18] would be hard-pressed to object to that. But [19] a specific question about a specific action [20] in this case or any case, I think I have to [21] object and instruct Ms. Gay not to answer.

[22] **MS. DEWEY:** We'll move on but leave

---

**Page 88**

[1] the deposition open to that in case we have [2] to take it up later with the judge.

[3] **MR. SMORODIN:** I mean, I would [4] object to that as well because this is not [5] the scope of the deposition. There's nothing [6] in the record in the pleadings in this case [7] up till now that has ever raised the question [8] about whether Mr. Jefferson was treated [9] fairly or unfairly in his initial denial, [10] whether Mr. Jefferson's denial should have [11] included an indication that he could have [12] obtained public records, and so I would [13] object to leaving the deposition open. I [14] understand you can do it but I don't want my [15] silence to be construed as a consent to doing [16] that.

[17] **THE WITNESS:** If we could off the [18] record —

[19] **MR. SMORODIN:** No, I don't think we [20] better go off the record.

[21] **THE WITNESS:** Okay.

[22] **MS. DEWEY:** Can I have this marked

---

**Page 89**

[1] Exhibit 4?

[2] (Gay Deposition Exhibit No. 4 [3] was marked for identification.)

[4] **MS. DEWEY:** Just for the record as [5] well, part of the subject of this deposition [6] is also to determine what appropriate [7] sanctions should be, and I'll just state that [8] for the record.

[9] **MR. SMORODIN:** And I would object [10] because there's been no suggestion that [11] sanctions are appropriate for anything other [12] than the way that the case has been handled [13] once documents were purged and once the file [14] was supposed to be reconstructed. There's [15] been no suggestion or motion for or any [16] suggestion that sanctions would be [17] appropriate for Mr. Jefferson's initial [18] denial.

[19] **BY MS. DEWEY:**

[20] **Q:** Ms. Gay, I'm going to hand you [21] what has been marked as Exhibit No. 4, and this is [22] an orientation manual for United States

---

**Page 90**

[1] Attorneys. It's dated June 3.



[2] A: Yeah.

[3] Q: And I'd like you just to look at [4] the very back page of that, the very last [5] page. It was attached, which is why I'm [6] having the whole thing marked, but the very [7] last page. It's a chart.

[8] A: Mm-hmm.

[9] Q: And I just want to use this as a [10] tool for us to just discuss what happened in [11] Mr. Jefferson's case just so we could follow [12] that.

[13] MR. SMORODIN: I would only object [14] for the record because I think — and I don't [15] know the answer to this — that the document [16] is dated June 1998, and I'm not sure whether [17] these same procedures were in effect during [18] the time that Mr. Jefferson's request came [19] in, but the witness can certainly answer.

[20] MS. DEWEY: I think Ms. Gay could [21] tell us.

[22] BY MS. DEWEY:

Page 91

[1] Q: Ms. Gay, would this same flowchart [2] have applied when Mr. Jefferson made his [3] request in 1995?

[4] A: To really answer that is hard [5] because we continually improve procedures and [6] change procedures. This was actually [7] prepared in about 1990, so there may have [8] been some things that aren't exactly like [9] this, but this is generally the procedure, [10] and it's the general idea. You know, it [11] wasn't put together to be a legal exhibit.

[12] Q: Just so I understand what happened, [13] and I think I do at this point, but I just [14] want to make sure with Mr. Jefferson's case, [15] if we were to start at the top of the [16] flowchart, where it says "DOJ," and then go [17] down and it says "FOIA unit receives [18] request," that is your office; is that [19] correct?

[20] A: Yes.

[21] Q: The second box going down?

[22] A: Mm-hmm.

Page 92

[1] Q: And then the box right underneath [2] that says, "Request acknowledged, logged, [3] given number"?

[4] A: Yes.

[5] Q: And that was probably your initial [6] letter back to Mr. Jefferson saying he [7] received your request; we need to know what [8] United States Attorney's Office you think [9] these records are located in, right?

[10] A: Yes. Yes. Because we — what [11] happened is that we had not received his [12] request at that point officially. It was an [13] unperfected request, so we had to get more [14] information before we had all of the [15] statutory requirements to

accept a request as [16] received. The word "received" actually has a [17] technical meaning, and so, yes, we had to get [18] whatever place needed to be looked at for the [19] records, that information from him, before we [20] could go any further.

[21] Q: About the fourth box down from the [22] top it says, "Search checklist sent to

Page 93

[1] districts."

[2] A: Mm-hmm.

[3] Q: What does that mean, search [4] checklist?

[5] A: That's what the O-10 form is.

[6] Q: And your office searches it or —

[7] A: We sent — no, our office does not [8] search. Our office sends the form to where [9] we've been told the records are likely to be [10] located.

[11] Q: So search checklist is a noun? [12] That's the form?

[13] A: The number of the search checklist [14] could be O-10, O-10 A or O-10 B.

[15] Q: Going down from that box, we then [16] have three boxes going across and we start to [17] branch out. Which box would we go to for [18] Willie Jefferson's case? What happened in [19] his case?

[20] A: We'd go to the one over by the [21] telephone.

[22] Q: The far right?

Page 94

[1] A: Mm-hmm.

[2] Q: Which says, "Records pertain to [3] open case"?

[4] A: Yes.

[5] Q: And then underneath that box it [6] says, "District contacts FOIA unit to [7] discuss," and that would be the U.S. [8] Attorney's Office in Tampa, for example, [9] contacting your office to discuss; is that [10] right?

[11] A: Yeah, sometimes.

[12] Q: Did that happen in this case?

[13] A: I have no idea. I don't have the [14] case file with me.

[15] Q: But you don't remember?

[16] A: Of course not.

[17] Q: And then underneath that box in the [18] flowchart it says, "Decision to release some [19] records or deny in full."

[20] A: Yeah.

[21] Q: And in this case it was denied in [22] full, correct?

Page 95

[1] A: It was denied in full, except that [2] if he had requested the public records

he [3] would have been able to get them. His [4] request was not for public records.

[5] Q: And then off to the right of that [6] box it says, "FOIA unit prepares response," [7] and would that be what Exhibit 3 is?

[8] A: Yes.

[9] Q: That would be your response that [10] would correlate with that box?

[11] A: Yeah, the O-21A form would be the [12] response.

[13] MS. DEWEY: I just wanted to get a [14] sense by using this. Thank you. If I could [15] have that for the court reporter, thank you. [16] This is No. 4 if you want it for your [17] records?

[18] MR. SMORODIN: Let's go off the [19] record.

[20] (Discussion off the record)

[21] BY MS. DEWEY:

[22] Q: So your office denied

Page 96

[1] Mr. Jefferson's request in full in December [2] of '95. He appealed that in January of '96, [3] and your denial was affirmed in April of '96.

[4] A: By the Office of Information [5] Privacy, I take it?

[6] Q: (Nodding)

[7] A: Yeah, it's an administrative [8] appeal.

[9] Q: Mr. Jefferson then filed a lawsuit [10] in the federal district court in June of '96. [11] Do you remember when you learned about that, [12] that he had filed a complaint in court?

[13] A: Well, we can put it this way. At [14] the time, 1996?

[15] Q: (Nodding)

[16] A: I probably would have seen the [17] complaint first. Whether I read it or not, I [18] don't know. Then I would have put it in John [19] Boseker's box. At the time we didn't have a [20] whole lot of extra people to assign them to, [21] so either he or I would have been the ones to [22] do it, so generally that's what would happen.

Page 97

[1] So I may or may not have read the complaint [2] initially.

[3] Q: So you don't remember if you did?

[4] A: I don't remember, no. I know I [5] would have read it before I signed the [6] declaration that was filed in '96.

[7] Q: There have been interrogatory [8] responses that have been prepared in this [9] case in response to discovery. Did you [10] review those responses, the answers, or did [11] you help Mr. Smorodin prepare answers?

[12] A: With respect to the ones I knew [13] the answer to, yeah, and then I asked



other [14] people for the information I didn't know.

[15] Q: The answer to interrogatory number [16] 7 states that Mr. Jefferson's FOIA request [17] was sent to Belinda Brown and that happened [18] in September of '96. Do you know why that [19] would be the case?

[20] A: Why are you saying September of [21] '96?

[22] Q: Because that's what the answer

---

Page 98

[1] says.

[2] A: Oh, I know. Probably Belinda gave [3] us that information, but we have found here [4] today that that probably was Ms. Guzman at [5] that time because she was the predecessor to [6] Belinda Brown. I don't know whether Belinda [7] was a trainee with Ms. Guzman or what. I [8] don't know how long she's been there.

[9] Q: What I'm trying to understand is [10] why in September of '96 would the FOIA [11] request be sent to Tampa?

[12] A: Well, I don't — why would it have [13] been sent to Tampa? Because that's where the [14] records were.

[15] Q: So it was in response to [16] Mr. Jefferson filing a complaint in district [17] court? You then send the —

[18] A: No, wait a minute, no. No. No.

[19] MS. YESNER: Can we go off the [20] record?

[21] MR. SMORODIN: Sure.

[22] (Discussion off the record)

---

Page 99

[1] BY MS. DEWEY:

[2] Q: When you learn that a complaint has [3] been filed, saying, for example, [4] Mr. Jefferson's complaint was filed in [5] district court, what does your office do [6] when you receive a complaint?

[7] A: Well, the first thing we do, of [8] course, is read it. Either I read it or John [9] reads it or we both read it, and then we [10] decide who it's going to be assigned to. And [11] then whoever it's assigned to prepares — you [12] know, gets all of the background which would [13] include any folders relating to the [14] individual, either initial determination or [15] the appeal folder, both of them, and we [16] usually pull any other requests from the [17] same person because we need to know the [18] interrelationship, and then we prepare a [19] draft answer for the U.S. Attorney's Office.

[20] Q: Do you remember if you were [21] assigned Willie Jefferson's complaint?

[22] A: To tell you the truth, I don't

---

Page 100

[1] think I was. I think that John was but [2] I'm just not sure because I really didn't get [3] involved that much in the beginning.

[4] Q: Are you aware that the District [5] Court in Willie Jefferson's case entered an [6] order in August of '97 requesting that an [7] index be prepared?

[8] A: Do you have the order?

[9] Q: (Nodding)

[10] A: August of '97?

[11] Q: Mm-hmm.

[12] A: I am aware of that, yes. I'm not [13] — I don't — I don't remember exactly what [14] it said or whatever, but I know —

[15] Q: There was an order in August of [16] '97 and then even prior to that in March a [17] request that your office go through and [18] explain how releasing documents would be [19] harmful?

[20] A: Yeah, well, that's not a request [21] for an index.

[22] Q: Do you remember that, however? I

---

Page 101

[1] mean, were you working on this case then?

[2] A: I worked closely with John, whe- [3] ther or not I was working on it. I do [4] remember that we got a declaration from [5] Jeff Downing about that time.

[6] Q: Before we get to that —

[7] A: Oh, no, we didn't get a declaration [8] at that time. I think you better give me [9] documents. I don't really remember.

[10] Q: You submitted what's been titled a [11] supplemental declaration in September of '97, [12] and attached to the declaration there's an [13] Appendix A and then there's an Appendix B. [14] The Appendix B is also a Vaughn index [15] prepared by your office, and I'll be happy to [16] hand this to you for you to look at.

[17] A: Well, it wasn't intended to [18] actually be a Vaughn index.

[19] Q: So you do remember working on this?

[20] A: Yeah, I remember working on this.

[21] Q: What is Appendix A?

[22] A: I need to look at the — well, I

---

Page 102

[1] can tell you what one document was and then [2] what the other one was. Are you just asking [3] about Appendix A?

[4] Q: I was going to start there, yes. [5] What is Appendix A?

[6] A: So just one thing was — no, wait a [7] minute.

[8] Q: There's an Appendix B. I just [9] didn't tab it.

[10] A: Oh, you don't have Appendix B?

---

[11] Q: No, it's right here.

[12] A: Well, the Appendix B is in my [13] handwriting. I guess we did call it a Vaughn [14] index, didn't we? So your question again?

[15] MR. SMORODIN: What is Appendix A?

[16] BY MS. DEWEY:

[17] Q: What is Appendix A? Do you know [18] what that is?

[19] A: Yeah, I do. When I first learned [20] that the files in Tampa had been purged of [21] duplicates and triplicates, et cetera, I [22] believe that was — can I use dates if I know

---

Page 103

[1] closely?

[2] MR. SMORODIN: Yes.

[3] THE WITNESS: Okay. On or about [4] September 3, 1997, Stephanie Boucher came to [5] me and said that she had learned from Jeff [6] Downing that it appeared they had purged [7] these files and it was after hours, so I [8] asked her if she would call the first thing [9] the next day and find out if it was really [10] true and she told me, yes, it was, that they [11] had purged and that there were a lot less [12] boxes than there were originally.

[13] Then I got in touch with the [14] criminal chief, the AO —

[15] MR. SMORODIN: Tell them what the [16] AO stands for.

[17] THE WITNESS: Administrative [18] officer and Mr. Downing to see what they [19] would all tell me because I figured that [20] maybe some of them had been sent, like, to [21] the records center or something. So I asked [22] them to figure — to tell me how many

---

Page 104

[1] boxes were left, and so I suppose they got [2] back to me within the same day and because I [3] told them I wanted to —

[4] BY MS. DEWEY:

[5] Q: "They" being?

[6] A: The three people like the AO, Jeff [7] Downing, and the criminal chief. As a [8] courtesy, I'm sure I called Jeff Down- [9] ing first and told him what I was going to [10] do. You know, he was helpful in telling me [11] who I already knew to talk to, plus I [12] already knew one of them. I knew the AO. So [13] — because I was [13] very concerned, of course, and figured, well, [14] what I want to do is find out what's there [15] right now.

[16] So I asked Stephanie to go to Tampa [17] and make an index of all the boxes that were [18] there, and she took off within 72 hours and [19] went to Tampa and spent three days and worked [20] something like 50 hours on making an index.

---



WILLIE JEFFERSON    v.
JANET RENO et al

BONNIE LEWIS GAY
June 10, 1999

[21] This is not the index she made, but [22] it is almost the index she made.

**Page 105**

[1] MR. SMORODIN: This being Appendix [2] A?

[3] THE WITNESS: Appendix A. What [4] happened is she sent me Appendix A — I [5] mean, she sent me her index on the — [6] no, I guess I read from a hard copy, and [7] I told her to make [7] a few deletions, not a [8] whole lot, but some [8] things I thought shouldn't be in the index [9] simply because it wasn't appropriate. So I [10] made —

[11] BY MS. DEWEY:

[12] Q: Can you give me an example of [13] that?

[13] A: Well, information about a [14] confidential informant or information about [15] somebody else's health problems. You know, [16] in other words, obviously private information [17] or information that, you know, was not [18] appropriate to release, and so then this is [19] what came out.

[20] Q: So Appendix A represents an [21] edited [21] version of Stephanie Boucher's index?

[22] A: Mm-hmm.

**Page 106**

[1] Q: Of what remained in Jeff Downing's [2] office after he purged files?

[3] A: Yes, her going down immediately [4] after we found out about the, you know, fact [5] that it had happened. I immediately got [6] approval, which didn't take but a minute, to [7] send her down and travel.

[8] MS. DEWEY: Before we go any [9] further, can we take a short break?

[10] THE WITNESS: Oh, sure.

[11] MR. SMORODIN: Sure.

[12] (Recess)

[14] BY MS. DEWEY:

[14] Q: Ms. Gay, I'm just going to ask you [15] a quick question. I'm looking at Exhibit No. [16] 2, page 2. Is this Mr. Downing's signature?

[17] A: I don't know because I don't [18] know what his signature — I actually have never [19] seen something that I know is his signature. [20] Maybe you should ask him.

[21] Q: We were just talking about when [22] Mr. Jefferson filed his complaint in district

**Page 107**

[1] court in June of '96, and in response to [2] that complaint you filed a declaration in July of [3] '96. To prepare that declaration, who did [4] you talk to?

[5] A: I have no idea. I probably didn't [6]

talk to anybody.

[7] Q: You didn't talk to anybody? Would [8] you like to look at the declaration?

[9] A: Yeah, I better look at the [10] declaration.

[11] Q: Would that help?

[12] A: No, it wouldn't help at all.

[13] Q: I mean, that's in response to [14] Mr. Jefferson's complaint with the court, his [15] FOIA complaint.

[16] A: No, it isn't. This is not an [17] answer.

[18] Q: I know it's not an answer but in [19] response in the more general sense. That's [20] what spurred you to file a declaration. You [21] didn't do that in a vacuum?

[22] A: I think we must have — it must

**Page 108**

[1] have accompanied a motion for summary [2] judgment or something.

[3] Q: But regardless —

[4] MR. SMORODIN: The record is clear [5] that the United States Attorney's Office [6] filed a motion for summary judgment on a [7] couple of occasions. I believe this was the [8] first occasion, and it was a summary judgment [9] asserting simply 7-A, as I recall. I don't [10] think there's a dispute about that right now.

[11] MS. DEWEY: No. No, I'm just [12] wondering what Ms. Gay —

[13] BY MS. DEWEY:

[14] Q: If you could just explain to me [15] what you did to prepare that declaration?

[16] A: Well, first of all, I don't know [17] whether I prepared the whole thing.

[18] Q: But you at least reviewed it before [19] you signed it, I assume?

[20] A: Oh, of course, and I would have [21] reviewed the file as well.

[22] Q: Would you spoken with anyone in the

**Page 109**

[1] Tampa office, United States Attorney's [2] Office?

[3] A: Well, let's see. I believe that we [4] filed a declaration — that Mr. Downing filed [5] a declaration as well, but I don't [6] know. Anyway, who would I have spoken to?

[7] Q: Mm-hmm.

[8] A: I probably spoke with Mr. Downing. [9] I more than likely did.

[10] Q: Because he was the assistant United [11] States Attorney on the case?

[12] A: Yeah. And I believe that it was [13] either me or John would have spoken with him [14] because we asked him to prepare a declaration [15] to accompany

my declaration, I'm pretty sure.

[16] Q: Do you remember what the nature [17] of your conversation was? Do you remember [18] what you talked about?

[19] A: The only thing I would have [20] talked about would have been that we needed a [21] declaration and that he needed to explain [22] whatever he could with respect to the 7-A

**Page 110**

[1] issues.

[2] Q: Is there any other place you would [3] have gathered the facts that went into your [4] declaration other than conversations?

[5] A: Oh, the facts would have been [6] gathered from official files in my office.

[7] Q: But this declaration is dated July [8] of '96. At this point did you review any [9] documents relating to Mr. Jefferson's FOIA [10] request?

[11] A: No. No, in the ordinary course of [12] business, I would never have reviewed [13] documents for this type of a declaration.

[14] MR. SMORODIN: And when you say [15] documents, I think both the questioner and [16] the answerer knew what you meant by [17] "documents." I'd object to the term as being [18] ambiguous, however, when we look back at the [19] transcript.

[20] BY MS. DEWEY:

[21] Q: By "documents" I mean Willie [22] Jefferson's case file that would be relevant

**Page 111**

[1] to his FOIA request.

[2] A: No, I would not have looked at [3] documents from his original criminal case [4] file.

[5] Q: What did you review in the way of [6] documents?

[7] A: I would have reviewed the entire [8] file we have in our office that has all the [9] papers from the beginning to the end of the [10] FOIA request, and they're in chronological [11] order.

[12] Q: And what would those documents be?

[13] A: The request, our initial response [14] to the requester, which in this case asks him [15] to tell us where to look, and then the letter [16] that came back that said look in Florida, and [17] then the form that went out asking Florida [18] for the records, and then there might be all [19] kinds of — let's say our people bugged the [20] people in Florida about getting back to us. [21] Those notes would be in the file, and [22] would be on the left side of the file.

Page 112

[1] And then the response from the [2] District and then our response to [3] Mr. Jefferson, and then in the appeal file, [4] you know, you have all of that stuff added to [5] it.

[6] Q: Do you have any recollection of how [7] often you spoke to Mr. Downing during this [8] time period once Mr. Jefferson had filed his [9] complaint with the district court?

[10] MR. SMORODIN: Objection. I think [11] it misstates the witness' testimony. She [12] didn't state that she recalled talking to him [13] at all, that maybe Mr. Boseker or maybe she [14] talked to him.

[15] MS. YESNER: Can you read that [16] back? I thought her testimony was that she [17] probably spoke.

[18] THE WITNESS: Yeah, I said John or [19] I probably spoke to him.

[20] BY MS. DEWEY:

[21] Q: Do you have any recollection of [22] about how often you would have spoken to

Page 113

[1] Mr. Downing during that time?

[2] A: Well, how often we would or-[3] dinarily [3] speak to them? Once, maybe twice.

[4] Q: Ms. Gay, this declaration that [5] we've been talking about was filed in July of [6] '96, and it was in relation to a motion for [7] summary judgment. After that motion was [8] decided by the court, the district court, in [9] March of '97, the court requested your office [10] to come up with more categorical approach for [11] why the documents were not being released.

[12] Do you have any recollection of [13] that?

[14] A: I remember speaking with John about [15] that.

[16] MR. SMORODIN: John?

[17] THE WITNESS: Boseker.

[18] BY MS. DEWEY:

[19] Q: In your office?

[20] A: In my office.

[21] Q: And what did you all talk about?

[22] A: Well —

Page 114

[1] MR. SMORODIN: Objection. I mean, [2] I think that is work product, and I would [3] instruct Ms. Gay not to answer that question [4] on the grounds of privilege.

[5] BY MS. DEWEY:

[6] Q: Were you the person responsible [7] for responding to the court's direc-[7] tives?

[8] A: Ultimately, yes.

[9] Q: Were you in March of '97?

[10] A: Yes.

[11] Q: And what did you do in response to [12] the court?

[13] A: I believe we prepared two [14] declarations, had Jeff prepare one and then [15] we prepared one. Maybe we just had Jeff [16] prepare one. I don't know. Maybe you all [17] know.

[18] Q: Jeff meaning Mr. Downing?

[19] A: Downing, mm-hmm. Because it really [20] related to more to having him explain the [21] categories, I imagine.

[22] Q: So at that time you would have to

Page 115

[1] speak with Mr. Downing?

[2] A: Me?

[3] Q: Did you speak to Mr. Downing?

[4] A: I didn't speak to him because I [5] didn't prepare that.

[6] Q: How would Mr. Downing know to [7] prepare a declaration?

[8] A: Whoever was working on the case [9] would have called him, but I'm very sure it [10] was John at that time because I know I didn't [11] talk with him about the declaration.

[12] Q: So in response to the court's order [13] that the government prepare a more [14] categorical listing or categories for why the [15] documents were not being released, what did [16] you do? Did you do anything in response to [17] that?

[18] MR. SMORODIN: When you say "you," [19] are you talking about Ms. Gay per-[19] sonally?

[20] BY MS. DEWEY:

[21] Q: Yes, I'm talking about you [22] personally.

Page 116

[1] A: Yeah, I do remember that I re-[2] viewed Downing's declaration to approve it before it [3] was given to the assistant U.S. Attorney. In [4] other words, I was ultimately responsible for [5] the case, and I generally review the [6] declarations, you know, if I've worked on the [7] case at all.

[8] Q: When you reviewed Mr. Dow-[9] ning's declaration, do you remember talking [10] to him about it, talking to Mr. Downing about his [11] declaration?

[12] A: No. I know I did not. If I had [13] asked for something more, John would have [14] talked to him.

[15] Q: Do you remember the first draft of [16] that declaration, if you had any edits or [17] changes to it?

[18] A: I don't think so. I don't know is [19] the appropriate answer.

[20] Q: And then apparently what was given [21] to the plaintiffs still was not

satisfactory [22] and then that brings us up to August of 1997,

Page 117

[1] when the court ordered that a Vaughn index be [2] prepared. I'm just trying to lead us through [3] the chronology here and your involvement in [4] responding and working on this case. And at [5] that time, all of that, that's when we come [6] to this declaration of you.

[7] A: Okay, what date were you saying [8] that wasn't sufficient, they wanted more [9] information?

[10] Q: There was a separate court order in [11] August of 1997.

[12] MR. SMORODIN: It's not a secret. [13] I think the court denied the second mot-[14] ion for summary judgment without prejudice [15] and directed the defendant to file additional [16] information. That's what you're asking [17] about, right?

[18] MS. DEWEY: Right, and that's —

[19] MS. YESNER: Wait, let's go off the [20] record a second.

[21] (Discussion off the record)

[22] BY MS. DEWEY:

Page 118

[1] Q: Ms. Gay, did anyone in your office [2] that you were aware of speak with Mr. Downing [3] about preparing his dec-[4] laration in April of 1997?

[5] A: Somebody would have had to have [6] told him — it would have been John told him [7] that they needed another declaration, yeah, [8] and the court order specifically said what [9] needed to be in it.

[10] Q: Did your office send Mr. Downing a [11] copy of the court order?

[12] A: I'm quite sure we did.

[13] MR. SMORODIN: I'm sorry, did or [14] did not?

[15] THE WITNESS: Did.

[16] BY MS. DEWEY:

[17] Q: You have in front of you what is [18] your September '97 declaration, and we've [19] already gone over you ex-[19] plained what Appendix A was, that that was prepared by both you and [21] Stephanie Boucher as an index of the files [22] that were remaining after you learned about

Page 119

[1] the purging of files by Mr. Downing, right?

[2] A: That's correct.

[3] Q: I want to go back because you had [4] explained to me when you first learned that [5] Mr. Downing had purged files, and you had [6] stated that your first reaction was to [7] contact the chief of the criminal division, [8] the AO, admin-



WILLIE JEFFERSON   v.
JANET RENO et al

Downing told you a lot more than just [15] St. Petersburg.

[16] A: Yeah, but I can explain why we [17] don't have a problem with any of the other [18] places.

[19] Q: That would —

[20] A: We may as well do direct.

[21] Q: We can go through Downing's [22] declaration. He gave categories and you can

Page 164

[1] tell me you think where all those things are?

[2] A: Yeah, if you want. It doesn't [3] matter to me whatever way you want to do it.

[4] Q: How about attorney trial notes from [5] the Culver and Mathis trials? Where are [6] those?

[7] A: Those should be in the 12 boxes.

[8] Q: How about sets of documents that [9] were provided to counsel as discovery under [10] Rule 16?

[11] A: They should be — at least one copy [12] should be in the file in there or over at [13] St. Petersburg, because I'm sure some of [14] those things fell into it.

[15] Q: So this could be either in the [16] boxes we have or at St. Petersburg?

[17] A: Yeah.

[18] Q: Why don't you know where those [19] documents are?

[20] A: I do know.

[21] Q: Where are they, then?

[22] A: What documents are you talking

Page 165

[1] about?

[2] Q: The sets of documents that were [3] provided to counsel as discovery under Rule [4] 16?

[5] A: I said they're either in the box [6] or, if they had been obtained from St. [7] Petersburg, they're at St. Petersburg —

[8] Q: We need to know where they are. [9] They can't be either here or there or [10] there. We need to know where they are.

[11] A: Yes, they could be either here or [12] there. You're mistaken. Things that came [13] out of the St. Petersburg Police Department [14] are now back in the St. Petersburg Police [15] Department, and I think some of those items [16] were probably given to the defendant in [17] discovery. That would be the normal thing [18] that would happen.

[19] Q: Right. Well, they're supposed to [20] be produced to us, though, to re-construct [21] the file.

[22] A: Well, do you want —

Page 166

[1] Q: Mr. Downing purged them, and now we [2] need to know where they are.

[3] A: Okay, they're in the St. Petersburg [4] Police Department, and I do not have access [5] to them.

[6] Q: Let's talk about that. Why don't [7] you have all of the documents that are at the [8] St. Petersburg Police Department?

[9] A: I don't have access to them bec-ause [10] they have already been pro-vided to Willie [11] Jefferson by the police department. He made [12] 25 FOIA requests, and they responded to all [13] of those requests providing — I don't know [14] whether it was every single page, but in any [15] event they provided a lot of material, and, [16] furthermore, the chief of police of [17] St. Petersburg, Florida, advised me that he [18] will not give me anything without a court [19] order directed to him.

[20] Q: Have you made any efforts to obtain [21] a court order to get those documents?

[22] A: Why should I do that?

Page 167

[1] Q: Because you're under court order to [2] reconstruct the file.

[3] A: The answer's no.

[4] Q: Did the St. Petersburg Police [5] Department give you an index of what it has [6] provided to Willie Jefferson in response to [7] Willie's FOIA request?

[8] A: They gave me copies of their [9] response to the FOIA request, so that wasn't [10] technically an index to the documents they [11] provided. I mean, they — whatever they said [12] in their response to Mr. Jefferson, they [13] pro-vided us and we provided it to you.

[14] Q: Did you compare that with what [15] needs to be reconstructed from the purged [16] files? Do you know what is left that is yet [17] to be produced?

[18] A: How could I possibly know? You [19] mean that was purged? St. Petersburg [20] probably knows. I don't know. I know there [21] were 10 to 15 notebooks of — trial notebooks [22] of this and that that they have.

Page 168

[1] Q: That they've produced to [2] Mr. Jefferson or you just know that these [3] exist there?

[4] A: I know that they exist there.

[5] Q: Have you obtained a copy of them?

[6] A: No, I have not.

[7] Q: And why have you not?

[8] A: Because I have been refused to have [9] a copy of them. I have asked for a copy and [10] been told I can't have it.

[11] Q: Did you offer to purchase them?

[12] A: We did offer to purchase them.

[13] Q: And what was the response?

[14] A: It doesn't have to do with money. [15] It has to do with the time that the police [16] force can give to providing Mr. Jefferson [17] with not one but two sets of documents.

[18] Q: So the police department is telling [19] you they won't produce them to you because [20] they don't have time?

[21] A: Yes.

[22] Q: Did you learn that the police

Page 169

[1] department has files on its computers?

[2] A: Yes.

[3] Q: And did you ask to purchase their [4] computer files or to have them printed?

[5] A: No.

[6] Q: Why not?

[7] A: Because I understand most of those [8] are in hard copy, anyway.

[9] Q: They're not able to be put on [10] disks?

[11] A: I don't know how to answer this [12] question. I don't know.

[13] Q: Who have you spoken to at the [14] St. Petersburg Police Department?

[15] A: Paul Cooke.

[16] Q: Is that it?

[17] A: Yes.

[18] Q: Have you spoken with Major Pro-fit?

[19] A: No.

[20] Q: Why not?

[21] A: Because I had a letter from Paul [22] Cooke that was signed that said Major Profit

Page 170

[1] says to advise you that we cannot produce any [2] of the records.

[3] Q: So you just took that at face value [4] without talking to Mr. Profit about it?

[5] A: Yes, I did.

[6] Q: You didn't think there might be [7] something you could work out with Major [8] profit to obtain the files?

[9] A: No, when he said I will not give [10] them to you, period, you need a court order.

[11] Q: And you have made no attempts to [12] get a court order?

[13] A: No.

[14] Q: With whom have you spoken to at the [15] FBI concerning Jefferson doc-uments?

[16] A: Actually, I don't recall the names [17] of all the people. I think it's in the [18]

**Min-U-Script®**

interrogatories, but I called the FBI, and I [19] spoke to a couple of people till I got to a [20] person who knew about the records, and then I [21] was given a great deal of detail, you know, [22] like there were so many volumes of the

---

Page 171

[1] records, and then I was advised that they had [2] produced all the records to Mr. Jefferson [3] that he was entitled to from their files.

[4] Q: Do you remember who told you that?

[5] A: No, I don't remember. I mean, it's [6] in some of these papers here.

[7] Q: Have you asked the FBI for copies [8] of their files?

[9] A: No, because why should I if they've [10] already — first of all, that information [11] wasn't necessarily in our files.

[12] Q: How would you know?

[13] A: What do you mean, how would I know?

[14] Q: How do you know that?

[15] A: Because the FBI has sent to us [16] already several groups of information for us [17] to respond to, for us to review and provide [18] what we could to — either back to them or to [19] Mr. Jefferson.

[20] Q: So you compared what the FBI [21] provided you with what you think has been [22] purged from Mr. Downing's files?

---

Page 172

[1] A: No. No.

[2] Q: Then I don't understand how you [3] would know that those —

[4] A: How I would know what?

[5] Q: If those FBI documents were purged [6] by Mr. Downing.

[7] A: I told you I didn't think that [8] anything was purged that wasn't duplicates. [9] What is it you think that we had from the [10] FBI?

[11] Q: I don't know. That's why they need [12] to be reconstructed. We don't know and I [13] don't know how you know.

[14] A: Well, if the FBI has told me that [15] they have given him every piece of paper that [16] they have ever had on him that he's entitled [17] to, why would I think that I'd have something [18] different?

[19] Q: Because you're under a court order [20] to reconstruct the file.

[21] A: Wait a minute. That has nothing to [22] do with how many records the FBI has. What

---

Page 173

[1] I'm saying is we certainly wouldn't

have had [2] any pieces of paper relating to the FBI that [3] the FBI didn't have, and they've produced all [4] the records relating to him to him that he's [5] entitled to.

[6] Q: How is that relevant to [7] reconstructing the file?

[8] A: It's very relevant because I would [9] not have anything to do with releasing any [10] documents from the FBI. They have to be [11] referred to the FBI, and the FBI makes a [12] determination, so why am I going to do that [13] if they've already done it? It just doesn't [14] make any sense. In other words, it would be [15] stupid to do that.

[16] Q: I mean, the court has ordered that [17] the files be reconstructed. If there were [18] FBI files in there —

[19] A: I have answered that to the court [20] in the information I provided. What I have [21] said is that the FBI has already handled [22] everything that we ever may have had,

---

Page 174

[1] possibly could have had.

[2] Q: The short answer basically is that [3] you have not obtained the FBI files that may [4] have been purged by Mr. Downing. You have [5] not reconstructed that part of the file; is [6] that right?

[7] A: That's not true. I have found out [8] what the story is on all of that, and I've [9] provided it.

[10] Q: You've provided the story, but you [11] do not have the FBI files; is that right?

[12] A: You know, I do not have control [13] over the FBI files at all. So if the judge [14] wants what the FBI has, you'll have to go to [15] the FBI. I cannot get stuff from the FBI.

[16] Q: Have you asked for it?

[17] A: Yes, and I've been told that they [18] have already given him everything that he's [19] entitled to, which would include any possible [20] item that would have been in our files. I [21] consider that a complete reconstruction.

[22] Q: Where are the legal research files

---

Page 175

[1] that were purged?

[2] A: I don't understand what you're [3] talking about.

[4] Q: These are categories of documents [5] that Mr. Downing has identified as documents [6] that he purged, and since you have primary [7] responsibility for reconstructing I would [8] like to know what efforts you have made to [9] reconstruct the files. Where are they?

[10] MR. SMORODIN: Objection, [11] argumentative. You can answer, Ms. Gay.

[12] BY MS. DEWEY:

[13] Q: Where are the legal research files [14] that Mr. Downing purged?

[15] A: I understand that one copy of all [16] the legal research files is within the 12 [17] boxes.

[18] Q: And the witness folders?

[19] A: I for a fact have seen the witness [20] folders.

[21] Q: Where are they?

[22] A: The folders? They're in my office.

---

Page 176

[1] Q: Why don't we have a copy of them?

[2] A: You do have a copy of everything [3] that we found in the boxes.

[4] Q: So are they in the 12 boxes? Is [5] that what you're saying?

[6] A: Yeah.

[7] Q: What about the summary electronic [8] surveillance logs? Where are they?

[9] A: Explain to me what you're talking [10] about. I know what you're talking about, but [11] I think there were telephone information. [12] There was no wiretapping.

[13] Q: Transcripts.

[14] A: Transcripts?

[15] Q: Right.

[16] A: I don't actually know. Did we list [17] — I wasn't specifically looking for those. [18] I don't know whether we listed them in here [19] or not.

[20] Q: They're listed.

[21] A: Well, then, we withheld them from [22] you.

---

Page 177

[1] Q: Do you know why?

[2] A: Because if we — didn't we list [3] them —

[4] Q: This isn't really about [5] withholding. This is about reconstructing [6] the file.

[7] A: Wait a minute. It is about [8] withholding as well. We are not required to [9] give you things that we're taking exemptions [10] for.

[11] Q: You're required to tell us where [12] they are regardless of what ultimate [13] determination you make in terms of —

[14] A: Well, all the pieces of paper that [15] we withheld are in my office.

[16] Q: So do you have summary electronic [17] surveillance logs, the transcripts, in your [18] office?

[19] A: Well, I'd have to read through [20] every single thing. I have, like — I don't [21] know how many boxes of records but a whole [22] lot relating to the stuff we got from Florida

---

**Page 178**

[1] and I personally haven't looked at every [2] single piece of paper in there.

[3] Q: So is the answer that you don't [4] know where these are, or are they in your [5] office?

[6] A: I think I've answered that [7] somewhere. I don't know where. You say [8] they're listed on the appendix?

[9] Q: No, these are categories of [10] documents that Mr. Downing in his declaration [11] has identified as the categories of documents [12] that he purged from the files. You're now [13] under a court order —

[14] A: That he purged?

[15] Q: Yes.

[16] A: Where? Please show me.

[17] Q: This is Mr. Downing's declaration [18] dated March 15, 1999. These are all the [19] categories of documents that need to be [20] reconstructed.

[21] A: Oh, he only said that he destroyed [22] drafts and duplicate copies.

**Page 179**

[1] Q: Where are the originals?

[2] A: Then they're in my office. I [3] probably withheld them from you.

[4] MR. SMORODIN: I don't want to [5] speak for the witness, but I think when [6] Ms. Gay says she withheld them she's talking [7] about withholding them under other FOIA [8] exemptions.

[9] THE WITNESS: Yes, that's what I'm [10] talking about.

[11] MR. SMORODIN: And I'm not trying [12] to testify for the witness.

[13] MS. YESNER: We expected that [14] reconstruction efforts to reconstruct the [15] files meant an explanation as to where the [16] originals of the files were and if the [17] originals of the files are in Ms. Gay's [18] office and being withheld under another FOIA [19] exemption, then we expected to be told that [20] information.

[21] THE WITNESS: You were given a [22] response letter. Let me see. I'm trying to

**Page 180**

[1] figure out where that was.

[2] MR. SMORODIN: I don't believe it's [3] in there, that document.

[4] THE WITNESS: No. Oh, where did we [5] put that? Oh, it might — wait a minute. [6] Where's my — the one with the appendix? I [7] think we did have transcripts listed, and we [8] put exemptions that we were taking somewhere.

[9] Okay, I have it. It's in box 8-A, [10] binder containing transcripts of taped [11] conversations between various third-parties, [12] including co-defendants and law

enforcement [13] officials. Willie Jefferson is not included [14] in these transcripts unless he was an unknown [15] individual on one of the tapes. We have 220 [16] pages, 170 pages of text and 50 pages of [17] dividers, and text are withholding that under [18] (b)(7)(C), (b)(3), and 18 USC 2517 et seq.

[19] BY MS. DEWEY:

[20] Q: There's a more like 2,000 phone [21] calls. It's a lot more than 200 pages that [22] we're talking about here.

**Page 181**

[1] A: Oh, wait a minute. There weren't [2] 2,000 pages of transcripts of telephone [3] calls.

[4] Q: It's our understanding that —

[5] A: What happened to —

[6] Q: It's in the very back of that, in [7] your hand.

[8] A: Pardon?

[9] Q: If you'll go to page 6 of Downing's [10] declaration, number 5 at the bottom, [11] transcripts made of recorded telephone [12] conversations, et cetera, can you read that? [13] Do you see that?

[14] MR. SMORODIN: Read it out loud or [15] to yourself?

[16] BY MS. DEWEY:

[17] Q: To yourself.

[18] A: "Drafts and" —

[19] MR. SMORODIN: No, to yourself.

[20] THE WITNESS: Oh, okay.

[21] BY MS. DEWEY:

[22] Q: My question is why would that be

**Page 182**

[1] withheld?

[2] A: I just gave you the exemptions [3] about why it would be withheld.

[4] Q: So is it your testimony that, like, [5] whatever we do not have in the 12 boxes is [6] being withheld by you? Everything else is [7] sitting in your office?

[8] MR. SMORODIN: Objection. I don't [9] think that's her testimony.

[10] BY MS. DEWEY:

[11] Q: Read it out loud.

[12] A: "Drafts and duplicate copies of [13] transcripts made of recorded telephone [14] conversations, the final copies of which were [15] provided to all defense counsel pursuant to [16] Rule 16 and which were used as trial [17] exhibits. Those are with the court."

[18] MR. SMORODIN: Just for the record, [19] that is different than what Ms. Gay was [20] looking at a moment ago and to which she [21] referred you to the part on the appendix, [22] just so that when we look at this we're not

**Page 183**

[1] confused. We've now shifted to a separate or [2] at least a different sub-category of [3] documents.

[4] THE WITNESS: "Extra copies of [5] the" —

[6] MR. SMORODIN: Wait a minute. [7] There's no question.

[8] BY MS. DEWEY:

[9] Q: Did you retain a copy of those?

[10] A: Yes, of the ones that I was [11] referring to there definitely.

[12] MR. SMORODIN: Wait a minute. I [13] don't think that's the question, Ms. Gay.

[14] BY MS. DEWEY:

[15] Q: Number 5 that you just read, did [16] you retain a copy?

[17] A: Of the trial exhibits?

[18] Q: Mm-hmm.

[19] A: I don't know whether what I have [20] was also a trial exhibit.

[21] Q: Why would that be in the file? If [22] it was a trial exhibit, it would be provided

**Page 184**

[1] to —

[2] A: If it's a trial exhibit, it's not [3] withheld, okay? I don't have copies of the [4] trial exhibits.

[5] MR. SMORODIN: You need to wait [6] till her question's finished.

[7] THE WITNESS: Okay, all right.

[8] BY MS. DEWEY:

[9] Q: Where are the tapes of phone calls?

[10] A: The tapes of phone calls? Who made [11] the tapes?

[12] Q: I don't know.

[13] MR. SMORODIN: I'm going to object. [14] That's not quite fair. If you're referring [15] to a part of Mr. Downing's affidavit or [16] statement, it would be helpful if you could [17] refer Ms. Gay to where you're taking that [18] from because Ms. Gay has testified that [19] things went back to St. Petersburg, and if [20] we're talking about St. Petersburg Police [21] Department tapes I think she has a right to [22] be refreshed by looking at Mr. Downing's

**Page 185**

[1] declaration, so I would object to that [2] question.

[3] BY MS. DEWEY:

[4] Q: I am going through the categories [5] from Mr. Downing's declaration in front of [6] you, and one of the things listed there is [7] transcripts of telephone conversations.

[8] MR. SMORODIN: I think that's the [9] same one, number 5, that Ms. Gay just

asked [10] about, so I'd object.

[11] THE WITNESS: And he said that [12] these are all —

[13] BY MS. DEWEY:

[14] Q: And then you go to the next page, [15] Ms. Gay —

[16] A: Extra copies are what was purged.

[17] Q: Where is the copy that you [18] retained? If copies were purged, where is [19] the copy that was supposed to be [retained?

[20] A: The copy that was retained of what?

[21] Q: Of number 5, where your fingers [22] are?

### Page 186

[1] A: Either it's in my file or in the [2] court. I don't know if what I have was an [3] exhibit.

[4] Q: If it's an exhibit, it cannot be [5] withheld.

[6] A: I said that if it's an exhibit it's [7] with the court.

[8] Q: So you don't have a copy?

[9] A: I don't know. If you can prove to [10] me that it's an exhibit, then I will give you [11] what I have.

[12] Q: The burden is not on us to try to [13] figure this out. I'm trying to figure it out [14] by asking you questions, but the burden is on [15] you to reconstruct the files that have been [16] purged.

[17] A: Well, I must have tell you that I [18] have done everything humanly possible, and I [19] don't like your coming on at me like that, [20] so —

[21] Q: I'm just trying to understand where [22] things are.

### Page 187

[1] A: I'm telling you to the best of my [2] ability. Maybe I'll just say I don't know.

[3] Q: Who did you ask to help you do [4] this, reconstruct the files?

[5] A: Who did I ask to help me? [6] Stephanie, John, Mr. Downing, Kathy Peluso, [7] Belinda Brown.

[8] Q: And they can't find out where the [9] originals are of these things?

[10] MR. SMORODIN: Objection, [11] misstates the witness' testimony. You can answer, if [12] you can.

[13] THE WITNESS: I don't remember what [14] the question was.

[15] BY MS. DEWEY:

[16] Q: How have these people helped you?

[17] A: How did people help me?

[18] MR. SMORODIN: The specific peo- [19] ple you just named.

[20] BY MS. DEWEY:

[21] Q: Right. Downing, Stephanie.

[22] A: Okay, Downing helped me by telling

### Page 188

[1] me where things could be located and his [2] recollections of various things. Stephanie [3] helped by preparing the index and by [4] preparing the doc- uments which were provided [5] to you for delivery and copying.

[6] Q: I don't mean to cut you off, but [7] I'm talking about helping you recon- struct the [8] files that were purged by Mr. Downing.

[9] A: Well, then, that was Paul Cooke. [10] That would be Paul Cooke, by telling me of [11] all the possible things he has, which it [12] would have been impossible for Jeff Downing [13] to have anything he doesn't have from [14] St. Petersburg Police Department that was [15] orig- inally from the St. Petersburg Police [16] Department.

[17] Q: On number 5 that we've been [18] talking about in Downing's dec- laration, did [19] you ask Mr. Downing if he kept a copy of those [20] transcripts?

[21] A: I haven't talked to him about this [22] particular.

### Page 189

[1] Q: You haven't talked to him about his [2] declaration?

[3] A: About this declaration, no.

[4] Q: Have you looked at this declaration [5] before, this declaration being Dow- ning's [6] March '99 declaration?

[7] A: No, I have not.

[8] Q: Then how is it that you are going [9] about trying to reconstruct the files that [10] have been purged?

[11] A: I have already answered that [12] question.

[13] Q: But wouldn't this declaration where [14] he breaks it down into cate- gories be helpful [15] to you in your efforts?

[16] A: You've just pointed out to me, yes, [17] it might be, and that was March 15, 1999, and [18] frankly I didn't even know that stuff was in [19] it.

[20] Q: So Mr. Downing has never given you [21] this information himself directly?

[22] A: Well, I expect that he's given me

### Page 190

[1] information that would include this [2] information previously and that it was taken [3] into consideration, but not even having read [4] this I can't tell you for sure.

[5] Q: I'm going to ask you some more [6] questions, then, and I'm referring to [7] Downing's declaration of March '99

because [8] I'm trying to figure out what you've figured [9] out in terms of where things are. That's the [10] purpose of these questions. He has listed [11] cate- gories of documents that he purged. One [12] is law enforcement investigative reports.

[13] A: Where is that?

[14] Q: That is number 13 on page 8.

[15] A: Okay, those would have either been [16] from St. Petersburg Police Department or the [17] FBI and are either at the St. Petersburg [18] Police Dep- artment or have been already [19] re- viewed by the FBI and provided to [20] Mr. Jefferson if he's entitled to them.

[21] Q: Let's go to number 10 in Dow- [22] ning's list there, which is on page 7, the bottom of

### Page 191

[1] page 7, summary electronic sur- [2] veillance logs, [2] do you know where those are?

[3] A: I believe those are the ones that [4] are at St. Petersburg because St. Peter- sburg [5] Police Department provided pages and pages of [6] logs to Mr. Jef- ferson.

[7] Q: Is there a copy in your file?

[8] A: No. We already said there weren't. [9] We gave St. Petersburg stuff back to them. [10] That is usual thing you do at the end of a [11] trial.

[12] Q: You say "we." Are you talking [13] about the United States Attorney's Office?

[14] A: I'm talking about the federal [15] government.

[16] Q: What about number 11 on page 8, [17] photographs of trial document ex- hibits? Do [18] you know where those are?

[19] A: Paul Cooke told me that either he [20] had a copy of every single trial exhibit or [21] it's with the court. So every single exhibit [22] is still in existence. The ones that weren't

### Page 192

[1] entered into evidence he has, and the ones [2] that were, the court has, and he may have [3] some of the ones that were, but he can't — [4] he at that time — you know, I didn't ask him [5] to go one by one.

[6] BY MS. DEWEY:

[7] Q: Was there a copy kept of those?

[8] A: Copy where? In —

[9] Q: In the file.

[10] A: Let's see. What did he say?

[11] Q: It doesn't say.

[12] A: I don't know.

[13] Q: What about witness folders?

WILLIE JEFFERSON  v.
JANET RENO et al

BONNIE LEWIS GAY
June 10, 1999

[14] MR. SMORODIN: Objection, asked and [15] answered.

[16] BY MS. DEWEY:

[17] Q: That's right, you said those were [18] in the 12 boxes, and they make up two boxes, [19] according to Downing's [20] declaration.

[20] MR. SMORODIN: The copies and [21] drafts of which make up two boxes. I object [22] to the comment as misstating testimony and

---

**Page 193**

[1] the declaration.

[2] BY MS. DEWEY:

[3] Q: Is it your testimony, Ms. Gay, that [4] all of the witness folders are in the 12 [5] boxes?

[6] A: I don't think that I can answer [7] that question because I haven't looked at the [8] list of ever how many witnesses there were, [9] and I haven't looked at ever how many are in [10] the boxes, so I can't answer that question.

[11] Q: Directing your attention to number [12] 9, which is on page 7, first the Jencks [13] material. Do you know where that is?

[14] A: I don't know.

[15] MR. SMORODIN: I'm going to object [16] to the question as being unclear because [17] there's no way that Ms. Gay can know what [18] Mr. Downing meant by Jencks material.

[19] BY MS. DEWEY:

[20] Q: Have you asked Mr. Downing about [21] what's referred to there in the paragraph [22] number 9?

---

**Page 194**

[1] A: No.

[2] Q: Did you ever speak to Mr. Downing's [3] secretary, Cindy Cole?

[4] A: Yes.

[5] Q: What did she tell you about the [6] files?

[7] A: That she —

[8] MR. SMORODIN: Talking about the [9] criminal case files, correct?

[10] MS. DEWEY: Right. Sorry, criminal [11] case files.

[12] THE WITNESS: That she didn't know [13] about them because they were in, like, Kathy [14] Peluso's office at that time.

[15] BY MS. DEWEY:

[16] Q: Did she —

[17] A: And somebody else had helped — [18] I see, the secretaries don't do the same things [19] that the paralegals do, and she hadn't really [20] been very involved.

[21] Q: Did she handle Mr. Downing's files [22] in relation to the Willie Jefferson

---

matter?

---

**Page 195**

[1] A: I don't know. I doubt it but I [2] don't know.

[3] Q: The 12 boxes that you sent to us of [4] Jefferson documents, did you send those same [5] 12 boxes to Mr. Jefferson?

[6] A: No.

[7] Q: Why not?

[8] A: Because I can't afford to make but [9] one copy. I already paid $1,080 for what I [10] made.

[11] Q: Have you seen the court order [12] requiring that you send Mr. Jefferson a copy [13] of those 12 boxes?

[14] A: I've seen the order, and I don't [15] think it makes any sense to make two boxes — [16] I mean, two copies of everything.

[17] Q: So you just made the decision not [18] to follow the court order?

[19] A: Well, my boss told me to make one [20] set and that any reasonable attorneys would [21] find that sufficient.

[22] Q: Was that Mr. Frazier that told you

---

**Page 196**

[1] that?

[2] A: No.

[3] Q: Who told you that?

[4] A: Jane Bondurant.

[5] Q: Who is she?

[6] A: She's the operations supervisor, so [7] if I need money I have to ask her for it.

[8] Q: Was she aware that there was a [9] court order requiring —

[10] A: Yes, she was.

[11] Q: Had you informed Mr. Smorodin [12] that you had decided not to mail Mr. Jefferson [13] documents?

[14] A: Yes.

[15] MR. SMORODIN: Objection. I object [16] and instruct the witness not to answer that, [17] for what it's worth.

[18] BY MS. DEWEY:

[19] Q: When you spoke to Ms. Cole, who's [20] Mr. Downing's secretary, did you ask her if [21] she kept indexes of any of the criminal files [22] in the Jefferson matter?

---

**Page 197**

[1] MR. SMORODIN: I'm sorry, was that [2] Ms. Cole?

[3] MS. DEWEY: Ms. Cole.

[4] MR. SMORODIN: Excuse me.

[5] THE WITNESS: It was my [6] understanding that none existed, so why [7] would I ask her?

[8] BY MS. DEWEY:

[9] Q: Because —

---

[10] A: I had a very, very short [11] conversation with Ms. Cole. She told me she [12] didn't know anything about this, so why am I [13] going to ask her questions when she tells me [14] she doesn't know anything about it?

[15] Q: Ms. Gay, based on your efforts to [16] date, what in your opinion needs to be done [17] to reconstruct the destroyed files?

[18] A: I would say that whatever was [19] originally in them from the St. Petersburg [20] Police Department; however, I believe after [21] reviewing the FOIA requests that [22] Mr. Jefferson already has a copy of all those

---

**Page 198**

[1] things and that he paid for it already.

[2] Q: How do you know that?

[3] A: Because I looked at the FOIA [4] requests.

[5] Q: How do you know what Mr. Jefferson [6] received?

[7] A: Because he paid and I saw letters [8] that he wrote back.

[9] MR. SMORODIN: Can I interject? [10] I'm not coaching the witness, but maybe this [11] would be perceived as that, but I would [12] suggest respectfully to counsel to ask which [13] FOIA request Ms. Gay's talking about.

[14] BY MS. DEWEY:

[15] Q: Which FOIA request are you [16] referring to?

[17] A: I was referring to the 26 FOIA [18] requests which Mr. Jefferson made of the [19] St. Petersburg Police Department.

[20] Q: So you're not referring to the [21] matter that we're here about today?

[22] A: Yeah, I am. It's the same

---

**Page 199**

[1] documents.

[2] Q: But different request, is that [3] correct, or requests?

[4] A: Yeah. Yeah, but it's the same [5] documents.

[6] MR. SMORODIN: Go off the record [7] for a second?

[8] (Discussion off the record)

[9] MS. DEWEY: Let's take a [10] couple-minute break so we can talk to [11] Mr. Jefferson, and then we should be able to [12] wrap up.

[13] (Recess)

[14] MS. DEWEY: Mr. Jefferson, our [15] client, is no longer with us by telephone.

[16] MR. SMORODIN: Through no fault of [17] the United States.

[18] MS. DEWEY: Right.

[19] BY MS. DEWEY:

[20] Q: Ms. Gay, is it your belief or your [21] feeling that you have no obligation to review [22] the 12 boxes that were produced to us to

---

Page 200

[1] figure out what in there was purged by [2] Mr. Downing?

[3] A: Well, what's in the 12 boxes wasn't [4] purged by anybody.

[5] Q: I mean duplicates. What in the 12 [6] boxes was a copy that was kept and so that [7] other copies of it were purged by [8] Mr. Downing?

[9] A: I don't think I could possibly know [10] as a fact.

[11] Q: Have you made any efforts in that [12] regard?

[13] A: I have worked with these documents, [14] with the list, with the whole project, as I [15] told you, at least 200 hours, which means I'm [16] quite familiar with most everything.

[17] Q: Right. But have you spoken with [18] Mr. Downing to try to figure out what in the [19] 12 boxes was a duplicate of something that he [20] purged? Have you worked with him on this?

[21] A: Was a duplicate? I have actually [22] made a point of not speaking with Mr. Downing

---

Page 201

[1] since we were both noticed for depositions in [2] this case because I thought that it was [3] legally inappropriate.

[4] Q: Well, prior to that did you work [5] with Mr. Downing at all to try to figure out [6] what in the 12 boxes that were not destroyed [7] represents a duplicate of documents that he [8] did destroy?

[9] A: Yes. I mean, I didn't go through [10] document by document, but I have spoken with [11] him many times —

[12] (Interruption)

[13] MS. DEWEY: Hello, Mr. Jefferson. [14] We've started again. Glad to have you back. [15] Sorry about that.

[16] BY MS. DEWEY:

[17] Q: I'm sorry, Ms. Gay. Continue. You [18] have made efforts, you said, or you haven't?

[19] A: I've spoken with Mr. Downing [20] regarding this whole matter on a number of [21] occasions prior to the time we were both [22] noticed for depositions. I have made a point

---

Page 202

[1] of not speaking with him since then.

[2] Q: I understand. What sort of [3] methodology have you used to try to figure [4] out, along with working with Mr. Downing, [5] what in the 12 boxes

represents a duplicate [6] of something that was destroyed by him?

[7] A: I don't understand your question. [8] It's my understanding that everything that [9] was destroyed were duplicates of what's in [10] the box.

[11] Q: So you just take that as an [12] assumption. I mean —

[13] MR. SMORODIN: Objection. I think [14] that misstates the witness' testimony. I [15] don't think she said she assumed it.

[16] BY MS. DEWEY:

[17] Q: What did you say, then?

[18] A: Maybe you want to read back what I [19] said. I don't know because I don't remember [20] the question.

[21] Q: Are you taking Mr. Downing's [22] representation to you that everything in the

---

Page 203

[1] 12 boxes represents a duplicate of something [2] he destroyed at face value, or are you doing [3] your own independent investigation of this?

[4] A: We've been doing our own [5] independent investigation of this matter.

[6] Q: And how are you going about doing [7] it?

[8] A: How? I think I've answered that [9] question.

[10] Q: You said before you have documents [11] in your office. Are the documents in your [12] office what is in Appendix B, which is the [13] Vaughn index? Is that what's in your office?

[14] A: No.

[15] Q: What's in your office?

[16] A: I don't know what Appendix B is.

[17] Q: It's the Vaughn index. It's what's [18] withheld, right?

[19] A: Yeah, right. We have what's [20] withheld, sure.

[21] Q: So the documents on that [22] are what's in your office?

---

Page 204

[1] MR. SMORODIN: With respect to [2] Willie Jefferson.

[3] BY MS. DEWEY:

[4] Q: Right, with respect to Willie [5] Jefferson?

[6] A: Yeah.

[7] Q: Do you have an index of what's in [8] your office with respect to Mr. Jefferson?

[9] A: Yeah, we do.

[10] Q: Is that it? Is it the Vaughn [11] index?

[12] A: We've — the Vaughn index? Well, [13] the Vaughn index is — oh, go ahead.

[14] MR. SMORODIN: The Vaughn index

is [15] Appendix B, correct?

[16] MS. DEWEY: Correct.

[17] MR. SMORODIN: And then there's [18] Appendix A, which is attached to the October [19] 1 filing of Ms. Gay's supplemental [20] declaration.

[21] MS. YESNER: Both Appendix A and [22] Appendix B were attached. Appendix B is the

---

Page 205

[1] Vaughn index of the withheld documents?

[2] THE WITNESS: Yes.

[3] BY MS. DEWEY:

[4] Q: Is that what's in your office?

[5] A: What's in my office?

[6] Q: The documents listed on the Vaughn [7] index which is Appendix B which was attached [8] to your declaration, is that an index of the [9] documents now sitting in your office?

[10] A: No, that's only a portion. The [11] other documents, everything that is listed on [12] the index is in my office.

[13] Q: What index?

[14] A: Appendix A.

[15] Q: Do you have documents in addition [16] to Appendix A and Appendix B in your office?

[17] MR. SMORODIN: Regarding Willie [18] Jefferson.

[19] BY MS. DEWEY:

[20] Q: Regarding Willie Jefferson.

[21] MR. SMORODIN: Objection. I mean, [22] I will represent to counsel that she has

---

Page 206

[1] e-mails and letters from me, for instance, [2] but I think your question, to be fair, was [3] not intending to get to that information.

[4] MS. DEWEY: That's correct.

[5] MR. SMORODIN: But I think the [6] criminal case materials, not our internal.

[7] THE WITNESS: If we have any [8] additional materials, they were items created [9] after the date of this appendix because there [10] were some appeals. There are a few little [11] items, and I understand — I don't know [12] whether — I know that we gave you anything [13] that we thought was relevant but probably [14] — I don't know how many pages or even for a [15] fact that we do because I know we have [16] everything that's on these indexes. There [17] may be a few more documents that were created [18] after the index was made.

[19] MR. SMORODIN: To clarify that, I [20] believe that there were criminal appeals or [21] habeas matters, and those came up to us, and [22] I don't remember what my

---

WILLIE JEFFERSON  v.
JANET RENO et al

BONNIE LEWIS GAY
June 10, 1999

instructions were to

Page 207

[1] EOUSA as to whether we produce them to you. [2] They're clearly not responsive because [3] Mr. Jefferson couldn't have asked for things [4] that weren't created yet, but I think that's [5] the category of documents that I'm aware of. [6] I don't know that there's a dispute about [7] those, but that's fair.

[8] BY MS. DEWEY:

[9] Q: Is there anything else?

[10] A: No, that's what I was referring to.

[11] Q: Is there anything else in your [12] office beyond that?

[13] A: Not that I know about. I think the [14] answer's no.

[15] Q: So, just to clarify, you don't have [16] any documents, for example, in your office [17] relating to Willie Jefferson that were [18] produced to you by the St. Petersburg Police [19] Department in response to your efforts to [20] reconstruct the file?

[21] MR. SMORODIN: Objection.  Other [22] than those we've produced?

Page 208

[1] MS. DEWEY: Yes.

[2] MR. SMORODIN: Because we have [3] produced documents that we received from [4] St. Petersburg.

[5] MS. DEWEY: Right.

[6] THE WITNESS: Wait a minute. That [7] was created — I don't know.

[8] MR. SMORODIN: Ms. Gay, do you have [9] any documents in your office, not including [10] attorney-client or attorney work product, but [11] I think the question is specifically do you [12] have anything in your office from [13] St. Petersburg that we haven't produced to [14] the plaintiff's counsel?

[15] THE WITNESS: Yes, I have a listing [16] of the computer — what's on the computer.

[17] BY MS. DEWEY:

[18] Q: Anything else?

[19] A: But that was created after this [20] time. No, nothing else.

[21] Q: Have you tried to find out, based [22] on that list that St. Petersburg provided you

Page 209

[1] of what's on the computer, what out of that [2] list would be documents that would [3] reconstruct what has been destroyed out of [4] the Jefferson files?

[5] A: Well, probably all the things that [6] we've told you that they had from the [7] beginning and they still have.

[8] Q: I don't know if that really answers

[9] my question, but maybe I'll ask it again. [10] They provided you a list of what's on their [11] computer, right? That's what you just said?

[12] A: Yeah.

[13] Q: St. Petersburg? Have you made any [14] efforts based on reviewing that list to [15] contact St. Petersburg and ask for certain [16] things that you think —

[17] A: That was provided to me [18] simultaneously with the time they said I [19] would not be given anything else.

[20] Q: Have you shown that list to [21] Downing?

[22] A: Yes.

Page 210

[1] Q: And has he been able to tell you [2] what from that list was what he destroyed?

[3] A: I don't know that I asked him that [4] question.

[5] Q: Then why did you show it to him? [6] Then why else would you share that with him [7] if it wasn't to try to reconstruct the file?

[8] A: That's privileged information.

[9] MR. SMORODIN: I object to [10] answering the question. Can I confer with [11] my client?

[12] MS. YESNER: Yes, please.

[13] (Witness conferred with counsel)

[14] MR. SMORODIN: The objection is [15] that — well, wait a minute.

[16] (Witness conferred with counsel)

[17] MR. SMORODIN: I'm going to [18] withdraw my objection. You can answer the [19] question.

[20] THE WITNESS: Okay, I talked with [21] Mr. Downing about whether it would be [22] appropriate to release the document.

Page 211

[1] BY MS. DEWEY:

[2] Q: To release what document?

[3] A: The list I have of the computer [4] files. Isn't that what we're talking about?

[5] Q: The question was if you —

[6] MR. SMORODIN: No. Actually, just [7] so that the record is clear, there have been [8] a couple of questions, but the question to [9] which I asserted privilege after Ms. Gay [10] indicated it was privileged was what was the [11] conversation between Ms. Gay and Mr. Downing [12] about, and she didn't want to answer it at [13] first. We conferred and she's indicated what [14] the conversation was about. I mean, you're [15] free to ask other questions, but I just want [16] to make sure that we understand what my [17] objection was to and what was withdrawn.

[18] MS. YESNER: I don't understand. [19] Was she representing Mr. Downing as his [20] counsel?

[21] MR. SMORODIN: No, the objection [22] that I've withdrawn went to law enforcement

Page 212

[1] privilege based on the information contained [2] on this document. It was not attorney- [3] client, and frankly I didn't know what [4] Ms. Gay was talking about at first and that's [5] why we conferred.

[6] BY MS. DEWEY:

[7] Q: My question is you shared this list [8] of what's on the St. Petersburg computer [9] files with Mr. Downing. When you did that, [10] did you ask Mr. Downing, can you [11] tell me what on this list represents [12] documents that you destroyed?

[13] A: No.

[14] Q: I'm going to try to wrap things up [15] here. It's true that you have essentially [16] done nothing to reconstruct the files or to [17] review the 12 boxes that you have to help us [18] determine —

[19] A: No, that is not true, and I really [20] resent your trying to make that kind of a [21] statement when I have not only spent 200 [22] hours working with this, but I've also spent

Page 213

[1] five and a half hours today trying to answer [2] your questions.

[3] Q: Do you know why we still don't have [4] a reconstructed file, then? .

[5] A: Because I cannot produce a [6] reconstructed file for you. That is why.

[7] Q: What do you suggest we do from [8] here, then? How are we ever going to [9] reconstruct this file?

[10] A: We've done all we can do.

[11] Q: Can you tell us where in Appendix B [12] attached to your declaration the purged files [13] are?

[14] MR. SMORODIN: Objection.

[15] THE WITNESS: No, I can't. I [16] wasn't there.

[17] BY MS. DEWEY:

[18] Q: Ms. Gay, in your opinion, as now [19] the senior counsel and before the assistant [20] director and before that the attorney in [21] charge of the Executive Office handling FOIA [22] matters, how do you believe this matter has

Page 214

[1] been handled concerning Mr. Jefferson, if you [2] had to an offer an opinion?

[3] A: How do I believe it's been handled? [4] I believe it's been handled the best

that it [5] could be under the circumstances.

[6] **Q:** And what do you mean by "under the [7] circumstances"?

[8] **A:** Well, you know all the facts that I [9] know. I cannot recreate pieces of paper that [10] were purged. The only thing I can do is what [11] I've done.

[12] **Q:** What in your opinion went wrong in [13] this case?

[14] **MR. SMORODIN:** Objection, but you [15] can answer, Ms. Gay.

[16] **THE WITNESS:** Pardon?

[17] **MR. SMORODIN:** You can answer. I'm [18] sorry.

[19] **THE WITNESS:** I think it was a [20] simple misunderstanding between Belinda Brown [21] and Jeffrey Downing as to what the word [22] "appeal is completed" meant.

---
Page 215

[1] **BY MS. DEWEY:**

[2] **Q:** Do you know if Mr. Downing ever [3] called your office to get advice on whether [4] he could purge his files?

[5] **A:** I don't know.

[6] **Q:** Do you know if Mr. Downing ever [7] checked on the status of Mr. Jefferson's [8] appeal before he purged his files, his [9] criminal appeal? Excuse me.

[10] **A:** I don't know.

[11] **Q:** Have you been reprimanded at all, [12] Ms. Gay, for your handling of this matter?

[13] **A:** No. I'm, like, at a loss to think [14] why you would think to even ask such a [15] question.

[16] **Q:** Do you consider yourself in [17] contempt of court?

[18] **A:** No.

[19] **Q:** What do you suggest should be done [20] in the future to prevent such purging of [21] files?

[22] **A:** What I suggest is that every

---
Page 216

[1] assistant U.S. Attorney be made to have FOIA [2] and privacy training on an annual basis and [3] that they have to sign in that they've had [4] the training, just like they do on ethics and [5] other things.

[6] **Q:** Do you have any idea why the way [7] things are currently set up assistant United [8] States Attorneys are given such discretion on [9] the initial determination of the 7-A [10] checklist without training on FOIA?

[11] **A:** The thing is they are speaking as [12] to the facts of their case. John and I are [13] making the determinations with respect to [14] whether that's sufficient to meet 7-A [15] criteria, and I would — I'm

going to go on [16] to say that I think that John Boseker and I [17] are probably the world experts on 7-A.

[18] **Q:** Why do you think the court kept [19] coming back and asking for more detail?

[20] **A:** I am totally perplexed because [21] under the law the second declaration should [22] have been sufficient. It is for all of the

---
Page 217

[1] other judges that we've had 7-As before.

[2] **MS. DEWEY:** I think that's it. [3] Thank you.

[4] **MR. SMORODIN:** Thank you.

[5] (Whereupon, at 6:21 p.m., the [6] deposition of BONNIE LEWIS GAY [7] was adjourned.)

**WILLIE JEFFERSON    v.**
**JANET RENO et al**

**BONNIE LEWIS GAY**
**June 10, 1999**

## $

**$1,080** 195:9

## 0

**021A** 74:13

## 1

**1** 56:7, 8, 18; 60:9; 64:4;
85:20; 204:19
**10** 167:21; 190:21
**100** 30:19
**100-percent** 121:10
**1001** 67:21, 22
**10th** 17:4
**11** 191:16
**11/94** 67:11
**12** 126:19; 140:17, 20;
162:1; 163:6; 164:7;
175:16; 176:4; 182:5;
192:18; 193:4; 195:3, 5,
13; 199:22; 200:3, 5, 19;
201:6; 202:5; 203:1;
212:17
**13** 67:2; 78:5; 83:15;
190:14
**14** 140:21
**15** 167:21; 178:18; 189:17
**150** 18:17; 20:16; 21:9;
35:1
**16** 147:10; 164:10; 165:4;
182:16
**16.10** 133:1; 135:18;
137:17
**160** 29:5
**1610** 135:21
**170** 180:16
**18** 67:19; 69:7; 127:22;
145:20; 148:4; 180:18
**1800** 18:4; 29:4
**1817** 68:1
**19** 16:5
**1962** 8:10, 16
**1964** 9:6
**1968** 10:4
**1969** 10:3
**1970** 10:3; 11:3
**1971** 10:22
**1974** 11:16, 17
**1977** 13:8
**1980** 13:21
**1981** 16:5
**1984** 15:1, 4; 16:22
**1986** 131:14
**1988** 16:6
**1989** 16:22; 17:4; 33:9
**1990** 91:7
**1994** 64:12
**1995** 50:6; 75:3; 91:3

**1996** 24:14; 96:14; 137:4
**1997** 27:5; 48:20; 103:4;
116:22; 117:11; 118:4;
137:22; 142:1; 148:10;
149:15
**1998** 90:16; 137:9
**1999** 178:18; 189:17

## 2

**2** 60:1, 3, 7, 19, 21; 61:1,
1, 4; 65:2, 3, 4, 5; 73:1, 7,
21; 75:13, 21, 21; 77:9, 9;
78:15; 81:5, 5; 82:14, 15;
85:5; 106:16, 16
**2,000** 180:20; 181:2
**20** 146:3
**200** 180:21; 200:15;
212:21
**20530** 4:15
**22** 21:1; 62:13
**220** 180:15
**24** 157:20; 162:5
**25** 50:6; 166:12
**2517** 180:18
**26** 198:17
**28** 135:18, 21
**29** 75:3

## 3

**3** 74:5, 6; 79:22; 84:11;
85:1, 21; 90:1; 95:7; 103:4
**30** 142:7
**302s** 83:22
**34** 13:17
**35** 69:5; 70:15
**350** 30:13, 19
**37** 29:7

## 4

**4** 80:7; 89:1, 2, 21; 95:16
**4,000** 29:5, 18; 50:4
**40** 39:8

## 5

**5** 125:11, 12, 13, 17;
126:16; 129:1; 181:10;
183:15; 185:9, 21; 188:17
**5/95** 74:13
**50** 30:22; 104:20; 180:16
**500** 72:8

## 6

**6** 129:21, 22; 130:4; 181:9
**60** 142:8, 9
**600** 4:14; 19:3
**601** 4:14

**65** 152:21
**6:21** 217:5

## 7

**7** 97:16; 132:15, 16, 21;
135:5; 190:22; 191:1;
193:12
**7-A** 23:5; 43:19; 44:14,
18; 45:5, 6; 46:16; 48:3;
51:12; 52:1, 2, 4; 64:21,
22; 65:11, 15; 72:18, 22;
73:20; 82:14; 108:9;
109:22; 216:9, 14, 17
**7-As** 217:1
**7/29/94** 77:13
**7100** 4:15; 19:3
**72** 104:18

## 8

**8** 190:14; 191:16
**8-A** 180:9
**80** 13:21; 14:1
**84** 17:1
**88** 155:16, 17
**89** 17:1, 2, 21; 18:4; 25:9
**8th** 17:3

## 9

**9** 27:11; 140:20; 193:12,
22
**93** 20:12; 131:13
**94** 155:18
**95** 50:1; 51:11; 54:18;
74:1, 2; 75:2; 84:16, 18;
96:2; 149:22; 155:18
**96** 25:16; 26:5, 21; 48:14;
96:2, 3, 10; 97:6, 18, 21;
98:10; 107:1, 3; 110:8;
113:6; 148:6
**97** 25:18; 27:12; 100:6,
10, 15; 101:11; 113:9;
114:9; 118:18; 137:6, 7;
149:21
**98** 147:12, 13; 148:6
**99** 25:20; 189:6; 190:7
**9th** 17:3

## A

**ability** 187:2
**able** 42:22; 53:13; 70:18;
95:3; 169:9; 199:11; 210:1
**accept** 68:14; 92:15
**accepted** 9:1
**access** 53:19; 166:4, 9
**accompanied** 108:1
**accompany** 109:15
**accordance** 31:13
**according** 192:19

**acknowledged** 92:2
**acronym** 31:7
**across** 93:16
**Act** 14:6; 16:11, 12, 12,
13; 19:18; 80:21; 85:14
**acting** 25:17; 26:6, 10,
20; 27:5; 28:6
**action** 87:19
**actions** 86:13; 87:7
**active** 38:8
**activities** 87:7
**acts** 13:1
**actual** 25:4
**actually** 4:17; 9:15; 10:9,
18; 11:2, 14, 22; 12:10;
17:11, 15; 23:7; 27:10, 13,
21; 31:4; 37:14; 39:6; 43:4,
9; 67:9; 79:8; 91:6; 92:16;
101:18; 106:18; 145:19;
147:7; 170:16; 176:16;
200:21; 211:6
**added** 112:4
**addition** 7:1; 16:2;
205:15
**additional** 27:22; 28:2;
117:15; 206:8
**address** 4:12, 14
**addressed** 55:6
**adjourned** 217:7
**administrative** 12:20;
19:17; 46:9, 11, 12; 96:7;
103:17; 119:8; 155:4
**advanced** 146:1; 147:2
**advice** 20:5, 8; 34:11;
40:8, 12, 22; 150:7; 215:3
**advise** 170:1
**advised** 50:6; 151:2, 9;
166:17; 171:1
**Advisory** 16:13
**advocacy** 146:1
**affidavit** 23:7; 64:8;
184:15
**affirmed** 96:3
**afford** 52:7; 195:8
**again** 15:1; 38:14; 58:7;
59:16; 60:7; 85:2; 102:14;
122:12; 125:2; 156:19;
158:17; 201:14; 209:9
**agencies** 12:5, 14
**agency** 17:14; 32:13, 14
**ago** 6:15; 127:6; 139:17;
182:20
**agree** 30:17; 33:5; 35:20
**agreed** 157:15
**ahead** 38:19; 42:4; 138:9;
204:13
**Alcohol** 12:14
**allowed** 146:2
**almost** 64:8; 69:22;
104:22
**along** 24:19; 44:7;
138:21; 202:4
**altogether** 16:7
**always** 33:9; 65:5; 155:6

**ambiguous** 110:18
**American** 8:6, 9; 9:2
**amount** 47:19; 152:17;
153:16
**analyst** 19:4
**and/or** 66:20
**Anderson** 131:3
**annual** 216:2
**answer's** 44:20, 22;
167:3; 207:14
**answered** 31:16; 128:14;
173:19; 178:6; 189:11;
192:15; 203:8
**answerer** 110:16
**antitrust** 32:16
**AO** 103:14, 16; 104:6, 12;
119:8
**apologize** 80:13
**apparently** 116:20
**appeal** 19:22; 36:17;
37:5; 38:11, 12, 13, 16;
39:13; 60:16; 65:7; 82:6;
96:8; 99:15; 112:3;
137:19; 139:19; 142:5;
143:5, 8, 9, 16, 17, 22;
144:1, 2, 13; 150:15, 16,
17; 151:12, 13, 14; 153:3;
214:22; 215:8, 9
**appealed** 96:2
**appeals** 12:13, 20; 19:17;
46:12; 61:16; 69:12;
77:12; 78:11; 80:6;
206:10, 20
**appearance** 121:11
**appeared** 103:6
**appears** 60:8; 69:18;
149:8
**appellate** 12:10; 40:4
**appendix** 41:18; 101:13,
13, 14, 21; 102:3, 5, 8, 10,
12, 15, 17; 105:1, 3, 4, 20;
118:19; 138:22; 162:19;
178:8; 180:6; 182:21;
203:12, 16; 204:15, 18, 21,
22, 22; 205:7, 14, 16, 16;
206:9; 213:11
**apples** 153:4
**applicable** 66:17; 79:2;
80:4, 10
**applied** 91:2
**applies** 57:10; 58:7;
64:22; 79:2
**apply** 23:11; 64:20
**approach** 113:10
**appropriate** 22:21, 22;
32:6; 62:18; 63:16; 89:6,
11, 17; 105:9, 18; 116:19;
210:22
**approval** 106:6
**approve** 116:2
**approximate** 31:3
**approximately** 10:3, 22;
11:16; 16:5; 20:12; 29:18;
30:19; 140:21
**April** 27:11, 12; 96:3;

118:3; 131:14
**April-May** 139:16
**area** 6:1; 62:20; 161:2, 6
**areas** 13:17; 14:8; 21:10; 87:10
**argumentative** 175:11
**arise** 19:17; 20:3
**around** 24:10; 128:9; 140:17
**arrive** 7:20
**articulate** 35:19
**aside** 153:19
**asserted** 211:9
**asserting** 108:9
**assign** 42:15; 96:20
**assigned** 11:22; 19:4, 7; 63:9, 10; 99:10, 11, 21
**assistance** 40:9; 67:5
**assistant** 15:6; 16:20; 23:4; 25:17, 19; 26:6, 10, 21; 27:7, 8, 19; 28:4, 6, 15; 35:15; 40:9; 43:18; 48:7; 61:13, 15; 63:10; 77:4; 78:6; 84:3; 109:10; 116:3; 123:15; 129:4, 7; 145:15; 146:10, 16; 147:15; 213:19; 216:1, 7
**assistants** 146:22; 147:8
**assisting** 157:12
**assume** 108:19; 123:6; 130:18; 136:16; 145:6; 154:13; 162:20
**assumed** 122:22; 138:21; 202:15
**assuming** 23:13; 143:14; 144:1; 150:3
**assumption** 202:12
**assure** 31:12
**attached** 90:5; 101:12; 163:5; 204:18, 22; 205:7; 213:12
**attachment** 44:5
**attempts** 170:11
**attend** 147:17
**attended** 148:8, 12
**attends** 129:12; 146:8, 12
**attention** 193:11
**attorney** 5:3; 11:5, 6; 17:4, 22; 18:2; 19:11; 23:4; 24:4, 8, 15; 25:2, 8, 16; 26:5, 10; 27:1, 11, 13, 14; 29:9; 33:19; 35:16; 43:19; 61:14, 15; 63:10, 12, 21; 68:10, 18; 78:7; 83:14; 109:11; 116:3; 123:15; 126:2; 131:3; 146:17; 164:4; 208:10; 212:2; 213:20; 216:1
**Attorney's** 20:12; 50:8; 51:7, 9, 15; 52:10; 56:20; 60:11; 70:14; 92:8; 94:8; 99:19; 108:5; 109:1; 131:1, 12; 142:17; 148:1; 158:7; 160:18; 191:13
**attorney-client** 5:6; 86:8;

208:10
**Attorneys** 15:9, 17; 17:6; 18:15; 20:6, 9, 20; 22:6, 8, 13; 26:16, 17; 28:13; 34:22; 40:10; 90:1; 129:5, 8; 130:7; 145:4, 16; 146:10; 147:16; 195:20; 216:8
**audience** 146:20
**August** 100:6, 10, 15; 116:22; 117:11
**AUSA** 35:16
**AUSAs** 35:17
**author** 128:4
**authorizes** 65:19
**auto** 7:3
**available** 4:21; 41:20; 46:20; 69:22; 71:16; 72:2
**average** 30:4
**aware** 100:4, 12; 118:2; 124:12; 125:7; 196:8; 207:5
**away** 131:22

**B**

B 57:4, 4; 58:4; 93:14; 101:13, 14; 102:8, 10, 12; 203:12, 16; 204:15, 22, 22; 205:7, 16; 213:11
**b)(3** 180:18
**b)(5** 41:11
**b)(7)(A** 65:19
**b)(7)(C** 180:18
**baby** 9:21
**bachelor** 8:13
**back** 23:14; 25:7; 36:2; 40:6; 43:17; 51:5; 54:13; 55:13, 20; 56:16; 57:21; 58:12; 62:22; 68:13; 70:4; 72:1, 3; 73:15, 22; 74:2, 16; 75:12; 78:15; 81:7; 82:1; 90:4; 92:6; 104:2; 110:18; 111:16, 20; 112:16; 119:3; 133:14; 140:3; 150:11; 165:14; 171:18; 181:6; 184:19; 191:9; 198:8; 201:14; 202:18; 216:19
**background** 8:3, 5; 99:12
**backlog** 18:5
**bad** 120:12, 15, 19
**bar** 5:3
**based** 86:18; 197:15; 208:21; 209:14; 212:1
**basic** 48:10
**basically** 120:6; 174:2
**basis** 40:7; 132:1; 216:2
**became** 10:9; 11:14; 13:10; 17:4, 21; 25:2, 13, 17, 18, 20; 26:6, 20; 27:5, 16; 124:12
**began** 10:6; 16:3, 4; 47:10

**beginning** 43:11; 48:10, 20; 49:17; 100:3; 111:9; 119:16; 145:9; 149:4; 209:7
**behind** 18:9
**belief** 199:20
**Belinda** 54:5, 8; 62:1; 97:17; 98:2, 6, 6; 143:6; 148:7, 9, 14; 149:3, 16; 150:3; 154:7; 160:17; 187:7; 214:20
**belong** 32:11
**Besides** 52:4
**best** 187:1; 214:4
**better** 7:22; 88:20; 101:8; 107:9
**beyond** 86:6; 207:12
**blg** 13:4; 158:4, 9, 15
**binder** 70:10; 130:5; 180:10
**bit** 8:3; 9:7; 34:18; 38:18
**blank** 57:20
**Bondurant** 196:4
**BONNIE** 4:3, 13; 130:19, 21; 217:6
**book** 125:19, 20; 126:21; 127:1, 11; 129:12
**books** 39:15
**BOP** 163:11
**Boseker** 24:4, 7; 26:18, 22; 30:1; 31:1; 33:15; 35:4; 42:11; 49:7; 112:13; 113:17; 216:16
**Boseker's** 96:19
**boss** 10:19; 11:21; 195:19
**both** 13:1; 30:1, 2; 73:6; 99:9, 15; 110:15; 118:20; 160:18; 201:1, 21; 204:21
**bottom** 57:2; 61:4; 85:20; 181:10; 190:22
**Boucher** 49:7, 8; 103:4; 118:21; 122:7; 140:11, 12
**Boucher's** 105:21
**box** 22:22; 46:19; 57:12; 69:21; 70:1; 71:15; 87:16, 17; 91:21; 92:1, 21; 93:15, 17; 94:5, 17; 95:6, 10; 96:19; 140:14, 14; 165:5; 180:9; 202:10
**boxes** 93:16; 103:12; 104:1, 17; 138:20; 139:1, 6, 7, 15; 140:5, 10, 22; 157:20; 162:1, 5; 163:7; 164:7, 16; 175:17; 176:4; 177:21; 182:5; 192:18, 18, 21; 193:5, 10; 195:3, 5, 13, 15; 199:22; 200:3, 6, 19; 201:6; 202:5; 203:1; 212:17
**branch** 20:21; 53:17, 20; 54:12; 93:17
**break** 6:5; 64:7; 81:21; 84:6; 106:9; 199:10
**breaks** 189:14
**briefly** 84:11

**brings** 116:22
**brought** 28:1
**Brown** 54:5, 8; 62:1; 97:17; 98:6; 141:19; 143:15; 144:2; 148:7, 9, 15; 149:3, 16; 150:4; 151:8; 153:2; 154:8; 160:17; 187:7; 214:20
**Bucella** 28:11
**budget** 21:2
**bugged** 111:19
**burden** 186:12, 14
**Bureau** 13:11, 12, 16, 20; 14:15
**Burnita** 9:13
**business** 110:12
**busy** 43:3

**C**

**call** 23:5; 40:18, 21, 21; 48:7; 57:12; 58:21; 64:3, 5; 102:13; 103:8; 119:15; 122:2; 142:20; 151:4; 160:10, 12
**called** 4:4; 19:12; 43:20; 104:8; 115:9; 119:18; 151:8; 159:11; 170:18; 215:3
**calls** 180:21; 181:3; 184:9, 10
**came** 7:15; 13:15; 25:7; 29:4, 6; 55:19; 56:1; 90:18; 103:4; 105:19; 111:16; 126:18; 130:5; 165:12; 206:21
**camera** 156:4
**can** 18:1; 31:14; 36:1, 16; 38:19; 47:15; 50:22; 51:22; 52:4; 53:20; 58:12; 59:7; 60:13; 61:6, 17; 62:13; 65:15; 66:19; 76:1; 77:4; 79:12; 80:8, 17; 83:10; 86:21; 88:14, 22; 90:19; 96:13; 98:19; 102:1, 22; 105:12; 106:9; 112:15; 124:20; 125:2, 11; 126:21; 127:9; 129:18; 132:14; 133:13; 134:21; 136:3; 145:18; 151:16; 155:5; 156:14; 158:14; 159:16; 160:16; 161:13; 163:16, 21, 22; 168:16; 175:11; 181:12; 186:9; 187:11, 12; 193:6, 17; 198:9; 199:10; 210:10, 18; 212:10; 213:10, 11; 214:10, 15, 17
**capacity** 13:7
**caps** 126:6
**care** 54:2; 63:15
**Carolina** 145:22
**case** 5:10; 6:14, 18; 7:4; 30:2; 35:8, 10, 16; 38:16, 22; 39:7, 15; 42:7, 15; 47:5, 5; 49:17; 51:12; 52:5; 53:21; 55:2, 15; 57:14, 16;

**briefs** 116:22
**brought** 28:1

58:15; 59:16; 61:14; 62:16, 19; 63:3, 5, 7, 18, 19, 19, 22; 64:21, 22; 66:14; 69:12, 22; 76:3, 4, 6, 11, 12, 22; 77:2, 4, 8, 12, 21; 78:3, 11; 79:3, 13, 21; 81:2; 83:2, 15; 84:4; 87:20, 20; 88:1, 6; 89:12; 90:11; 91:14; 93:18, 19; 94:3, 12, 14, 21; 97:9, 19; 100:5; 101:1; 109:11; 110:22; 111:3, 14; 115:8; 116:5, 7; 117:4; 124:9, 12, 14; 126:2; 138:17; 142:8; 144:5; 149:5; 151:5; 152:7; 153:7, 19; 157:9; 158:4; 194:9, 11; 201:2; 206:6; 214:13; 216:12
**cases** 14:5; 21:13, 14, 19; 29:5; 35:6, 6; 39:7; 43:8, 14, 15; 55:5; 57:11; 58:8; 66:17; 145:5; 154:16
**categorical** 45:7; 113:10; 115:14
**categorically** 82:16
**categories** 45:14; 81:21; 82:3; 84:6; 114:21; 115:14; 163:22; 175:4; 178:9, 11, 19; 185:4; 189:14; 190:11
**category** 45:12; 207:5
**cause** 77:5; 81:18; 83:2, 6, 20
**center** 103:21; 143:1; 151:1; 153:9, 11
**cert** 76:13, 14, 15
**cert's** 142:6
**certain** 86:13; 136:12; 156:22; 209:15
**certainly** 86:9; 90:19; 173:1
**certify** 35:10
**certiorari** 39:21; 76:20, 22; 144:9
**cetera** 12:16, 16; 24:20, 20; 30:18; 55:15; 102:21; 135:22; 181:12
**CFR** 135:11, 13, 18, 21
**change** 17:7, 9, 15, 17; 24:18; 25:11, 13; 29:14; 91:6
**changed** 53:2
**changes** 26:2; 116:17; 136:15
**changing** 136:13
**chapter** 126:19; 129:14
**characterizing** 117:10, 12
**charge** 17:4, 22; 18:2; 24:8, 15; 25:3, 8, 16; 26:5, 10; 72:9, 11; 161:1; 213:21
**chart** 90:7
**check** 22:22; 31:22; 32:4, 6; 46:19; 57:9, 17, 18; 58:15, 17; 59:20; 69:20; 71:15; 86:3; 120:2; 160:2
**checked** 60:14; 65:8, 9;

80:10; 85:19; 86:2; 87:17, 17; 215:7
**checklist** 23:6, 6; 35:5; 43:20; 44:15; 48:6; 61:9; 65:1; 66:4; 73:20, 20; 74:18; 75:19; 78:16; 81:6, 20; 82:14; 92:22; 93:4, 11, 13; 148:21, 22; 216:10
**checks** 57:19
**chief** 103:14; 104:7; 119:7; 166:16
**chiefs** 147:3, 3
**chronological** 70:22; 71:7; 111:10
**chronology** 27:4; 49:18; 74:2; 117:3
**Cindy** 194:3
**circuit** 69:12; 77:12; 78:10; 80:5
**circumstances** 86:11; 214:5, 7
**civil** 35:7, 7; 38:3; 62:18; 130:7; 146:1; 147:3
**clarify** 45:22; 157:5; 206:19; 207:15
**class** 148:5
**clear** 60:17; 108:4; 211:7
**clearly** 207:2
**clerk** 9:11; 24:22; 70:16
**clerkship** 9:14
**client** 199:15; 210:11; 212:3
**clippings** 66:20
**clips** 23:12; 46:21
**close** 30:6; 155:3
**closed** 55:15; 57:11, 13, 16; 58:8, 16; 59:16; 63:20; 66:17, 19; 75:18, 22, 22; 76:2, 3, 5, 9, 11, 12, 17; 77:1, 9, 16, 17, 19, 19, 22; 78:20, 22; 79:13; 80:1, 8, 17; 155:15
**closely** 101:2; 103:1
**closing** 130:18; 131:19
**co-defendant** 77:3; 143:18
**co-defendants** 67:2, 2; 76:18, 19; 78:6; 79:1; 180:12
**coach** 149:12
**coaching** 198:10
**Cole** 194:3; 196:19; 197:2, 3, 11
**collect** 73:17
**college** 8:5, 15, 20, 22; 9:2
**column** 57:4, 4, 4, 8, 10; 58:4; 59:8, 9
**columns** 56:4; 57:3, 17
**combined** 8:21
**coming** 186:19; 216:19
**comment** 192:22
**comments** 128:12
**Committee** 16:13

**committees** 15:14
**communicate** 54:12
**communication** 54:9; 55:16
**company** 10:7, 10, 13, 15
**compare** 167:14
**compared** 171:20
**compiled** 65:21
**complaint** 96:12, 17; 97:1; 98:16; 99:2, 4, 6, 21; 106:22; 107:2, 14, 15; 112:9
**complete** 55:12; 57:21; 58:2; 60:17; 62:10; 66:4; 151:17; 154:4; 174:21
**completed** 30:13; 51:13; 60:10; 61:9, 11, 18; 62:5; 64:9; 67:4, 6; 68:12; 74:1; 82:15; 214:22
**completely** 50:15
**comply** 5:9
**complying** 148:20
**computer** 10:6, 16, 21; 29:12; 62:20; 63:2; 169:4; 208:16, 16; 209:1, 11; 211:3; 212:8
**computers** 12:2, 7; 53:19; 169:1
**concept** 145:12
**concerned** 104:13; 126:10
**Concerning** 7:17; 40:10; 137:9; 170:15; 214:1
**conduct** 21:17
**confer** 210:10
**conference** 86:18
**conferred** 210:13, 16; 211:13; 212:5
**confidential** 105:14
**confirm** 84:17
**confused** 158:6; 183:1
**confusing** 78:21; 79:16, 18, 19, 20
**confusion** 78:14
**Congress** 12:3
**connection** 7:3
**consent** 88:15
**consider** 38:15; 65:12; 174:21; 215:16
**consideration** 190:3
**considered** 26:1; 38:22; 39:22
**construed** 88:15
**contact** 20:21; 21:4, 9; 22:2, 11, 12; 23:1, 2; 35:1; 52:9; 54:2, 15; 55:7, 17; 56:18; 58:6; 61:14, 22, 22; 73:14; 74:17; 119:7; 125:21; 127:21; 141:17, 22; 148:3; 149:7; 154:8; 159:3, 7; 160:6, 14; 209:15
**contacting** 94:9
**contacts** 18:17; 20:19; 21:1, 6, 8; 62:12; 94:6; 129:10, 11; 148:14

**contained** 135:17; 212:1
**containing** 180:10
**contempt** 215:17
**contents** 139:2
**context** 53:1
**continually** 91:5; 132:9
**Continue** 201:17
**continued** 14:18
**continuously** 16:18
**contributed** 159:22
**control** 174:12
**convenient** 17:19
**conversation** 109:17; 197:11; 211:11, 14
**conversations** 5:1; 110:4; 180:11; 181:12; 182:14; 185:7
**conviction** 38:6
**Cooke** 169:15, 22; 188:9, 10; 191:19
**Cooke's** 161:8
**cooperative** 120:5
**coordinate** 63:15, 20
**coordinator** 12:11; 52:13
**copies** 52:7, 8; 132:4, 10; 161:17; 167:8; 171:7; 178:22; 182:12, 14; 183:4; 184:3; 185:16, 18; 192:20; 195:16; 200:7
**Copy** 57:5; 58:4, 10; 59:4; 105:6; 118:11; 121:14, 20; 129:13; 133:21; 135:10, 13; 150:11; 153:8; 155:9; 157:6; 164:11; 168:5, 9, 9; 169:8; 175:15; 176:1, 2; 183:9, 16; 185:17, 19, 20; 186:8; 188:19; 191:7, 20; 192:7, 8; 195:9, 12; 197:22; 200:6
**copying** 188:5
**core** 158:1, 3
**correctly** 27:4; 82:13
**correlate** 95:10
**correspondence** 71:5
**COUNSEL** 4:7; 5:1, 15; 7:8, 12; 11:4; 13:10, 12, 19; 14:4; 21:3; 25:20; 27:16, 20; 29:1; 135:4; 136:4, 7; 164:9; 165:3; 182:15; 198:12; 205:22; 208:14; 210:13, 16; 211:20; 213:19
**counseling** 29:9
**counted** 147:10
**country** 20:13
**couple** 6:13; 17:12; 42:14; 48:22; 49:1; 56:21; 64:13; 108:7; 163:11; 170:19; 211:8
**couple-minute** 199:10
**course** 14:14; 15:16; 16:8, 9, 14; 23:10; 32:21; 42:12; 51:14; 75:10; 79:15; 94:16; 99:8; 104:13; 108:20; 110:11;

127:20, 21; 128:2; 129:11, 12; 147:5
**courses** 15:17; 16:1; 146:1, 22; 147:8
**court** 4:22; 9:12; 39:2, 22; 40:1; 44:3; 46:6, 8; 52:18; 53:12; 66:20; 69:12; 77:12; 78:10; 80:5; 95:15; 96:10, 12; 98:17; 99:5; 100:5; 107:1, 14; 112:9; 113:8, 8, 9; 114:12; 117:1, 10, 13; 118:8, 11; 124:8; 144:10; 156:4, 11; 158:18; 166:18, 21; 167:1; 170:10, 12; 172:19; 173:16, 19; 178:13; 182:17; 186:2, 7; 191:21; 192:2; 195:11, 18; 196:9; 215:17; 216:18
**court's** 5:9; 114:7; 115:12; 153:15
**courtesy** 104:8
**courts** 38:1; 39:13; 79:4, 7
**cover** 59:12; 79:7, 9
**created** 5:12; 64:12; 74:14; 206:8, 17; 207:4; 208:7, 19
**criminal** 35:6; 38:3, 16, 22; 39:20; 55:2; 62:19; 63:5; 67:1; 79:6; 103:14; 104:7; 111:3; 119:7; 130:7; 143:9, 10, 16, 16; 144:2; 145:3; 146:1; 147:3; 152:7; 153:7, 18; 158:4; 194:9, 10; 196:21; 206:6, 20; 215:9
**criteria** 216:15
**crystal** 50:17
**Culver** 164:5
**currently** 24:7; 30:7, 8, 10, 11; 39:19; 216:7
**curriculum** 15:13, 16
**cut** 127:9; 188:6

**D**

**D.C** 4:15; 8:7; 9:12; 36:22
**daily** 40:7; 132:1
**date** 26:18; 48:12; 50:3; 56:11; 117:7; 154:15; 197:16; 206:9
**dated** 50:6; 54:18; 75:1; 90:1, 16; 110:7; 178:18
**dates** 102:22
**daughter** 9:20
**Dave** 132:2
**David** 4:18
**day** 17:18; 18:7; 26:19; 40:14; 48:19; 58:21; 103:9; 104:2; 132:7; 150:18; 159:10
**days** 50:20; 51:1; 104:19; 142:7, 9, 10; 150:13, 14
**DEA** 160:20, 21
**deadlines** 51:4

**deal** 80:16; 145:14; 170:21
**death** 152:19
**December** 74:1, 1; 75:1, 3; 84:15, 18; 96:1
**decide** 99:10; 122:6
**decided** 76:20; 113:8; 156:21; 196:12
**decision** 36:15; 41:12, 15, 20; 59:4, 13; 62:18; 94:18; 156:13; 195:17
**decisions** 24:5
**declarant** 67:8
**declaration** 24:14; 42:22; 44:1, 2, 5, 8; 48:11, 17, 19; 64:8, 19; 65:12; 97:6; 101:4, 7, 11, 12; 107:2, 3, 8, 10, 20; 108:15; 109:4, 5, 14, 15, 21; 110:4, 7, 13; 113:4; 115:7, 11; 116:2, 9, 11, 16; 117:6; 118:3, 7, 18; 163:5, 22; 178:10, 17; 181:10; 185:1, 5; 188:18; 189:2, 3, 4, 5, 6, 13; 190:7; 192:19; 193:1; 204:20; 205:8; 213:12; 216:21
**declarations** 20:2; 31:6; 42:18, 19; 47:9; 114:14; 116:6
**declaratory** 67:10, 14
**declare** 67:16, 17
**Defendant** 38:5; 39:20; 76:5; 79:6; 81:3; 117:15; 165:16
**defendants** 83:15
**defense** 182:11
**definitely** 183:11
**definition** 80:22; 81:2; 138:8
**degree** 8:11, 21
**delegated** 33:14; 42:10
**deletions** 105:7
**deliberative** 41:12; 86:9
**delivery** 188:5
**demoted** 28:22
**denial** 84:12, 18; 85:1, 10; 88:9, 10; 89:18; 96:3; 155:8
**denied** 40:1; 78:1; 83:11; 94:21; 95:1, 22; 117:13; 155:9, 11
**deny** 94:19
**denying** 74:20
**Department** 4:19; 5:3, 5; 11:4, 15; 12:12, 13, 21; 13:2, 7, 14; 14:4; 15:6, 19; 16:20; 125:5; 127:8; 128:7, 16, 19; 134:11, 12; 135:16; 152:2; 165:13, 15; 166:4, 8, 11; 167:5; 168:18; 169:1, 14; 184:21; 188:14, 16; 190:16, 18; 191:5; 197:20; 198:19; 207:19
**depending** 42:14; 62:16

**depends** 131:20; 138:7
**deposed** 6:6, 9; 7:5
**deposition** 4:20, 21;
5:13; 7:17; 56:8; 60:3;
74:6; 86:7, 10, 20; 87:2;
88:1, 5, 13; 89:2, 5;
125:13; 129:22; 132:16;
133:9; 135:1; 217:6
**depositions** 6:12; 201:1,
22
**describe** 31:6, 14; 80:1
**describing** 126:14, 15;
146:9
**description** 66:3
**descriptions** 45:13, 16
**descriptive** 124:21
**designed** 10:7; 15:12
**designing** 128:1
**desk** 134:21
**destroy** 155:7; 201:8
**destroyed** 124:7; 140:2,
6, 22; 155:5; 162:10;
178:21; 197:17; 201:6;
202:6, 9; 203:2; 209:3;
210:2; 212:12
**detail** 31:15; 170:21;
216:19
**details** 54:2; 158:13
**determination** 19:9, 11,
12; 22:3, 5, 7; 31:22; 33:3,
10, 11, 12; 34:1; 35:18;
36:6, 11; 46:13; 81:1, 8;
82:5; 99:14; 173:12;
177:13; 216:9
**determinations** 12:19;
30:16; 31:12; 33:16; 34:6;
35:3; 67:3; 216:13
**determine** 34:20; 35:13;
37:1; 68:22; 69:1; 89:6;
139:6; 156:5, 12; 159:4;
212:18
**develop** 45:8
**developed** 16:8
**DEWEY** 4:8, 9; 6:2; 8:1;
30:9; 36:8, 13; 38:20;
40:16; 42:8; 44:16, 19;
46:14; 53:8; 56:6, 15;
59:15, 22; 60:5, 22; 68:2;
73:11, 19; 74:8; 86:17;
87:22; 88:22; 89:4, 19;
90:20, 22; 95:13, 21; 99:1;
102:16; 104:4; 105:11;
106:8, 13; 108:11, 13;
110:20; 112:20; 113:18;
114:5; 115:20; 117:18, 22;
118:16; 119:14; 123:20,
22; 124:10, 13; 125:10, 15;
127:15; 128:18; 129:20;
130:2, 15; 131:16; 132:14,
18; 133:12; 134:2; 135:19;
136:18; 137:1; 138:3;
140:9, 16; 141:3, 13;
146:13, 15; 147:21; 150:2;
162:14; 175:12; 180:19;
181:16, 21; 182:10; 183:8,
14; 184:8; 185:3, 13;
187:15, 20; 192:6, 16;

193:2, 19; 194:10, 15;
196:18; 197:3, 8; 198:14;
199:9, 14, 18, 19; 201:13,
16; 202:16; 204:3, 16;
205:3, 19; 206:4; 207:8;
208:1, 5, 17; 211:1; 212:6;
213:17; 215:1; 217:2
**dichotomy** 80:19
**difference** 27:18
**different** 12:5; 21:21;
55:19; 71:9; 77:18; 121:5;
127:19; 129:15, 15;
133:17; 135:7, 22; 136:2;
147:11; 153:22; 154:16;
172:18; 182:19; 183:2;
199:2
**difficulty** 36:5
**direct** 163:20
**directed** 87:11; 117:15;
166:19
**Directing** 193:11
**directives** 114:7
**directly** 189:21
**director** 10:9; 15:6;
16:21; 24:16; 25:17, 19;
26:7, 11, 13, 21; 27:6, 7, 8,
19; 28:5, 7, 10, 15, 22;
213:20
**disagree** 33:6; 35:21, 21;
81:14
**disappointed** 145:2
**disclosure** 65:22
**discovered** 149:6
**discovery** 87:11; 97:9;
134:3; 164:9; 165:3, 17
**discretion** 216:8
**discrimination** 14:5, 7, 7;
120:3, 8; 122:7, 7; 123:9;
130:8; 139:12; 151:19;
189:14
**discuss** 90:10; 94:7, 9;
139:2
**discussing** 7:19
**Discussion** 95:20;
98:22; 117:21; 141:2;
199:8
**disks** 169:10
**disposed** 137:18
**dispute** 108:10; 207:6
**disseminate** 41:9
**district** 9:12; 19:1; 35:8;
46:6, 7; 52:12; 55:3, 7, 9,
11; 94:6; 96:10; 98:16;
99:5; 100:4; 106:22;
112:2, 9; 113:8; 150:11
**districts** 93:1
**divide** 30:3
**divided** 29:13
**dividers** 180:17
**division** 119:7; 130:7
**divorce** 7:4
**divorces** 6:14
**document** 44:4; 47:20;
54:18; 55:11; 81:10, 12;
90:15; 102:1; 131:17;
155:13; 180:3; 191:17;
201:10, 10; 210:22; 211:2;
212:2

**documentation** 32:7;
47:21; 48:2
**documents** 19:8; 21:11;
23:14; 34:20; 35:12, 14;
37:1; 41:14; 45:11; 51:17;
52:1; 59:18; 66:21; 75:5;
79:11; 80:2; 81:13; 82:18;
83:1, 4, 13; 84:19; 89:13;
100:18; 101:9; 110:9, 13,
15, 17, 21; 111:3, 6, 12;
113:11; 115:15; 122:13,
15; 124:7; 126:1; 138:21;
140:6; 154:21; 155:20;
156:2, 7, 22; 157:1, 6;
162:2, 4, 10, 12; 163:6, 7,
8; 164:8, 19, 22; 165:2;
166:7, 21; 167:10; 168:17;
170:15; 172:9; 173:10;
175:4, 5; 178:10, 11, 19;
183:3; 188:4; 190:11;
195:4; 196:13; 199:1, 5;
200:13; 201:7; 203:10, 11,
21; 205:1, 6, 9, 15;
206:17; 207:5, 16; 208:3,
9; 209:2; 212:12
**DOJ** 91:16
**domain** 84:2
**done** 19:22; 22:18; 25:4;
33:9; 50:20; 77:1; 87:7;
173:13; 186:18; 197:16;
212:16; 213:10; 214:11;
215:19
**Donna** 28:11
**doubt** 195:1
**Douglas** 28:9
**down** 53:15; 54:1; 59:19;
61:4; 81:21; 84:6; 91:17,
21; 92:21; 93:15; 106:3, 7;
120:3, 8; 122:7, 7; 123:9;
130:8; 139:12; 151:19;
189:14
**Downing** 61:14; 64:1;
67:7; 68:8; 71:9; 73:5;
101:4; 103:6, 18; 104:7, 8;
109:4, 8; 112:7; 113:1;
114:18, 19; 115:1, 3, 6;
116:10; 118:2, 10; 119:1,
5, 9, 19; 120:10; 122:3;
123:7; 124:18; 126:11;
132:11; 133:15; 137:3;
138:4; 139:3, 5, 20;
143:14; 144:12; 145:9;
148:11; 150:4, 7; 151:9;
157:11; 158:20; 159:3, 7,
13; 160:7; 163:14; 166:1;
172:6; 174:4; 175:5, 14;
178:10; 187:6, 21, 22;
188:8, 12, 19; 189:20;
193:18, 20; 200:2, 8, 18,
22; 201:5, 19; 202:4;
209:21; 210:21; 211:11,
19; 212:9, 10, 10; 214:21;
215:2, 6
**Downing's** 67:5; 106:1,
16; 116:2, 8; 127:7; 141:4;
144:19; 163:21; 172:2;
178:17; 181:9; 184:15, 22;
185:5; 188:18; 189:5;
190:7, 21; 192:19; 194:2,

21; 196:20; 202:21
**draft** 48:18; 99:19; 116:15
**drafted** 48:17
**drafts** 132:8; 161:19;
178:22; 181:18; 182:12;
192:21
**driving** 163:10
**due** 12:1
**duly** 4:5
**dumping** 151:20
**duplicate** 178:22;
182:12; 200:19, 21; 201:7;
202:5; 203:1
**duplicates** 102:21;
132:6; 138:11, 14, 16;
140:2; 151:21; 153:12;
161:20; 162:9; 172:8;
200:5; 202:9
**during** 14:9; 15:20;
52:15; 84:9; 90:17; 112:7;
113:1
**duties** 15:11, 21, 22;
18:1, 11, 12; 19:15; 29:13;
31:6; 37:16; 40:7
**duty** 14:18

# E

**E** 4:14; 19:3
**e-mail** 41:6; 160:8
**e-mails** 160:11; 206:1
**earlier** 149:7
**easily** 39:17; 66:21; 68:4;
69:15; 70:8; 80:9
**edited** 105:20
**edits** 116:16
**Education** 15:7, 8; 16:21;
145:22
**educational** 8:4
**effect** 90:17; 127:4;
129:1; 133:4, 14, 17, 22;
137:3, 22
**effort** 5:9
**efforts** 157:13; 166:20;
175:8; 179:14; 189:15;
197:15; 200:11; 201:18;
207:19; 209:14
**eight** 16:7; 19:5; 23:17;
25:1; 40:14; 132:8
**either** 17:3; 33:5; 35:20;
38:3, 6; 77:16; 96:21; 99:8,
14; 109:13; 142:18;
164:15; 165:5, 9, 11;
171:18; 186:1; 190:15, 17;
191:19
**electronic** 176:7; 177:16;
191:1
**else** 29:10; 46:22; 48:18;
59:10; 69:9; 138:12;
142:19; 149:19; 182:6;
194:17; 207:9, 11; 208:18,
20; 209:19; 210:6
**else's** 7:4; 105:15
**end** 41:14; 111:9; 152:18;
191:10

**energy** 10:8
**enforcement** 35:7;
65:21; 66:1; 68:21; 75:20;
180:12; 190:12; 211:22
**engage** 87:11
**engaged** 86:10
**Engraving** 13:11, 13, 16;
14:15
**enough** 42:21; 52:3;
136:20
**enter** 66:10
**entered** 100:5; 192:1
**entire** 12:20; 42:21; 66:8;
75:9; 111:7; 162:5
**entitled** 78:16; 126:2;
171:3; 172:16; 173:5;
174:19; 190:20
**EOUSA** 18:16; 20:10;
26:14; 31:7; 207:1
**essentially** 12:12; 26:3;
29:7; 136:9; 137:5, 11;
138:1; 139:21; 212:15
**estimate** 47:15
**et** 12:15, 16; 24:19, 20;
30:18; 55:15; 102:21;
135:21; 180:18; 181:12
**ethics** 216:4
**even** 39:14; 45:12; 56:1;
59:2; 79:13; 86:12, 18;
100:16; 119:17; 121:4;
153:14; 189:18; 190:3;
206:14; 215:14
**event** 24:21; 39:1; 143:2;
166:15
**events** 51:15
**Everybody** 21:4; 62:16;
148:2
**everybody's** 121:22
**everyone** 154:12, 14;
160:3
**evidence** 154:22; 156:3,
11; 157:3; 192:1
**evidently** 142:1
**exact** 60:9
**exactly** 6:16; 30:12;
31:14; 33:8, 17; 34:19;
37:18; 54:10; 72:4; 82:10;
91:8; 100:13; 139:14;
140:15; 150:19; 155:19
**EXAMINATION** 4:7
**examined** 4:5
**example** 21:2, 14, 19;
30:16; 32:13; 38:8, 22;
41:10; 44:7, 11; 55:6;
81:13; 94:8; 99:3; 105:12;
152:7; 156:11; 207:16
**except** 7:19; 60:9; 95:1;
162:2
**excess** 161:20
**excuse** 26:18; 137:7;
197:4; 215:9
**executive** 10:9; 15:8;
17:6, 22; 24:16; 28:12;
36:22; 81:6; 213:21
**exempt** 41:18, 19

**exemption** 39:14; 46:17; 65:19; 68:21; 85:13; 179:19

**exemptions** 177:9; 179:8; 180:8; 182:2

**Exhibit** 56:7, 8, 18; 60:1, 3, 7, 9, 20; 61:1, 4; 64:4; 65:3, 4; 66:11; 73:1, 7, 21; 74:5, 6; 75:13, 21; 77:9; 81:5; 82:15; 84:11; 85:1, 21; 89:1, 2, 21; 91:11; 95:7; 106:15; 125:11, 11, 13, 17; 126:15; 128:4; 129:1, 21, 22; 130:4; 132:15, 16, 21; 133:13; 135:5; 161:18; 183:20, 22; 184:2; 186:3, 4, 6, 10; 191:20, 21

**exhibits** 182:17; 183:17; 184:4; 191:17

**exist** 122:15; 168:3, 4

**existed** 123:11; 197:6

**existence** 191:22

**expanding** 142:19

**expect** 62:8; 78:12; 189:22

**expected** 179:13, 19

**experience** 9:8; 12:1; 124:6

**experts** 216:17

**explain** 18:1; 45:3; 51:22; 56:3; 76:1; 82:17; 100:18; 108:14; 109:21; 114:20; 141:6; 153:5; 159:16; 163:16; 176:9

**explained** 50:15; 75:14; 118:19; 119:4; 144:15; 145:8

**explaining** 41:13; 43:18; 55:13; 56:22

**explains** 23:7, 8; 154:20

**explanation** 141:4; 143:11; 144:19; 179:15

**explanations** 48:8

**extent** 148:20

**extra** 96:20; 132:5; 153:13; 183:4; 185:16

---

# F

**face** 68:14; 170:3; 203:2

**fact** 59:10; 78:5, 9; 79:19; 106:4; 120:16; 141:5; 142:15; 175:19; 200:10; 206:15

**facts** 86:11, 15; 110:3, 5; 214:8; 216:12

**factual** 34:2

**Fair** 136:20; 184:14; 206:2; 207:7

**fairly** 34:15; 88:9

**familiar** 6:19; 42:21; 47:11; 152:1; 154:9; 200:16

**familiarity** 70:12

**far** 47:16; 93:22; 139:22; 147:15

**faster** 22:20

**fault** 199:16

**favor** 78:13

**FBI** 83:22; 161:4, 11; 163:11; 170:15, 18; 171:7, 15, 20; 172:5, 10, 14, 22; 173:2, 3, 10, 11, 11, 18, 21; 174:3, 11, 13, 14, 15, 15; 190:17, 19

**federal** 9:11; 15:18; 16:13; 79:3, 7; 80:20; 96:10; 135:6, 11, 13; 153:9, 11; 191:14

**feeling** 199:21

**feels** 48:22

**fell** 164:14

**felt** 50:9

**few** 6:15; 43:9; 105:7; 139:17; 206:10, 17

**field** 22:12; 37:8, 16; 40:12; 43:19; 57:19, 21; 58:6; 59:17; 81:8

**figure** 86:21; 103:22; 180:1; 186:13, 13; 190:8; 200:11, 18; 201:5; 202:3

**figured** 103:19; 104:13; 190:8

**file** 39:21; 42:21; 47:8, 21; 55:2; 66:22; 75:9; 80:9; 89:13; 94:14; 107:20; 108:21; 110:22; 111:4, 8, 21, 22; 112:3; 117:15; 120:11, 21; 121:1, 14; 124:18; 126:8; 131:22; 138:5; 155:5; 157:17, 19, 21; 158:1, 3, 5, 9, 15; 160:1; 164:12; 165:21; 167:2; 172:20; 173:7; 174:5; 177:6; 183:21; 186:1; 191:7; 192:9; 207:20; 210:7; 213:4, 6, 9

**filed** 44:2; 69:19; 77:12; 96:9, 12; 97:6; 99:3, 4; 106:22; 107:2; 108:6; 109:4, 4; 112:8; 113:5

**files** 45:9; 63:13; 70:22; 71:4, 9, 11; 73:16; 87:9, 10; 102:20; 103:7; 106:2; 110:6; 118:21; 119:1, 5; 121:3, 4, 8; 122:4; 123:1, 12, 16; 126:3, 12; 127:3, 7; 129:6, 16; 130:17; 131:18; 132:1; 133:15; 137:4; 141:6; 142:4; 144:15; 148:14, 18; 150:5, 8; 151:16, 20; 152:3, 6, 8, 10; 153:3, 7, 10, 19; 154:1; 155:7; 157:11; 159:5, 8, 14, 21, 22; 160:15; 162:17; 167:16; 169:1, 4; 170:8; 171:3, 8, 11, 22; 173:17, 18; 174:3, 11, 13, 20, 22; 175:9, 13, 16; 176:3; 178:12; 179:15, 16, 17; 186:15; 187:4; 188:8; 189:9; 194:6, 9, 11, 21;

196:21; 197:17; 209:4; 211:4; 212:9, 16; 213:12; 215:4, 8, 21

**filing** 98:16; 204:19

**fill** 22:21; 35:4; 58:18; 68:6; 69:17

**filled** 54:3; 66:18; 68:7, 8; 80:3; 85:8, 9, 10, 11, 12, 13; 149:8

**fills** 23:2; 43:19; 68:9; 81:22

**final** 31:21; 33:3; 36:15; 38:15; 41:12, 15, 20; 70:3; 182:14

**find** 18:21; 53:20; 63:9; 103:9; 104:14; 157:16; 187:8; 195:21; 208:21

**fine** 142:10

**fingers** 53:3, 14; 185:21

**finished** 83:19; 184:6

**Firearms** 12:15

**firms** 147:1

**first** 4:5; 8:4, 22; 10:11; 18:3, 6; 29:6; 36:16; 48:11, 12, 13; 50:19; 55:16; 56:18; 60:8; 61:3, 5, 17; 62:13; 63:1; 66:5; 73:9; 81:17; 96:17; 99:7; 102:19; 103:8; 104:9; 108:8, 16; 116:15; 119:4, 6, 15, 18; 120:10; 122:2; 124:14; 126:13; 130:9; 146:21; 171:10; 193:12; 211:13; 212:4

**fit** 66:3

**five** 6:10; 17:13; 41:6; 45:8; 49:2; 124:5; 132:3; 161:17; 213:1

**floors** 142:18

**Florida** 51:7, 9; 52:13; 111:16, 17, 20; 139:12, 15, 17; 158:11; 166:17; 177:22

**flowchart** 91:1, 16; 94:18

**focused** 143:21; 144:16; 155:20

**FOI** 11:14

**FOIA** 6:20; 12:8, 17, 22; 14:10, 11, 14; 15:21, 22; 16:2, 17; 17:16; 18:4, 17, 20; 19:18; 20:3, 7; 21:7, 12; 22:11; 26:14; 28:12, 14; 34:12, 13; 36:12; 37:22; 40:10, 10, 13; 41:4, 8; 42:1; 43:15; 44:3, 13; 46:4; 48:9; 50:1; 55:7; 61:22; 63:14; 65:19; 66:13; 73:16; 74:20; 81:3; 82:2, 12; 85:14; 91:17; 94:6; 95:6; 97:16; 98:10; 107:15; 110:9; 111:1, 10; 120:16; 121:3, 8; 123:19; 124:9, 12; 126:8; 127:21; 128:8, 20; 129:6, 10, 11; 132:22; 135:16; 137:20; 138:6, 15; 141:17, 22; 143:7; 145:4, 7, 14, 16; 146:4; 147:4, 17; 148:12,

14, 19; 149:4, 7; 150:9; 151:13, 16; 153:3, 19, 21; 154:7, 8, 19, 22; 155:1, 21; 156:1, 8; 157:1, 3; 166:12; 167:7, 9; 179:7, 18; 197:21; 198:3, 13, 15, 17; 213:21; 216:1, 10

**folder** 99:15

**folders** 99:13; 175:18, 20, 22; 192:13; 193:4

**folks** 150:17

**follow** 90:11; 195:18

**followed** 7:21; 160:5

**follows** 4:6; 57:14

**force** 168:16

**foreign** 145:12

**forever** 17:11

**form** 22:21; 50:14, 14; 51:12; 55:1, 3; 56:2, 21; 57:1, 3, 20; 60:9, 17, 18; 61:2, 18; 62:6, 10; 64:3, 4, 10, 11; 65:11, 15; 66:8; 67:3, 11, 19; 68:7; 69:17, 20; 70:2; 72:14; 73:19; 74:10, 13, 14; 75:19; 77:7, 9; 78:15; 79:2, 4, 16, 22; 80:3, 13; 81:5, 20; 82:9; 93:5, 8, 12; 95:11; 111:17; 135:7, 8; 149:22

**former** 136:5

**forms** 22:20; 54:3; 68:12; 81:7; 145:11

**forth** 130:10

**forward** 51:16; 57:5; 58:4, 10; 59:5

**found** 98:3; 106:4; 174:7; 176:3

**four** 6:10; 11:11; 37:6; 41:6; 124:5; 132:3, 4; 145:22

**fourth** 92:21

**frankly** 189:18; 212:3

**Frazier** 28:9, 18; 34:3; 195:22

**free** 211:15

**Freedom** 16:11; 17:5; 18:13; 80:20

**front** 118:17; 185:5

**full** 4:12; 83:11; 85:10; 94:19, 22; 95:1; 96:1

**further** 38:12; 92:20; 106:9

**furthermore** 166:16

**future** 39:16, 17; 77:6; 215:20

---

# G

**games** 136:10

**gathered** 110:3, 6

**gave** 98:2; 134:18; 135:8; 145:21; 147:9; 160:2; 161:3, 4, 8; 163:22; 167:8; 182:2; 191:9; 206:12

**GAY** 4:3, 9, 13, 20, 21;

5:2, 4, 19; 6:3; 7:21; 8:2; 46:1, 2; 54:17; 56:8, 16; 60:3, 6; 74:6; 86:16; 87:4, 13, 21; 89:2, 20; 90:20; 91:1; 106:14; 108:12; 113:4; 114:3; 115:19; 118:1; 125:13, 16; 127:6, 9; 129:22; 132:16; 134:21; 135:2; 136:14; 157:8; 175:11; 179:6; 182:19; 183:13; 184:17, 18; 185:9, 15; 193:3, 17; 197:15; 199:20; 201:17; 208:8; 211:9, 11; 212:4; 213:18; 214:15; 215:12; 217:6

**Gay's** 5:13; 36:4; 86:7; 134:20; 162:8; 179:17; 198:13; 204:19

**gee** 31:3

**Gene** 131:2

**General** 11:4; 13:12; 91:10; 107:19; 160:8, 10, 10; 161:6

**generally** 42:17; 87:16; 91:9; 96:22; 116:5; 123:19, 20; 153:10; 156:8

**gets** 43:6; 44:2; 53:22; 86:7; 99:12

**given** 15:17; 38:1; 63:5; 81:18; 83:2, 19; 92:3; 116:3, 20; 159:13; 165:16; 170:21; 172:15; 174:18; 179:21; 189:20, 22; 209:19; 216:8

**gives** 58:22; 129:13, 15

**giving** 16:14; 39:18; 149:13

**Glad** 201:14

**goes** 86:6

**good** 10:20; 122:9; 125:1, 4; 151:3

**government** 12:5; 15:14, 18; 16:8, 12; 19:16; 115:13; 191:15

**graduate** 8:8; 9:5

**graduated** 8:15, 20; 9:9

**Great** 136:3; 170:21

**grounds** 114:4

**group** 81:12; 162:22

**groups** 171:16

**guess** 16:4; 24:9; 25:15; 34:9; 42:2; 48:11; 102:13; 105:5; 151:1, 14; 161:7

**guidance** 127:13, 20; 129:3; 131:11; 159:12

**guidelines** 130:17

**Gutman** 53:6, 7, 9

**guy** 161:10

**Guzman** 98:4, 7; 149:21

**Guzman-Michaels** 61:12, 19

---

# H

**habeas** 38:4; 206:21

half 9:16, 18, 19, 21, 22; 48:4; 57:3; 60:14; 147:7; 213:1
hand 65:3; 89:20; 101:16; 121:16; 132:20; 133:13; 181:7
handing 130:3
handle 12:6; 20:1; 43:3; 194:21
handled 12:12, 17; 14:14; 63:21; 89:12; 173:21; 214:1, 3, 4
handles 54:15
handling 14:10; 35:16; 84:4; 213:21; 215:12
handwriting 102:13
happen 40:11, 17; 69:9; 77:20; 94:12; 96:22; 144:22; 165:18
happened 9:17; 13:9, 22; 15:4; 25:5; 28:21; 38:10; 39:17; 51:11; 72:13; 90:10; 91:12; 92:11; 93:18; 97:17; 105:4; 106:5; 145:2; 181:5
happening 39:3; 142:13
happens 20:19; 43:1; 45:18; 68:17; 73:14
happy 101:15; 124:19, 21, 22; 125:3
hard 30:11; 43:2; 91:4; 105:6; 169:8
hard-pressed 87:18
harm 35:20; 77:5; 81:9, 18; 82:17; 83:2, 6, 20
harmful 109:19
head 17:16; 31:19
headquarters 18:16; 20:22
health 105:15
heard 142:14
hearsay 140:1; 141:8
heck 142:6
Hello 4:9; 201:13
help 97:11; 107:11, 12; 120:6; 135:1; 139:6; 187:3, 5, 17; 212:17
helped 49:4, 6; 187:16, 22; 188:3; 194:17
helpful 104:10; 159:15; 184:16; 189:14
helping 188:7
hey 150:17
hierarchy 28:16
high 43:7
highest 28:15
himself 189:21
hired 147:1
history 58:12; 72:5
hit 149:11
hmm 25:14; 47:18
Hoffa 39:10, 11
hold 150:12, 14, 17, 21
holding 65:17

home 9:20
hope 24:19
hour 48:4; 147:7
hours 47:15; 48:21; 103:7; 104:18, 20; 200:15; 212:22; 213:1
huge 10:19; 42:9
humanly 186:18
hundred 48:22; 49:2

I

IBM 10:18, 18
idea 31:3; 91:10; 94:13; 107:5; 144:8; 151:3; 216:6
identification 56:9; 60:4; 74:7; 89:3; 125:14; 130:1; 132:17
identified 126:18; 175:5; 178:11
identify 50:7
ignorant 82:11
ill 43:4
imagine 114:21
immediately 106:3, 5
impact 34:20; 35:13; 37:2; 81:9
impact/harm 80:1
important 121:7, 11, 11, 13; 123:2
impossible 188:12
impression 124:15
impressive 16:16
imprisoned 5:19
improve 91:5
inappropriate 201:3
incidentally 73:5
include 99:13; 174:19; 190:1
included 16:10; 88:11; 160:1; 180:13
includes 46:21
including 15:18; 20:8; 180:12; 208:9
incorporating 41:14
independent 203:3, 5
index 44:6, 11; 45:6; 100:7, 21; 101:14, 18; 102:14; 104:17, 20, 21, 22; 105:5, 8, 21; 117:1; 118:21; 122:13, 14, 19; 123:1, 3, 11, 16; 163:3; 167:5, 10; 188:3; 203:13, 17; 204:7, 11, 12, 13, 14; 205:1, 7, 8, 12, 13; 206:18
indexed 140:11
indexes 45:7; 124:5; 196:21; 206:16
indicate 70:6
indicated 64:17; 77:7; 211:10, 13
indicates 18:17; 65:16
indicating 85:16

indication 88:11
indictment 152:11
individual 99:14; 180:15
individually 31:18
individuals 19:7
informal 129:3, 17
informant 105:14
information 5:17, 20, 22; 10:7; 16:8, 11, 11; 17:5; 18:14; 19:20; 36:1, 3, 7; 39:19; 45:9; 46:20; 64:16; 67:18; 71:13; 80:21; 92:14, 19; 96:4; 97:14; 98:3; 105:13, 14, 16, 17; 117:9, 16; 127:2; 146:4; 155:8, 10; 171:10, 16; 173:20; 176:11; 179:20; 189:21; 190:1, 2; 206:3; 210:8; 212:1
informed 196:11
initial 19:12; 22:3, 7; 23:18; 36:11; 46:12; 50:15; 82:5; 88:9; 89:17; 92:5; 99:14; 111:13; 216:9
initially 45:20; 97:2
input 128:1, 6, 11
inquiry 157:15
instance 65:10; 206:1
instances 145:20
institute 15:7
instruct 86:15; 87:13, 21; 114:3; 196:16
instructed 87:4
instructing 158:19
instruction 82:2
instructions 7:22; 58:5; 206:22
instructs 129:4
intended 101:17
intending 5:5; 206:3
intent 5:16
interfere 21:17; 23:9; 65:22; 78:9
interference 39:18
interject 198:9
intermix 70:20
internal 206:6
interpretations 38:1; 43:16
interrelationship 99:18
interrogatories 170:18
interrogatory 97:7, 15; 159:9
interrupt 66:7
interruption 201:12
into 5:17; 9:1; 12:4; 16:6; 17:13; 47:4; 81:21; 84:2, 6; 86:7, 9; 87:5; 110:3; 120:2; 128:6; 164:14; 189:14; 190:3; 192:1
investigation 55:14; 60:16; 203:3, 5
investigative 190:12
investigatory 65:20

involved 23:5; 39:16; 42:1, 3; 48:4; 100:2; 161:4; 194:20
involvement 117:3
involves 39:10, 12
involving 16:2; 63:4
irrelevant 71:12; 78:4; 133:5
IRS 12:14
issue 32:4; 41:8; 156:7
issues 110:1
item 174:20
items 59:11; 165:15; 206:8, 11

J

jacket 149:11
Jackson 53:5
Jane 196:4
January 13:8, 21, 22; 15:1, 4; 17:1; 25:19; 27:15; 28:21; 29:15; 96:2; 155:6, 7, 14, 17, 18
Jeff 61:14; 67:7; 68:8; 71:9; 73:4, 10; 101:4; 103:5; 104:6, 8; 106:1; 114:14, 15, 18; 119:18, 19; 122:18; 159:19; 188:12
Jefferson 5:18; 47:5; 49:4; 50:7; 51:5; 52:16; 65:16; 74:3, 10, 16; 77:13; 78:8, 10; 79:5; 84:13; 88:8; 91:2; 92:6; 96:9; 98:16; 106:22; 112:3, 8; 138:20; 144:9; 157:9, 21; 166:11; 167:6, 12; 168:2, 16; 170:15; 171:2, 19; 180:13; 190:20; 191:6; 194:22; 195:4, 5, 12; 196:12, 22; 197:22; 198:5, 18; 199:11, 14; 201:13; 204:2, 5, 8; 205:18, 20; 207:3, 17; 209:4; 214:1
Jefferson's 5:10; 47:12; 49:17; 50:1; 51:10, 18; 76:6, 11; 77:8, 21; 78:3; 85:2, 10; 88:10; 89:17; 90:11, 18; 91:14; 93:18; 96:1; 97:16; 99:4, 21; 100:5; 107:14; 110:9, 22; 144:1, 5, 13; 215:7
Jeffrey 214:21
Jencks 193:12, 18
Jersey 39:12
Jimmy 39:10, 11
job 13:4; 18:12; 54:15; 122:11, 12
jobs 17:18
John 24:4, 7, 21; 26:18, 22; 30:1; 33:15; 35:3, 20; 37:13; 42:11; 43:2; 47:22; 49:7; 69:6; 96:18; 99:8; 100:1; 101:2; 109:13; 112:18; 113:14, 16; 115:10; 116:13; 118:6;

122:9; 187:6; 216:12, 16
judge 9:12, 13; 87:10; 88:2; 174:13
judges 217:1
judgment 108:2, 6, 8; 113:7; 117:14
July 48:13; 107:2; 110:7; 113:5; 148:6
June 90:1, 16; 96:10; 107:1; 142:1; 149:15, 20; 157:16
Justice 4:19; 5:4, 5; 15:5, 19; 16:20; 125:6; 128:7, 17, 20; 134:11, 12; 135:17
Justice's 152:2
justification 38:4; 68:20; 69:3

K

K 61:15
Kathy 139:18; 160:17; 187:6; 194:13
keep 31:19; 59:7; 70:22; 71:8; 121:13; 123:15; 154:1, 16; 155:9, 12; 158:10
keeps 158:7
Kentucky 6:15, 18
kept 70:13; 71:10; 121:20; 152:21; 155:13; 188:19; 192:7; 196:21; 200:6; 216:18
Kessler 87:10
key 39:3
kind 24:17; 29:12; 32:1; 54:14; 58:22; 212:20
kinds 15:17; 111:19; 136:15; 154:16
Kleenexes 153:12
knew 97:12; 104:11, 12; 110:16; 122:10, 16; 124:22; 170:20
knowledge 36:19
known 17:9; 159:19
knows 167:20

L

lack 36:18
language 58:5
lap 43:6, 8
large 147:6
larger 146:5
last 32:18; 40:4; 43:4; 52:20; 90:4, 7; 137:15; 147:11; 157:5
later 88:2
law 8:17, 19; 9:1, 3, 5, 9, 11; 10:1, 8; 13:17; 24:22; 65:21; 66:1; 68:20; 69:4; 70:16, 16; 75:20; 82:3; 138:17; 147:1; 180:12; 190:12; 211:22; 216:21

lawsuit 96:9; 137:19
lawyer 133:7; 141:10, 14
lead 117:2
learn 99:2; 168:22
learned 96:11; 102:19; 103:5; 118:22; 119:4; 120:10; 122:4; 124:18; 126:11
learning 8:3; 9:7
least 49:14, 15; 51:2; 72:17; 108:18; 121:13; 139:22; 160:3; 162:21; 164:11; 183:2; 200:15
leave 87:22
leaving 88:13
led 5:18
left 56:17; 104:1; 111:22; 167:16
legal 11:7; 13:10, 15, 19; 15:7, 7; 16:21; 21:3; 30:15; 33:16; 91:11; 121:15; 145:21; 147:8, 9; 174:22; 175:13, 16
legally 201:3
less 52:4; 103:11; 152:13
letter 50:5; 70:3; 71:21, 22; 74:12; 92:6; 111:15; 169:21; 179:22
letters 198:7; 206:1
level 36:16
LEWIS 4:3, 13; 217:6
liaison 19:16; 54:15
life 16:18; 152:20, 20
likely 84:21; 93:9; 109:9
line 130:19
lines 61:5, 8
Lisa 4:9
list 45:11; 62:14, 15; 176:16; 177:2; 190:22; 193:8; 200:14; 208:22; 209:2, 10, 14, 20; 210:2; 211:3; 212:7, 11
listed 58:19; 176:18, 20; 178:8; 180:7; 185:6; 190:10; 203:21; 205:6, 11
listing 115:14; 208:15
literally 17:18
litigation 20:3; 21:16, 17; 22:15; 23:9, 14; 25:3; 29:6; 34:21; 35:14; 37:2, 3, 5, 19, 21; 39:1, 14; 40:1; 42:1, 13, 15; 44:3; 45:1, 6, 19; 46:1, 5, 17; 47:19; 48:9; 75:15; 77:19; 82:4, 7; 84:8, 9; 151:13, 17; 154:19; 155:1; 156:2, 8; 157:1, 3, 9
litigation's 22:16
little 8:3; 9:7; 34:18; 38:18; 45:4; 53:16; 78:20; 79:4; 82:2; 124:20; 146:7; 206:10
located 18:22; 50:10; 92:9; 93:10; 157:18; 188:1
location 31:10; 32:8

logged 92:2
logs 176:8; 177:17; 191:1, 6
long 10:12; 11:10; 13:6, 19; 14:21; 16:19; 71:6; 98:8; 152:6; 156:14
longer 199:15
look 21:22; 48:5; 50:18; 54:20; 62:19; 63:1, 8; 81:2; 83:16; 90:3; 101:16, 22; 107:8, 9; 110:18; 111:15, 16; 120:4; 123:10; 182:22
looked 92:18; 111:2; 178:1; 189:4; 193:7, 9; 198:3
looking 12:3; 106:15; 132:22; 176:17; 182:20; 184:22
looks 73:22; 74:9; 85:7
loss 215:13
lot 21:14; 23:8; 36:3; 43:7; 77:18; 96:20; 103:11; 105:7; 139:20; 153:14; 163:14; 166:15; 177:22; 180:21
lots 37:7
loud 126:7; 181:14; 182:11

## M

ma'am 57:7; 70:6
mafiosa 39:12
mail 196:12
mailed 68:13; 73:22
main 39:3; 53:17
mainly 40:22
maintenance 126:1
major 83:15; 169:18, 22; 170:7
makes 22:3, 5; 23:18; 33:4; 121:18; 173:11; 195:15
making 4:21; 25:5; 29:20; 32:10; 33:3; 34:1; 41:15; 104:20; 216:13
managers 20:9
manual 89:22; 125:21; 127:13, 20
many 6:8; 18:8; 28:2; 30:4, 12; 43:9; 48:21; 51:1, 3; 55:5; 72:13; 103:22; 124:4; 132:7; 140:5, 10; 145:13; 150:13, 14; 153:9; 154:15; 170:22; 172:22; 177:21; 193:8, 9; 201:11; 206:14
March 64:12; 100:16; 113:9; 114:9; 148:6, 10; 178:18; 189:6, 17; 190:7
mark 129:20
marked 56:7, 9, 17; 60:1, 4, 6; 64:4; 73:21; 74:4, 7; 88:22; 89:3, 21; 90:6; 125:11, 14, 17; 130:1, 3;

132:14, 17, 21
Maryland 16:5
material 66:20; 69:21; 70:7; 77:5; 80:8; 166:15; 193:13, 18
materials 15:16; 19:20; 78:7; 120:4; 128:2; 138:17; 161:21; 206:6, 8
Mathis 76:14; 143:19, 22; 164:5
matter 6:11, 20; 47:6, 10, 12; 49:4; 65:7, 16; 69:17; 74:3; 80:2, 17; 120:2, 16; 164:8; 194:22; 196:22; 198:21; 201:20; 203:5; 213:22; 215:12
matters 12:3; 13:15; 14:14; 86:12; 154:3; 206:21; 213:22
Matthews 9:13
may 5:7, 8; 16:22; 17:1, 2, 3, 21; 21:11; 25:8; 30:22; 33:9; 44:7, 12; 45:9; 68:5; 73:3; 91:7; 97:1, 1; 122:22; 136:14; 139:16; 150:15; 156:12; 157:5; 163:20; 173:22; 174:3; 192:2; 206:17
maybe 10:3; 37:6, 8; 41:6; 45:3; 48:3; 49:15; 68:1; 69:9; 78:3; 103:20; 106:20; 112:13, 13; 113:3; 114:15, 16; 124:2, 3; 127:16; 133:13; 135:1; 149:18; 153:13; 154:19; 187:2; 198:10; 202:18; 209:9
mean 4:14; 7:16; 19:9, 14; 27:8; 30:2; 31:3, 17; 32:2; 34:12; 40:20; 45:15; 52:8; 53:10; 68:10; 71:8; 72:16; 75:8; 77:16; 83:8, 14; 84:22; 86:18; 88:3; 93:3; 101:1; 105:4; 107:13; 110:21; 114:1; 121:20; 122:1; 123:18; 125:8; 126:17; 131:18, 20; 136:10; 137:7; 144:2, 6; 145:7; 146:11; 148:17; 154:5; 155:9; 156:15; 157:19; 158:4, 12; 161:5; 167:11, 19; 171:5, 13; 173:16; 188:6; 195:16; 200:5; 201:9; 202:12; 205:21; 211:14; 214:6
meaning 36:11; 37:22; 75:15, 18; 76:7, 8; 92:17; 114:18
means 18:20; 23:1; 38:2; 42:4, 20; 45:7; 48:5; 49:2; 69:8, 13; 76:2, 2, 3; 128:22; 153:8; 200:15
meant 31:15; 37:18; 75:14; 110:16; 143:7; 179:15; 193:18; 214:22
meet 51:3; 216:14
meeting 157:16
member 5:2

members 49:3
memo 41:13; 130:16
memorandum 130:4
memory 49:22; 160:16
memos 41:10
mentioned 20:11, 15; 64:7
messed 121:2
methodology 202:3
Michael 33:18
Michaels 149:22
Middle 52:12
might 7:3; 21:5; 37:4; 45:8; 63:6; 68:9; 69:16; 70:20; 71:1; 111:18; 121:19, 20; 131:10; 132:6, 7; 137:15; 159:22; 170:6; 180:5; 189:17
Mike 161:10
mind 17:10, 12; 120:8; 123:2, 4
minimum 152:12
minute 27:11; 82:1; 98:18; 102:7; 106:6; 130:10; 155:17; 158:16; 172:21; 177:7; 180:5; 181:1; 183:6, 12; 208:6; 210:15
minutes 16:3
miscellaneous 59:11
misstates 112:11; 162:8; 187:10; 202:14
misstating 192:22
mistaken 165:12
misunderstanding 214:20
mixing 153:4
Mm-hmm 14:20; 23:21; 25:10; 26:8; 33:8; 54:7; 59:21; 73:4; 84:14; 85:6; 90:8; 91:22; 93:2; 94:1; 100:11; 105:22; 109:7; 114:19; 119:20; 129:19; 183:18
moment 127:6; 133:2; 182:20
money 168:14; 196:7
month 30:5, 13, 19
months 127:22; 139:17; 148:4; 160:13
more 14:6; 16:15; 23:6; 31:15; 34:19; 35:22; 36:2; 42:14; 45:4; 48:7; 49:15; 57:12; 71:2; 84:22; 112:3; 107:19; 109:9; 113:10; 114:20; 115:13; 116:13; 117:8; 124:20; 152:14; 155:20; 158:8; 163:14; 180:20, 21; 190:5; 206:17; 216:19
morning 86:19
most 21:13; 22:17; 63:19; 79:9; 145:3; 169:7; 200:16
motion 89:15; 108:1, 6; 113:6, 7; 117:13

mouthful 15:10
move 47:4; 87:22
moves 24:10
moving 27:19; 142:11, 14, 16, 18, 19
much 18:12; 29:3; 39:16, 18; 43:14; 47:13; 49:11, 13, 14, 15; 52:3; 54:12; 71:12; 100:3; 120:6; 146:3
murderer 39:11
must 10:17; 70:15; 107:22, 22; 123:6; 186:17
myself 29:8; 35:4; 43:10

## N

N.W 4:14; 19:3
Nadiak 52:14; 53:4, 14; 54:9, 19; 62:3; 63:3; 148:5
Nadiak's 54:11
name 4:12, 18; 10:15; 52:13, 14; 55:8; 61:13; 73:12, 13; 83:1; 85:11; 143:19; 160:3, 19; 161:3, 5, 10
named 53:6; 161:9; 187:19
names 61:8; 160:2; 170:16
national 16:10
nature 67:16; 109:16; 127:14
necessarily 61:7; 122:1; 138:7; 171:11
necessary 149:2; 153:13; 154:18
need 6:5; 19:21; 22:19; 34:9; 35:22, 22; 41:8; 51:2; 52:21; 62:19; 63:14; 92:7; 99:17; 101:22; 119:11; 159:18, 21; 162:4, 17; 163:1; 165:8, 10; 166:2; 170:10; 172:11; 178:19; 184:5; 196:7
needed 29:2; 92:18; 109:20, 21; 118:7, 9
needs 19:22; 167:15; 197:16
new 28:4; 34:15; 39:5, 12; 69:10; 78:12; 81:16; 136:11; 146:22
news 23:12; 46:21; 66:20; 125:1, 4
next 58:4; 66:18; 68:17; 103:9; 136:19; 155:6, 14; 185:14
no-records 32:5
nobody 121:7
Nodding 96:6, 15; 100:9; 119:10; 131:6
none 197:6
nor 122:9
normal 50:11; 51:14; 123:14; 144:19; 165:17
normally 37:10; 55:22

note 57:11
notebook 126:19
notebooks 167:21, 21
notes 71:1, 5; 111:21;
164:4
nothing's 77:20; 80:3
notice 150:16
noticed 201:1, 22
noun 93:11
November 25:16, 18;
26:5, 21; 27:5
number 14:8; 18:18;
47:15; 55:9; 63:5; 66:5;
67:20; 74:13; 79:22;
85:12; 92:3; 93:13; 97:15;
136:2; 142:21; 160:3, 11;
161:6, 9; 181:10; 183:15;
185:9, 21; 188:17; 190:14,
21; 191:16; 193:11, 22;
201:20
numbered 50:14
numbers 31:4; 61:16;
160:2

**O**

O-10 64:5, 6, 6, 10, 11;
73:19; 74:17; 93:5, 14, 14,
14; 149:1, 8
O-21A 95:11
Object 38:17; 42:3;
86:15; 87:12, 18, 21; 88:4,
13; 89:9; 90:13; 110:17;
133:9; 162:7; 184:13;
185:1, 10; 192:21; 193:15;
196:15; 210:9
objected 87:1, 3
Objection 73:8; 86:5;
112:10; 114:1; 140:7;
147:18; 175:10; 182:8;
187:10; 192:14; 196:15;
202:13; 205:21; 207:21;
210:14, 18; 211:17, 21;
213:14; 214:14
objections 133:7; 141:10
obligation 199:21
obtain 136:4; 166:20;
170:8
obtained 21:6; 88:12;
165:6; 168:5; 174:3
obviously 32:2; 105:16;
120:22; 121:21; 155:12;
156:20
occasion 108:8
occasionally 72:17
occasions 108:7; 201:21
occurred 84:15, 18;
142:1
occurs 127:21
October 11:2; 51:11;
54:18; 204:18
off 22:6; 33:1, 22; 56:12,
17; 57:9; 59:20; 60:14;
65:8, 9; 88:17, 20; 95:5,
18, 20; 98:19, 22; 104:18;

117:19, 21; 141:1, 2;
145:10; 188:6; 199:6, 8
offer 168:11, 12; 214:2
Office 11:4, 20; 13:18;
14:2, 16; 15:7, 8; 16:21;
17:6, 16, 22; 19:19; 20:21,
22; 21:2, 3; 22:8, 10, 13;
23:15; 25:1, 8; 27:22;
28:12, 12, 14; 30:14;
31:11; 32:16; 34:16; 35:1;
36:21; 37:1, 11, 19; 46:15;
49:9, 21; 50:6, 8; 51:6, 7,
8, 9, 16; 52:2, 6, 10; 53:2,
3, 18, 20; 54:4, 6, 13, 19;
56:1, 19, 20; 57:13; 60:11;
68:13; 70:4, 14; 74:17;
75:4, 16; 81:6, 6; 84:19;
91:18; 92:8; 93:6, 7, 8;
94:8, 9; 95:22; 96:4; 99:5,
19; 100:17; 101:15; 106:2;
108:5; 109:1, 2; 110:6;
111:8; 113:9, 19, 20;
118:1, 10; 131:1, 13;
142:17; 145:21; 154:12,
15; 156:21; 158:7, 19;
160:19; 161:1, 6, 7;
175:22; 177:15, 18; 178:5;
179:2, 18; 182:7; 191:13;
194:14; 203:11, 12, 13, 15,
22; 204:8; 205:4, 5, 9, 12,
16; 207:12, 16; 208:9, 12;
213:21; 215:3
office's 32:19; 49:19;
50:11
officer 12:8; 103:18;
119:8
offices 18:15, 16, 18;
20:7, 8, 13, 17, 20, 21;
21:5, 9; 54:13; 55:17;
129:16; 131:13; 148:1
official 11:14; 12:11;
33:10, 11; 110:6; 127:4;
153:15
officially 92:12
officials 33:13; 180:13
often 40:11, 11; 41:22;
112:7, 22; 113:2
old 9:21
once 9:8; 31:19; 37:8;
89:13, 13; 112:8; 113:3;
126:7; 129:6; 151:16
one 6:17, 22; 7:5; 19:6;
21:9; 22:18; 23:17; 24:12;
27:1; 31:18; 39:7, 10, 11;
41:11; 48:11, 12, 13;
52:15, 22; 57:12; 61:5;
62:14; 63:7; 64:15; 67:7;
70:10, 11; 71:1; 72:20;
80:21; 82:21; 85:14;
93:20; 102:1, 2, 6; 104:11;
114:14, 15, 16; 121:13, 13,
16; 127:1, 18; 130:22;
131:13; 132:7; 145:10;
148:9; 149:9; 152:2; 19;
153:8; 157:6; 158:4, 9, 15,
22; 160:9, 10, 10, 12;
164:11; 168:17; 175:15;
180:6, 15; 185:6, 9;
190:11; 192:5, 5; 195:9, 19

one's 73:9
ones 52:3, 4; 96:21;
97:12; 132:5; 145:7;
147:1; 148:3; 156:8;
157:4; 183:10; 191:3, 22;
192:1, 3
ongoing 22:16; 52:5;
63:19
only 7:5; 17:12; 27:1;
35:2; 37:3; 42:3, 17; 43:10,
12; 45:7; 46:11; 49:1;
50:10; 57:10, 16; 58:7;
59:7; 64:20; 65:6; 81:2;
83:14; 84:8, 9; 90:13;
109:19; 120:18; 122:8;
128:9; 138:14; 140:2;
146:2; 148:20; 149:3;
156:7; 160:12; 161:20;
162:3, 16; 178:21; 205:10;
212:21; 214:10
open 77:2, 3; 80:5; 88:1,
13; 94:3
operations 196:6
opinion 33:16; 34:4;
82:13; 132:13; 138:4;
197:16; 213:18; 214:2, 12
opinions 11:7, 9; 41:4
opposed 36:6; 41:16;
143:9, 22
opposite 77:15
oranges 153:4
order 4:22; 5:9; 71:1, 7;
80:22; 100:6, 8, 15;
111:11; 115:12; 117:10;
118:8, 11; 158:18; 162:4;
166:19, 21; 167:1; 170:10,
12; 172:19; 178:13;
195:11, 14, 18; 196:9
ordered 117:1; 173:16
ordinarily 113:2
ordinary 75:10; 110:11
Oregon 131:4, 5, 10
organizing 25:4
orientation 89:22
original 111:3; 126:21;
140:2
originally 103:12;
188:15; 197:19
originals 161:22; 162:1;
179:1, 16, 17; 187:9
Orlando 53:5, 18; 54:16;
55:20
others 5:14; 37:16
otherwise 57:13; 152:17;
162:19
out 9:15; 17:17; 18:21;
19:1; 22:12, 20, 21, 21;
23:2, 3; 32:5; 35:4; 36:1;
37:8; 39:18; 40:12; 43:19,
19; 50:16; 53:20; 54:3;
58:18; 63:9; 65:18; 66:18;
68:7, 7, 8, 9; 69:18; 77:5;
78:13; 80:3; 81:18, 22;
83:2, 19, 21; 84:1; 85:8, 9,
10, 11, 12, 13; 86:21;
93:17; 103:9; 104:14;
105:19; 106:4; 111:17;

120:21; 121:1, 4; 125:18;
126:7; 127:11; 130:5;
132:5; 135:10; 138:11, 13,
15; 139:6; 142:20; 149:8;
150:22; 151:20; 153:11;
155:16; 157:16; 161:20;
165:13; 170:7; 174:7;
180:1; 181:14; 182:11;
186:13, 13; 187:8; 189:16;
190:8, 9; 200:1, 18; 201:5;
202:4; 208:21; 209:1, 3
outcome 42:6
outstanding 120:17
over 14:2, 4; 15:14;
40:22; 93:20; 118:19;
142:5, 7; 143:5; 151:6, 7,
13, 14; 153:3; 164:12;
174:13
overlap 154:6
own 21:4; 127:16;
131:12; 203:3, 4

**P**

p.m 217:5
page 57:6; 60:8, 14, 19,
21; 61:1, 3; 65:2, 4; 75:21;
77:9; 78:15; 81:5; 82:14;
85:5, 20; 90:4, 5, 7;
106:16; 127:11; 166:14;
181:9; 185:14; 190:14, 22;
191:1, 16; 193:12
pages 45:10; 60:1; 72:8;
163:11; 180:16, 16, 16, 21;
181:2; 191:5, 5; 206:14
paid 195:9; 198:1, 7
Paluso 61:15
paper 72:21, 21, 21; 73:6;
83:16; 126:14; 157:2;
172:15; 173:2; 177:14;
178:2; 214:9
papers 72:7; 111:9;
171:6
paperwork 32:22; 33:1
paragraph 193:21
paralegal 19:4; 29:20;
33:4, 19; 37:11; 42:19;
49:9; 63:12; 67:4; 68:9
paralegals 23:18; 37:14,
15; 42:15; 147:22; 194:19
Pardon 181:8; 214:16
parole 152:15, 16
part 29:9, 15; 42:10;
61:13; 86:19; 89:5;
131:14; 146:5; 155:12;
174:5; 182:21; 184:15
particular 57:5; 63:4;
64:11, 22; 76:4, 5; 129:14;
132:22; 147:12; 149:5;
151:5; 188:22
particularly 45:1; 69:10;
139:18
parts 56:22
past 41:10; 128:10;
142:7, 8; 145:19; 160:13
Pat 52:13; 53:4, 13, 17;

54:9, 11, 19; 62:3; 63:3;
148:5
Pat's 53:18
patient 36:18; 49:20
pattern 15:2
Paul 161:8; 169:15, 21;
188:9, 10; 191:19
pay 30:17
Peluso 139:18; 160:17;
187:6
Peluso's 194:14
penalty 35:10; 44:1;
67:17, 19
pending 5:11; 21:16;
22:14; 23:3, 14; 34:21;
35:14; 37:2, 19, 21; 38:2,
9, 12, 14, 14; 39:1, 6, 8, 14,
22; 46:17; 55:14; 60:15,
17, 18; 61:2; 65:6, 7; 66:1,
14; 68:20; 69:6, 8, 11, 13,
13; 73:20; 75:15, 20; 77:3,
14, 15, 16; 78:10, 16, 18;
80:2, 18, 20; 121:9;
123:19; 137:19; 138:15
people 17:13; 14:20;
27:22; 28:2; 35:3, 4, 5;
40:12, 18; 42:14, 17; 51:3;
59:17; 70:20; 72:18;
96:20; 97:14; 104:6;
111:19, 20; 121:18; 127:2;
154:7; 160:11, 20; 170:17,
19; 187:16, 17, 18
perceived 198:11
perhaps 86:8
period 82:4; 112:8;
157:22; 170:10
periods 153:22
perjury 35:11; 44:1;
67:17, 19
permitted 39:13
perplexed 216:20
person 4:10; 6:19; 17:15;
21:9; 22:2, 5, 12, 14; 23:1,
2, 22; 30:16; 33:2, 5; 39:4,
5; 52:9; 53:6; 57:19; 58:6;
61:18, 21; 62:2, 5, 17;
63:4, 5; 69:19; 78:22;
81:22; 99:17; 114:6;
120:5; 122:8, 9; 123:9;
142:2; 159:1; 161:4;
163:2; 170:20
personally 30:20; 41:22;
115:19, 22; 178:1
personnel 21:2
pertain 94:2
pertaining 76:4; 78:7;
81:3
pertains 66:13
Petersburg 104:4; 162:2,
3, 11, 13, 16; 163:8, 15;
164:13, 16; 165:7, 7, 13,
14; 166:3, 8, 17; 167:4, 19;
169:14; 184:19, 20;
188:14, 15; 190:16, 17;
191:4, 4, 9; 197:19;
198:19; 207:18; 208:4, 13,
22; 209:13, 15; 212:8

WILLIE JEFFERSON    v.
JANET RENO et al

BONNIE LEWIS GAY
June 10, 1999

**petition** 39:21; 40:2;
76:13
**petitioned** 144:9
**petitions** 76:19, 22
**phone** 7:19; 41:1; 61:16;
160:2, 3, 9, 12; 180:20;
184:9, 10
**photographs** 191:17
**physically** 53:19
**pick** 53:13
**picture** 58:13
**piece** 72:20; 83:16;
126:14; 172:15; 178:2
**pieces** 72:21; 73:6;
157:2; 173:2; 177:14;
214:9
**place** 32:1, 3, 11; 71:1;
92:18; 110:2; 133:5;
135:22; 159:20; 162:3, 16
**places** 162:12; 163:18
**PLAINTIFF** 4:7
**plaintiff's** 135:4; 136:4;
208:14
**plaintiffs** 116:21; 138:20
**play** 136:10
**playing** 141:14
**plays** 149:3
**pleading** 71:2
**pleadings** 46:16, 21, 21;
69:18; 70:10, 13; 71:5;
72:9, 12, 14; 88:6; 153:14,
15
**please** 66:4; 142:21;
149:12; 178:16; 210:12
**plus** 104:11; 152:12, 18,
19; 155:5, 14; 163:7
**point** 41:1; 64:15; 75:4;
84:17; 91:13; 92:12;
110:8; 121:15; 131:9;
151:15; 200:22; 201:22
**pointed** 189:16
**Police** 165:13, 14; 166:4,
8, 11, 16; 167:4; 168:15,
18, 22; 169:14; 184:20;
188:14, 15; 190:16, 18;
191:5; 197:20; 198:19;
207:18
**policies** 129:15; 154:6, 9
**policy** 12:11, 22; 14:13;
43:15
**political** 8:13
**portion** 205:10
**position** 6:19; 26:15;
28:15; 76:13, 14; 157:14
**possibility** 59:12; 160:4
**possible** 39:4; 66:5;
120:6; 174:19; 186:18;
188:11
**possibly** 77:20; 167:18;
174:1; 200:9
**potential** 154:22; 156:3,
11
**potentially** 157:3
**practice** 46:15; 50:11;
123:14

**practiced** 9:22; 13:17
**practices** 16:9
**practicing** 69:4, 6; 70:16
**precedent** 43:13
**precedent-setting** 43:14
**predecessor** 98:5
**prejudice** 117:14
**preparation** 31:11; 32:19
**prepare** 62:10; 97:11;
99:18; 107:3; 108:15;
109:14; 114:14, 16; 115:5,
7, 13
**prepared** 91:7; 97:8;
100:7; 101:15; 108:17;
114:13, 15; 117:2; 118:20;
131:19; 138:22
**prepares** 95:6; 99:11
**preparing** 23:5; 59:18;
118:3; 188:3, 4
**present** 25:12
**presently** 5:11
**presents** 69:19
**preservation** 133:1;
137:10
**presidential** 11:8
**pretty** 43:14; 54:12;
71:12; 109:15; 158:6
**prevent** 215:20
**previously** 190:2
**primarily** 157:12
**primary** 159:1; 175:6
**printed** 169:4
**Printing** 13:11, 13, 16;
14:15
**prior** 100:16; 135:15, 21;
136:8; 201:4, 21
**privacy** 11:14; 12:3, 22;
16:2, 12; 17:5; 19:18, 20;
20:7; 26:14; 85:14; 96:5;
146:4; 216:2
**private** 15:15; 105:16
**privilege** 86:8; 114:4;
211:9; 212:1
**privileged** 210:8; 211:10
**privileges** 5:6, 7, 8, 21
**Probably** 6:10; 22:17;
40:14; 45:4; 47:19; 48:22;
49:1, 14; 50:13; 52:7; 63:2,
12; 68:7; 69:16; 72:10;
76:21; 81:14; 84:16; 92:5;
96:16; 98:2, 4; 107:5;
109:8; 112:17, 19; 122:16,
18; 124:4; 135:13; 143:6;
161:11; 165:16; 167:20;
179:3; 206:13; 209:5;
216:17
**probation** 152:16, 19
**problem** 72:6; 134:8;
163:17
**problems** 105:11
**procedure** 62:11; 91:9;
144:20
**procedures** 90:17; 91:5,
6; 154:2
**proceed** 57:14

**proceeding** 23:4; 66:2;
67:1; 77:6; 83:3; 124:8
**PROCEEDINGS** 4:1;
12:18; 75:20; 78:9, 17
**process** 19:22; 41:12;
86:9, 20; 87:3, 5; 145:9;
159:20
**processing** 18:13; 19:13
**processor** 10:11
**produce** 10:10; 136:5;
168:19; 170:1; 207:1;
213:5
**produced** 137:9; 139:2;
165:20; 167:17; 168:1;
171:2; 173:3; 199:22;
207:18, 22; 208:3, 13
**producing** 5:4
**product** 86:8; 114:2;
208:10
**professional** 9:8
**professionally** 9:10
**profile** 43:7
**Profit** 169:18, 22; 170:4, 8
**project** 200:14
**promotion** 24:19; 26:9
**promotions** 26:2
**promulgation** 128:7
**pronounce** 31:7
**prosecution** 5:18
**prospective** 66:1
**prove** 186:9
**provide** 19:20; 20:5, 7;
21:18; 23:10; 40:8, 12;
41:3; 47:1; 71:17, 19;
127:19; 133:20; 150:7;
171:17
**provided** 44:7; 68:4;
79:12; 127:2; 138:19;
164:9; 165:3; 166:10, 15;
167:6, 11, 13, 13; 171:21;
173:20; 174:9, 10; 182:15;
183:22; 184:4; 190:19;
191:5; 208:22; 209:10, 17
**providing** 166:13;
168:16
**provisions** 31:14;
133:18
**public** 23:12; 41:21;
46:20, 22; 66:19, 20; 68:3;
69:21; 70:7; 71:16; 73:16;
79:11; 80:8; 83:12; 84:2;
85:17; 88:12; 95:2, 4;
138:17
**publication** 133:18;
135:6
**published** 11:9
**pull** 99:16
**purchase** 168:11, 12;
169:3
**purge** 127:3; 129:5;
132:1, 8; 138:8, 8, 10;
142:3; 150:5, 8; 151:4;
153:3; 161:15; 215:4
**purged** 89:13; 102:20;
103:6, 11; 106:2; 119:5;
120:10; 122:4; 124:18;

126:9, 11; 131:18, 21;
132:11, 12; 133:15; 137:4;
138:5; 139:7; 141:6;
144:15; 151:15, 16;
153:10; 157:11, 20; 158:1,
20; 159:20; 160:1; 161:12,
16; 162:6; 166:1; 167:15,
19; 171:22; 172:5, 8;
174:4; 175:1, 6, 14;
178:12, 14; 185:16, 18;
186:16; 188:8; 189:10;
190:11; 200:1, 4, 7, 20;
213:12; 214:10; 215:8
**purging** 87:8; 119:1;
126:2; 127:7; 129:16;
130:17; 133:5; 150:20;
151:2; 154:2, 3; 215:20
**purpose** 37:9; 86:19;
87:2; 149:2; 190:10
**purposes** 65:21; 75:16
**pursuant** 4:22; 182:15
**put** 16:1; 27:13; 42:5;
43:6, 8; 72:14; 84:2; 91:11;
96:13, 18; 169:9; 180:5, 8
**putting** 82:22; 134:21

**Q**

**question's** 184:6
**questioner** 110:15
**quick** 106:15
**quickly** 49:18; 75:13;
122:11
**quite** 118:12; 184:14;
200:16

**R**

**raise** 38:6
**raised** 88:7
**rarely** 41:5; 42:18
**rather** 80:10
**reach** 81:1; 82:4, 7
**reached** 86:13
**reaction** 119:6; 120:9,
18; 122:2; 144:18
**read** 61:6; 66:8; 96:17;
97:1, 5; 99:8, 8, 9; 105:6;
112:15; 126:5, 7; 130:8;
131:17; 133:3; 137:13, 14;
177:19; 181:12, 14;
182:11; 183:15; 190:3;
202:18
**reading** 24:13; 83:7
**reads** 99:9
**real** 43:13; 75:13
**reality** 43:1
**really** 5:12, 20; 32:4;
34:1; 43:2, 12; 48:1; 80:18;
91:4; 100:2; 101:9; 103:9;
114:19; 120:12; 121:12;
125:8; 128:11; 143:11;
144:3; 151:11; 177:4;
194:19; 209:8; 212:19
**reason** 11:22; 43:11;

72:4; 131:2; 136:13;
144:7; 149:16; 155:4
**reasonable** 195:20
**reasons** 22:18
**recall** 108:9; 119:22;
123:13; 135:2, 7; 142:13;
159:10; 170:16
**recalled** 112:12
**receive** 8:12; 18:20; 81:7;
99:6; 145:16
**received** 49:22; 74:16;
92:7, 11, 16, 16; 198:6;
208:3
**receives** 22:11; 91:17
**Recess** 56:14; 106:12;
199:13
**recollection** 53:11;
112:6, 21; 113:12
**recollections** 188:2
**recommendation** 19:10;
23:19, 20; 29:20; 32:22;
33:4, 6
**recommendations** 24:1;
29:21
**recommending** 36:7
**reconstruct** 157:10;
158:19; 159:13; 160:15;
162:5, 17; 165:20; 167:2;
172:20; 175:9; 179:14;
186:15; 187:4; 188:7;
189:9; 197:17; 207:20;
209:3; 210:7; 212:16;
213:9
**reconstructed** 89:14;
167:15; 172:12; 173:17;
174:5; 178:20; 213:4, 6
**reconstructing** 159:4, 8;
173:7; 175:7; 177:5
**reconstruction** 87:9;
174:21; 179:14
**record** 4:12, 18; 22:19;
41:8; 50:3; 56:13; 86:17;
88:6, 18, 20; 89:4, 8;
90:14; 95:19, 20; 98:20,
22; 108:4; 117:20, 21;
141:1, 2; 149:13; 153:6;
158:11; 182:18; 199:6, 8;
211:7
**record-keeping** 153:17
**recorded** 181:11; 182:13
**records** 12:4; 18:22;
19:2; 21:5, 15, 18, 20;
22:1; 23:10; 24:6; 30:18;
31:10, 13; 32:3, 9; 33:21;
44:12, 12; 50:9; 51:9; 54:4;
55:4, 14; 57:12; 65:20;
66:3; 68:3; 69:14; 85:17;
88:12; 92:9, 19; 93:9; 94:2,
19; 95:2, 4, 4, 17; 98:14;
103:21; 111:18; 133:2;
137:10, 17; 142:22; 149:6;
150:12, 14, 22; 153:9, 11,
16; 157:17; 158:7, 10;
160:21; 170:2, 20; 171:1,
2; 172:22; 173:4; 177:21
**recreate** 214:9
**reduce** 142:21

**refer** 32:12, 17; 184:17

**referred** 75:22; 173:11; 182:21; 193:21

**referring** 46:3, 4; 70:1; 130:6; 139:14; 143:15, 17; 183:11; 184:14; 190:6; 198:16, 17, 20; 207:10

**reflect** 149:13

**refreshed** 184:22

**refused** 168:8

**regard** 200:12

**regarding** 52:2; 24:5; 66:17; 68:19; 87:5; 129:16; 201:20; 205:17, 20

**regardless** 108:3; 177:12

**regional** 161:7

**Register** 135:6, 11, 14

**regs** 128:13, 15; 129:13; 133:16, 19; 134:15

**regulation** 127:8, 12; 137:2, 8; 138:12

**regulations** 13:1; 14:10, 13; 125:6; 132:20, 22; 133:21; 134:11, 12; 135:3, 16; 136:5, 9, 11, 13; 138:6, 6; 152:2

**relate** 5:20; 6:18; 87:8

**related** 7:6, 7; 12:18; 114:20

**relating** 14:5; 51:17; 99:13; 110:9; 173:2, 4; 177:22; 207:17

**relation** 86:14; 113:6; 194:22

**release** 31:13; 83:5; 94:18; 105:18; 210:22; 211:2

**released** 41:16; 78:8; 80:2; 81:10; 83:10; 113:11; 115:15; 155:11; 156:5

**releasing** 35:13; 82:17; 100:18; 173:9

**relevance** 133:9, 10

**relevant** 19:1; 21:11; 24:3; 44:13; 77:10; 78:5; 79:20; 110:22; 136:15; 173:6, 8; 206:13

**remained** 106:1

**remaining** 118:22

**remember** 6:16; 18:5, 6; 25:15; 47:21; 50:2, 4; 52:14, 15; 94:15; 96:11; 97:3, 4; 99:20; 100:13, 22; 101:3, 9, 19, 20; 109:16, 17; 113:14; 116:1, 9, 15; 135:12; 137:12; 140:5, 15; 150:19; 171:4, 5; 187:13; 202:19; 206:22

**removal** 126:1

**reorganization** 27:21; 28:21

**rephrase** 38:21

**report** 28:18

**reporter** 52:18; 95:15

**reporter's** 53:12

**reports** 190:12

**represent** 4:19; 205:22

**representation** 202:22

**represented** 211:8

**representing** 211:19

**represents** 105:20; 201:7; 202:5; 203:1; 212:11

**reprimanded** 215:11

**request** 18:21; 19:3, 13; 21:7, 10, 12; 22:11; 32:13; 44:13; 47:12; 50:1, 16; 51:10, 18; 53:1, 22; 54:1; 55:2, 9, 19, 22; 56:2; 63:14; 66:13; 74:20; 75:6; 77:22; 81:4; 83:11; 84:13; 85:2, 12, 17; 90:18; 91:3, 18; 92:2, 7, 12, 13, 15; 95:4; 96:1; 97:16; 98:11; 100:17, 20; 110:10; 111:1, 10, 13; 121:3, 8; 123:19; 126:8; 129:6; 134:3; 137:19; 138:15; 145:14; 148:19; 149:4; 150:9; 151:5; 154:22; 155:4, 21; 167:7, 9; 198:13, 15; 199:2

**requested** 51:8; 66:3; 95:2; 113:9; 134:3

**requester** 36:16; 41:21; 47:2; 50:12, 18; 70:5; 71:18, 20, 22; 72:2, 6; 73:15; 79:12; 111:14

**requester's** 55:8

**requesters** 7:8

**requesting** 100:6

**requests** 12:17; 18:4, 14; 19:18, 19; 20:3; 25:6; 29:4, 11, 18; 30:13; 32:3; 99:16; 145:7; 166:12, 13; 197:21; 198:4, 18; 199:3

**require** 30:14, 15; 33:16

**required** 41:15; 42:1; 44:18; 45:5, 6, 7, 21; 72:18, 19, 20; 81:11; 82:3, 5, 6, 7, 16; 84:6; 146:17; 147:16; 155:10; 177:8, 11

**requirement** 127:13

**requirements** 92:15; 148:21, 22

**requiring** 195:12; 196:9

**research** 174:22; 175:13, 16

**resent** 212:20

**resolve** 5:10

**respect** 15:21, 22; 64:21; 67:12; 97:12; 109:22; 150:9; 153:21; 204:1, 4, 8; 216:13

**respectfully** 198:12

**respond** 19:21; 50:12; 55:4; 145:6; 148:19; 171:17

**responded** 51:5; 166:12

**responding** 114:7; 117:4

**response** 21:15, 15, 22; 49:20; 50:19; 63:16; 70:3; 74:12, 15; 95:6, 9, 12; 97:9; 98:15; 107:1, 13, 19; 111:13; 112:1, 2; 114:11; 115:12, 16; 150:10, 11; 155:8; 167:6, 9, 12; 168:13; 179:22; 207:19

**responses** 20:2; 31:11; 32:19; 33:21; 97:8, 10

**responsibilities** 54:11; 150:6

**responsibility** 13:14; 30:3; 33:15; 42:11; 175:7

**responsible** 14:12; 42:6; 114:6; 116:4; 148:15; 157:12

**responsive** 51:10; 207:2

**retain** 183:9, 16

**retained** 152:6, 8, 10, 11, 22; 185:18, 19, 20

**retention** 152:3; 153:7; 154:6, 9; 156:16; 158:12

**retrieval** 10:7, 8, 16, 21

**return** 55:10

**returned** 65:5, 6

**Revenue** 14:3, 6, 17, 21

**review** 19:8; 22:6; 23:18; 26:4; 29:21; 30:1, 5, 12, 14, 18, 20, 21, 22; 31:9, 20; 32:20, 22; 34:18; 37:1; 42:16; 44:6, 21; 45:13, 15; 47:20; 97:10; 110:8; 111:5; 116:5; 128:10; 139:5; 156:4; 171:17; 199:21; 212:17

**reviewed** 19:10; 33:20; 48:1; 68:18; 75:5; 84:19; 108:18, 21; 110:12; 111:7; 116:1, 8; 190:19

**reviewing** 25:6; 30:2; 36:6; 145:8; 148:16, 17; 197:21; 209:14

**reviews** 24:1; 34:19; 35:12

**right** 12:9; 20:18; 22:9, 15; 27:6, 9, 16; 29:22; 31:2; 32:1, 11; 36:14; 40:2; 45:17; 46:7, 10; 50:5; 53:15; 57:18; 60:18; 61:13; 62:3, 21; 64:1; 66:15; 68:14; 73:6; 74:21; 75:2, 7; 76:10, 16; 79:14; 82:10; 85:3, 18; 92:1, 9; 93:22; 94:10; 95:5; 102:11; 104:15; 108:10; 117:17, 18; 119:1, 9; 122:4; 123:7; 124:15; 126:20; 138:16; 141:14; 147:17; 154:10; 156:1, 10, 10; 158:21; 159:5; 163:13; 165:19; 174:6, 11; 176:15; 184:7, 21; 187:21; 192:17; 194:10; 199:18; 200:17; 203:18, 19; 204:4; 208:5; 209:11

**role** 149:3; 157:15

**Room** 4:15; 19:2

**routine** 48:16

**rule** 151:10; 152:17; 153:18; 164:10; 165:3; 182:16

**rules** 39:2; 128:8, 15, 20, 20, 22; 132:19; 154:7, 20; 158:12

**run** 49:18

# S

**S** 131:3

**same** 11:20; 14:16; 17:18; 20:8; 32:9; 49:22; 60:9; 67:15; 90:17; 91:1; 99:16; 104:2; 130:5; 136:9; 137:8, 11; 153:16; 185:9; 194:18; 195:4; 198:22; 199:4

**samples** 127:1

**sanctions** 89:7, 11, 16

**satisfactory** 116:21

**save** 153:17

**saw** 198:7

**saying** 29:19; 44:22; 51:6; 58:9; 72:1; 92:6; 97:20; 99:3; 117:7; 149:11; 173:1; 176:5

**scheduled** 5:14

**school** 8:17, 19; 9:1, 4, 5, 9

**science** 8:13, 14

**scope** 86:6; 88:5; 150:6

**search** 31:10, 20; 32:1; 92:22; 93:3, 8, 11, 13

**searches** 93:6

**second** 56:13; 91:21; 117:13, 20; 199:7; 216:21

**Secret** 12:15; 117:12

**secretaries** 147:9; 194:18

**Secretary** 11:8; 194:3; 196:20

**Section** 125:22; 133:1; 135:18, 21; 152:9

**sector** 15:15

**security** 16:10

**seem** 154:5

**seems** 6:16; 15:2; 49:21; 59:2; 79:9; 80:17

**segment** 147:4, 6, 9

**segregable** 71:11

**segregated** 66:21; 68:4; 69:15; 70:8, 19; 80:9

**self** 85:12

**send** 18:22; 21:10, 21; 22:15, 20; 37:7; 52:1; 54:1; 55:5, 11, 13; 56:4, 5; 57:14, 15, 21, 21; 58:14, 19, 20, 22; 59:9, 12, 14, 18, 19; 72:8, 14, 20; 73:17; 98:17; 106:7; 118:10; 120:3, 7; 122:6; 123:9; 142:22; 148:3; 150:10, 16, 22; 153:11; 195:4, 12

**sending** 59:20

**sends** 70:4; 93:8

**senior** 24:21; 25:20; 27:16, 20; 29:1; 213:19

**sense** 28:16; 32:9; 33:2; 47:13; 95:14; 107:19; 173:14; 195:15

**sent** 19:2; 37:14, 15; 55:20; 74:10; 92:22; 93:7; 97:17; 98:11, 13; 103:20; 105:4, 5; 128:9; 140:3; 142:20; 149:22; 153:8; 160:9, 11; 171:15; 195:3

**sentence** 38:7, 10; 126:5; 137:15; 152:13, 18, 20, 20, 21

**separate** 117:10; 153:20; 183:1

**September** 48:20; 50:1, 6; 97:18, 20; 98:10; 101:11; 103:4; 118:18

**seq** 180:18

**serve** 13:6; 18:19; 19:16

**served** 14:4

**Service** 12:15

**set** 11:19; 12:21; 15:13; 43:15; 133:16; 195:20; 216:7

**sets** 130:16; 164:8; 165:2; 168:17

**setting** 12:4; 43:13

**settlement** 10:19

**seven** 16:7

**several** 75:21; 171:16

**shall** 16:17; 80:21

**share** 210:6

**shared** 212:7

**Sharing** 14:3, 6, 17, 22

**sheets** 127:19

**Shelton** 9:13

**shifted** 183:1

**short** 19:14; 106:9; 174:2; 197:10

**show** 54:17; 178:16; 210:5

**showing** 125:16

**shown** 209:20

**side** 10:1; 111:22

**sign** 22:6; 33:1; 42:17, 19; 58:2; 69:20; 216:3

**signals** 149:14

**signature** 61:5, 7; 106:16, 18, 19

**signed** 33:22; 47:22, 22; 48:1, 2; 61:6; 67:7; 68:11; 73:4, 10; 85:3, 15; 97:5; 108:19; 145:10; 169:22

**signing** 67:18; 82:22

**signs** 68:10

**silence** 88:15

**similar** 135:5

**simple** 214:20

**simply** 105:9; 108:9

**simultaneously** 80:18;

209:18
single 79:3; 81:12; 83:16; 166:14; 177:20; 178:2; 191:20, 21
sitting 35:8; 182:7; 205:9
situation 35:11; 44:15; 79:8, 10; 121:6
six 18:8; 132:8; 155:13, 17; 161:17
skipped 63:6
slid 17:13
slow 52:18
SMORODIN 4:16, 18; 7:11, 14, 21; 30:7; 36:4; 38:17; 40:15; 42:2; 44:14; 45:22; 46:6, 9; 52:17, 20; 56:12; 59:8; 60:19; 67:21; 73:8; 86:5, 22; 88:3, 19; 89:9; 90:13; 95:18; 97:11; 98:21; 102:15; 103:2, 15; 105:1; 106:11; 108:4; 110:14; 112:10; 113:16; 114:1; 115:18; 117:12; 118:13; 119:11; 123:18; 124:9; 127:5; 128:14; 130:12; 132:3; 133:6; 134:1, 5, 8, 16, 20; 135:10, 15, 20; 136:3, 20; 137:21; 140:7, 12; 141:1, 9; 146:11, 14; 147:18; 149:10; 162:7; 175:10; 179:4, 11; 180:2; 181:14, 19; 182:8, 18; 183:6, 12; 184:5, 13; 185:8; 187:10, 18; 192:14, 20; 193:15; 194:8; 196:11, 15; 197:1, 4; 198:9; 199:6, 16; 202:13; 204:1, 14, 17; 205:17, 21; 206:5, 19; 207:21; 208:2, 8; 210:9, 14, 17; 211:6, 21; 213:14; 214:14, 17; 217:4
somebody 7:4; 21:20; 29:10; 32:14; 37:8; 41:7; 48:18; 53:6; 105:15; 118:5; 120:3, 8; 121:2; 142:20; 148:4; 149:19; 161:9; 194:17
somebody's 151:4
Sometimes 32:12; 37:4; 41:5; 68:5, 8; 94:11
somewhere 12:7; 24:18; 140:20; 142:19; 178:7; 180:8
soon 50:22
sorry 27:9; 36:9; 66:7; 75:12; 79:19; 80:12; 82:11; 118:13; 125:2; 130:11; 134:19; 136:6; 141:19; 146:14; 194:10; 197:1; 201:15, 17; 214:18
sort 6:20; 8:11; 36:1; 202:2
Sounds 13:4; 163:13
source 66:19; 70:7; 80:8
South 145:22
space 52:3; 153:17
spaces 55:8

speak 7:14, 18; 113:3; 115:1, 3, 4; 118:2; 122:3; 179:5; 194:2
speakers 15:12
speaking 113:14; 200:22; 202:1; 216:11
special 36:11
specialist 33:20
specific 50:8, 14; 62:22; 87:6, 6, 7, 13, 19, 19; 128:12; 187:18
specifically 71:20; 118:8; 176:17; 208:11
speed 137:15
spend 47:14
spent 47:16; 48:21; 49:12, 14; 104:19; 139:20; 212:21, 22
split 31:1
spoke 109:8; 112:7, 17, 19; 139:10; 145:11; 170:19; 196:19
spoken 108:22; 109:6, 13; 112:22; 169:13, 18; 170:14; 200:17; 201:10, 19
spurred 107:20
St 140:4; 162:2, 3, 11, 13, 16; 163:8, 15; 164:13, 16; 165:6, 7, 13, 14; 166:3, 8, 17; 167:4, 19; 169:14; 184:19, 20; 188:14, 15; 190:16, 17; 191:4, 4, 9; 197:19; 198:19; 207:18; 208:4, 13, 22; 209:13, 15; 212:8
staff 11:6; 26:17; 49:3; 130:8; 145:20
stage 40:4; 48:9; 82:4; 83:13; 84:5; 151:14
stages 149:4
standard 54:22; 55:1, 3
stands 103:16
start 8:2; 49:16; 91:15; 93:16; 102:4; 119:15; 121:17; 151:19; 160:4
started 4:17; 17:11; 18:3, 6; 24:22; 33:18; 43:11; 201:14
starting 16:6
starts 65:18
state 4:11; 89:7; 112:12
stated 47:10; 119:6
statement 23:11; 81:15; 83:1; 184:16; 212:21
statements 81:14, 16; 83:18
States 15:8; 18:15; 20:12; 22:13; 28:13; 40:9; 43:18; 50:8; 51:6, 8, 15; 52:10; 56:19; 60:10; 70:14; 79:3, 6; 89:22; 92:8; 97:16; 108:5; 109:1, 11; 123:15; 126:2; 129:5; 131:1; 145:15; 146:16; 147:16; 148:1; 191:13; 199:17;

216:8
status 86:18; 144:4, 13; 215:7
statute 37:22
statutory 92:15
step 63:6
Stephanie 49:7, 8; 103:4; 104:16; 105:21; 118:21; 122:7, 10; 139:8, 10, 11, 19; 163:3; 187:6, 21; 188:2
still 14:10; 16:14; 33:10; 38:12; 63:20; 77:3; 79:12; 116:21; 160:6; 191:22; 209:7; 213:3
stole 10:18
stop 149:11
story 174:8, 10
straight 48:15
Street 4:14
structure 59:1
structured 41:17
students 146:12, 13
stuff 18:8; 20:6; 29:12; 56:5; 59:7; 70:11; 71:3; 112:4; 121:17; 138:18; 140:3; 142:22; 151:21; 174:15; 177:22; 189:18; 191:9
stupid 173:15
subcategory 183:2
subject 6:1, 11; 55:8; 75:6; 85:11; 89:5; 124:7; 137:18; 154:21; 155:21; 156:22
submitted 101:10
sufficient 68:19; 69:2; 117:8; 195:21; 216:14, 22
suggest 198:12; 213:7; 215:19, 22
suggestion 89:10, 15, 16
summarize 66:12
summary 108:1, 6, 8; 113:7; 117:14; 176:7; 177:16; 191:1
summer 43:4, 5
Sunshine 16:12
supervise 18:13; 29:10
supervisor 34:3; 196:6
supervisory 33:19
supplemental 101:11; 204:19
supplied 135:3
supplying 116:7; 135:4
support 130:8
suppose 104:1
supposed 5:6; 55:12; 58:1, 19, 20, 22; 69:20; 70:13; 86:11; 89:14; 148:3; 165:19; 185:19
Supreme 39:2, 21; 40:1; 144:10
sure 25:5; 27:3; 31:22; 32:6, 10; 33:17; 49:19; 82:12; 84:22; 90:16; 91:14; 98:21; 100:2;

104:8; 106:10, 11; 109:15; 115:9; 118:12; 123:8; 137:14; 138:2; 140:19; 141:20; 143:20; 154:11; 164:13; 190:4; 203:20; 211:16
surprised 124:17
surrounding 86:12
surveillance 176:8; 177:17; 191:1
swear 42:22; 53:11; 77:4; 134:16
swearing 43:22; 82:21; 83:5
switched 17:18
sworn 4:5; 64:18; 82:22
systems 10:8, 16, 21; 12:4

## T

tab 102:9
talk 8:4; 104:11; 107:4, 6, 7; 113:21; 115:11; 146:3; 166:6; 199:10
talked 5:15; 84:12; 109:18, 19; 112:14; 116:14; 141:5, 16; 143:5; 144:14; 188:21; 189:1; 210:20
talking 26:19; 44:9; 51:13; 83:7, 9; 106:21; 112:12; 113:5; 115:19, 21; 116:9, 10; 132:19; 153:6; 154:1; 155:22; 156:16; 157:22; 158:1, 8, 15; 163:9; 164:22; 170:4; 175:3; 176:9, 10; 179:6, 10; 180:22; 184:20; 188:7, 17; 191:12, 14; 194:8; 198:13; 211:4; 212:4
talks 147:11
Tampa 51:7, 16; 52:11; 53:2, 3, 5, 18; 54:1, 6; 55:19; 56:20; 60:11; 61:22; 94:8; 98:11, 13; 102:20; 104:16, 19; 109:1; 122:7; 142:18; 148:15; 161:2
taped 180:10
tapes 180:15; 184:9, 10, 11, 21
target 146:19
task 159:18
taught 16:9
teach 16:15
teachers 146:12
teaching 16:4; 17:11
technical 92:17
technically 167:10
telephone 93:21; 176:11; 181:2, 11; 182:13; 185:7; 199:15
telling 59:3; 104:10; 156:6; 168:18; 187:1, 22; 188:10

tells 22:14; 62:12; 197:13
ten 19:5; 23:17; 40:14; 45:8; 50:20; 124:4; 128:10; 152:12, 14, 14
tenure 14:19
Terez 53:10
term 36:10; 37:18, 21; 110:17
terminology 36:19
terms 28:16; 29:19; 40:7; 177:13; 190:9
testified 4:5; 184:18
testify 179:12
testifying 80:11
testimony 82:19; 112:11, 16; 182:4, 9; 187:11; 192:22; 193:3; 202:14
Theresa 53:10
thinking 121:22; 145:5
third 130:19
third-parties 180:11
third-party 21:20; 33:21
Thomasa 61:12, 19
thoroughly 66:4
though 45:12; 49:21; 58:9; 59:2; 79:13; 85:7; 122:20; 141:8; 145:12; 165:20
thought 12:6; 105:8; 112:16; 120:12, 15; 142:6; 143:3, 11; 144:21; 151:19; 201:2; 206:13
thousands 45:10; 49:1
three 8:22; 10:14, 22; 47:9; 51:2; 93:16; 104:6, 19; 127:1, 18, 19; 129:15; 132:4; 160:13
threw 161:20
throughout 14:18; 15:18; 18:14
throw 121:4; 132:4
throwing 121:17
thrown 131:22; 155:16
tied 12:2
till 11:2; 13:8, 21; 15:1; 45:19; 88:7; 130:12; 155:5; 170:19; 184:6
times 6:8; 24:3; 37:6, 7; 40:14; 41:6; 51:2; 72:13; 201:11
timing 120:13, 15, 19
tissue 121:4
title 12:8; 24:10, 11; 25:11, 13
titled 101:10
titles 25:15
Tobacco 12:15
today 4:11; 5:4; 7:9, 15, 18, 19; 98:4; 198:21; 213:1
together 30:21; 71:6; 91:11
told 29:2; 46:18; 93:9; 103:10; 104:3, 9; 105:6; 118:6, 6; 123:9; 141:16;

143:2, 3, 12; 151:10;
159:17; 160:20; 161:12,
16; 163:14; 168:10; 171:4;
172:7, 14; 174:17; 179:19;
191:19; 195:19, 22; 196:3;
197:11; 200:15; 209:6
**took** 51:1; 64:7; 104:18;
133:5; 157:14; 159:20;
170:3
**tool** 90:10
**top** 60:14; 78:16; 91:15;
92:22
**total** 47:9
**totally** 78:4; 216:20
**touch** 63:11; 103:13;
121:8
**trainee** 98:7
**training** 145:16, 21;
146:5, 6, 9, 17; 147:17;
148:4, 8, 12; 149:18, 20;
151:2; 216:2, 4, 10
**transcript** 110:19
**transcripts** 46:16;
176:13, 14; 177:17; 180:7,
10, 14; 181:2, 11; 182:13;
185:7; 188:20
**travel** 37:12; 106:7
**Treasury** 11:3, 8, 15;
12:12, 13, 21; 13:1, 2, 7,
14; 14:3
**treat** 64:18
**treated** 88:8
**tree** 53:16
**trial** 38:9, 10; 39:5, 6;
65:7; 78:12; 81:16, 17;
141:12; 145:22; 164:4;
167:21; 182:16; 183:17,
20, 22; 184:2, 4; 191:11,
17, 20
**trial's** 69:10
**trials** 83:20; 164:5
**tried** 208:21
**triplicates** 102:21; 132:6;
140:3
**trouble** 80:14; 139:1
**true** 43:1; 103:10; 142:15;
174:7; 212:15, 19
**trust** 163:4
**truth** 99:22
**try** 5:10; 38:21; 59:11;
70:22; 156:19; 160:15;
186:12; 200:18; 201:5;
202:3; 210:7; 212:14
**trying** 25:14; 28:20; 38:5;
80:12; 98:9; 117:2;
149:12; 153:17; 157:10;
179:11, 22; 186:13, 21;
189:9; 190:8; 212:20;
213:1
**turned** 9:15; 17:17; 78:13
**turns** 22:20; 23:3
**twice** 37:8; 113:3; 128:10
**two** 22:18, 19; 28:3; 31:5;
39:7; 41:10, 11; 56:4; 57:3;
60:1; 61:5; 72:21; 114:13;
155:5; 160:10; 168:17;

192:18, 21; 195:15, 16
**two-way** 55:10
**two-week** 146:6, 8
**two-year** 9:14
**type** 12:1; 21:22; 38:4;
110:13
**types** 21:19; 45:8

## U

**U.S** 17:6; 18:15; 20:6, 9,
20; 23:4; 35:15; 43:16;
61:13, 15; 63:10; 78:6;
94:7; 99:19; 116:3; 129:7;
131:3, 12; 142:17; 146:10;
158:7; 160:18; 216:1
**ultimate** 177:12
**Ultimately** 114:8; 116:4
**unclear** 193:16
**under** 11:20; 13:13;
35:10; 37:22; 43:22;
46:16; 53:3; 67:16, 17, 19;
73:16; 80:20; 81:1; 85:13,
14; 137:19; 164:9; 165:3;
167:1; 172:19; 178:13;
179:7, 18; 180:17; 214:5,
6; 216:21
**underlying** 5:17
**underneath** 26:16; 92:1;
94:5, 17
**understood** 24:13; 87:1;
143:15; 144:2
**unfairly** 88:9
**unfortunate** 144:21
**Unit** 26:14; 91:17; 94:6;
95:6
**United** 15:8; 18:14;
20:12; 22:13; 28:13; 40:9;
43:18; 50:8; 51:6, 8, 15;
52:10; 56:19; 60:10;
70:14; 79:3, 6; 89:22; 92:8;
108:5; 109:1, 10; 123:15;
126:2; 129:5; 131:1;
145:15; 146:16; 147:16;
148:1; 191:13; 199:17;
216:7
**University** 8:6, 9; 9:2;
16:4
**unknown** 180:14
**unless** 180:14
**unperfected** 92:13
**up** 5:13; 11:19; 12:4;
15:13, 15; 29:13; 38:11;
41:14; 53:13; 55:20; 72:2;
75:4; 79:4, 5; 84:17; 88:2,
7; 113:10; 116:22; 120:8;
130:19; 137:16; 154:15;
155:14; 192:18, 21;
199:12; 206:21; 212:14;
216:7
**USC** 67:20; 180:18
**use** 36:5; 44:4; 52:5; 55:1,
2; 90:9; 102:22; 145:1;
161:18
**used** 18:9; 50:13; 64:12;
72:7; 81:17; 182:16; 202:3

**useful** 79:9
**using** 85:13; 95:14
**usual** 191:10
**usually** 19:6; 37:4, 5;
46:19; 50:20; 55:18; 99:16

## V

**vacation** 43:3
**vacuum** 107:21
**vague** 38:18; 42:3
**value** 68:15; 170:3; 203:2
**various** 47:8; 56:22;
129:13;'180:11; 188:2
**Vaughn** 45:5; 101:14, 18;
102:13; 117:1; 203:13, 17;
204:10, 12, 13, 14; 205:1,
6
**version** 19:14; 64:11;
67:10; 105:21; 134:15;
135:5
**versions** 132:3
**view** 121:15; 157:14
**vignette** 146:7
**violate** 125:5
**violated** 127:7
**violation** 138:5, 11
**Virginia** 131:2
**volumes** 170:22
**voluntary** 29:14
**volunteering** 18:11

## W

**wait** 27:11; 82:1; 98:18;
102:6; 117:19; 130:10, 12;
155:17; 158:16; 172:21;
177:7; 180:5; 181:1;
183:6, 12; 184:5; 208:6;
210:15
**waive** 5:6
**waiving** 5:21
**wants** 41:7; 174:14
**Washington** 4:15; 8:7;
9:2, 12; 35:9; 36:22
**way** 24:19; 29:13; 39:4;
42:6, 11; 47:15; 79:16;
89:12; 96:13; 111:5;
155:2; 164:3; 193:17;
216:6
**ways** 71:9
**weeks** 18:8; 41:11; 49:2
**Weinstein** 33:18
**welcome** 25:22
**weren't** 71:11; 81:17;
124:21; 160:21; 181:1;
191:8, 22; 207:4
**West** 131:2
**What's** 10:15; 25:4;
42:22; 56:17; 60:6; 62:14;
64:4; 65:2; 101:10;
104:14; 125:16; 126:22;
130:3; 132:21; 158:3;

193:21; 200:3; 202:9;
203:13, 15, 17, 19, 22;
204:7; 205:4, 5; 208:16;
209:1, 10; 212:8
**whenever** 77:1
**Where's** 180:6
**Whereupon** 4:2; 217:5
**wherever** 53:5
**who's** 7:11; 80:11; 84:3;
129:9; 154:8; 161:1;
196:19
**whole** 18:10; 20:6; 23:8;
43:16; 90:6; 96:20; 105:7;
108:17; 136:11; 177:21;
200:14; 201:20
**whose** 52:13; 143:16
**Willie** 47:5, 12; 49:4, 17;
52:15; 74:3; 76:6, 10; 77:8,
13, 21; 78:2, 7, 10; 79:5;
85:10; 93:18; 99:21;
100:5; 110:21; 157:21;
166:10; 167:6; 180:13;
194:22; 204:2, 4; 205:17,
20; 207:17
**Willie's** 167:7
**wiretapping** 176:12
**withdraw** 210:18
**withdrawn** 211:17, 22
**withheld** 156:9; 157:4, 7;
176:21; 177:15; 179:3, 6,
18; 182:1, 3, 6; 184:3;
186:5; 203:18, 20; 205:1
**withhold** 31:12; 46:16;
156:21
**withholding** 65:20;
177:5, 8; 179:7; 180:17
**within** 20:22; 50:20;
104:2, 18; 150:6; 175:16
**without** 117:14; 166:18;
170:4; 216:10
**witness** 4:4; 30:8; 36:10;
42:5; 44:17; 46:4, 7, 10;
52:19, 22; 56:10; 59:9;
60:21; 67:22; 73:9; 81:13,
16; 83:18; 88:17, 21;
90:19; 103:3, 17; 105:3;
106:10; 112:11, 18;
113:17; 118:15; 119:13;
123:21; 124:11; 128:16;
130:14; 131:5, 8; 133:8,
11; 134:4, 7, 14, 18; 135:8,
12; 136:1, 21; 138:1;
140:8, 13; 141:11; 147:20;
149:12, 15; 175:18, 19;
179:5, 9, 12, 21; 180:4;
181:20; 183:4; 184:7;
185:11; 187:11, 13;
192:13; 193:4; 194:12;
196:16; 197:5; 198:10;
202:14; 205:2; 206:7;
208:6, 15; 210:13, 16, 20;
213:15; 214:16, 19
**witnesses** 193:8
**woman** 142:4
**wondering** 10:17;
108:12
**word** 10:11; 36:5; 75:15,

18; 78:20; 92:16; 137:12,
12; 138:2, 2; 145:1; 214:21
**words** 37:6; 44:4; 70:9;
105:16; 116:4; 149:1;
150:22; 155:6; 173:14
**work** 7:6, 7; 10:6, 12;
11:3; 15:5, 5; 16:1; 19:19;
29:3; 42:16; 86:7; 114:2;
148:1; 160:18; 170:7;
201:4; 208:10
**work-product** 5:7
**work-related** 7:2
**worked** 9:16; 10:20; 18:7;
26:16; 101:2; 104:19;
116:6; 200:13, 20
**working** 11:5; 35:6;
101:1, 3, 19, 20; 115:8;
117:4; 139:18; 202:4;
212:22
**works** 42:12; 155:3
**workshop** 147:7
**world** 216:17
**worry** 133:10; 141:9
**worth** 196:17
**Wow** 40:17
**wrap** 199:12; 212:14
**wrist** 53:14
**write** 132:3
**writing** 22:18; 132:2
**written** 22:19; 41:3;
79:17; 131:14
**wrong** 22:4; 46:2; 86:21;
214:12
**wrote** 11:7; 12:22; 41:13;
131:12; 198:8

## X



**XII** 125:22

## Y



**year** 9:16, 17, 19, 21, 21,
22; 15:3; 18:5; 27:15; 29:5,
18; 37:6, 9; 41:7; 50:4;
139:16; 145:20; 147:12;
152:19
**years** 6:15; 8:22; 10:14;
11:1, 11; 16:7, 7; 17:12;
25:1; 39:9; 64:13; 69:5, 7;
70:15; 124:4; 128:10;
152:12, 14, 14, 21; 153:10;
154:16; 155:5, 14
**yellow** 125:19, 20; 130:5
**yes-or-no** 156:17, 18
**YESNER** 98:19; 112:15;
117:19; 131:4, 6; 133:20;
134:10; 179:13; 204:21;
210:12; 211:9
**young** 9:20

# In The Matter Of:

*WILLIE JEFFERSON    v.*
*JANET RENO et al*

---

*JEFFREY S. DOWNING*
*June 15, 1999*

---

*Beta Reporting*
*910 17th Street, N.W.*
*Suite 200*
*Washington, DC  20006*
*(202) 638-2400   or   (800) 522-2382*

*Original File AADOWNIN.TXT, 321 Pages*
*Min-U-Script® File ID: 1778964265*

**Word Index included with this Min-U-Script®**

WILLIE JEFFERSON   v.
JANET RENO et al

JEFFREY S. DOWNING
June 15, 1999

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
WILLIE JEFFERSON,          :
        Plaintiff,         :
        v.                 : No. 96-1284 (GK)
JANET RENO et al.,         :
        Defendants.        :
        Washington, D.C.   :
        Tuesday, June 15, 1999
Deposition of
        JEFFREY S. DOWNING
a witness, called for examination by counsel
for Plaintiff, pursuant to notice and
agreement of counsel, beginning at
approximately 10:45 a.m., at the law offices
of Piper & Marbury, 1200 19th Street
Northwest, Washington, D.C., before Shari R.
Broussard of Beta Reporting and Video
Service, notary public in and for the
District of Columbia, when were present on
behalf of the respective parties:

Page 2

APPEARANCES:
On behalf of Plaintiff:
    DONNA LEE YESNER, ESQUIRE
    Pepper, Hamilton, L.L.P.
    600 14th Street, Northwest
    Washington, D.C. 20005
    (202) 220-1245
    ELIZABETH R. DEWEY, ESQUIRE
    Piper & Marbury
    1200 19th Street, Northwest
    Washington, D.C. 20036
    (202) 861-6218
On behalf of Defendants:
    DAVID T. SMORODIN, ESQUIRE
    Assistant U.S. Attorney
    Department of Justice
    555 4th Street, Northwest, 10th Floor
    Washington, D.C. 20001

Page 3

CONTENTS
EXAMINATION BY:              PAGE
    Counsel for Plaintiff      5
    Counsel for Defendants    283
DOWNING DEPOSITION EXHIBITS:
No.  1 - Disposition Schedules        45
No.  2 - Memo, Campbell to Administrative  46
         Officers, Attachments
No.  3 - Excerpt, U.S. Attorneys' Manual  76
No.  4 - Memo, Downs to Gay, Attachments  99
No.  5 - FOIA/Privacy Act Regulations  101
No.  6 - Contacts Manual             103
No.  7 - EOUSA Resource Manual       120
No.  8 - April 30, 1997, Declaration of  165
         Downing
No.  9 - Response to Motion To Compel  188
No. 10 - Telephone Records           197
No. 11 - Petition for Writ of Certiorari  218
No. 12 - March 15, 1999, Declaration of  218
         Downing
No. 13 - Investigation Initiation Form  258
No. 14 - ACIIS Intelligence Supplement  287
         Report

Page 4

[1] PROCEEDINGS
[2] Whereupon, [3] JEFFREY S. DOWNING
[4] called as a witness, and having been
first [5] duly sworn, was examined and
testified as [6] follows:

[7] MR. SMORODIN: Before we begin, I [8]
will object for the record to the depo-
sition [9] of Jeffrey Downing, an As-
sistant United [10] States Attorney form-
ally in Tampa and now in [11] New
Hampshire.

[12] We are making Mr. Downing available
[13] pursuant to the court's February
1999 order. [14] We will object and do
object to any questions [15] that go

beyond the scope of the court's order [16]
specifically without limitation to any [17]
questions that go into Mr. Downing's
mental [18] processes during the criminal
trials giving [19] rise to the FOIA request,
and I've been [20] assured by counsel
previously that was not [21] their intent. I,
however, make the objection [22] just to
preserve it and now that Ms. Yesner

Page 5

[1] is sitting at the table I'll shut up and let
[2] the deposition begin.

[3] MS. YESNER: Just to make sure I [4]
understand, are you objecting to the [5]
deposition of Mr. Downing, or only
subject to [6] those limitations?

[7] MR. SMORODIN: No, subject to those
[8] limitations.

[9] We have produced Mr. Downing [10]
pursuant to the court's order and pur-
suant to [11] the court's instructions in
open court on a [12] couple of occasions —
I don't recall the [13] dates — and we
agreed to make Mr. Downing [14] avail-
able, and I may have phrased my [15]
objection poorly. We do object to any [16]
questions that go beyond the scope that
the [17] court has outlined.

[18] MS. YESNER: That's understood.

[19] MR. SMORODIN: Okay.

[20] EXAMINATION BY COUNSEL FOR
PLAINTIFF

[21] BY MS. YESNER:

[22] Q: This is the deposition of Jeffrey

Page 6

[1] S. Downing taken in Civil Action [2]
Number 96-1284 (GK) in the United
States [3] District Court for the District of
Columbia in [4] accordance with the
Federal Rules of [5] Civil Procedure
and the witness has been [6] sworn.

[7] Good morning, Mr. Downing.

[8] A: Good morning.

[9] Q: Thank you for coming down. [10]
My name is Donna Yesner, and I am [11]
representing the Plaintiff Willie Jef-
ferson, [12] and with me is Lisa Dewey of
the firm Piper & [13] Marbury, who is co-
counsel.

[14] Mr. Downing, do you understand the
[15] nature of this particular civil action
and [16] why you have been asked to
provide a [17] deposition?

[18] A: I think so, yes.

[19] Q: You're an attorney, so I don't [20]
really need to tell you what to expect in a [21]
deposition, but, please, if you want to
take [22] a break, just let me know, and
we'll take a

Page 7

[1] break.

[2] A: Okay.

[3] Q: We will be having to stop every [4]
hour or so, we'll see how it goes, to
confer [5] with Mr. Jefferson, since he's
got to attend [6] by telephone.

[7] Let me just ask you to state your [8]
name and your present address for the
record.

[9] A: Jeffrey S. Downing, and my busi-
ness [10] address is 55 Pleasant Street,
Room 352, [11] Concord, New Hampshire
03301.

[12] Q: You're represented here today by
[13] Mr. Smorodin?

[14] A: Yes.

[15] Q: Now, in preparing for today [16]
deposition did you confer with anyone
other [17] than your counsel?

[18] A: I spoke with counsel — other [19]
counsel for the government.

[20] Q: Other than counsel for the [21]
government, did you speak with anyone
else?

[22] A: Not in preparation, no.

Page 8

[1] Q: Since you have been noticed for [2]
your deposition have you spoken to Mr.
Paul [3] Cooke?

[4] A: No.

[5] Q: Have you spoken to Bonnie Gay?

[6] A: No.

[7] MR. SMORODIN: Since when? [8] Ob-
jection.

[9] MS. YESNER: Since being noticed [10]
for this deposition.

[11] THE WITNESS: No. I received an [12]
E-mail from her telling me I was going to
be [13] deposed.

[14] BY MS. YESNER:

[15] Q: Can you just briefly summarize
your [16] educational background?

[17] A: Graduated from high school in
1979, [18] graduated from Allegheny
College in [19] Meadville, Pennsylvania, in
1983 with a [20] bachelor of art's degree
in Political [21] Science. Graduated from
Dequesne University [22] School of Law
in 1986.

Page 9

[1] Q: Where did you work after you [2]
graduated from law school in '86?

[3] A: I worked for approximately six [4]
months at Tucker, Arensburg, P.C. It was a
[5] medium-sized law firm in Pittsburgh,
[6] Pennsylvania.

[7] Q: For about six months?

[8] A: About six months.

[9] Q: Where did you go after you left [10]
there?

[11] A: I went to the U.S. Attorneys' [12]
office in Tampa, Middle District of —

[13] Q: Directly from private practice into

[14] the U.S. Attorneys' Office?

[15] A: Yes.

[16] Q: So that was the end of '86?

[17] A: I started there March 15th of 1987.

[18] Q: How long were you in the U.S. [19] Attorneys' Office in Tampa?

[20] A: I left there — my last day was [21] September 23rd, I believe, of 1998. That was [22] my last official day there. I then started

**Page 10**

[1] in the U.S. Attorneys; Office in the District [2] of New Hampshire in, I believe, the following [3] day, and that's where I am currently [4] employed.

[5] Q: So since the end of September '98?

[6] A: Actually — I was actually working [7] in the District of New Hampshire as of the [8] end of September, but I was still detailed to [9] the Tampa office until the end of November.

[10] Q: Who was your secretary during the [11] period in which you were a prosecutor in [12] Tampa?

[13] A: Cindy Cole.

[14] Q: The entire time?

[15] A: Yes.

[16] Q: Now, when you went to the U.S. [17] Attorneys' Office for the Middle District of [18] Florida, did you go into the criminal [19] division or were you in the civil division?

[20] A: I was in the criminal division.

[21] Q: Now, were you assigned to a special [22] section at that time?

**Page 11**

[1] A: When I started in the U.S. [2] Attorneys' Office, there were no sections. [3] The criminal division reported to a deputy [4] chief and a chief. There were people who [5] were designated to the Organized Crime Drug [6] Enforcement Task Force. They were not a [7] section. I was designated to work as an [8] OCDETF, Organized Crime Drug Enforcement Task [9] Force attorney in December of 1987.

[10] Q: What does that mean?

[11] A: I'm sorry?

[12] Q: A task force attorney for OCDETF?

[13] A: It is a — those are Assistant U.S. [14] Attorneys who are specifically designated to [15] work on organized crime and drug organization [16] cases.

[17] Q: Did a point in time come when the [18] office was organized so that there was a [19] narcotics section?

[20] A: Yes.

[21] Q: When was that?

[22] A: I don't know exactly. I believe,

**Page 12**

[1] roughly, 1989.

[2] Q: So you were assigned to OCDETF [3] prior to the reorganization?

[4] A: Right.

[5] Q: Then when the office created a [6] narcotics section, were you assigned to that [7] section?

[8] A: Yes, all the OCDETF attorneys were [9] signed to that section at that time.

[10] Q: Because they all involved [11] narcotics?

[12] A: Right.

[13] Q: In your career as a prosecutor did [14] you ever do any appellate work?

[15] A: No. Well, let me — when I was — [16] when was in law school, I worked in the [17] District Attorneys' Office in Allegheny [18] County in Pittsburgh. My third year I was [19] certified to try cases. I was assigned to [20] the drug section during that time. I tried [21] approximately 30 jury trails and I also did [22] some appellate work during my third year as

**Page 13**

[1] well. I also did appellate work my second [2] year, but not as an Assistant U.S. Attorney I [3] did not.

[4] Q: So that work that you were doing, [5] appellate work you were doing, was as a law [6] student?

[7] A: That's correct.

[8] Q: Under the supervision of attorneys?

[9] A: That's right.

[10] Q: How did you as a trial lawyer for [11] the U.S. Attorneys' Office? Were your cases [12] on occasion appealed?

[13] A: Yes.

[14] Q: How many cases would you say you [15] have handled a year?

[16] MR. SMORODIN: Cases that go to [17] trial or any cases?

[18] MS. YESNER: Cases that went to [19] trial, that were not dismissed prior to [20] trial.

[21] MR. SMORODIN: My question is, [22] because I would assume that a lot of the

**Page 14**

[1] cases were pleas and so they didn't go to [2] trial, but they —

[3] MS. YESNER: Where you had a jury [4] verdict.

[5] THE WITNESS: That's difficult to [6] answer because there were — there were [7] years when I probably tried six or seven jury [8] trials. There were other years that I may [9] have tried two. The — the when I say, you [10] know, one or two,

**Page 15**

it's difficult if you're [11] trying to determine how long was I in trial. [12] I had trials that lasted three days. I had [13] trials that lasted three months. So —

[14] BY MS. YESNER:

[15] Q: Over the course of, say, ten years, [16] from March of '87 to March of '97, how can [17] you estimate how many cases that you took to [18] the jury where you got a conviction?

[19] A: If I could tell you how many I [20] tried, I could tell you how many I convicted [21] because it was all of them. I would say —

[22] Q: That's a good record.

**Page 15**

[1] A: I would say probably 40.

[2] Q: In all of those cases which you —

[3] A: Forty — 40 trials and you've asked [4] me for the number of trials; you're not [5] asking for the number of defendants, right?

[6] Q: No, no, no, the numbers of trials [7] where you got a conviction.

[8] A: Approximately 40.

[9] Q: In those cases can you approximate [10] how many resulted in appeals or appeals were [11] taken?

[12] A: I would say probably most of them.

[13] Q: Were those appeals all taken to [14] the 11th Circuit?

[15] A: Yes. That would be — that would [16] be the circuit —

[17] Q: The Circuit Court for the Middle [18] District?

[19] A: Yes.

[20] Q: Were any of those cases, then, [21] after the 11th Circuit rule, did any of those [22] result in a remand for a new trial or —

**Page 16**

[1] A: Not for a new trial. There — [2] there was at least one that I can recall that [3] was remanded for a sentencing issue related [4] to the sentencing guidelines and it related [5] to a problem that occurred when the [6] guidelines went into effect.

[7] Q: Did any of those cases get [8] overturned?

[9] A: No.

[10] Q: So by far, the majority of your [11] cases, then, were affirmed by the 11th [12] Circuit?

[13] A: Yes, everything — every case that [14] I know of that — that I tried where the [15] defendant appealed the conviction was [16] affirmed in the 11th Circuit.

[17] Q: In any of those cases did the [18]

LIE JEFFERSON    v.
ET RENO et al

JEFFREY S. DOWNING
June 15, 1999

dant petition the Supreme Court
certiorari?

I'm sure they did. I don't [21]
mber specifics. I know that — I
[22] that in this particular series of
I

**Page 17**

ow that Ronald Mathis petitioned
rt.

How about prior to that time, [3]
t?

don't know. I can't — I can't [5]
fically tell you that I recall any cases
here that occurred. Maybe I —
I [7] should tell you that at a
n point, and [8] I believe it was
bly around 1990, we [9] have — we
n appellate division that was [10]
d in our office. Prior to that time
did handle our own appeals, so
jogged [12] my memory as to your
us question. I [13] did handle — I
ndle appeals prior to [14] that time
would have written appellate [15]

So in those early years you were a
etty junior attorney then. In the
[18] that were appealed, then affir-
y the 11th [19] Circuit did any of the
ants file [20] petitions for writs?

L. SMORODIN: Writs of certiorari?

. YESNER: Yes.

**Page 18**

WITNESS: Not that I recall.

MS. YESNER:

Now, after you created an appellate
ision so that you had attorneys
[5] your office responsible for
ls, was that [6] all that those attor-
lid? Were they just [7] appellate
ys?

SMORODIN: Objection to the [9]
ng of the question, which you —

MS. YESNER:

It was pretty clumsy. Did you [12]
stand me?

. SMORODIN: My objection was
didn't create the appellate div-
out —

WITNESS: I think I understand
question. Let me — let me just see
can maybe clarify.

en I started in '87, I would have [19]
imary responsibility for handling
appeals on cases that I — that I
uted. [21] When the appellate
n was formed [22] initially, there
ast a few assistants

**Page 19**

hat division and they were es-
ly [2] responsible for the entire
, which [3] was approximately a

hundred Assistant U.S. [4] Attorneys.

[5] Those — for a short period of [6] time,
and I cannot tell you exactly how long [7]
that was, perhaps a year or two, the [8]
assistants who were trying cases were
still [9] primarily responsible for writing
the [10] appellate briefs. The briefs were
edited, if [11] you will, by the attorneys in
the appellate [12] division.

[13] At some point, again, I can't tell [14]
you specifically when, but at some point
the [15] appellate division took over the
case and [16] handled the appellate work
from start to [17] finish.

[18] BY MS. YESNER:

[19] Q: Now, how would you know if one
of [20] your cases was appealed to the
11th Circuit [21] after the appellate div-
ision was created?

[22] A: The trial attorney would get the

**Page 20**

[1] notice of appeal. The case was not
assigned [2] to an appellate division
attorney until after [3] the notice of
appeal came in.

[4] Q: Then you would have to make sure
[5] that the record was sent up?

[6] A: Right. Well — well, what I would [7]
do as a trial attorney at that point is I [8]
would, or my secretary would prepare
the file [9] to — at least the file jacket, to
go to an [10] appellate division, usually to
the chief or [11] to the chief's secretary,
and then the case [12] would be assigned
to an appellate division [13] attorney.

[14] Q: The government was always the
[15] respondent in your appeals; is that an
[16] correct assumption?

[17] A: That's usually true. I do recall [18]
one case where a supression issue was
[19] appealed and we would have — we
would have [20] filed it as an inter-
locutory —

[21] Q: I was going to say was that an [22]
interlocutory issue?

**Page 21**

[1] A: Yes.

[2] Q: But except for rare instance where
[3] there was an interlocutory issue
during the [4] trial, for post-verdict
appeals, those were [5] all brought by the
defendants?

[6] A: Yes.

[7] Q: As I understood your testimony, a
[8] large percentage of those, virtually all
of [9] those convictions were appealed to
the [10] circuit court?

[11] A: Yes. Most of the defendants that
[12] were convicted appealed.

[13] Q: Knew that because you got a
notice [14] of appeal as the prosecutor?

[15] A: That's correct.

[16] Q: Let me back up. How would you

know [17] what the circuit court dec-
ided?

[18] A: The — and I'm assuming your [19]
question is referring to cases after the [20]
appellate division was created and they
had [21] the responsibility to —

[22] Q: Yeah, sure.

**Page 22**

[1] A: Generally, we would just be ad-
vised [2] when the result came out by the
appellate [3] attorney. For a while they
were sending a [4] duplicate copy up to
the — of the opinion or [5] the order or
the mandate, they were sending [6] it to
the trial attorney.

[7] Q: Was that just as a courtesy [8]
practice in that office?

[9] A: Yeah.

[10] Q: Now, with respect to the final [11]
appeal stage, petition to the Supreme
Court, [12] in the early days prior to 1990,
if you were [13] the appellate counsel,
you would know if the [14] defendant
filed a petition for a writ because [15] you
would be the attorney of record; is that
[16] right?

[17] A: Well, what would happen is the
[18] petition would be filed and, gener-
ally, the [19] Solicitor General would have
to make a [20] determination whether we
would file a [21] response and so we
would know — we would [22] know if it
was done, that is, if there was a

**Page 23**

[1] petition for cert, but we would not [2]
participate in it at that point.

[3] Q: How soon after a petition was filed
[4] would the Solicitor's Office let the
U.S. [5] Attorneys' Office know that a
petition had [6] been filed?

[7] A: I don't know the answer to that. I [8]
would assume — I could only say that I
would [9] think relatively quickly bec-
ause there's a [10] relatively short time
period, I believe, for [11] the Solicitor
General to file a response, if [12] a
response is requested from the court.

[13] Q: I'm assuming, please correct me if
[14] I'm wrong, that once you had an
appellate [15] division and there was
counsel from the U.S. [16] Attorneys'
Office who was appellate counsel [17] of
record in an 11th Circuit case, that the
[18] Solicitor's Office would inform that
attorney [19] if there had been a petition
to the Supreme [20] Court; is that right?

[21] A: That's probably correct.

[22] Q: If there was such an occurrence

**Page 24**

[1] that a case of yours, say, was petitioned
or [2] there was a petition to the Supreme
Court, [3] how would you know if that
happened?

[4] **A:** I would know — I would know [5] probably if I asked the appellate attorney. [6] Usually what would happen is, for example, if [7] we got an affirmance back from the 11th [8] Circuit, I would know because the appellate [9] attorney would tell me in most instances.

[10] They would get the order. They [11] would get the opinion. As I said, usually as [12] a courtesy they were sending copies up. [13] Sometimes they would just call you or see you [14] in the hall and say, hey, this was affirmed.

[15] If there was anything that happened [16] further after that, a petition for rehearing [17] or — a petition for rehearing, for example, [18] in the 11th Circuit or a petition for cert —

[19] **Q:** En banc?

[20] **A:** Yeah, there could be a petition for [21] a rehearing on panel, a petition for [22] rehearing en banc or a petition for cert.

Page 25

[1] Generally I can only tell you what I [2] would [3] do, and that is if I knew that that happened, [3] and I would know that because the [4] appellate attorney would, number one, want to [5] send the file back down, and number two, [6] would usually tell us or would tell me that [7] it was happening and — and then I would [8] either be told when it, you know, if cert was [9] denied or occasionally I would call the [10] appellate attorney and say what's going on [11] with this case.

[12] **Q:** Now, are you familiar with the [13] rules on amount of time in which a party can [14] file, for example, a petition for rehearing?

[15] **MR. SMORODIN:** In the court of [16] appeals.

[17] **MS. YESNER:** In the court of [18] appeals.

[19] **THE WITNESS:** I don't know. I [20] don't know the exact period of time, no.

[21] **BY MS. YESNER:**

[22] **Q:** Do you know how much time a

Page 26

[1] defendant would have to appeal a [2] conviction to the —

[3] **A:** Ten days.

[4] **Q:** Ten days?

[5] **A:** Yes.

[6] **Q:** But you don't know how much time [7] for a petition after an affirmation?

[8] **A:** For a rehearing I don't know [9] specifically. If I had to — if I had to give [10] you an educated guess, I would probably [11] say 30 to 45 days.

[12] **Q:** Do you know how much time a party [13] has to petition the Supreme Court from a [14] circuit court decision?

[15] **A:** No, I don't.

[16] **Q:** You've always been a prosecutor. [17] You've never been an attorney in any civil [18] actions; is that right?

[19] **A:** I worked for six months before I [20] went to the U.S. Attorneys' Office and did [21] litigation.

[22] **Q:** Are you familiar at all with any

Page 27

[1] rules that would require preservation of [2] evidence in a case?

[3] **A:** Evidence?

[4] **Q:** Uh-huh.

[5] **MR. SMORODIN:** You're talking about [6] a criminal case now, right?

[7] **MS. YESNER:** No.

[8] **MR. SMORODIN:** Any kind of case?

[9] **MS. YESNER:** Any kind of case. [10] Civil or criminal.

[11] **THE WITNESS:** Well, generally, I'm [12] familiar with — with the constitutional [13] cases that would require us to preserve [14] evidence in a criminal case. United States [15] v. Youngblood and a number of other cases.

[16] **BY MS. YESNER:**

[17] **Q:** Now, is there an obligation on the [18] part of witnesses or parties with, I [19] shouldn't say parties, but people with [20] information relevant to the case, for those [21] people to preserve that information?

[22] **MR. SMORODIN:** Objection.

Page 28

[1] Ambiguous. Are you talking about the [2] government or are you talking about [3] individuals who may have been a witness to a [4] crime or to an automobile accident?

[5] **BY MS. YESNER:**

[6] **Q:** Are you familiar with the concept [7] of obstruction of justice?

[8] **A:** Oh, I know — I know — certainly [9] I know what obstruction of justice is. I've [10] prosecuted a number of obstruction of [11] justice cases.

[12] **Q:** If I had documents that were [13] relevant to a case that you were prosecuting, [14] would I be obstructing justice if I destroyed [15] those documents knowing that those documents [16] were relevant to your case?

[17] **A:** It would depend on as far as — are [18] you talking about a violation of Title 18, [19] Section 1503 of obstruction of justice?

[20] **Q:** Yes.

[21] **A:** It would depend on what your [22] relationship was to the case, what you knew

Page 29

[1] about the case and at what stage the [2] proceeding was in.

[3] **Q:** So there's a possibility —

[4] **A:** It would also — it would also [5] relate to the materiality of the documents [6] to the — to the issue. There would be a number [7] of matters that would be involved in that, [8] state of mind, willful obstruction.

[9] **Q:** Let me ask you this: Have you ever [10] sought sanctions against anyone for [11] destroying documents?

[12] **MR. SMORODIN:** When you say [13] sanctions, are you meaning —

[14] **BY MS. YESNER:**

[15] **Q:** You know, in the context of an [16] ongoing case.

[17] **MR. SMORODIN:** Other than [18] prosecuting them, which is sanctions?

[19] **MS. YESNER:** Other than prosecuting [20] them.

[21] **THE WITNESS:** I'm not sure I [22] understand your question.

Page 30

[1] **BY MS. YESNER:**

[2] **Q:** Can you tell me if there are [3] sanctions available under the rules of [4] criminal procedure for destruction of [5] documents, what would be a sanction within [6] the court proceeding as opposed to a separate [7] criminal prosecution?

[8] **A:** Well, I'm not sure in what sense [9] I — for example, if, as a criminal [10] prosecutor, I subpoenaed documents to a — [11] or I subpoenaed a records custodian to produce [12] documents to a Grand Jury —

[13] **Q:** That's a good example.

[14] **A:** And after — after they received [15] notice of — after they were served with the [16] subpoena they intentionally destroyed those [17] documents so as not to produce them to the [18] Grand Jury, the — I mean that — that would [19] be a crime — could be a crime of criminal [20] prosecution.

[21] As far as other sanctions, if that [22] individual came into the Grand Jury and just

Page 31

[1] said, I refuse to produce those documents, [2] potentially a judge could hold him in [3] contempt after a compulsion hearing, which I [4] guess is a sanction.

[5] **Q:** Have you ever sought to have [6] someone held in contempt for failing to [7] produce any information that was subpoenaed?

[8] **A:** Yes, I did.

[9] **Q:** You have?

WILLIE JEFFERSON    v.
JANET RENO et al

JEFFREY S. DOWNING
June 15, 1999

[10] A: Yeah. It was an attorney.

[11] Q: Pardon?

[12] A: It was an attorney.

[13] Q: An attorney that failed to produce [14] something?

[15] A: Yes.

[16] Q: It was covered by a subpoena?

[17] A: Yes.

[18] Q: Was that for a Grand Jury?

[19] A: Yes.

[20] Q: What was the result?

[21] A: Well, he was — he was prosecuted [22] and convicted for obstruction of justice.

                                    Page 32

[1] Q: Are you at all familiar with the [2] Federal Rules of Civil Procedure?

[3] A: No.

[4] Q: You deal strictly with the Rules of [5] Criminal Procedure?

[6] A: Yes.

[7] Q: Let me change subjects here, talk [8] about a favorite subject, the Freedom of [9] Information Act.

[10] Over the course of ten years, since [11] you began at the U.S. Attorneys' Office for [12] the Middle District of Florida, can you [13] estimate how many cases that you had which [14] you were advised that a person had submitted [15] a FOIA request for documents located or [16] records located in those case files?

[17] A: I know of — I know of or I recall [18] two.

[19] Q: Two?

[20] A: Yes.

[21] Q: Does that include Mr. Jefferson's [22] case?

                                    Page 33

[1] A: Yes.

[2] Q: So there was one other one?

[3] A: Yes.

[4] Q: When was the other request?

[5] A: I don't know. The only reason I — [6] the only reason I recall it is because I do [7] recall — I do recall another occasion when a [8] paralegal came in and had prepared the [9] response form. I don't even know what case [10] it was on. But I do recall that there was [11] another occasion other than this case. You [12] said 10 years. It's actually closer to 12 [13] years.

[14] Q: I was just thinking in the period [15] of time —

[16] A: You were just talking about '87 [17] to '97.

[18] Q: Roughly the time period. [19] When you began at the U.S. [20] Attorneys' Office, did anyone ever provide [21]

you with any training on Freedom of [22] Information Act requests?

                                    Page 34

[1] A: No.

[2] Q: I'm sorry. The other case that you [3] were talking about, did that precede [4] Mr. Jefferson's FOIA request?

[5] A: Yes.

[6] Q: Again, what year was that?

[7] MR. SMORODIN: Objection. Go [8] ahead.

[9] BY MS. YESNER:

[10] Q: You don't recall?

[11] A: I don't recall.

[12] Q: Do you remember how long it was, [13] roughly, after you began working?

[14] A: No, I don't.

[15] Q: In the first case in which someone [16] had requested documents did it come from the [17] defendant?

[18] A: I believe it did, yes.

[19] Q: Was the case still open?

[20] A: I don't know.

[21] Q: Were you asked to produce [22] documents?

                                    Page 35

[1] A: No. I was — the only way that — [2] that I would have been aware that a request [3] had even been made, generally, I believe it [4] was the practice in the office for the [5] Freedom of Information Act request to go to [6] Pat Nadiak in Orlando. She would then take [7] what — take the request and I presume she [8] would send it to the paralegal who was [9] responsible for handling the Freedom of [10] Information Act request in the appropriate [11] office.

[12] My only recollection of the [13] previous FOIA request was — I can't even [14] tell you who the paralegal was who brought it [15] into my office — was in bringing in the [16] one-page sheet that had information about the [17] case on it, I reviewed it. It was accurate [18] and I was told I was supposed to sign it and [19] I did.

[20] Q: You don't recall whether, in [21] reviewing that sheet of paper, whether the [22] case was still open or whether there was an

                                    Page 36

[1] appeal pending?

[2] A: I don't remember, no.

[3] Q: Well, would you have been con- [4] cerned if documents were to be released if [5] the case was still open?

[6] A: When you say was the case still [7] open, I'm sure I would have been at least [8] concerned. I certainly would have

been [9] concerned about it had it been made while the [10] criminal prosecution was still pending and [11] I — I probably would have been at least, you [12] know, aware of it obviously if there was an [13] appeal ongoing. But I don't recall — I [14] really don't recall the stage that that was [15] in. Let me say this. I'm sure it wasn't [16] during the criminal prosecution.

[17] Q: Were you advised that there was a [18] policy in the office concerning the release [19] of records while the case was pending?

[20] A: The release of records while a case [21] was pending?

[22] Q: Uh-huh.

                                    Page 37

[1] A: A policy?

[2] Q: By release I mean release under [3] FOIA to a requester.

[4] A: Not that I know of, no.

[5] Q: When you began working at the U.S. [6] Attorneys' Office, were you in- [7] troduced to anyone on the staff who was [8] responsible for handling FOIA requests?

[9] A: Not specifically. I don't — I [10] don't recall how it was disseminated to us. [11] I really don't know how we learned about it. [12] I mean there were people that handled certain [13] things in the office and, you know, even [14] though you may not have ever had any dealings [15] with that particular subject, you would know [16] that those people handled certain things. I [17] knew that — that there were one or two [18] paralegals who handled FOIA requests.

[19] Q: How did you know about Pat [20] Nadiak?

[20] A: I knew about Pat Nadiak, I believe, [21] through this particular request and as far as [22] I — as far as I recall, someone — someone

                                    Page 38

[1] mentioned to me that she was the [2] clearinghouse, if you will, for the FOIA [3] requests.

[4] Q: How many attorneys are there or [5] were there in the U.S. Attorneys' Office in [6] Tampa when you were there?

[7] A: In Tampa?

[8] MR. SMORODIN: Are you referring to [9] civil or criminal or everybody?

[10] MS. YESNER: In the criminal [11] section.

[12] BY MS. YESNER:

[13] Q: Is it a division? Is that how [14] it's —

[15] A: It's a criminal division. I'm not [16] sure. I'll give you an estimate. 25.

[17] Q: Did that change over the course of [18] time you were there?

[19] A: Yes.

[20] Q: How many were there in, say, the [21] first five years you were there?

[22] A: When I — when I first got there

---

Page 40

[1] in '87, there were probably 10, 11, 12 maybe [2] criminal assistants.

[3] Q: Do you know how many staff people [4] there were, secretaries and paralegals?

[5] A: I have no idea.

[6] Q: Were there as many as attorneys?

[7] A: No.

[8] (Discussion off the record)

[9] BY MS. YESNER:

[10] Q: Did the criminal division have its [11] own staff that was separate from the civil [12] division?

[13] A: I'm not sure I understand. When [14] you say staff, are you talking about support [15] personnel?

[16] Q: Support personnel, nonattorneys.

[17] A: The support personal were as- signed [18] to either a criminal division or a civil [19] division attorney.

[20] Q: So a paralegal would work solely [21] for the criminal division?

[22] A: When — yes, I believe that's

---

Page 40

[1] correct.

[2] Q: When you began at the U.S. [3] Attorneys' Office, were you provided any [4] information on retention of re- cords, standard [5] practices and policies for retention of [6] records?

[7] A: No.

[8] Q: So you were never given any man- uals [9] or memoranda that described how you were to [10] retain records?

[11] A: When I started in the U.S. [12] Attorneys' Office, there wasn't a whole lot [13] of — there were policies, there were —[14] there were memos on vari- ous things. I don't [15] recall ever getting any kind of memo on [16] retention of files or anything like that.

[17] Q: Now, how about after you began. At [18] some point in time were you ever provided any [19] information on how to retain documents after [20] a case was closed?

[21] A: No, never — never received any [22] memos to, you know, as to that subject.

---

Page 41

[1] Q: When memoranda were issued either [2] by the Department of Justice or the U.S. [3] Attorneys' Office affecting Assistant U.S. [4] attorneys, how would those be distributed to [5] you?

---

[6] A: Before we each had a computer on [7] our desk they would have been photocopied,a [8] hard copy would have been put in our mailbox. [9] After com- puters — after everybody had a [10] computer the items, for the most part, would [11] have been E-mailed to us.

[12] Q: When did you each get com- puters in [13] Tampa?

[14] A: I don't know. I don't recall.

[15] Q: In addition to E-mail [16] com- munications when you got computers, did [17] you have electronic access to Department of [18] Justice and U.S. Attor- neys' Office practices [19] and policies?

[20] A: Generally, at some point, and I [21] can't tell you when, it would have been after [22] we got computers, I believe that we had the

---

Page 42

[1] capability to access an executive office of [2] the U.S. Attorneys' Web site to attain any [3] information that they had on there.

[4] Q: How about your own agency, in- ternal [5] documents, administrative doc- uments?

[6] A: Not that I recall, no.

[7] Q: Do you remember if you got [8] computers before Mr. Jefferson's case?

[9] MR. SMORODIN: His criminal case or [10] the FOIA case?

[11] MS. YESNER: The criminal case.

[12] THE WITNESS: I don't believe we [13] did.

[14] BY MS. YESNER:

[15] Q: Do you remember if you had them by [16] the conclusion of his case, after the [17] verdict?

[18] A: I really don't know when we got [19] them, so I don't know how I could answer [20] that. I'm just not sure when we got the [21] computers for the first time.

[22] Q: When was the next big case that you

---

Page 43

[1] had after Mr. Jefferson's case?

[2] A: Well, I had significant complex [3] litigation going on while that was going on.

[4] Q: If you had computers, would it [5] assist you in preparing your cases?

[6] A: Not really. For me it probably [7] would not because most of the stuff that I [8] would do, because of the volume of what we [9] were doing, it would not have been efficient [10] time wise for me to use a computer to type.

[11] Q: I'm just trying to figure a way to [12] try to jog your memory as to when you would [13] have started using the com-

---

puter.

[14] A: I don't know. I can tell you — I [15] mean I probably was one of the last people to [16] start using it. I am sure I resisted it and [17] I know that I didn't — I wasn't doing my own [18] typing, for example.

[19] Q: Is there a point in time when you [20] had a computer that allowed access to the [21] Internet?

[22] A: Yes.

---

Page 44

[1] Q: Do you remember when you would have [2] started accessing the Internet from work?

[3] A: Well, when you say the Internet, I [4] believe we had a capability to access the [5] Internet and I believe that DOJ net is on the [6] Internet. No, I'm sorry. I don't — I just [7] don't know the times that — I just don't —[8] I don't remember.

[9] Q: Did you have a computer before you [10] left the Tampa office?

[11] A: Yes, I did. I had a computer [12] before I — before we moved into our new [13] offices, which, I believe, was around April [14] of 1998. How long I had a computer before [15] that I don't really know. It took up space [16] on my desk.

[17] Q: Mr. Downing, I'd like to show you a [18] series of documents and, basically, I'd just [19] like to know if you have ever seen them [20] before. Here we go.

[21] The first document I'm going to [22] show you we'll mark as Exhibit 1.

---

Page 45

[1] MR. SMORODIN: I think, counsel, [2] these are documents that we produced in [3] discovery.

[4] MS. YESNER: Yes.

[5] (Downing Deposition Exhibit [6] No. 1 was marked for [7] identification.)

[8] BY MS. YESNER:

[9] Q: What I've handed you is an order [10] dated from March of 1985, which I believe was [11] two years before you joined the U.S. [12] Attorneys' Office, the subject of which is [13] the disposition schedules for United States [14] Attor- neys' records. Have you ever seen this [15] document before?

[16] A: I've never seen this document.

[17] MR. SMORODIN: Is that Exhibit 1?

[18] MS. YESNER: Yes.

[19] BY MS. YESNER:

[20] Q: No one ever provided you with a [21] copy of this Appendix 1?

[22] A: I have never seen that document.

---

Page 46

[1] MR. SMORODIN: Off the record for a [2] second.

---

WILLIE JEFFERSON  v.
JANET RENO et al

JEFFREY S. DOWNING
June 15, 1999

[3] (Discussion off the record)

[4] MS. YESNER: Let's mark this next [5] one 2.

[6] (Downing Deposition Exhibit [7] No. 2 was marked for [8] identification.)

[9] BY MS. YESNER:

[10] Q: I'm showing you a document that's [11] stamped Received U.S. Attorney, Middle [12] District of Florida, October 31, 1991, and it [13] is to All Administrative Officers concerning [14] the NEW Records Transfer Procedures to [15] Federal Records Centers. I'll give you a [16] second to look at those. Have you ever seen [17] this document before?

[18] A: No.

[19] Q: What was the practice in Florida at [20] the U.S. Attorneys' Office in Tampa for [21] sending records to the Federal Records [22] Center?

Page 47

[1] A: The records would be sent to the [2] Federal Records Center from our docketing.

[3] Q: Did you have any knowledge about [4] what was required in order to send records [5] off site to the Federal Records Center?

[6] A: Well, I knew what would, generally, [7] what would go in a closed file and those — [8] what would happen is once a file was closed [9] there is an orange closing sheet that goes, I [10] believe, on the left side — maybe the right [11] side — on top of the documents in a file [12] similar to this that would indicate that the [13] case was closed and how long it should be [14] retained based on the length of the sentence [15] that was imposed in the case.

[16] I knew, generally, what went into [17] the file when it was closed because for every [18] case that I opened I would close it [19] eventually and the final closing of the file [20] would have been done by my secretary. So I [21] knew, generally, what went into the file.

[22] MR. SMORODIN: Just for the record,

Page 48

[1] we have produced a copy of that one-page [2] sheet in discovery to counsel. I'm not sure [3] if it was orange or salmon or whatever [4] because it may have been a Xerox copy, but we [5] have produced that record.

[6] BY MS. YESNER:

[7] Q: Just looking at this document, too, [8] that I just gave you, is that form USA-207, [9] Notice to Close Legal Case File, for all [10] retired case files; is that the orange form?

[11] A: I don't know the answer to that. I [12] don't know what it's called. I don't know if [13] it's the USA-207. It sounds like

that's what [14] it is. All I can tell you is it's an orange [15] or a salmon colored sheet that is 8 x11.

[16] Q: Were you —

[17] MR. SMORODIN: Actually, I think I [18] have produced one that was orange, because, [19] as I'm looking at my file, it would normally [20] be right here, and I don't have it, so I'm [21] thinking I gave it to either you or [22] Mr. Hoffman at one of the status conferences.

Page 49

[1] BY MS. YESNER:

[2] Q: I'm just trying to determine if you [3] knew whether the referral in this document [4] Form 207 is the document that you are [5] familiar with.

[6] A: I don't know if — I don't know if [7] the document that I'm describing is the Form [8] USA-207.

[9] Q: At some point in time did someone [10] tell you, you had to put the orange colored [11] form with closed case files?

[12] A: I don't think anyone ever told me [13] that. When — when I started working in the [14] office before I was assigned to the drug [15] section or as an OCDETF attorney, I had a [16] couple of filing cabinets full of cases. A [17] lot of them were old. They were cases that I [18] was assigned to after other Assistant U.S. [19] Attorneys had gone either to another section [20] or another division of the office.

[21] When — I started to deal with [22] those cases and I would get to a point where

Page 50

[1] I was done with one of the cases, I gave it [2] to my secretary and she told me it had to be [3] closed. The next thing that would have [4] happened would have been I would have gotten [5] the file back on my desk with the orange [6] sheet on top of the file and I would probably [7] told that at that time I needed to sign it so [8] that it could send it to docketing to close [9] it.

[9] Q: Were you relying on your secretary [10] to handle the administrative require-ments for [11] preparing the file for docketing?

[12] A: The final closing, yes.

[13] Q: Did you prepare lists of what was [14] contained in the boxes that were sent off [15] site? Did you personally do that?

[16] MR. SMORODIN: Objection.

[17] THE WITNESS: I'm not sure I [18] understand.

[19] BY MS. YESNER:

[20] Q: Well, in Deposition Exhibit 2, in [21] the third paragraph —

[22] MR. SMORODIN: On than the first

Page 51

[1] page?

[2] MS. YESNER: On the first page.

[3] MR. SMORODIN: Uh-huh.

[4] BY MS. YESNER:

[5] Q: The document states that to send [6] documents to the Federal Records Center the [7] records must be accompanied by an attached [8] case listing by box number. Indicating the [9] case number and the names of the litigants in [10] each case. Did you ever do that task?

[11] A: No. That would have been handled [12] by docketing and I can tell you that from [13] occasionally having to go to docketing to [14] retrieve a file that was on its way to the [15] Federal Records Center, that the files would [16] be placed within a banker's box and those [17] notations would be made on the side of the [18] box, or the top of the box.

[19] Q: So the docketing staff was [20] different staff, than secretaries to the [21] assistants?

[22] A: Yes. There is a — there was an

Page 52

[1] entire area of the administrative part of the [2] office that was docketing.

[3] Q: What did they do in addition to [4] preparing documents for storage?

[5] A: Well, when a case was opened, we [6] would open a case with a blue sheet, which [7] would indicate the defendants, the charge or [8] the potential charge, who had the litigated [9] responsibility, that is, the U.S. Attorney, [10] DOJ or some other litigating branch. We [11] would indicate a program category, which [12] would be an internal program category for the [13] type of offense. We would indicate a short [14] description of the — the reason we wrote in [15] the file, we would indicate whether it was a [16] trigger lock case, whether it was ab [17] OCDETF case, whether there was forfeiture [18] potential, whether it would require U.S. [19] Attorney approval, whe-ther it required [20] whether there were public officials, police [21] officers or other prominent figures were in-[22]volved in the case.

Page 53

[1] We would sign it and then it would [2] go to the supervisor. That document would go [3] to docketing and they would input all of that [4] information into the docketing data base and [5] they would open up a file.

[6] Any time there was any type of [7] significant events in the prosecution of the [8] case — an indictment, an arraign-ment, a plea [9] of guilty, a sentencing, a notice of [10] appeal — all of that — whenever that would [11] happen, a

yellow sheet would be filled out by [12] the secretary, which would go to docketing so [13] that they could update the status and [14] progress of every case. I believe they would [15] also do that with opposing counsel and — so [16] they were very busy. We were one of the [17] busiest districts in the country.

[18] **Q:** So your docketing section, would [19] they keep an index of documents that were [20] created in connection with the particular [21] case?

[22] **A:** No, they would not. They would not

---

**Page 54**

[1] keep any type of — there was no docketing as [2] to the documents that went into the case [3] file. They would keep a — in the computer [4] the progress of the defendants or the [5] subjects of the investigation as that would [6] happen.

[7] For example, if I opened up a [8] criminal file on A and B and when I did that, [9] I filled out a blue sheet and sent it down, [10] they would put in their computer subjects A [11] and B. If I then returned an indictment [12] against A and declined prosecution on B, I [13] would then — that information would then be [14] forwarded down to them and they would update [15] that in the computer so that if someone [16] wanted to find out what the status of that [17] case was, they had the case number or the [18] USAO file jacket number, they could type that [19] in to the docketing data base and they would [20] be able to tell you that Defendant A had been [21] indicted on such and such a date and that [22] Defendant B had been declined for prosecution

---

**Page 55**

[1] on such and such a date. As when A appeared [2] for arraignment, that would then be updated [3] by the secretary filling out another form [4] that would go down to docketing. So they [5] would be able to tell you, if you have the [6] name of a defendant, any defendant, and you [7] wanted to know what the status was, they [8] could type in the defendant's name and they [9] could tell you what the status of the case [10] was.

[11] **Q:** I see. So they would not be [12] responsible for docketing in the sense of [13] court docketing or, you know, keeping a [14] record of filings with the court. They would [15] only be responsible for the status of the [16] case?

[17] **A:** Right. They would not have any — [18] they would not have anything in that data [19] base that would indicate, for example, what [20] documents were filed with the court or what [21] documents were in the case file.

---

**Page 56**

[1] maintained?

[2] **A:** That information being?

[3] **Q:** As I understand it, docketing would [4] know, for instance, if you had filed an [5] affirmation or there was an indictment?

[6] **A:** That's correct.

[7] **Q:** Just the status of the case?

[8] **A:** That's correct.

[9] **Q:** But as far as the paper, once an [10] indictment was brought and you were [11] proceeding, assuming there was a decision [12] not [12] to prosecute, to go forward, now you're going [13] to trial and even before the trial you've got [14] a lot of, you know, pretrial motions on [15] evidentiary issues, docketing would not [16] keep a record of all of the defendant's [17] motions or [17] the government's motions and the responses to [18] those motions?

[19] **A:** No, the docketing on that would [20] be kept in the clerk's office, where those [21] documents — where those items were filed.

[22] **Q:** Did your office also keep a record

---

**Page 57**

[1] of what was filed —

[2] **A:** No.

[3] **Q:** To keep track of what was filed [4] in —

[5] **A:** Well, I'm not — I'm not sure I [6] understand when you say to keep track of it. [7] If I would present an indictment to the Grand [8] Jury, certainly I would have a copy of the [9] indictment in the criminal file. If a [10] defendant filed a Motion To Suppress, I would [11] get a copy of that served on me and that [12] would go in the criminal file or it would go [13] into a pleadings folder or a pleadings file, [14] however that attorney chose to keep those [15] documents, so that he could — he or she [16] could get to them.

[17] So those items would be in the [18] file, but in — at least as far as the way I [19] handled cases and the way most other [20] attorneys that I knew of in the office [21] handled cases, there wouldn't have been [22] any — anything to look at a list to see what

---

**Page 58**

[1] was filed and what wasn't.

[2] **Q:** So you didn't keep a pleadings file [3] in the sense that every document filed in the [4] order in which it was filed with the court [5] would be kept in chronological order within a [6] jacket?

[7] **A:** No, at — I believe at one point in [8] the last couple of years that I was there in

---

[9] the office we started to do that. I don't — [10] I don't think there was ever any policy about [11] doing that. I think it was just a practice [12] that was started because of a way that the [13] criminal secretary of chief felt comfortable [14] doing things.

[15] **Q:** How did you keep track of when [16] responses were due?

[17] **A:** I put it on the calendar.

[18] **Q:** On the calendar. Was there any way [19] before you started keeping pleadings in a [20] chronological order, prior to that time, how [21] would anyone find a particular motion or [22] response that they would be interested in?

---

**Page 59**

[1] **A:** Again, it would depend on — a lot [2] would depend on how big the file was and it [3] also would depend on how the attorney chose [4] to set up his filing system — his or her [5] filling system.

[6] For example, if it was a relatively [7] average case, at the end of the case the [8] entire file would probably fit in a banker's [9] box. That would be an average case.

[10] The way I would set up — the way I [11] would set up the file and the way my [12] secretary would set up the file would be, [13] for example, using A and B again, she would [14] have — she would have the indictment in the [15] file folder and then she would set up a [16] separate folder like this that would say A, [17] motions, responses; B motions, responses, [18] orders and so on. So if A filed a motion, [19] generally, what would happen would be my [20] secretary would throw one in the file and/or [21] she would give it to me. I would make a copy [22] of it.

---

**Page 60**

[1] **Q:** Did she enter anywhere on a piece [2] of paper —

[3] **A:** No.

[4] **Q:** If the attorney who had set up the [5] case file where you just put documents in [6] folders, if something happened to that [7] attorney and you had to have a substitute [8] attorney, how would that substitute attorney [9] readily put their hands on particular [10] documents?

[11] **A:** They would — they would have to [12] start at the beginning of the file and go [13] through the file. Depending — well, when I [14] say that they would have to do that, if it [15] wasn't set up — that's not — that's not — [16] I mean that's what I would do. If I had a [17] file, and it happened many times, where an [18] assistant was transferred or an assistant [19] left and the file was sent to me, I would [20] start at the beginning of the file and I [21] would go through the file

---

**WILLIE JEFFERSON** v.
**JANET RENO et al**

**JEFFREY S. DOWNING**
**June 15, 1999**

document by [22] document so that I
would be familiar with

---

Page 61

[1] every document that was filed in the
case.

[2] Now, in all likelihood, because [3] most
of the assistants, or at least I know in [4]
the drug section, set up their — their
stuff [5] in a somewhat similar way, you
would have had [6] a file in there that
would have said A, [7] motions, re-
sponses; B, motions, responses, [8] orders,
correspondence, that type of thing. [9]
The stuff wouldn't be just thrown about,
[10] although it could be.

[11] When — I mean, let me just — when
[12] you talk about the file, let me just —
let [13] me just say this. You know, there —
for [14] every assistant that there was
there were [15] probably a different state
of disarray that a [16] file would be in.

[17] The — the Middle District of [18]
Florida was one of the busiest districts in
[19] the country. It had one of the highest
number of [20] filings of indictments.
When I started [21] in 1987, I think we had
six OCDETF attorneys. [22] When I left in
1998, we had five, one of whom

---

Page 62

[1] was a supervisor and wasn't handling
drug [2] cases. So when I started, DEA had
one group [3] of investigators of ten,
that's ten people. [4] When I left they had
forty. So as we get [5] more and more
investigators, we seemed to get [6] less
and less attorneys. So the — and more [7]
and more cases per assistant. So the —
the [8] filing sometimes was done the
best way it [9] could be and that's the only
way I can [10] describe it.

[11] Q: By the time you left the office in
[12] Tampa had they instituted any stan-
dardization [13] in terms of document
control or document [14] maintenance?

[15] A: Again, I'm not sure. When you say
[16] standardization, you're talking about
this [17] is — this is the way it's supposed
to be [18] done? There — there may have
been — there [19] may have been some
procedures that were set [20] out for the
support staff for closing of the [21] files.
That's very possible. That's [22] pretty
much, as I say, the final closing in

---

Page 63

[1] how the file was supposed to go to
docketing [2] or how it was supposed to
go to the appellate [3] division.

[4] In fact, I know at one point there was some [5]
memo at one point put out, I believe, by
the [6] appellate division saying when
you — when [7] you send a file to us, this
is what has to be [8] in it. That would not
have been the closing [9] of the file.

[10] Q: Yeah, I understand. You had [11]
mentioned before that towards the end

---

of your [12] stint down in Tampa that you
began to develop [13] pleadings files
where a copy of everything [14] filed
would be placed in that file.

[15] A: Or it was supposed to be placed.

[16] Q: Or was supposed to be placed in
[17] that file.

[18] A: Right.

[19] Q: Was that. something that the [20]
secretaries would keep?

[21] A: Yes.

[22] Q: So that you could have your own

---

Page 64

[1] working files, but there would be this
[2] pleadings file that the secretary would
keep?

[3] A: It would be with the case file.

[4] Q: With the case file?

[5] A: Yes.

[6] Q: Do you remember when that prac-
tice [7] started?

[8] A: No, I don't. A couple of years I [9]
would think before. I don't think it was
[10] a — as I said, I don't think it was a [11]
policy. I think it was more of a — of a [12]
practice that was instituted by the sec-
retary [13] in — in that section. I don't
know if they [14] were doing it in every
place in the — in [15] every division or
every section in the [16] office. I know we
started doing it in the — [17] in the drug
trafficking section.

[18] Q: Was that something that an office
[19] administrator asked the secretaries to
start [20] doing?

[21] A: I don't know.

[22] Q: You don't recall talking to anyone

---

Page 65

[1] about starting this practice?

[2] A: No, I know that — I know that [3]
when it happened — I know that when it
[4] happened, I didn't like it for the
following [5] reasons: One, as I indicated
before, the [6] workload was substantial.
The support [7] staff — Cindy was my
secretary and at [8] various other times
was also working for at [9] least one other
lawyer and two other lawyers. [10] I was
busy enough during most of the time [11]
that I was there that my secretary — that
[12] Cindy could have worked for me and
come in on [13] weekends and worked
eight hours on Saturday [14] and eight
hours on Sunday and not kept up [15]
with my work. So when we instituted
this [16] practice, if you will, about the
pleadings [17] folders, what it did is it just
was one more [18] thing that my secretary
had to do that was, [19] to me, more form
over substance, if you will.

[20] With all the paperwork that was [21]
flying around there, it was a rare oc-
casion [22] when you could have walked

---

into someone's

---

Page 66

[1] office and said do you have a copy of
this [2] motion or this response and they
couldn't put [3] their hand on it. So you —
you had to kind [4] of adjust to the way
the caseload was and the [5] stress level
was as far as the workload.

[6] It also, because of that, it was — [7] it
created even more paperwork because
when [8] the — when a document came
in the mail, for [9] example, someone filed
a Motion To Suppress, [10] what normally
would happen is I would take [11] that
motion, I would put it on my desk, jot [12]
down in the calendar when it was due
and — [13] and then when I would
respond to it, I would [14] file my re-
sponse, I would give the response [15]
and — I would give the original back to
my [16] secretary and/or I would take —
take the [17] original and I would put it in
the motions' [18] file for that defendant.

[19] What it required her to do so that [20]
this stuff — because — because it was
my [21] practice and the practice of most
of the [22] other attorneys there to put
that into a

---

Page 67

[1] separate folder, when — when this
happened, [2] what was happening was
the original was going [3] into the folder
and it wasn't going into the [4] pleadings
file. So what it would require [5] from her
is when my mail would come in and I [6]
would get a stack of mail with motions
and — [7] and orders and that type of
thing, she would [8] have to take every-
thing, photocopy it, keep [9] the original
and then give me copies in order to [10] to
keep up with it that way and it just — it
[11] never worked.

[12] BY MS. YESNER:

[13] Q: How about with corres-
pondence? Did [14] you keep the only
copy of correspondence both [15] in-
coming and outgoing in your case files?

[16] A: Well, before I answer that let [17]
me — I'm not sure I understand. When
you [18] say in your case files, I'm —

[19] Q: Let me try this way.

[20] A: Can you clarify that?

[21] Q: Let me —

[22] A: Because I don't — I don't want.

---

Page 68

[1] there to be some sort of like [2]
misunderstanding that there was — that
my [3] secretary had case files and I had
case [4] files.

[5] We had a — there was a case file. [6] It
was — it was usually in a file drawer and
[7] within that setup would be, as I
indicated [8] before, there would be the
case file and then [9] we would — then I

---

would have separate [10] folders for each defendant's motions and [11] responses, and, again, depending on how many [12] defendants there were, separate files for [13] each defendant's correspondence.

[14] Q: The material in those folders that [15] you had, were those duplicates of what was in [16] the case file?

[17] MR. SMORODIN: Objection. I think [18] it misstates his testimony. I think that is [19] the case file.

[20] THE WITNESS: Yeah, that's what I'm [21] trying to clarify. There are — what I'm [22] referring to is the case — is the case file.

Page 69

[1] Okay? This is a file jacket.

[2] BY MS. YESNER:

[3] Q: Yes.

[4] A: And — and when I say that there [5] were files with motions and responses, [6] correspondence, those were — those were file [7] folders that were part of the case file.

[8] Q: Okay.

[9] A: So when correspondence would come [10] into, in most of the time it would go into my [11] in-box, I would look at it, I would read it [12] and do whatever I needed to do with respect [13] to it. Then I would take it, I would put it [14] in my out-box or I would give it to my [15] secretary and then she would get it and put [16] it in the correspondence file.

[17] Q: So your secretary maintained a [18] correspondence file that was part of the case [19] file with a separate folder or a file with [20] prongs that you would put correspondence in?

[21] A: Right, that was the usual practice [22] to do that.

Page 70

[1] Q: As I understand what you were [2] saying, you did not have a similar seg-regated [3] file with prongs to just put court papers in. [4] You would put those in a folder that would [5] say motions and responses or another folder [6] that would say orders?

[7] A: I think so. I mean —

[8] Q: Let me back up and try again. All [9] correspondence went in the corres-pondence [10] file?

[11] A: That's right.

[12] Q: Did your secretary ever make [13] duplicates of correspondence for you to use [14] in working files?

[15] A: She may have on occasion. I may [16] have made copies on occasion. If I got [17] a letter and I wanted to respond to it and I [18] wanted to take it home with me to work on it [19] or I wanted to take it to another part of the [20] office, to a war

room or I wanted to do [21] something else with it, I may have made [22] another copy of it.

Page 71

[1] Q: If a Motion To Suppress was filed, [2] the secretary would not put that original [3] document in a file that kept all court [4] papers. She would give it to you to put in [5] your filing system?

[6] A: That's usually — that was usually [7] the practice, right. I would get — I would [8] get the motion and — and then I would — I [9] would deal with the motion.

[10] Q: Would place it in a file that was [11] the most usable to you depending on your [12] preference?

[13] A: Right.

[14] Q: So a copy of that document would [15] not be made and put in an official pleadings [16] file?

[17] A: No, not up until — not — at some [18] point, as I said, when they started the [19] practice of doing the pleading files the [20] secretaries were supposed to do that and I [21] had — and I had cases where that, in fact [22] was, done. But when that was done, there

Page 72

[1] were occasions when I would make copies and [2] take it out and throw it in a file. For [3] example, if it was a substantial issue, I may [4] make a separate file for the Motion To [5] Suppress and —

[6] Q: That would be your personal work-ing [7] file? Papers that you were dealing with?

[8] A: The whole file would be my work-ing [9] file. What I would do is in that instance I [10] may take a copy of the motion out, the [11] Motion To Suppress, or take the Motion To Suppress, [12] make a copy and then even though I had a file [13] for Defendant A's motions and re-sponses, [14] I would — would have the original motion in [15] there and I may still have another file that [16] would say A, Motion To Suppress, and you, [17] know, then I would go, you know, I would put [18] research in there, my notes, drafts, I mean [19] anything relating to that, so that if I [20] needed to pull that out, I could get to it.

[21] One of the — one of the problems [22] with the files being kept in the pleadings

Page 73

[1] folders were that those — I mean, sometimes [2] they — they got rather bulky and if you had, [3] for an example, if you had a Motion To Suppress [4] and you just wanted to have —

[5] Q: They are in our case.

[6] A: You just wanted to have the Motion [7] To Suppress, you know, you had one of

these [8] big binders with the Ecco on there and, first [9] of all, it was hard to keep it open while you [10] were looking at it and you had to cart that [11] whole thing around, whereas it was a lot [12] easier if you just took a copy of motion and [13] you had a folder like this and you had your [14] motion and you had your response in it.

[15] Q: As I understand it, the reason for [16] not having, until fairly recently, for not [17] having both a chronological file and a [18] subject matter working file was that it just [19] took too much time for the secretaries to do [20] that?

[21] A: That was — that was one of the [22] reasons I think. The other reason pro-bably

Page 74

[1] was just attorney preference and, you know, [2] the ability to put your hands on something [3] quickly and to find it.

[4] If you — I mean if you had a — if [5] you had a case, for example, and it was not [6] unusual to have cases in that district where [7] you had five or ten co-defendants, you know, [8] you could have a fairly substantial pleadings [9] file.

[10] If you were looking for a Motion To [11] Compel or a motion for — for this or for [12] that, the way you would have to go about it [13] is you would have to grab the pleadings [14] files, open it up and then you'd have to go [15] through and find when it was filed and then [16] the tab. You're familiar with that system?

[17] Q: Yes.

[18] A: It was a lot — what I'm saying, it [19] was a lot easier — it was a lot easier in [20] terms of being able to actually work with the [21] stuff to have separate, for me, separate [22] files for each defendant.

Page 75

[1] Q: But there was nothing to prevent [2] having a document that was either created or [3] received by your office, an official [4] document, kept in one file and a copy made [5] for you for using that document during your [6] trial pre-paration?

[7] A: No, it happened. That happened. [8] But when you say that, when you say for my [9] use, I mean I would still use the pleadings [10] file when it was there. I mean it was all [11] part of the file. It wasn't — it wasn't [12] separate.

[13] Q: Right, but you're concerned about [14] being able to organize the documents and you [15] get your hands on the documents according to [16] your own needs and preferences. There was [17] nothing that would have precluded you from [18] getting a copy for your own use and having [19] another copy in an official file that could [20] be kept as the official

**WILLIE JEFFERSON    v.**
**JANET RENO et al**

**JEFFREY S. DOWNING**
**June 15, 1999**

and chronological way [21] as the usual pleadings were?

[22] MR. SMORODIN: Objection. Asked

**Page 76**

[1] and answered. I mean I think he's testified [2] about a dozen times that they didn't have [3] that for a number of reasons. You can answer [4] if you want.

[5] MS. YESNER: Okay.

[6] MS. YESNER: I will show you one [7] more quick document, and then we'll go on to [8] something else. I will show you this [9] document that we'll mark as Exhibit 3.

[10] (Downing Deposition Exhibit [11] No. 3 was marked for [12] identification.)

[13] BY MS. YESNER:

[14] Q: This is a document that was [15] produced to us in discovery. I do not have a [16] copy of the entire document, the United [17] States Attorneys' Manual. This particular [18] document says at the top, Chapter 4, United [19] States Attorneys' Manual.

[20] MR. SMORODIN: The entire U.S. [21] Attorneys' Manual is, I think, several [22] looseleaf binders of documents, at least one

**Page 77**

[1] big one. I think it's fatter than the FOIA [2] Contacts Manual that we produced.

[3] MS. YESNER: I am assuming that [4] this is —

[5] MR. SMORODIN: I will also state [6] for the record, excuse me, counsel, that the [7] United States Attorneys' Manual is a [8] publicly-available document that's available [9] in public libraries.

[10] BY MS. YESNER:

[11] Q: I am assuming that this Chapter 4 [12] that we received in discovery is one chapter [13] from the U.S. Attorneys' Manual. Is that [14] correct?

[15] MR. SMORODIN: Yes, that's my [16] understanding. I haven't gone and compared [17] what we produced with the looseleaf and tried [18] to figure out where it fits in.

[19] MS. YESNER: In other words, I did [20] not excerpt pages from any of the documents. [21] This is as we received it.

[22] MR. SMORODIN: Correct.

**Page 78**

[1] BY MS. YESNER:

[2] Q: Do you recognize this material that [3] is in Chapter 4?

[4] A: No, I've never read this material.

[5] Q: Did you receive a United States [6] Attorneys' Manual when you began working at [7] the United States Attorneys' Office?

[8] A: I did. Actually I received what I [9] believe is Chapter 9, which is the book that [10] deals with the criminal division — criminal [11] division matters. It may have been two [12] books, two parts. I don't recall ever having [13] a full set of the U.S. Attorneys' Manual.

[14] I think the U.S. Attorneys' [15] Manual — this is July of 1992, and I don't [16] know if that's just the date that this was [17] updated or where this came out of.

[18] At one point the U.S. Attorneys' [19] Manual was actually in about 10 or 12 [20] binders. I believe that — I don't know if [21] it's been reduced to a smaller part of that, [22] but the items that I would be most familiar

**Page 79**

[1] with would be, I believe, Chapter 9, [2] which covers criminal prosecutions. I've never [3] seen — never seen this.

[4] Q: You did not have a full set of the [5] whole manual in your office?

[6] A: Oh, I'm sure — oh, I know we had [7] it in our — in our office in our library. [8] Without any doubt we did. I did not have a [9] full set of the U.S. Attorneys' Manual in my [10] office, my personal office. I had — I did [11] have the Chapter 9 manuals. I believe it was [12] Chapter 9.

[13] Q: Did you ever have any occasion to [14] refer to the manual?

[15] A: I referred to the manual many [16] times.

[17] Q: Just Chapter 9?

[18] A: I'm sure that on occasion I have [19] referred to other chapters in there. I [20] couldn't tell you what or when. If I had [21] occasion to think that that would be helpful [22] to me to look at the U.S. Attorneys' Manual,

**Page 80**

[1] I would have, but I did not — I did not sit [2] down and read it from front to back.

[3] Q: When the first occasion arose when [4] you needed to close a case, did you go and [5] refer to the manual about what were the [6] procedures for closing a case that were set [7] out in the manual?

[8] A: No, the — the first time that I [9] closed a case would have — would have [10] probably been within the first couple of [11] weeks that I was working in the office there [12] and my secretary would have done that.

[13] The only thing I would have done [14] would have been to sign the orange sheet and, [15] you know, I can't remember, but it probably [16] would have went something like she would have [17] come in, set the thing down and said sign [18] here. I was still trying to find my way [19] around the office.

[20] Q: Did an occasion ever arise where

[21] you felt that you needed some guidance on [22] closing of records?

**Page 81**

[1] A: No.

[2] MR. SMORODIN: Closing of files?

[3] THE WITNESS: You're talking about [4] closing of files?

[5] MS. YESNER: Closing files.

[6] THE WITNESS: No. Again, with [7] the — with the number of files that were — [8] that were being handled, when the file would [9] come in, I'm sure that when I would get a [10] file, that I did look through it to see what [11] was in there so that I would know what would [12] go in to — what typically would go into a [13] closed file.

[14] Occasionally — my secretary — I [15] would have a file — we would do a file [16] review and the criminal division chief would [17] say why isn't this case closed because the [18] defendant had been sentenced. And — I mean [19] I can recall going out and saying to my [20] secretary can we close this and she would say [21] we don't have the judgment yet. So, of [22] course, I knew that went in there. Just

**Page 82**

[1] from — from looking through the files as [2] they were closed, I — I knew what, [3] generally, went into the file when it was [4] closed.

[5] BY MS. YESNER:

[6] Q: Did you ever refer to the United [7] States Attorneys' Manual to make sure that [8] your understanding of what was required to [9] close a case was correct?

[10] A: No, I didn't. No, I — for that I [11] relied on my secretary. She had been — she [12] had worked in that office for some time [13] before I got there. She was — she was very [14] good. She was very competent and she — I [15] relied on her to know what was going into [16] that closed file.

[17] Q: By and large, then, the material [18] that would be covered in this chapter on [19] office files and records management, did you [20] rely on your secretary to make sure that the [21] information here was, the procedures I should [22] say, that are spelled out here were followed?

**Page 83**

[1] A: If —

[2] MR. SMORODIN: Objection. He said [3] he hasn't read it, so I'm not sure how you [4] can ask him whether he relied on her for [5] these things. I think it's an ambiguous [6] question.

[7] BY MS. YESNER:

[8] Q: Did you rely on your secretary to [9] make sure that any requirements that

might be [10] contained in the United States Attorneys' [11] Manual concerning record management were [12] followed?

[13] A: As far as the closing of the file, [14] yes.

[15] Q: Would that also be true for [16] disposing of records?

[17] A: I'm not sure what you — what [18] you're referring to when you say dis- posing of [19] records.

[20] Q: Did you have any understanding of [21] any office policies or procedures that [22] governed the preservation or disposal of

**Page 84**

[1] documents in case files?

[2] MR. SMORODIN: I'm going to object [3] unless you indicate what kind of documents [4] you're talking about. I think it's an [5] ambiguous question.

[6] BY MS. YESNER:

[7] Q: Any documents in case files.

[8] MR. SMORODIN: My objection stands. [9] You can answer the question to the extent you [10] can.

[11] THE WITNESS: I'm not sure — I'm [12] not sure I understand. Can you repeat the [13] question for me?

[14] BY MS. YESNER:

[15] Q: Let me ask another question. Were [16] you familiar at all with an United States [17] Attorneys' Office records man- agement [18] program?

[18] A: No.

[19] Q: I gather, then, you were not [20] familiar with any standard practices with [21] respect to the preservation and disposal of [22] records that were in the custody of the U.S.

**Page 85**

[1] Attorneys' office?

[2] A: Not from — not from the U.S. [3] Attorneys' Manual, if you're talking about [4] that.

[5] Again, there are — I'm sure that [6] there are hundreds of practices that I — [7] that I undertook or that my secretary or [8] other support staff did that we did on a [9] daily basis that were set out in a [10] U.S. Attorneys' Manual somewhere as the [11] way to do [11] them. That doesn't mean that when I did it, [12] I did it because I read it in the U.S. [13] Attorneys' Manual, or I was aware that there [14] was a U.S. Attorneys' Manual policy to [15] indicate that. Someone may have told me this [16] is how we do it.

[17] So I don't know what the U.S. [18] Attorneys' Manual says about what is to be in [19] a file, for example, that's to be closed or [20] what records are to be retained. I do know [21] what the practice in the U.S. Attorneys' [22] Office in the

Middle District of Florida was

**Page 86**

[1] with respect to what documents would go into [2] a closed file and what documents would not be [3] retained.

[4] Q: What documents could be des- troyed [5] before the file was sent to storage?

[6] A: Right, exactly.

[7] Q: But that, as I understand what [8] you're saying, that was by word of mouth?

[9] A: It was by word of mouth, it was by [10] experience. Again, you know, I had [11] situations, for example, where my secretary [12] would come in. I had a file, it wasn't very [13] big file, it was — you know, some of the [14] first files that I had may have been, you [15] know, a couple inches thick. She came in. I [16] looked at it. She said here's, you know, [17] here's the closing sheet. Sign it. There [18] were occasions where, you know, she did tell [19] me I took this stuff out of it. Do you want [20] to keep it or what do you want me to do with [21] it? So from that — from the practice and [22] from experience, I would have — I would have

**Page 87**

[1] gathered from that that these types of items [2] were items that were not required to be in a [3] closed file and were items that could be [4] disposed of in some way depending on what [5] they were. So I hope that answers your [6] question.

[7] MS. YESNER: Let's take a break.

[8] MR. SMORODIN: How long? We're not [9] talking lunch, or are you?

[10] (Recess)

[11] BY MS. YESNER:

[12] Q: Mr. Downing, earlier this morning [13] we were talking about your experi- ence with [14] FOIA and also your appell- ate experience. Do [15] you recall a case in which you tried Preston [16] Williams and Robert Lee?

[17] A: Yes.

[18] Q: Do you remember when you tried that [19] case?

[20] A: Sometime in 1989. It was indicted [21] on January 13th of 1989. There were — there [22] were more than two defen- dants in the case.

**Page 88**

[1] Q: Was that case appealed?

[2] A: Yes, the — there were two appeals [3] actually, I think, that came out of that [4] case. I actually tried one, two, three — I [5] believe five defendants in one trial, one [6] defendant in another trial and then one of [7] the other defendants was a fugitive for [8] several years and I tried

that case as well. [9] All three of those cases went up for appeal.

[10] Q: All three defendants appealed?

[11] A: All three of the cases appealed. I [12] think there were five — I think there were [13] five defendants.

[14] Q: Five defendants in three separate [15] trials?

[16] A: I think there were five defendants [17] in the — four or five defendants in the [18] first trial, one defendant in the second [19] trial and one defendant in the third trial [20] out of that indictment. All — all three of [21] the — so we're referring to — the fist [22] trial was Robert Earl Lee, Preston Williams,

**Page 89**

[1] Roy Larry Lee, Azell Macon. I believe those [2] are the four people that went to trial.

[3] The second trial out of that group [4] of people that was indicted was an indi- [5] vidual by the name of Johnny Grubbs and the [6] third [6] defendant, who was a fugitive, was a [7] defendant by the name of Jeffrey Earl — [8] excuse me — Jeffrey Eugene Lee, Jed. All [9] three of those cases went to trial and all [10] three of those cases resulted in appeals. So [11] six defendants.

[12] Q: Were all of those cases affirmed on [13] appeal?

[14] A: Yes, they were.

[15] Q: Do you remember when the cir- cuit [16] court affirmed, what year?

[17] A: I don't know. I know that the [18] indictments were returned in January of '89. [19] I believe we tried the Robert Earl Lee [20] multi-defendant case and the Johnny Grubbs [21] case that year. Mr. Lee was a — that's [22] Jeffrey Lee, was a fugitive for some time. I

**Page 90**

[1] don't remember. I couldn't tell when you [2] those cases were affirmed.

[3] Q: Do you recall Mr. Preston Williams [4] submitted a FOIA request for records in his [5] case file?

[6] A: He may have. That may be the other [7] one I'm referring to.

[8] Q: When you were talking about [9] receiving a notice of a FOIA request this [10] morning?

[11] A: I can't say for sure, but now — [12] now that you say that it may very well have [13] been out of that case.

[14] Q: Do you recall whether Preston [15] Williams was one of the defendants who [16] appealed?

[17] A: Yes, he did.

[18] Q: Do you remember if his FOIA request [19] was made while his appeal was pending?

WILLIE JEFFERSON v.
JANET RENO et al

JEFFREY S. DOWNING
June 15, 1999

[20] A: I don't know.

[21] Q: Let me ask you about another [22] case. But that would have been the case where you

---

Page 91

[1] received a form to sign?

[2] MR. SMORODIN: Objection. I think [3] it misstates the witness' testimony. You can [4] answer, sir.

[5] THE WITNESS: I'm not sure. It may [6] have been. It may have been. I have some [7] I have some recollection now that you've [8] mentioned Preston Williams of that — of that [9] being — I have some recollection of it being [10] out of this investigation, so it's very [11] possible it was, but I can't say for sure.

[12] BY MS. YESNER:

[13] Q: Do you recall, whether it was [14] Mr. Williams or not, whether you were ever [15] asked in connection with that FOIA request to [16] review any documents to determine if they [17] could be released, documents themselves that [18] were the subject of the request?

[19] A: I don't have any recollection of [20] that. I can tell you — I can tell you this: [21] That if it was Preston Williams who made that [22] request, I don't know that I would have had

---

Page 92

[1] to review any documents because there was — [2] there was a fugitive in that case. Jeffrey [3] Lee was a fugitive. So there was still [4] pending litigation in that matter. I [5] don't — the answer to the question is I [6] don't recall being asked to review anything.

[7] Q: Now, do you remember a case that [8] was prosecuted in your, that's is your [9] office, that is, the U.S. Attorneys' Office [10] in Tampa, against the defendants Raymond Lee, [11] Bobby Lee and Stanley Calloway?

[12] A: Yes, I indicted that case.

[13] Q: You indicted that case?

[14] A: Uh-huh.

[15] Q: Did you prosecute that case?

[16] A: I did not try it. I — I handled [17] most of the case. I handled the sentencing. [18] The case was tried by Kathy Peluso because I [19] was in another trial when that case was [20] called for trial and I believe it was tried [21] in front of a visiting judge from Tennessee [22] and he wouldn't grant a continuance, so Kathy

---

Page 93

[1] Peluso tried that case.

[2] Q: Do you remember what year that was?

[3] A: No.

[4] Q: Do you think it may have been

---

1994?

[5] A: It could have been around '94 [6] or '95. That sounds — that sounds about [7] when it would have been.

[8] Q: Did the defendants in that case [9] appeal?

[10] A: I'm sure they did. All three of [11] them were sentenced to life in prison without [12] parole so I'm sure they appealed.

[13] Q: Do you know who the attorney was [14] that handled the appeal?

[15] A: No.

[16] Q: Did you have any involvement in [17] the appeal in that case?

[18] A: No, not that I recall. It's [19] possible — well, it's possible that Kathy [20] Peluso handled the appeal, but — because she [21] tried it. When you say involvement in the [22] appeal, I'm sure that at some point I would

---

Page 94

[1] have been consulted by whoever the [2] appellate attorney was if there were any issues that — [3] that they needed to talk to me with because [4] I — I did indict it and do most of the [5] prosecution.

[6] Q: But you were not counsel on the [7] briefs?

[8] A: To the best of my recollection, no.

[9] I may — my name could have been put on the [10] brief as one of the counsel on the brief and [11] if it was, it would have been, you know, it [12] would have been just someone putting it on [13] there because I had worked on the case and I [14] had, you know, perhaps been consulted about [15] some of the appellate issues. But to the [16] best of my recollection, I did not write any [17] of that — any of that brief because that — [18] that would have been at the time that we did [19] have an appellate division that was writing [20] briefs.

[21] Q: Now, as I understand it, when the [22] circuit court rules, you, that is, the trial

---

Page 95

[1] attorney, is informed by the appellate [2] attorney that there's been a decision [3] normally, what happens to the records after [4] the 11th Circuit rules in a case?

[5] A: Which records?

[6] Q: The records from the trial and the [7] records related to the prosecution of the [8] case.

[9] MR. SMORODIN: Are you talking [10] about the records that are in the court or in [11] the U.S. Attorneys' Office?

[12] MS. YESNER: No, in the U.S. [13] Attorneys' office after the appeal.

[14] THE WITNESS: Are you talking [15] about — are you talking about the file.

---

[17] Q: Uh-huh.

[18] A: The criminal file?

[19] Q: The case file.

[20] A: Generally, what happens is, as I've [21] indicated, at — at some point when the [22] case — when there is a notice of appeal, the

---

Page 96

[1] secretary would prepare the case file jacket [2] to go down to — or to go to the appellate [3] attorney. That would include the indictment, [4] the plea agreement, if any, the trial record [5] if there was a trial, which would be the [6] transcripts, copies or photographs of the [7] exhibits, the judgment and commitment order, [8] pre-sentence investigation report. That [9] stuff would go to the appellate attorney. [10] The remainder of the criminal case file would [11] stay with the attorney who was assigned to it [12] in the criminal division.

[13] If the — and what would happen [14] when — when the criminal case file would go [15] down there is the appellate division would [16] then generate an appellate file, which they [17] may or may not make copies of everything in [18] that file and put it in the appellate file.

[19] When the appeal is concluded, the [20] criminal case file would come back to the [21] criminal division attorney along with [22] anything that was sent to them to work on the

---

Page 97

[1] appeal.

[2] Q: You would retain those files, the [3] case files, any material that was not sent to [4] the appellate division, in storage or would [5] you just keep it during your —

[6] A: During the appeal or after the [7] appeal?

[8] Q: Uh-huh, during the appeal.

[9] A: During the appeal I would keep [10] it — I would still keep it in my file [11] drawer. A lot of times — a lot of times [12] even though you have, as was the case in — [13] the case that you just asked me about, a lot [14] of times you may have a fugitive who is [15] picked up and who you're prosecuting while [16] some of the other defendants who have gone to [17] trial before that are up on appeal. That [18] happens occasionally.

[19] Q: What would happen if someone missed [20] the time for filing an appeal? Then would [21] you —

[22] A: A defendant?

---

Page 98

[1] Q: Yes.

[2] A: What would happen if they missed [3] the time for filing their direct appeal?

---

[4] Q: Would you consider the case over [5] then if there was not going to be a [6] possibility of appeal?

[7] I should rephrase it. Missed has [8] an implication. If the time for appeal runs [9] and there is no appeal taken, then at that [10] point is the case considered over?

[11] A: At some point it would be, yes.

[12] Q: Now, if there is an appeal and some [13] records are sent over to the appellate [14] division and then there's a decision by the [15] circuit court, how long does the appellate [16] division retain its files before sending it [17] back to the prosecutor responsible for the [18] case?

[19] A: The criminal case? How long would [20] they keep the criminal case file?

[21] Q: Uh-huh.

[22] A: That would depend — that would

### Page 99

[1] depend on the attorney. It would probably [2] depend a lot on just them going, you know, [3] keeping up on their cases and getting that [4] stuff back. If they were going to close out [5] their appellate file, which they would do [6] once they got a mandate, once their case was [7] closed, if there was — that's usually when [8] the file would come back.

[9] Q: Would they retain the files they [10] had gotten from the trial attorney until they [11] heard from the Solicitor's Office whether [12] there was a petition or not?

[13] A: I don't know. I would say that [14] they would — that they would probably retain [15] the criminal case file or the criminal file [16] folder until the appellate litigation was [17] concluded.

[18] MS. YESNER: Let me show you a [19] document that we'll mark as 4.

[20] (Downing Deposition Exhibit [21] No. 4 was marked for [22] identification.)

### Page 100

[1] BY MS. YESNER:

[2] Q: Ask if you have ever seen this [3] document before. It is a memorandum, the [4] subject of which is, Orientation Manual for [5] United States Attorneys. The date of this is [6] June 3, 1998.

[7] MR. SMORODIN: Again, this is a [8] document, I believe, we produced in [9] discovery.

[10] MS. YESNER: Yes.

[11] THE WITNESS: No, I've never seen [12] this before.

[13] BY MS. YESNER:

[14] Q: This document on the cover sheet, [15] this memorandum, refers to updating of an [16] Orientation Manual for United States [17] Attorneys. Are you

familiar with a manual [18] called an Orientation Manual for United [19] States Attorneys?

[20] A: No.

[21] Q: Is the document that we were [22] talking about earlier, the large document

### Page 101

[1] that we referred to as the United States [2] Attorneys' Manual, to your knowledge is that [3] the same thing as the Orientation Manual for [4] United States Attorneys?

[5] A: No, it's not. I don't know what [6] the Orientation Manual is for United States [7] Attorneys, but it appears that it's a [8] separate — that it is a separate [9] publication. It is not the United States [10] Attorneys' Manual.

[11] Q: Have you ever received an [12] Orientation Manual?

[13] A: No.

[14] MS. YESNER: I'm going to show you [15] another document. We'll mark this one 5.

[16] (Downing Deposition Exhibit [17] No. 5 was marked for [18] identification.)

[19] BY MS. YESNER:

[20] Q: I ask you to look at it.

[21] MR. SMORODIN: I would note for the [22] record that neither Mr. Downing nor myself

### Page 102

[1] are United States Attorneys. Deposition [2] Exhibit No. 4 refers to Orientation Manual [3] for United States Attorneys.

[4] My belief, and that is all it is, [5] is that refers to the actual United States [6] Attorneys, as opposed to the Assistant United [7] States Attorneys. I think there are 93 or 94 [8] United States Attorneys. There are hundreds [9] of us, assistants, maybe thousands.

[10] MS. YESNER: Off the record.

[11] (Discussion off the record)

[12] THE WITNESS: No I've never seen [13] Exhibit No. 5.

[14] BY MS. YESNER:

[15] Q: Exhibit No. 5, there's a memorandum [16] concerning FOIA Privacy Act Regulations, [17] dated June 10, 1998, and attached to that is [18] a Federal Register notice of a final rule on [19] the Freedom of Information Act.

[20] Have you ever seen this particular [21] regulation that is published in the Federal [22] Register?

### Page 103

[1] A: No, I haven't.

[2] Q: Did you ever see a predecessor rule [3] from the Department of Justice concerning [4] Freedom of Information

Act and Privacy Act [5] regulations?

[6] A: No.

[7] (Downing Deposition Exhibit [8] No. 6 was marked for [9] identification.)

[10] MR. SMORODIN: Off the record.

[11] (Discussion off the record)

[12] BY MS. YESNER:

[13] Q: I'm showing you a document that we [14] marked as Deposition Exhibit 6, and I will [15] represent to you that I took this document [16] that's marked as Exhibit 6 out of a larger [17] document. This is a section from a large [18] binder. The cover sheet from the binder is [19] the first page of Deposition Exhibit 6. The [20] remainder of it was Chapter 12 from that [21] binder.

[22] MR. SMORODIN: Was this the FOIA

### Page 104

[1] Contacts Manual?

[2] MS. YESNER: Yes.

[3] MR. SMORODIN: I didn't see the [4] cover.

[5] BY MS. YESNER:

[6] Q: Freedom of Information Act and [7] Privacy Act Contacts Manual is the name of [8] the binder from which this Chapter 12 was [9] taken. Have you ever [10] MR. SMORODIN: Before you ask the [11] question I'll represent for the record that [12] it's yellow, because it's often referred [13] to —

[14] MS. YESNER: The Yellow Book?

[15] MR. SMORODIN: Right.

[16] MS. YESNER: Not the yellow book, [17] The Yellow Book —

[18] MR. SMORODIN: That's the yellow [19] book road.

[20] MS. YESNER: The yellow binder?

[21] MR. SMORODIN: Yeah, I think that's [22] what I heard it referred to by paralegals.

### Page 105

[1] THE WITNESS: I may have seen a [2] copy of the document within this document [3] called Removal and Maintenance of Documents [4] Order DOJ 2710.8A.

[5] MR. SMORODIN: That's the one dated [6] April 11th?

[7] THE WITNESS: Dated April 11, 1997. [8] I may have seen this document.

[9] MR. SMORODIN: Show it to her so [10] she can find it.

[11] THE WITNESS: This is the document [12] I'm referring to.

[13] MS. YESNER: Let me see if I can [14] find it. Okay.

[15] THE WITNESS: I have some [16] recollection of reviewing this, because I [17] was aware, in general, that there was —

there [18] was obviously a policy about department [19] employees who were leaving taking documents [20] with them.

[21] BY MS. YESNER:

[22] Q: That's the subject of this

---

Page 106

[1] particular document dated April 11, 1997? [2] This was addressed to all United States [3] Attorneys and all First Assistant United [4] States Attorneys?

[5] A: Right. I have — I have a [6] recollection of seeing this and it's very [7] possible that it could have been copied and [8] sent around to — distributed to all [9] Assistant U.S. Attorneys in the office.

[10] Q: Hard copy?

[11] A: That's my recollection. I — you [12] know, I cannot tell you definitely I've seen [13] this, but it looks familiar to me, as does [14] the employee certification that goes with it.

[15] Q: Do you recall signing this?

[16] A: I don't know. I don't know. [17] Occasionally there are items that come around [18] that require some certification that we've [19] seen them or that we've looked at them either [20] back to the department or — or within the [21] office, but I cannot tell you for certain [22] that I — that I saw it. It looks familiar

---

Page 107

[1] to me. I believe I did.

[2] Q: Can you go down a few more pages in [3] the document and I think there's a chart that [4] says — well, no, it's after the document you [5] were referring to. It's the next document [6] after the one you were just referring to, [7] after that certification page.

[8] A: Uh-huh. The one you're on now?

[9] Q: Yeah, there's a —

[10] A: It's entitled 3 EOUSA Exhibit D?

[11] Q: Yes, have you ever seen this [12] before?

[13] A: No.

[14] Q: Let me just ask you, did anyone [15] ever ask you to make a determination at the [16] conclusion of the case as to whether it was a [17] significant case or not?

[18] A: I believe that it was considered [19] a significant case within the office. [20] With — with significant cases we normally [21] have to update. We do an internal memo to [22] the U.S. Attorney through the chief of the

---

Page 108

[1] criminal division advising the status of [2] a [2] significant case and that would have been [3] done in this case.

[4] Q: Just in the normal procedures for [5] the office, at what point in time would

---

a [6] determination be made that a case is [7] significant? Would it be prior to trial?

[8] A: Yes, it certainly — it certainly [9] would be before trial. It would have been, [10] you know, it could be at any point along — [11] along the investigation when either the — [12] it's usually the chief of the division [13] that — that would make a determination that [14] yes, it's a significant case to report.

[15] Q: Is the case labeled in any way that [16] would indicate that it was considered a [17] significant case?

[18] A: No.

[19] MR. SMORODIN: Prior to closing or [20] at any time?

[21] BY MS. YESNER:

[22] Q: Prior to closing.

---

Page 109

[1] A: No, it would not be — when you say [2] labeled, you mean is there something on the [3] file or —

[4] Q: Yes, anywhere on —

[5] A: No. It's more of a — it is more [6] of a situation where at, least from my [7] knowledge, there's just a determination that [8] this is a significant case and that [9] information about the case is reported, as I [10] indicated, through the chief of the criminal [11] division to the U.S. Attorney, and my [12] understanding of that was not that it was any [13] type of administrative type of naming of the [14] case or any type of different handling of the [15] case, but more so to keep the United States [16] Attorney advised about the progress and the [17] status of the significant prosecutions in the [18] office.

[19] Q: The United States Attorneys for the [20] Middle District?

[21] A: Right.

[22] Q: When a case went to docketing, was

---

Page 110

[1] there any indication on there as to whether [2] it had been determined to be a significant [3] case?

[4] A: No.

[5] Q: How would docketing people know [6] that, whether it was or not?

[7] MR. SMORODIN: I object. I think [8] that assumes a fact not in evidence.

[9] THE WITNESS: I don't know.

[10] BY MS. YESNER:

[11] Q: You said Mr. Jefferson's case was [12] considered a significant case?

[13] A: It was.

[14] MR. SMORODIN: I'm not sure that [15] Mr. Downing finished going through the stack [16] of Exhibit 6 because I think there's another [17] document that he recognized in there.

---

[18] THE WITNESS: I did — I did [19] recognize he notice to close legal case file [20] in there and that appears — you asked me [21] earlier if that was the same as the orange or [22] the salmon colored sheet that would be used

---

Page 111

[1] to close the case file. That looks like that [2] is the file — that would be the file closing [3] sheet and it is Form USA-207.

[4] BY MS. YESNER:

[5] Q: Who would check on that form, where [6] it says Number 1, "Recommends permanent [7] retention by the National Archives 30 years [8] after close of case"? Who would check that [9] off? Whether it received a lot of media [10] attention or had an impact on it?

[11] A: It would — it would be checked off [12] probably by the secretary who was doing the [13] form. If there was some question about [14] whether it was or it wasn't when the file was [15] prepared for closing for the Assistant U.S. [16] Attorneys' signature, that — I mean that [17] would be something that would have to be [18] determined.

[19] Q: Now, number one, those are the [20] criteria for determining whether a case is [21] significant; aren't they?

[22] MR. SMORODIN: Object. If you mean

---

Page 112

[1] significant in the sense that he just talked [2] about in his prior answer, I don't —

[3] MS. YESNER: Yes, whether there's a [4] significant case.

[5] MR. SMORODIN: I think that [6] misstates his testimony.

[7] BY MS. YESNER:

[8] Q: Let me ask you this way. Are you [9] aware of any criteria whether a case should [10] be considered significant by your office, [11] that is, a matter to keep the U.S. Attorney [12] informed?

[13] A: I don't know what the criteria for [14] that are. As I — as I indicated, I think [15] that that's something that — when the [16] section chief or the criminal division chief [17] become aware that an assistant is working on [18] a case that may be a significant case within [19] the office as opposed to just a, you know, [20] a — the typical case in the office, then all [21] I know is that I have had — I have had many [22] significant cases that I've been told these

---

Page 113

[1] are significant cases and every three months [2] or every six months or so I had to prepare a [3] little paragraph about what the status of the [4] case was in what was called a significant [5] case report.

[6] **Q:** As I understand your testimony, [7] that was not your call, you were told that a [8] case was —

[9] **A:** That's right. I mean if I had a [10] case that I said, you know, I knew that it [11] was a significant case, you know, I could [12] suggest it to somebody that it's a [13] significant case, but, frankly, it was — it [14] wasn't normally anything that anyone really [15] had a dispute about it.

[16] **Q:** Did anyone ever ask you whether a [17] case you were handling would set a precedent?

[18] **A:** I don't know.

[19] **Q:** How would a secretary filling out [20] this form to close a file know whether the [21] case had an impact on the statute, rule, [22] regulation or law enforcement policy?

### Page 114

[1] **A:** Well, I mean the secretary could [2] know that because the secretaries are, [3] generally, pretty substantially involved in [4] the litigation process. They could know [5] that. It may be that they wouldn't and that [6] that would be a situation where if that was, [7] you know, if it was or had an impact on a [8] statute, rule, regulation or law enforcement [9] policy, that would be up to the Assistant [10] U.S. Attorney then to make the determination [11] and —

[12] **Q:** Did your — I'm sorry.

[13] **A:** If the, you know, if the secretary [14] did not or had some question about it.

[15] **Q:** Did your secretary, Ms. Cole, ever [16] ask you which box to check here or, if [17] at all, whether a case had an impact, set a [18] precedent?

[19] **A:** I don't think so.. If a case [20] received a lot of local, regional or national [21] media attention, my secretary would have [22] known about it.

### Page 115

[1] **Q:** It's the box above that, that I [2] wondered how she would know if she —

[3] **A:** I don't recall — I don't recall [4] ever having a conversation with her or her [5] her telling me about the first box.

[6] **Q:** Okay. Let me refer you to the [7] couple of pages before that document. [8] There's a closing file check list right [9] before that. Do you see that document?

[10] **A:** Yes.

[11] **Q:** Is that a form that you have ever [12] filled out?

[13] **A:** I don't think so.

[14] **Q:** You don't recognize the form?

[15] **A:** No.

[16] **Q:** Let me ask you to go a couple of [17] pages before that.

[18] **A:** Can I ask where this form came [19] from?

[20] **Q:** The form that's this closing file [21] check list?

[22] **A:** Yes.

### Page 116

[1] **Q:** It's part of this chapter from the [2] manual.

[3] **A:** Oh, okay. I don't recall ever — [4] ever seeing that.

[5] **Q:** This form may not be used in the [6] Middle District?

[7] **A:** I don't know.

[8] **Q:** My understanding, and your counsel [9] can correct me, is that the particular [10] documents that this came from is not unique [11] to the Middle District of Florida, so I don't [12] know. That form — you can tell me — that [13] form may not be used in your district.

[14] **MR. SMORODIN:** Or it may not be [15] used by the attorneys. I think that's the [16] more significant question.

[17] **THE WITNESS:** I don't — I don't [18] know that I've ever seen this, although, as I [19] was explaining to you before, what's, [20] basically, set out on there, as far as what [21] should be done with the documents is, as I [22] read through it, is essentially my

### Page 117

[1] understanding of what would go into a closed [2] file.

[3] **BY MS. YESNER:**

[4] **Q:** What was that understanding based [5] on?

[6] **A:** Again, it was based on my [7] experience in signing the closed — the [8] closure forms or whatever we call those [9] things, the notice to close legal case file, [10] and looking through the file and seeing in [11] what — what was in the file as my secretary [12] had prepared it.

[13] **Q:** Let's back up three more pages. [14] There's a memorandum.

[15] **A:** You say back up towards the [16] front?

[17] **Q:** Yes, three pages before where we [18] just were. There's a memorandum dated [18] April 9, 1986.

[19] **A:** "Office guidelines for purging at [20] closing"?

[21] **Q:** Yes. Do you know who Gene Anderson [22] is?

### Page 118

[1] **A:** I have no idea who Gene Anderson [2] is. A United States Attorney somewhere.

[3] **Q:** But you don't know where?

[4] **A:** No.

[5] **Q:** Which district?

[6] **A:** In 1986 was — it was a United [7] States Attorney somewhere.

[8] **Q:** He was not the United States [9] Attorney in the Middle District when you [10] joined the Middle District —

[11] **A:** No, he was not the United States [12] Attorney on April 9th of 1986 either in the [13] Middle District of Florida.

[14] **Q:** Have you ever seen this memorandum?

[15] **A:** No, I have not.

[16] **Q:** Have you ever seen a memorandum [17] similar to this document?

[18] **A:** No.

[19] **Q:** What about the third page? It says [20] at the top, Purging United States Attorney [21] Case Files. Have you ever seen a document [22] that contained information such as what's

### Page 119

[1] contained here?

[2] **MR. SMORODIN:** Are you asking him [3] if he's ever seen that document or a [4] document [4] like that?

[5] **MS. YESNER:** No, not this document [6] but a document like that.

[7] **MR. SMORODIN:** By document like [8] that, you're talking about a document that [9] talks about purging?

[10] **MS. YESNER:** Yes, that contains [11] substantially the same information.

[12] **THE WITNESS:** No. Again, I have — [13] I have not seen anything like that, but, [14] again, as I read through what is contained [15] in that document where it says, "Materials [16] which may be routinely purged," and it [17] enumerates 12 different items, those, as I [18] look through that, would be consistent with [19] my understanding of the materials that would [20] be purged or taken out of a file when it's [21] closed.

[22] **BY MS. YESNER:**

### Page 120

[1] **Q:** On that same document it says in [2] capital letters in the middle of the [3] paragraph preceding the listing of materials [4] which may be routinely purged, it says, "Once [5] a FOIA/PA request has been made, a file [6] cannot be purged."

[7] Have you ever seen any guidance on [8] purging files that would contain such a [9] statement?

[10] **A:** No.

[11] **Q:** Did you have any understanding in [12] connection with the closing of files and the [13] purging of documents from files whether a [14] file could or could not be purged if a FOIA [15] request had been made?

[16] **A:** No, I did not and, frankly, in this [17] case that was the reason that I went to [18] talk to Belinda Brown before I purged

this file.

[19] MS. YESNER: I have to show you one [20] more document.

[21] (Downing Deposition Exhibit [22] No. 7 was marked for

Page 121

[1] identification.)

[2] BY MS. YESNER:

[3] Q: Ask you if you recognize this [4] document?

[5] MR. SMORODIN: I think all the [6] exhibits were produced by the government in [7] this case.

[8] MS. YESNER: Yes.

[9] MR. SMORODIN: At least all of the [10] exhibits so far.

[11] MS. YESNER: Yeah. This was [12] produced in discovery.

[13] BY MS. YESNER:

[14] Q: The document I have shown you [15] marked as Deposition Exhibit No. 7 is marked [16] EOUSA Resource Manual at the top, and I'm [17] just asking you, Mr. Downing, if you [18] recognize this document.

[19] A: No, I don't recognize the document.

[20] Q: Just for the record, do you know [21] who EOUSA is?

[22] A: Yes, I do.

Page 122

[1] Q: What does that stand for?

[2] A: Stands for Executive Office of [3] United States Attorneys.

[4] Q: What is the relationship between a [5] United States Attorneys' District Office and [6] EOUSA?

[7] A: EOUSA — well, I'm not sure — I'm [8] not sure how to describe it. I'm not sure. [9] I mean they're a component of the Department [10] of Justice. There are a number of different [11] components to EOUSA that we — that deal with [12] on various matters that affect United States [13] Attorneys or Assistant United States [14] Attorneys.

[15] Q: Is the Executive Office of the [16] United States Attorneys involved primarily in [17] administration of the United States [18] Attorneys' Offices?

[19] A: I don't know. I mean I guess [20] that's one way of putting it. I mean there [21] are a number of — there are a number of — [22] like I said, there are a number of different

Page 123

[1] components that are part of EOUSA, [2] but that's probably a relatively fair [2] characterization.

[3] MR. SMORODIN: I mean I think one [4] of the problems is that an Assistant U.S. [5]

Attorneys' relationship with EOUSA is fairly [6] skewed to certain kinds of things and there [7] may be other things that EOUSA is doing that [8] a line assistant wouldn't be aware of.

[9] MS. YESNER: Either the witness, if [10] he knows or not.

[11] MR. SMORODIN: Right.

[12] BY MS. YESNER:

[13] Q: Mr. Downing, you report ultimately [14] up the chain to the United States Attorney [15] for the, or you did at that time, for the [16] Middle District of Florida; is that right?

[17] A: Well, when you say ultimately, I [18] guess ultimately I would report to the [19] Attorney General, but it —

[20] Q: I mean within your district.

[21] A: Within the district — within the [22] district I would consider my boss to be the

Page 124

[1] United States Attorney.

[2] Q: Then is there a deputy under him [3] or [3] her?

[4] A: In the United States Attorneys' [5] Office in Tampa, when I left, there was a [6] first assistant, there was an executive [7] assistant, there was a chief of the criminal [8] division, chief of the civil division, there [9] was a deputy chief of the criminal division, [10] there was a chief of the appellate division.

[11] Q: So how does the reporting lines [12] work? Were there certain matters that you [13] would report to one person on and not [14] another or did you just simply report up the [15] chain through —

[16] A: It would depend on what the matter [17] was.

[18] Q: Were there matters that involved [19] more administrative, procedural issues as [20] opposed to case-specific issues? Would those [21] type of matters report differently?

[22] A: That's difficult to answer. That's

Page 125

[1] difficult to answer the way you phrased it. [2] I'm just not sure how to answer that. I [3] would — I would report to the chief of the [4] drug trafficking section. His immediate [5] supervisor would have been the chief of the [6] criminal division. The chief of the criminal [7] division would report to the First Assistant [8] United States Attorney and the First [9] Assistant United States Attorney would report [10] to the United States Attorney. That was the [11] chain of command, if you will.

[12] Q: When you were talking before about [13] the reports that you would fill out [14] periodically in a significant case,

who would [15] that go to?

[16] A: It would usually go to the —

[17] MR. SMORODIN: You mean directly —

[18] MS. YESNER: Yes, who would it [19] be —

[20] MR. SMORODIN: Or who would it [21] ultimately go to?

[22] THE WITNESS: It — it would

Page 126

[1] usually go to — directly to the chief of [2] criminal division. Actually, it would go to [3] a secretary.

[4] BY MS. YESNER:

[5] Q: But he would be the addressee?

[6] A: Yeah, if there was an addressee and [7] it was — it was —

[8] Q: Wasn't a formal memorandum?

[9] A: Wasn't a formal type of memo. It [10] was here's a synopsis.

[11] (Discussion off the record)

[12] BY MS. YESNER:

[13] Q: Mr. Downing, are you familiar with [14] a FOIA request that Mr. Jefferson submitted [15] for records in connection with the criminal [16] case that you prosecuted?

[17] A: I know that one was made. I don't [18] think I've ever seen the request. I'm sure [19] I've never seen the request.

[20] Q: You were the prosecutor who handled [21] Mr. Jefferson's criminal case; is that right?

[22] A: That's correct.

Page 127

[1] Q: Mr. Jefferson was one of several [2] defendants?

[3] A: He was one of 32 defendants.

[4] Q: Was Mr. Mathis one of the [5] defendants initially when the case opened?

[6] A: Yes, he was. When I say there [7] were 32 defendants, there were — there [8] were 12 defendants, I believe, in one [9] indictment, 12 defendants in another [10] indictment, and 8 defendants in the third [11] indictment.

[12] Q: At some point in time was there a [13] decision made to try Mr. Mathis separately?

[14] A: Yes.

[15] Q: So did the remaining defendants, [16] those who did not enter plea agreements but [17] the remaining defendants who chose to go to [18] trial, were they all consolidated in one [19] trial?

[20] A: Yes, there were — there three [21] cases, I believe 91-301, 91-300 and 91-[22] 299, [22] and after the Mathis case become a

### Page 128

[1] death-penalty case, he was severed and the [2] remaining defendants from all three cases [3] were consolidated into one case for trial.

[4] Q: Including Mr. Jefferson?

[5] A: That's correct.

[6] Q: When did that decision to severe [7] Mr. Mathis from the rest of the defendants [8] occur in proximity to the first trial, that [9] is, the trial of the rest of the [10] co-defendants?

[11] A: The indictment, as I recall, the [12] original indictment, in three cases was in [13] November of 1991. The — I think the [14] superseding indictment and the — maybe —

[15] Q: That's okay.

[16] A: If I can just refer to this, I can [17] tell you. There was — there was a — the [18] superseding indictment, I believe, was in [19] April, around April of '92, and shortly after [20] that the government filed a notice of its [21] intention to seek the death penalty and I [22] don't recall specifically when the motion to

### Page 129

[1] severe was filed. I believe it was a motion [2] that was filed, my recollection, I believe it [3] was a motion that was filed by Mr. Mathis.

[4] Q: That would have been prior to the [5] beginning of the trial of the co-defendants?

[6] A: Yes. Well before. Well before [7] because the trial — the trial in [8] Mr. Jefferson's case, those eight [9] co-defendants, began in February of '93 and [10] my recollection is that — that was set for [11] some period of time. That is, when I say [12] that, I mean I believe it was set sometime [13] back in actually mid 1992 after the notice of [14] intention to seek the death penalty was filed [15] and the judge at that time had already made a [16] determination that she would try Mr. Mathis [17] after the other co-defendants were tried.

[18] Q: Now, were you also the prosecutor [19] in Mr. Mathis' —

[20] A: I was. I was the prosecutor with [21] respect to all of these defendants. Kathy [22] Peluso was co-counsel for the trial of the

### Page 130

[1] co-defendants.

[2] Q: Now, Ms. Peluso handled the appeals [3] from the trial of the co-defendants; is that [4] right?

[5] A: That is correct.

[6] Q: Was she co-counsel with you on [7] Mr. Mathis' trial?

[8] A: She was not. She was — when [9]

### Page 130 (continued, column 2)

the — when this case became a capital case, [10] it was suggested that another attorney be [11] assigned to the case at that point, [12] basically, to assist me with some of the [13] capital litigation because of the complexity [14] of the whole investigation.

[15] Kathy at that time was a relatively [16] junior attorney in the office and was [17] assigned to assist me with, you know, [18] anything that I asked her to do with respect [19] to the case.

[20] Q: Who was your co-counsel in Mathis' [21] case?

[22] A: I didn't have co-counsel.

### Page 131

[1] Q: You just had some support on the [2] issues that you needed to deal with in [3] Mathis' case?

[4] A: I had a secretary, and I'm sure at [5] some point I asked a paralegal for some [6] assistance, but primarily it was my case.

[7] Q: I guess I misunderstood you.

[8] A: Jefferson was primarily my case as [9] well. Ms. Peluso was there as much to get [10] experience in observing and watching a [11] complex federal trial as she was to assist me [12] with any other matters that I needed.

[13] Q: She questioned witnesses, didn't [14] she?

[15] A: She did. She did. I don't know [16] how many. There were 75 or 80 some [17] witnesses. She may have questioned 9 or 10 [18] of them.

[19] Q: You said she handled the appeals [20] that —

[21] A: She did.

[22] Q: What about Mr. Mathis' case?

### Page 132

[1] A: I believe she handled that appeal [2] as well.

[3] Q: At the conclusion of the [4] co-defendants' trial, did Ms. Peluso move [5] over to the appellate section?

[6] A: I'm not sure when she went to [7] the — went to the appellate division. I [8] believe it was sometime shortly after that, [9] but I don't know the exact date.

[10] Q: She would have had to have been in [11] that position to be the appellate counsel; [12] wouldn't she?

[13] A: Yes.

[14] Q: Did you stay in touch with her [15] about the co-defendants' cases on appeal?

[16] A: Absolutely, absolutely.

[17] Q: Did she consult with you in [18] connection with the preparation of the [19] briefs?

[20] A: Yes. I mean I'm sure that she did

### Page 133

[1] on — on numerous occasions.

[22] Q: Did she inform you about the

[1] decision in the appeals?

[2] A: I'm not sure if she informed me or [3] if I informed her on that. Frankly, we were [4] waiting — it took the 11th Circuit quite a [5] bit of time to render the opinion. Of [6] course, the opinion was rather lengthy, so it [7] was — and it was published, so it was a [8] lengthy opinion that they wrote. We were [9] obviously interested in what they were — [10] when they were going to issue their opinion [11] and so I know that I had been checking [12] Westlaw on a regular basis to see when that [13] happened. So I can't remember if I told her [14] that the opinion came out or if she told me.

[15] Q: Do you know how many of the eight [16] co-defendants that went to trial filed [17] appeals?

[18] A: I believe seven did.

[19] Q: Seven of the eight?

[20] A: Yes, one of the — one of the [21] co-defendants, Robert Terry Tucker, pled [22] guilty eight or nine weeks into the trial I

### Page 134

[1] believe.

[2] Q: So only seven of the co-defendants [3] actually were convicted by a jury?

[4] A: That's correct.

[5] Q: All seven of those appealed?

[6] A: Yes.

[7] Q: When you were just referring a [8] moment ago to an opinion from the court of [9] appeals that you were —

[10] A: Yes.

[11] Q: Was that in Mr. Jefferson's case?

[12] A: Yes.

[13] Q: Were there opinions in any of the [14] other appeals?

[15] A: I believe there was also an opinion [16] in Mathis' case.

[17] Q: But of the co-defendants —

[18] A: Well, the — the opinion — it was [19] a consolidated appeal, so there would have [20] been — all seven of the co-defendants would [21] have been on the appeal.

[22] Q: Okay.

### Page 135

[1] A: That's my recollection unless [2] there's something that occurred. But it's — [3] I believe the lead defendant on the appeal [4] was Ralph Brazel, United States v. Brazil [5] would be the opinion.

[6] Q: For the co-defendants?

[7] A: That's correct.

WILLIE JEFFERSON   v.
JANET RENO et al

JEFFREY S. DOWNING
June 15, 1999

[8] Q: Now, do you remember when [9] Mr. Mathis' case began?

[10] MR. SMORODIN: His trial.

[11] MS. YESNER: His trial.

[12] THE WITNESS: I believe it was [13] sometime in February of '94, but if I can [14] just — February 1 of 1994.

[15] BY MS. YESNER:

[16] Q: Is when Mr. Mathis' trial began?

[17] A: That's correct.

[18] Q: When were the jury verdicts in the [19] co-defendants' trial?

[20] A: May 7, 1993.

[21] Q: So had the co-defendants appeal-[22] ed before Mr. Mathis' trial began?

Page 136

[1] A: Yes. Mr. Jefferson filed a notice [2] of appeal on August 23, 1993, five days [3] after — five days after he was convicted.

[4] Q: At some point Mr. Jefferson's [5] appeal was consolidated with the other [6] appeals?

[7] A: That's correct. On October 8th the [8] appeals of all the co-defendants that were [9] consolidated for trial were [10] consolidated for [10] appeal.

[11] Q: When was Mr. Mathis' trial? When [12] did that conclude? You said it began in the [13] winter of '94?

[14] A: It began February 1st of 1994, and [15] a verdict was returned on March 17th of [16] 1994.

[16] Q: Subsequent to that Mr. Mathis [17] appealed?

[18] A: Yes. He was sentenced on June 3rd [19] of 1994, and he filed a notice of appeal on [20] June 10, 1994.

[21] Q: So were the co-defendants' [22] consolidated appeals still pending when

Page 137

[1] Mr. Mathis filed his appeal?

[2] A: Yes. When Mr. Mathis filed his [3] appeal, the opinion — the co-defen-[4] dants' [4] case was still pending. The opinion was [5] issued for the co-defen-[6] dants on [6] January 6, 1997. Mandate was issued on [7] March 28, 1997.

[8] Q: In the co-defendants' appeal?

[9] A: That's correct.

[10] Q: When was the decision on appeal in [11] Mr. Mathis' case?

[12] A: Mathis' conviction was affirmed [13] and a mandate was issued on Novem-[14] ber 12, 1996.

[14] Q: So Mr. Mathis' case was appealed [15] before the co-defendants would [15] appeal?

[16] A: That's correct.

[17] Q: Then Mr. Mathis filed a petition [18] for certiorari?

[19] A: That's correct.

[20] Q: That was denied in May of '97; is [21] that right?

[22] A: I believe it was filed January 7th

Page 138

[1] of 1997, and I believe, I want to say, [2] May 12th is the date that it was — the [3] cert was denied. If I can have just one [4] moment. [4] Cert was denied on May 12, 1997.

[5] Q: Now, Mr. Downing, I notice that [6] you are referring to a document in [7] providing your [7] answers.

[8] A: Yes.

[9] Q: Is that a declaration that you [10] filed in this case?

[11] A: Yes, there are three declarations [12] that have been filed in this case.

[13] Q: Where did you get the informat-[14] ion that you provided in your dec-[15] laration [15] concerning the dates that [16] you just recited?

[16] A: I would have gotten those from the [17] appellate division, either from [18] Kathy Peluso, [18] from the opinion out of [19] the 11th Circuit or [19] from support personnel in the appellate [20] division.

[21] Q: Are these dates concerning the [22] various stages of the appeal dates that [22] you

Page 139

[1] would have known at the time that they [2] occurred?

[3] A: Probably not all of them. I'm sure [4] I would have learned, for example, as I [5] said [5] to you, the opinion in the co-[6] defendants' [6] case, I learned about that [7] probably within a [7] couple of days of it coming out because my [8] recollection is [8] that it was on Westlaw before [9] we got a hard copy of it from the court of [10] appeals. So I would have learned about [11] that at or around the time that it [11] happened.

[12] With respect to, for example, the [13] May 12th date in the — for Mr. Mathis [14] when cert was denied, that probably [15] was — [15] not probably — that was something that I [16] would have learned after that date by [17] inquiring — by either inquiring of the [18] appellate division or them advising me.

[19] Q: Did you know at the time or close [20] to the time that Mr. Mathis filed a petition [21] for cert that he had filed?

[22] A: Did I know he had filed it?

Page 140

[1] Q: Uh-huh.

[2] A: I believe I knew that he had filed [3] it because I wasn't advised that the appeal [4] was concluded.

[5] Q: Had you been told that the 11th [6]

Circuit had affirmed his conviction?

[7] A: Yes. I had been — yes, I had been [8] told that probably by — by Kathy when — [9] when the opinion came out.

[10] Q: So fairly close to the time of the [11] decision you were told that Mr. Mathis' [12] appeal had been affirmed?

[13] A: Yes, I'm sure I was.

[14] Q: That was in 1996?

[15] A: Right.

[16] Q: Then as I understand what you say, [17] you found out subsequent to his filing a [18] petition for cert that he had done that?

[19] A: Yes.

[20] Q: Sometime after that you checked to [21] see what the status of his petition was?

[22] A: Yes, at some point I did.

Page 141

[1] Q: Before you said that you were [2] waiting for the opinion in the co-defen-[3] dants' [3] case, which would be Mr. Jefferson's case on [4] appeal?

[5] A: Right.

[6] Q: Were you expecting an opinion in [7] that case?

[8] A: It was a — we were in trial for [9] almost 14 weeks. There were a number of —[10] there were a number of issues that were [11] raised on appeal and in my experience it was [12] a case that was one that I thought the 11th [13] Circuit might write an opinion.

[14] Q: Was there oral agreement?

[15] A: There was.

[16] Q: Did Ms. Peluso handle the argum-[17] ent?

[17] A: As far as I know she did, yes.

[18] Q: Did you attend?

[19] A: No.

[20] Q: The court of appeals took some time [21] to decide the appeal of Mr. Jefferson's case; [22] is that a fair statem-[23] ent?

Page 142

[1] A: They — they took some time in [2] issuing an opinion. I don't know how long it [3] took them to decide how they were going to [4] rule, but they — it took them some time [5] to write and issue an opinion.

[6] Q: Did you check periodically to see [7] if it had come out?

[8] A: I did.

[9] Q: When did you begin checking?

[10] A: I don't know. I couldn't tell you [11] that. I — I really don't know. The appeals [12] were filed — let's see when the appeals [13] were actually filed.

[14] Well, Mr. Jefferson filed his [15] appeal on October 23rd of 1993. The — I'm [16] sure that the briefing schedule was rather [17] lengthy because trying to coordinate a [18] briefing schedule with seven attorneys in a [19] case like this, generally, takes some time. [20] I don't know when the case was argued. But [21] the opinion didn't come out until — when did [22] I say? 1997? So there was a significant

---

Page 143

[1] time while the case was on appeal.

[2] Q: Let me see if I can shorten the [3] time. Did you start checking or were you [4] checking on the status of Mr. Jefferson's [5] appeal after Mr. Mathis' appeal was decided?

[6] A: I don't know. I don't know when — [7] I don't know when the case was actually [8] argued where it would have been submitted to [9] the court. I mean, again, the opinion was [10] issued in January of '97. The appeal was [11] filed in August of '93. So that's three and [12] a half years from the time the notice of [13] appeal was filed until the time that the [14] opinion was issued.

[15] Q: I guess my question is, after you [16] heard about Mr. Mathis' decision from [17] the 11th Circuit, did you begin checking at [18] that point to see?

[19] A: I'm sure I would have been — I'm [20] sure I would have been waiting to hear from [21] the 11th Circuit before that.

[22] Q: You said you were checking Westlaw

---

Page 144

[1] to see if there was a decision?

[2] A: Yes.

[3] Q: That's quicker than the paper copy?

[4] A: Usually, yes.

[5] Q: Where did you have access to [6] Westlaw?

[7] A: At that time I don't know if I was [8] checking it myself. I may have been. We [9] probably had computers by that time.

[10] Q: So this would have been the end [11] of '96?

[12] A: Yes.

[13] Q: So you would have checked on [14] Westlaw from your desk?

[15] A: Yes.

[16] MS. YESNER: I think we've [17] exhausted our ability to sit here with [18] sandwiches in the room.

[19] (Whereupon, at 2:00 p.m., a [20] Luncheon recess was taken.)

---

Page 145

[1] AFTERNOON SESSION

[2] (2:35 p.m.) [3] Whereupon, [4] JEFFREY S. DOWNING [5] was recalled for examination and, having been [6] previously duly sworn, was examined and [7] testified further as follows:

[8] EXAMINATION BY COUNSEL FOR PLAINTIFF

[9] CONTINUED

[10] BY MS. YESNER:

[11] Q: Mr. Downing, before we broke, I [12] asked you, and I'm sorry if I'm repeating [13] this this, about your familiarity with the FOIA [14] request Mr. Jefferson submitted that's the [15] subject of this civil action. When did you [16] first learn about that request?

[17] A: I would have first learned about it [18] probably in — sometime in late '95 when the [19] paralegal brought the initial response to the [20] FOIA request in for me to sign.

[21] Q: Do you remember who that was?

[22] A: I believe it was Tomasa Guzman

---

Page 146

[1] Michaels.

[2] Q: She was a paralegal in the criminal [3] division?

[4] A: She was.

[5] Q: Do you remember what she brought [6] you to sign?

[7] A: I don't know what it's called. It [8] was a one-page response to a FOIA request.

[9] Q: Did you ever authorize anyone to [10] sign your name to any forms?

[11] MR. SMORODIN: FOIA forms or [12] court pleadings?

[13] MS. YESNER: Uh-huh, FOIA forms.

[14] THE WITNESS: Not that I recall, [15] no.

[16] BY MS. YESNER:

[17] Q: You said that was in 1995?

[18] A: I believe that's when it was. [19] Whenever — whenever — let me — if I [20] can just review my declaration. It would have [21] been in late 1995 because I believe that's [22] when the response was forwarded to EOUSA.

---

Page 147

[1] Q: When you signed the form, did you [2] have an understanding of what Mr. Jefferson [3] was asking for?

[4] A: No.

[5] Q: What were you being asked to [6] sign?

[7] A: I knew that he was requesting [7] documents. I did not know what documents [8] he was requesting or what category of documents [9] he was requesting.

[10] Q: By signing the form what were

---

you [11] stating?

[12] A: My recollection of the — of the [13] form, and I — and, you know, I haven't seen [14] the form since that time. My recollection of [15] that form was that it was a response that [16] indicated that there was general information [17] about the — about the number of defendants [18] whether there was litigation pending. That [19] was the — that's one thing I do remember, is [20] that there was an indication on there that [21] there was — that there were pending [22] proceedings. There may have been some box or

---

Page 148

[1] some indication on there that was checked [2] that indicated that producing documents would [3] interfere with pending proceedings.

[4] Q: I'm going to show you a document [5] that was attached to a declaration of Bonnie [6] Gay in July of 1996 that was filed with the [7] court and ask you if you recognize that [8] document.

[9] A: That looks like the document that [10] I'm talking about.

[11] Q: Look at the second page while [12] you're looking.

[13] A: That looks like the document.

[14] Q: The document that I'm referring to [15] is dated October 11, 1995?

[16] A: Right.

[17] Q: It was attached to a declaration of [18] Bonnie Gay that was filed in filed in this [19] case and the declaration is dated July [20] of 1996. Is that your signature on the [21] bottom of the first form?

[22] A: No, it's not.

---

Page 149

[1] Q: Did someone just print your name [2] there?

[3] A: It looks like they did and it looks [4] like they put Kathy Peluso's name there as [5] well.

[6] Q: On the second page, is that your [7] signature on the bottom?

[8] A: No, it's not.

[9] Q: Did you tell someone to sign your [10] name?

[11] A: I don't recall doing that.

[12] Q: Do you remember signing a document [13] like this?

[14] A: I remember looking at a document [15] like this and I was either asked to sign it [16] or to review it to determine that it was [17] accurate. I seem to recall signing it, but [18] I — I may not have. I may have just [19] reviewed — reviewed the information on it to [20] determine that it was accurate.

[21] Q: What does this, and we're looking [22] at the second page, what does this

WILLIE JEFFERSON  v.
JANET RENO et al

JEFFREY S. DOWNING
June 15, 1999

second

---

Page 150

[1] page of the form indicate?

[2] A: Can I — can I look at it a little [3] closer?

[4] Q: Yeah.

[5] A: It's a check list for pending law [6] enforcement proceedings.

[7] Q: At the time, that is, in October [8] of 1995, were there any pending trials of any [9] co-defendants in Mr. Jefferson's case?

[10] A: On December 5, 1995, there were no [11] pending trials.

[12] Q: October.

[13] A: October.

[14] Q: Is that what you mean?

[15] A: Yeah. If I can just back up for a [16] second.

[17] Q: Uh-huh.

[18] A: I'm just looking at the date on [19] this, the date that it looks like this was [20] signed, 12/5/95, and —

[21] Q: Where someone signed your [22] name? Is that what you mean?

---

Page 151

[1] A: Yes. My recollection is that I was [2] in trial at that time. There's — my name is [3] written on there. My recollection is that I [4] was in trial at that time, but I — I don't [5] know.

[6] Q: Okay.

[7] A: I'm sorry. Your question?

[8] Q: In December of '95, when some- [9] one signed your name on that form, were there any [10] pending trials for any co-defendants in [11] Mr. Jefferson's case?

[12] A: There were no pending trials. They [13] were — I believe both co-defendants and [14] Mr. Mathis were on appeal.

[15] Q: All the trials had concluded?

[16] A: That's correct.

[17] Q: Of all the people that you indicted [18] in this case, and by this case I mean [19] including Mr. Mathis, were there any [20] fugitives?

[21] A: No, there were not.

[22] Q: They were all apprehended?

---

Page 152

[1] A: That's correct.

[2] Q: Everyone was either pleaded guilty [3] or convicted?

[4] A: That's correct. There may have [5] also been — there may have also been some [6] other ancillary type pro- ceedings or maybe [7] that's not the right word, some challenges to [8] sentences based on 183582 going on with other [9] co-defendants at this time, but that

---

wouldn't [10] have affected this.

[11] Q: At the time that you reviewed the [12] document on pending litigation that we were [13] just talking about did you review any of the [14] documents that were the subject of [15] Mr. Jefferson's FOIA request?

[16] A: No.

[17] Q: Did anyone ask you to do that?

[18] A: No.

[19] Q: Did anyone ask you to make a [20] determination as to whether the re- quested [21] records would interfere with any law [22] enforcement proceedings?

---

Page 153

[1] A: At that time I seem to recall a [2] conversation with Tomasa, the sum and [3] substance of which was that this request had [4] been filed and we were responding to it, that [5] there were pending proceedings, that is, [6] there were appeals. I do not review anything [7] other than to confirm — I would have [8] confirmed to her that there were, in fact, [9] two appeals which — either one of which, if [10] the conviction would have been reversed, [11] would have resulted in a new trial.

[12] Q: So you confirmed that there were, [13] in fact, pending appeals in these cases?

[14] A: Right.

[15] Q: But did anyone ask you to make a [16] determination that disclosure of the records [17] sought would interfere with any law [18] enforcement proceedings?

[19] A: Not specifically, no.

[20] Q: Did you have a conversation with [21] Bonnie Gay between December 1995 and July [22] of 1996 in which you told her you had made

---

Page 154

[1] such a determination?

[2] A: A conversation with her?

[3] Q: Let me ask you this: Did Bonnie [4] Gay ask you, prior to July 22, 1996, whether [5] you had determined that disclosure of [6] requested records would interfere with any [7] law en- forcement proceedings?

[8] A: I honestly don't remember any [9] conversation with Bonnie Gay about anything [10] until she called me and asked me to do the [11] first declaration. I can't — I can't [12] remember any con- versation with her before [13] that.

[14] Q: Did you have any E-mail [15] cor- respondence with anyone concerning the [16] impact that release of Mr. Jef- ferson's [17] case file records would have on any law [18] enforcement proceeding prior to July 1996?

[19] A: No. Again, my — my recollection

---

[20] is as follows: I reviewed the form that [21] you're referring to there. That's my recol- [22] lection of the next contact that I had with Bonnie

---

Page 155

[1] Gay, and there was another gentleman whose [2] name I can't remember at EOUSA, was when I [3] was called around March, April of 1997 and [4] asked to do the first declaration that I did.

[5] My recollection — I do have — I [6] have no recollection of any other [7] conversations with — with Bonnie Gay.

[8] Q: Prior to that time?

[9] A: Prior to that time.

[10] Q: How about with Pat Nadiak? Is [11] that how you pronounce her name?

[12] A: Pat Nadiak.

[13] Q: Nadiak. Do you recall any [14] conversations with her in which she asked you [15] whether the disclosure of the documents [16] requested by Mr. Jefferson would have a [17] negative impact on any law enforcement [18] proceedings?

[19] A: I don't recall any conversation [20] with her. You know, if — let me say this as [21] far as Bonnie Gay is concerned. My [22] recollection is as I told you. I could have

---

Page 156

[1] spoken to — it's possible that I spoke to [2] someone in between that time of reviewing [3] that document and doing this declaration. I [4] just don't recall that. I certainly didn't [5] tell anyone that I reviewed any documents if [6] I did. If I would have had said anything at [7] all, it would have been to confirm what was [8] on that document, which was that there were [9] pending proceedings.

[10] Q: Let me show you Ms. Gay's [11] declaration from July of 1996. It was filed [12] in the district court July 27, 1996. I [13] particularly am going to bring to your [14] attention a line in paragraph 7 of her [15] declaration that begins on the bottom of [16] page 3 that begins with, "Three other [17] co-defendants," and go out to the next [18] page. Could you read that where it says, "Three [19] other"?

[20] A: "Three other co-defendants had also [21] appealed their convictions. All appeals were [22] pending as of July 17, 1996. Jeffrey

---

Page 157

[1] Downing, Assistant United States Attorney [2] determined that disclosures of the requested [3] records would in- terfere with three pending [4] pro- ceedings at the district court level and [5] four pending appeals, Exhibit E."

[6] Q: Now, you're taking a look at [7] Exhibit E which is behind it. Is Exhibit E a [8] document from you?

[9] A: It appears to be an E-mail from Pat [10] Nadiak. It says 11th Circuit appeal [11] numbers are 93-29988 and 94-2766. Willie's is the [12] first appeal. The district court number for [13] this case is 91301CRT17A, and then it says, [14] " Defendants are," and then it lists the [15] defendants. "Let me know if you need [16] anything else."

[17] Q: Mr. Downing, did you provide any [18] information indirectly or directly to Ms. Gay [19] that you had made the determination, as she [20] states in her declaration?

[21] A: No, although can I look at the [22] document that you referred to before? Is it

Page 158

[1] in here?

[2] MR. SMORODIN: I think it is, [3] actually.

[4] MS. YESNER: Yes, it's behind it.

[5] MR. SMORODIN: If you keep going —

[6] MS. YESNER: Keep going.

[7] MR. SMORODIN: I believe it's [8] two — there you go.

[9] BY MS. YESNER:

[10] Q: Does that help refresh your memory?

[11] A: It is possible that I advised [12] somebody that there were three pending [13] proceedings at the district court level, [14] which would have been the 3582 proceedings, [15] and I — but I don't know where four pending [16] appeals would come from.

[17] Although that could have been — [18] presumably those — those could have [19] been 3582 appeals as well, because there were [20] a number of those that were filed. But I — [21] I did not look at any records because I did [22] not know what records were being requested.

Page 159

[1] So there is no way — there is no way that I [2] could have told anyone that disclosure of [3] specific records would have interfered with [4] pending proceedings.

[5] Now, generally — generally — my [6] recollection of my conversation with Tomasa [7] was that if there were — if there were [8] pending proceedings, that that was a basis to [9] not produce the records under FOIA.

[10] Q: If there were pending proceedings?

[11] A: If there were pending proceedings.

[12] Q: Sentencing proceedings?

[13] A: That's the extent of the [14] conversation that I can recall. So I guess [15] what I'm — what I'm telling you is that I

[16] may have, generally, had a conversation where [17] someone would have told me if there are [18] pending proceedings, that's a reason to deny [19] the FOIA request. I did not have any idea [20] what the particular basis would be to deny a [21] FOIA request because I had no knowledge of [22] FOIA, so that information would have been

Page 160

[1] something that would have been told to me.

[2] Again, my recollection of that is [3] that I probably would have talked to Tomasa [4] about it, but I did not review any documents, [5] nor do I have any recollection of telling [6] Bonnie Gay that I reviewed any documents.

[7] Q: Well, aside from reviewing [8] documents, did you tell anyone that release [9] of Mr. Jefferson's case file records without [10] having reviewed them, let's take more [11] generally, that release of his file, records [12] of his file, would harm those district court [13] proceedings and the appeals?

[14] A: I'm sure if that was discussed, and [15] I believe it was, I'm sure that I would have [16] said something like that. I did not know the [17] nature of the documents that were being [18] requested, but my understanding of any [19] documents being requested other than what [20] would have been produced pursuant to the [21] Federal Rules of Criminal Procedure would [22] have, in my opinion, been an interference

Page 161

[1] with the pending proceedings in this way. [2] I'm sorry.

[3] Q: Go ahead. Finish.

[4] A: Mr. Jefferson, as any other — as [5] any other defendant, would be entitled to [6] discovery under Rule 16 of the Federal Rules [7] of Criminal Procedure. He would also be [8] entitled to any documents that would be — [9] that were produced that would have been [10] impeachment material, Brady, Jencks, anything [11] that any other co-defendant or criminal [12] defendant would be permitted to have. But [13] that's the extent of what would be permitted [14] under the federal rules and under federal [15] law.

[16] If he was to get additional [17] documents that were not, for example, in one [18] of those categories and his appeal was still [19] pending and the 11th Circuit would have sent [20] the case back for a new trial, that, in my [21] opinion, would have an interference with [22] the proceedings because it would have put him

Page 162

[1] in a position that he would not have been in [2] as a criminal defendant in a case.

[3] Q: So as a general matter, disclosure [4] of anything that he had not received during [5] his trial would interfere with law [6] enforcement proceedings because there was the [7] possibility that there might be a retrial?

[8] A: Well, it wasn't explained to me in [9] that way. It was explained — the way — the [10] way it was told to me was that if — I didn't [11] know what documents he was requesting and so [12] I — there was no way, and that's why I said [13] there's no way I could have said that [14] specific documents would have interfered. [15] However, as a general matter, without knowing [16] what documents were being — were going to be [17] disclosed, it could have been anything in my [18] file. It could have been — it could have [19] been confidential information because I [20] didn't know that any — I didn't know what [21] exemptions were in there or what exceptions [22] were in there to the disclosures.

Page 163

[1] So the answer to your question is, [2] I was, basically, told that the disclosure [3] would affect my case in this way: In that [4] he would be in a different position than he [5] would have been had he been a criminal [6] defendant without filing the FOIA. I agreed [7] with that.

[8] Q: Who told you that?

[9] A: To my recollection of when I had [10] that conversation was when I had that [11] conversation with — I had a conversation [12] with Bonnie Gay before I filed my declaration [13] and she asked — and she asked me to file the [14] declaration for that purpose, to indicate why [15] disclosing documents would interfere with [16] a — why it was a problem to disclose them [17] while there were proceedings that were [18] pending. But I don't remember having that [19] conversation that far before she asked me to [20] do the declaration.

[21] But I did — I did have that [22] conversation with Bonnie when she called me.

Page 164

[1] My recollection of it was that it was at or [2] near the time that I filed the declaration, [3] so I could be mistaken about when that [4] conversation occurred.

[5] Q: You may have had a conversation [6] with her the year before?

[7] A: I don't recall it being that far [8] before the declaration because when I recall [9] is I recall being called by Bonnie Gay and [10] having her tell me Jeff, I need you to do a [11] declaration and I need you

WILLIE JEFFERSON   v.
JANET RENO et al

JEFFREY S. DOWNING
June 15, 1999

to do the [12] declaration to explain why disclosing certain [13] matters would be a problem. That is when she [14] asked me to go through the file, to look [15] through the file to determine what was in it [16] and that's, basically, the substance of my [17] first declaration.

[18] Q: So when you're telling me your [19] first declaration, you're talking about your [20] April declaration?

[21] A: That's right.

[22] MS. YESNER: Let's mark this as an

Page 165

[1] exhibit so we know what we're talking about.

[2] (Downing Deposition Exhibit [3] No. 8 was marked for [4] identification.)

[5] BY MS. YESNER:

[6] Q: I'm handing you a copy of your [7] declaration that was filed in the court [8] April 30, 1997, and I —

[9] A: Can I interject something here?

[10] Q: Uh-huh.

[11] A: I just do not believe that I talked [12] to her before she filed that —

[13] Q: The July document?

[14] A: July 16th. If you look at the [15] footnote of my declaration —

[16] Q: Uh-huh.

[17] MR. SMORODIN: What footnote is [18] that?

[19] THE WITNESS: Footnote 1. It says, [20] "In the declaration dated July 16, 1996, this [21] language referring to three undisposed [22] defendants was subsequently interpreted by

Page 166

[1] attorney Bonnie Gay, EOUSA, to mean that [2] there were three defendants remaining to be [3] tried." That was corrected, and I — I do [4] remember when she called me to ask me to do [5] this declaration that she said that there had [6] been a motion filed by Mr. Jefferson in which [7] he alleged that there was — that there was [8] some inconsistency, which is — I'm referring [9] now to paragraph 6 of my declaration — as to [10] the number of co-defendants and the case [11] caption.

[12] That motion, March 6th of 1997, was [13] sent to me obviously after it was filed to [14] look at because, as I recall, Ms. Gay wanted [15] me to respond to that as well. So I have no [16] recollection of talking to her before [17] July 16th. It would not make any sense to me [18] that I did. If she would have talked to me [19] before July 16th of 1996, I don't believe [20] that she would have put things in that — [21] that declaration that were wrong and then she [22] asked me to correct them later on.

Page 167

[1] BY MS. YESNER:

[2] Q: Say nothing in this April 1997 [3] declaration about having made a determination [4] concerning the effect on law enforcement [5] proceedings prior to EOUSA's [6] December 29, 1995, denial of Mr. Jefferson's [7] request. Is that because you did not make [8] that determination?

[9] A: That is because I did not make that [10] determination at that time. As I indicate in [11] paragraph 18 of that document, I think I say [12] in there what I not quite as artfully tried [13] to say to you a few minutes ago about what [14] that type of disclosure of requested [15] documents would have — would have done as [16] far as putting Mr. Jefferson in a different [17] position.

[18] I was not told — let me just say [19] this. I was not told a whole lot of anything [20] by EOUSA FOIA about what was going on. I [21] wasn't asked a lot of questions about what [22] was going on. I certainly wasn't told

Page 168

[1] anything about how or — how the litigation [2] or the request would proceed or anything [3] else, so I —

[4] Q: Were you asked to support the [5] EOUSA's FOIA determination after the fact?

[6] A: My recollection of this is that [7] when Ms. Gay called me and asked me to do [8] this declaration, that she told me that she [9] had denied the request and that they [10] needed — they now needed a declaration from [11] me in indicating that disclosure of the [12] documents would put Mr. Jefferson in a, if [13] you will, a better situation than he should [14] have been in.

[15] Q: Did she ask for support for the [16] proposition that disclosure of these [17] documents would harm law enforcement [18] proceedings?

[19] A: I don't know if she asked that [20] specifically, law enforcement proceedings, [21] court proceedings, trial proceedings. There [22] were — I think the only — I think

Page 169

[1] concern at that point was consistent with [2] what I set out in paragraph 18, which was [3] that if certain documents — again, not [4] knowing what kind of documents those were — [5] were produced to Mr. Jefferson, that he would [6] have more discovery, if you will, than he [7] would have been entitled to under the Federal [8] Rules of Criminal Procedure.

[9] Q: In the event there was a new trial?

[10] A: In the event there was a new trial, [11] correct. It was — it was indicated to me, [12] again, without anyone telling me

anything [13] specific, because no one ever told me [14] anything specific, that essentially if there [15] was a pending proceeding, that that was a [16] basis to deny the request.

[17] Q: Let me ask you about the categories [18] of documents. You were asked to try and [19] summarize the material that were contained in [20] the case file.

[21] A: Are you referring to the —

[22] Q: Page 5 of the —

Page 170

[1] A: Declaration?

[2] Q: Yeah.

[3] A: Yes.

[4] Q: What did you do at the time that [5] you signed your April 1997 declaration in [6] order to help you describe the contents of [7] the case file?

[8] A: I went through the boxes.

[9] Q: Did you count them?

[10] A: Yes.

[11] Q: Count then you made notes as to [12] what the boxes contained?

[13] A: I did.

[14] Q: As I understand your testimony [15] before, there was no index or table of [16] contents of —

[17] A: That's right. The boxes were [18] located on the — I believe at that time they [19] were on the first floor of the Timberlake [20] Annex, which is the building behind our [21] building. As I recall, they were in a [22] storage area over there. I went over there.

Page 171

[1] I pulled all the boxes off of the storage [2] shelves that had this case caption on them. [3] I put them on the floor. I counted them and [4] I went through each one of them to, [5] generally, determine what was in there.

[6] Q: At this time in April of 1997 the [7] case had been on appeal for some time?

[8] A: It had.

[9] Q: When Ms. Gay asked you for the [10] declaration, did she tell you there had [11] been a court order in March of '97?

[12] MR. SMORODIN: Sorry.

[13] BY MS. YESNER:

[14] Q: Asking for a categorical [15] description of the documents?

[16] MR. SMORODIN: By court order [17] you're referring to the United States [18] District Court for D.C.?

[19] MS. YESNER: United States district [20] court where the FOIA action was pending.

[21] THE WITNESS: No.

[22] BY MS. YESNER:

Page 172

[1] Q: Did you know there was a district [2] court case?

[3] A: I did not know there was a district [4] court case. I did not know that — I did not [5] know anything about FOIA or how the FOIA [6] request would be handled. I believe that it [7] was administrative based on the little bit of [8] information that was provided to me by [9] Ms. Gay.

[10] I will tell you that I wasn't sure [11] of why I was putting the caption that I did [12] on the declaration when I was asked to submit [13] it that way, but I was never told that, in [14] fact, anything was going on at this time in [15] district court.

[16] Q: So to make sure I understand you [17] correctly, when Ms. Gay asked you for a [18] declaration, she did not inform you that [19] Mr. Jefferson had filed a lawsuit in the [20] United States District Court for the District [21] of Columbia?

[22] A: At this time I do not recall her

Page 173

[1] saying that.

[2] Q: Did you write your declaration?

[3] A: I did.

[4] Q: Did your secretary type it?

[5] A: She did.

[6] Q: Did anyone provide you any [7] assistance in preparing the form?

[8] A: I got a — Bonnie Gay or [9] somebody — there was — there was another [10] gentleman, I can't remember his name, at the [11] BOUSA.

[12] MR. SMORODIN: Do you want to [13] suggest the name to him, counsel? I think we [14] know who it is.

[15] MS. YESNER: John — I can't [16] remember his name.

[17] MR. SMORODIN: Boseker.

[18] MS. YESNER: Boseker.

[19] THE WITNESS: That sounds very [20] familiar. I was provided with — I don't [21] know if you want to call it a go by, may have [22] been a — I don't recall exactly what it was.

Page 174

[1] It may have been a declaration of someone [2] else or that — that Bonnie Gay or someone [3] else may have done in a similar situation.

[4] BY MS. YESNER:

[5] Q: To use as a model?

[6] A: To use as a way to set this up [7] because I had no idea how they wanted me to [8] respond to it and what they wanted me to put [9] in it, so I actually got that. As I recall, [10] it wasn't much help to me and I ended up [11] drafting this and then sending it out to [12] them.

[13] Q: Did Ms. Gay review and discuss

Page 174 continued

[14] it with you?

[15] A: I'm sure she did. Either she did, [16] or Mr. Boseker did.

[17] Q: At the time that you were preparing [18] your declaration did they tell you to put [19] this particular caption on it?

[20] A: I don't know where I got that. I [21] may have gotten that off the motion that they [22] sent down to me to review the motion

Page 175

[1] Mr. Jefferson had filed.

[2] Q: So if you reviewed a motion from [3] Mr. Jefferson, that motion would have had a [4] court caption on it?

[5] A: I'm sure it did.

[6] Q: So then it was your understanding [7] that there was an active piece of [8] litigation?

[8] A: Well, there was certainly a case [9] caption on it. What this — what was going [10] on with the litigation no one told me.

[11] Q: Let me just look at paragraph 17 of [12] your declaration. This is your description [13] of the contents of the boxes. [14] When you prepared this list, were [15] you just going through the boxes and writing [16] things down in categories?

[17] A: What I was doing is as I was going [18] through the boxes, I was making notes as to [19] the general category of what — what the [20] stuff was.

[21] Q: Okay.

[22] A: As I recall, that's what I was told

Page 176

[1] to do. There were some — there were was [2] mention — there was some mention, as I [3] recall, by Bonnie Gay about something, which [4] I still don't know exactly what it is, but a [5] bond index. I heard that referred to by [6] Stephanie Boucher at a later time and she [7] indicated that that wasn't necessary, that [8] —and I assumed that that was a [9] detailed description of the documents — that [10] that was not necessary and that all I needed to do was [11] to do a general summary of what was in the [12] boxes.

[13] Q: In paragraph D, subparagraph D of [14] paragraph 17 what are DOJ approval [15] authorization memos and police internal [16] affairs information?

[17] A: DOJ approval authorization memos [18] would have been memos that were prepared for [19] the bringing of a racketeering charge, which [20] has to be approved by the Organized Crime and [21] Racketeering Section at Department of [22] Justice. Also would have been in this case

Page 177

[1] approval — a memo requesting authorization [2] to seek the death penalty.

[3] Police internal affairs information [4] referred to a St. Petersburg police detective [5] who had allegedly had an interest in a [6] building that Mr. Mathis — some of [7] Mr. Mathis' workers were selling crack [8] cocaine out of and which a number — at least [9] two of the people that were working for [10] Mr. Mathis then burned — was the subject of [11] an arson count in the RICO count. There [12] were — there were some internal affairs [13] files that were provided to me about that [14] detective and those matters. That's what [15] that is.

[16] Q: Do you know what happened to those [17] documents? Were those documents part of the [18] material that was purged from the file?

[19] A: The — the DOJ approval [20] authorization memos are — are in the file. [21] The internal affairs documents were purged. [22] They were shredded.

Page 178

[1] Q: Where were the originals for the [2] police internal affairs information?

[3] A: I'm sure they were — I'm sure they [4] were at the St. Petersburg Police Department. [5] That's who provided them to me.

[6] Q: You didn't retain a single copy of [7] them?

[8] A: Of the internal affairs stuff, no, [9] I did not.

[10] Q: On the next page under subparagraph [11] F, there's a description about subpoenaed [12] documents and matters relating to witness [13] immunity.

[14] A: Yes.

[15] Q: Were those documents that were [16] subpoenaed for the Grand Jury?

[17] A: They could have been subpoenaed [18] for the Grand Jury or subpoenaed for trial.

[19] Q: The documents that were subpoenaed, [20] did they all require confidentiality?

[21] A: I'm not sure I understand what you [22] mean.

Page 179

[1] Q: Some Grand Jury material has to be [2] kept confidential; is that correct?

[3] MR. SMORODIN: I'm going to object, [4] but if you can answer, go ahead. I mean I [5] think all —

[6] THE WITNESS: Well, most Grand [7] Jury — most, if not all, of Grand Jury [8] materials under Rule 6(e) remain confidential [9] unless for some reason those documents [10] would — would subsequently be used as trial [11] exhibits or

WILLIE JEFFERSON    v.
JANET RENO et al

JEFFREY S. DOWNING
June 15, 1999

return of an indictment. Those [12] exhibits could be — could be something that [13] would not remain secret.

[14] BY MS. YESNER:

[15] Q: Documents that are simply shown, [16] that are obtained through Grand Jury subpoena [17] and are shown to a Grand Jury, do those [18] documents require confidentiality?

[19] A: Yes, they would. However, if I [20] was — for example, if I was to subpoena [21] documents from a records custodian, for [22] example, those documents would be — would be

---

Page 180

[1] covered under Rule 6(e), and I wouldn't — I [2] wouldn't be in a position to disclose those [3] documents. However, if I returned an [4] indictment with respect to a charge that I [5] was investigating in that Grand Jury, those [6] documents would not necessarily retain any [7] secrecy to them if they became part of [8] Rule 16 discovery.

[9] Q: In your description here of [10] subpoenaed documents were some of those [11] documents subject to Rule 16 discovery?

[12] A: I'm sure they were. I am trying to [13] remember exactly what those documents would [14] be.

[15] During the course of this [16] investigation there were numerous, numerous [17] times when officers would go to investigate [18] something and they wanted a document or they [19] wanted records and the people who had them [20] said you can have them. Just give me a [21] subpoena. So if it was prior to the [22] return of the indictment, which I don't recall — I

---

Page 181

[1] don't recall a lot of documents being [2] gathered in that way — it would have [3] been a [3] Grand Jury subpoena. Afterwards it would [4] have been a trial subpoena. They would have [5] been produced then.

[6] Q: Were most of the documents gathered [7] produced using a trial subpoena?

[8] A: My recollection is they were.

[9] Q: What happened to the subpoenaed [10] documents other than the Grand Jury [11] subpoenaed documents?

[12] A: The subpoenaed documents would have [13] been — would have been in the file and in [14] all likelihood most, if not all of them, were [15] part of the Rule 16 discovery.

[16] Q: What happened to the documents that [17] were not included in the Rule 16 discovery?

[18] A: I'm trying to think — I'm trying [19]

---

to think of what the documents were to see [20] if — to think if there were any that were — [21] that would not have been Rule 16 discovery [22] and I cannot tell you exactly what those

---

Page 182

[1] documents were.

[2] Q: Do you recall, and I'm not trying [3] to get into your particular reasons for [4] segregating documents, but do you recall ever [5] making a determination that there were [6] documents that should not be considered [7] Rule 16 discovery?

[8] A: I copied — I was very liberal in [9] my — in my Rule 16 discovery, so if there [10] were documents, the likelihood is that they [11] would have been — I would have — the only [12] reason I would not have turned them over is [13] if I had determined that they were material, [14] not material, and, as I said, I would have [15] been very liberal in that determination. So [16] I can't recall anything that I had in the way [17] of documents that I would not have turned [18] over in Rule 16 discovery.

[19] Q: Documents that you had subpoenaed?

[20] A: Subpoenaed or obtained in any way. [21] Anything that I had that would have been [22] documents, papers, anything at all that would

---

Page 183

[1] have been material in any way to the [2] preparation of the case, the trial or the [3] defense I would have turned over in Rule 16.

[4] Q: Did you keep a single copy of the [5] documents that were produced under subpoena?

[6] A: I don't think I kept a copy of the [7] document with the subpoena. I — if I [8] obtained a document, it would have been kept [9] with the copies of the Rule 16 stuff that I [10] sent out.

[11] Q: Did you keep a copy of what you [12] sent out as Rule 16 discovery? Did you have [13] a file folder that said Rule 16 discovery?

[14] A: Well, I had boxes of Rule 16 [15] discovery. I had extra copies of Rule 16 [16] discovery.

[17] Q: When you purged the files, did you [18] retain one set?

[19] A: I don't remember. I do not [20] remember that. I don't know whether I did. [21] I don't know.

[22] MR. SMORODIN: Excuse me.

---

Page 184

[1] (Witness conferred with counsel)

[2] THE WITNESS: The Rule 16 discovery [3] in this case was — was very voluminous, and [4] I had a number of

---

extra copies that took up [5] boxes of space, and I honestly don't know [6] whether — whether I would have kept a copy [7] of that or not. I probably didn't.

[8] BY MS. YESNER:

[9] Q: How about subparagraph J here, Tax [10] Information and Financial Affidavits.

[11] A: Uh-huh.

[12] Q: What type of information are you [13] talking about there?

[14] A: Tax information, my recollection is [15] that there was — there were a number of tax [16] returns that were seized out of Mr. Mathis' [17] house, his 1040s, as I recall. The financial [18] affidavits were financial affidavits [19] were filled out by all of the co-defendants [20] when they appeared in court in obtaining [21] court-appointed counsel.

[22] Q: Do you know what happened to this

---

Page 185

[1] information?

[2] A: The tax information would have been [3] shredded. The financial affidavits, in all [4] likelihood, also would have been shredded.

[5] Q: The last paragraph, there's a [6] paragraph K, electronic surveillance [7] information including logs and transcripts.

[8] A: Uh-huh.

[9] Q: This would include, I gather, the [10] summary of intercepted calls?

[11] A: Yes.

[12] Q: Would it also include the Pen [13] Registers?

[14] MR. SMORODIN: I'm going to object. [15] I don't know that there's a foundation for [16] that question.

[17] BY MS. YESNER:

[18] Q: Do you know what a Pen Register is?

[19] A: Oh, absolutely. It —

[20] MR. SMORODIN: That wasn't my [21] objection, just for the record. I didn't [22] doubt that Mr. Downing would —

---

Page 186

[1] THE WITNESS: I'm trying to —

[2] BY MS. YESNER:

[3] Q: Does the electronic surveillance [4] information —

[5] A: I'm trying to recall whether — I'm [6] trying to recall what we did in terms of Pen [7] Registers.

[8] Q: Well, when you were looking through [9] the boxes describing what you had and you had [10] this category of electronic surveillance [11] information.

---

[12] A: Yes.

[13] Q: Would that have included in this [14] category Pen Registers?

[15] A: Yes, it would have included Pen [16] Registers.

[17] Q: Summary of logs and transcripts [18] would be transcripts of the tapes?

[19] A: Right.

[20] Q: Now, let me just ask you a [21] question. At some point during the trial [22] Mr. Jefferson sought to compel phone toll

Page 187

[1] records, applications and orders for Pen [2] Registers and trap and trace devices, records [3] obtained pursuant to those orders, phone toll [4] records relating to telephone, cellular [5] telephones and digital pagers whether they [6] pertained to him or any of the co-defendants. [7] Do you recall that effort?

[8] A: I do.

[9] Q: Opposed that?

[10] A: I initially opposed it, but I ended [11] up allowing Mr. Horrox, who was his [12] counsel, to look at, as I recall, [13] everything that I had.

[14] Q: Let me just make sure I under-stand. [15] Did you have copies or did you have [16] applications and orders for Pen Registers and [17] trap and trace devices in your files?

[18] A: My recollection is that we — that [19] there were a number of Pen Registers that we [20] did, although I don't spec-ifically remember [21] what phones they were on. I know that — I [22] know that that information — everything that

Page 188

[1] I had — if I had any electronic surveillance [2] applications, I provided it, along with any [3] toll information or anything else, I provided [4] it during the course of the Rule 16 [5] discovery.

[6] Q: Mr. Jefferson sought to compel this [7] information himself and you filed a motion [8] under seal to oppose it?

[9] A: Can I — do you have the doc-uments? [10] Can I look at them?

[11] MS. YESNER: Maybe we should mark [12] it.

[13] (Downing Deposition Exhibit [14] No. 9 was marked for [15] identification.)

[16] BY MS. YESNER:

[17] Q: Mr. Jefferson also filed a motion [18] for an evidentiary hearing on sur-veillance; [19] did he not?

[20] MR. SMORODIN: I'm going to object. [21] I think Mr. Downing is still looking at [22] Exhibit 9 to try to refresh his re-collection

Page 189

[1] or otherwise.

[2] THE WITNESS: I'm sorry. What was [3] your — your question now was?

[4] BY MS. YESNER:

[5] Q: Just to make sure I understand what [6] happened at the trial, Mr. Jef-ferson sought [7] to compel production of the documents that [8] are described by you in the government's [9] con-solidated response, which is Deposition [10] Exhibit 9?

[11] A: Right.

[12] Q: He also sought an evidentiary [13] hearing, did he not, on an issue con-cerning [14] surveillance?

[15] A: What type of surveillance?

[16] Q: Wire taps I think. Do you [17] recall — [18] A: I don't recall any hearing.

[19] Q: A motion for an evidentiary [20] hearing?

[21] A: Well, there were a number of [22] evidentiary hearings that were re-quested. I

Page 190

[1] know that Mr. Jefferson filed a Motion To [2] Suppress. I recall that.

[3] Q: Do you recall him filing a motion [4] for an evidentiary hearing that you opposed [5] and it was denied con-cerning the existence of [6] unau-thorized surveillance?

[7] A: I don't recall that specifically, [8] but if you have the document showing that he [9] filed it and I filed a response and it was [10] denied, then it happened.

[11] Q: Do you recall filing an affidavit [12] in the case under seal?

[13] A: Not specifically.

[14] Q: Is that a usual occurrence, for a [15] prosecutor to file a declaration or an [16] affidavit under seal in response to a [17] defendant's motion?

[18] A: If it was a motion for unauthorized [19] electronic surveillance of some kind, it may [20] very well be a type of motion that requires [21] the government, if the government is [22] responding to it, opposing it, to file an ex

Page 191

[1] parte affidavit along with the — along with [2] its response.

[3] Q: With respect to this Exhibit 9, the [4] government's response here, your recollection [5] is that you withdrew your opposition?

[6] A: My recollection is that I — that I [7] opposed it. I have some recollection of [8] speaking to Mr. Horrox some point after this [9] and making some disclosures to him. I do not [10] recall the extent of the disclosures and I [11] apologize. This is

one of — if you have the [12] docket for this case, this is one of probably [13] several hundred motions that was filed during [14] the course of this case and I — I'm sorry. [15] I just don't recall this specifically.

[16] Q: Well, you said before that there is [17] discovery that defendants are en-titled to [18] under the Federal Rules of Criminal [19] Procedure, which I gather is different from [20] what would have been allowed if the case had [21] been brought under Florida State law.

[22] A: That's correct.

Page 192

[1] Q: You were concerned that you stated [2] in your declaration that a defendant might [3] get information that it wouldn't be entitled [4] to under the federal rules. My question is [5] whether there was any information in the [6] records that you did not provide under [7] Rule 16 of the Federal Rules of Criminal [8] Procedure, that you did not share with [9] defendant's counsel that were in the files?

[10] A: I think what you're referring to, [11] and under — my recollection is that there [12] were some Pen Registers that were done in [13] this case. Under federal law there is a very [14] minimal disclosure in the application for a [15] Pen Register regarding a case. It would have [16] the phone number, the address, where the [17] phone number was, the subscriber and the [18] subject of the investigation. Under Florida [19] law they are required to do an affidavit.

[20] There were Pen Registers that were [21] done in this case, as I recall, before the [22] case was brought over to me, in the infancy

Page 193

[1] of the investigation, that were state Pen [2] Registers. They're required to put [3] information in there that's almost the [4] equivalent of an affidavit for a warrant in [5] Florida and so the only thing that I can [6] think of that — that would have been a [7] reason for me to oppose these applications [8] being turned over would have been that there [9] was something in the affidavits that were [10] filed in support of the state Pen Registers.

[11] Q: Were those turned over in Rule 16 [12] discovery?

[13] A: The affidavits would not have been [14] turned over, no.

[15] Q: So there was some information that [16] was not turned over?

[17] A: That's correct.

[18] Q: What about trap and trace —

[19] A: I don't think it was, no, I don't [20] think it was turned over.

[21] Q: What about trap and trace devices?

[22] A: That would have been — that would

---

Page 194

[1] have been the same — the same thing. A Pen [2] Register — a Pen Register or a trap and [3] trace device. They're not the same thing. A [4] Pen Register records outgoing calls, a trap [5] and trace records incoming phone numbers, but [6] they're commonly requested in the same [7] application. In other words, it would be an [8] application for a Pen Register and trap and [9] trace device.

[10] Q: Is it the same equipment that's [11] used to —

[12] A: I'm not a — not an expert on [13] electronics. A trap and trace device is — [14] your caller I.D. box is a trap and trace [15] device, in effect.

[16] Q: Pen Register records where your [17] calls are going?

[18] A: Pen Register records outgoing [19] calls. I think of one of the other issues [20] with respect to some of these — these [21] items [22] was materiality because there was — there [22] was a lot of investigation of a number of

---

Page 195

[1] other things that were going on at the time. [2] Again, I'm trying to remember way back, but [3] I'm sure that materiality would have been [4] probably the central issue in the [5] determination of whether these things should [6] be turned over.

[7] Q: Phone toll records relating to [8] telephone, cellular telephones and digital [9] pagers, did you have records of that nature?

[10] A: If I had records and they were [11] material, I would have turned them over in [12] Rule 16.

[13] Q: Do you remember having these [14] records?

[15] A: I don't know.

[16] Q: When you were opposing [17] Mr. Jefferson's motion, did you look to see [18] if you had these?

[19] MR. SMORODIN: Objection. I [20] instruct the witness not to answer that [21] question because that does go into work [22] product and attorney/client information. I

---

Page 196

[1] mean what he did as far as filing things [2] with the court, I think is fair game, but [3] what he did in drafting the response I think is not.

[4] MS. YESNER:

[5] Q: At the time that you submitted this [6] document to the court did you have these [7] documents in your file?

---

[8] MR. SMORODIN: Objection and don't [9] answer that question either.

[10] MS. YESNER: Well, I think that [11] it's fair to ask about the existence of [12] records. That's what this case is all about. [13] I'm just trying to find out if at a [14] particular point in time these records [15] existed.

[16] MR. SMORODIN: So what is your [17] question again?

[18] MS. YESNER: At the time he filed [19] this response with the court, which would [20] have been 20th of November 1992, did the [21] documents referenced in this response exist [22] in Mr. Jefferson's case file?

---

Page 197

[1] MR. SMORODIN: Well, the problem is [2] I don't think there are specific documents [3] referenced.

[4] BY MS. YESNER:

[5] Q: Categories of documents. Did these [6] categories of documents exist?

[7] A: I don't recall if there were phone [8] toll records. At this time I do not know — [9] I do not recall whether there were phone [10] toll records.

[11] Q: Now, you say that you made some [12] things, if they were material, available to [13] Mr. Jefferson's attorney. Did you allow [14] him to view them or did you make copies for him?

[15] A: I'm sorry. I do not recall. I do [16] not recall.

[17] MS. YESNER: Let me show you a [18] document that was marked previously as [19] deposition Exhibit 3, but for this [20] deposition, we're going to mark it 10. [21] (Downing Deposition Exhibit [22] No. 10 was marked for

---

Page 198

[1] identification.)

[2] BY MS. YESNER:

[3] Q: So on the bottom here I'm marking [4] it as 3/10 and ask you if you recognize the [5] form that is used?

[6] A: Yes, I do.

[7] Q: Do you recognize this document?

[8] A: Yes, I do.

[9] Q: I will represent to you this is not [10] the entire document that we received from [11] the defendant, but just the first two and [12] last two tapes just to make it a smaller [13] document. Can you tell me what this represents?

[14] A: This is a call log or portions of a [15] call log that were kept — it was kept by [16] the St. Petersburg Police Department in [17] connection with the interception of phone [18] calls from Mr. Mathis' cordless telephone.

[19] Q: Did you provide a copy of the [20]

---

summary of all of the calls intercepted to [21] Mr. Jefferson's counsel?

[22] A: There was — I do not recall

---

Page 199

[1] whether — I do not think we made a copy [2] for every defendant. What I believe we did, we [3] had — as I recall, we got about 400 tapes [4] and we had — it was a special tape recorder. [5] Because there were three indictments, what we [6] did is with the court's blessing, if you [7] will, and the agreement of defense counsel, [8] we provided one complete copy of the tapes to [9] one co-counsel or one defense counsel in each [10] of the indictments.

[11] Q: The tapes of the intercepted calls?

[12] A: The tapes of the intercepted call. [13] At some point I believe defense counsel asked [14] if we would make — I don't recall how this [15] happened. I don't know if I indicated there [16] was a call log or how this happened, but at [17] some point it was made available to defense [18] counsel. I do not believe that it was — [19] that it was copied for everyone, but at some [20] point it was made — it was made available to [21] them.

[22] Q: Was a copy made available to

---

Page 200

[1] Mr. Jefferson's counsel?

[2] A: It would have been made available [3] to anybody in the case.

[4] Q: What do you mean by that?

[5] A: What do you mean by —

[6] Q: Did you tell him that —

[7] A: Well, I would have said I have a [8] copy of the logs. I would have told all [9] counsel I have a copy of the logs. If you [10] want to look at them, here they are.

[11] Q: Believe that you said that?

[12] A: To the best of my recollection I [13] believe we did.

[14] Q: Well, you gave your declaration, [15] you signed it April —

[16] A: 23rd.

[17] Q: Do you recall, and I think I asked [18] you before, Bonnie Gay asking you for this? [19] Did she tell you that this declaration was [20] required because of a court order?

[21] MR. SMORODIN: Objection. Asked [22] and answered. You can answer.

---

Page 201

[1] THE WITNESS: No. She told me the [2] second declaration I had to do because the [3] court ordered us to — for me to try to [4] reconstruct what was in the boxes.

[5] BY MS. YESNER:

[6] Q: But not with respect to your [7]

---

April '97 declaration?

[8] A: To the best of my recollection, no.

[9] Q: Prior to preparing this declaration [10] did you have a conversation with Belinda [11] Brown of your office that would have occurred [12] after she returned from FOIA training [13] Albuquerque, New Mexico?

[14] A: I'm sorry. When?

[15] Q: It would have prior to April 23rd. [16] Sometime between March 23rd and April 23rd.

[17] A: I may have had a conversation with [18] her about anything. Is there something [19] specific?

[20] Q: Do you remember talking to her [21] about information she had learned at a FOIA [22] training conference she went to at

Page 202

[1] Albuquerque, New Mexico?

[2] A: No.

[3] Q: Do you remember her telling you [4] that she had been at FOIA training?

[5] A: No, I don't.

[6] Q: Do you remember a conversation that [7] you would have had with her prior to [8] April 23rd in which you discussed with her [9] purging of Mr. Jefferson's case file?

[10] A: Prior to April?

[11] Q: Uh-huh.

[12] A: No.

[13] Q: Do you remember her telling you [14] prior to April 23rd anything about how long [15] documents needed to be preserved in a case [16] file?

[17] A: No.

[18] Q: You have no recollection of any [19] conversation with Belinda Brown prior to [20] filing your declaration in April of 1997 [21] concerning purging of case files?

[22] A: No, none that I recall. I don't

Page 203

[1] know why I would have had any reason to — to [2] talk to her at all at that point about is [3] purging the case file. I — [4] Q: You say in this April 23rd [5] declaration in footnote two that the mandate [6] in Mr. Jefferson's case which affirmed his [7] conviction was issued March 28, 1997; is that [8] right?

[9] A: I'm sorry. You're referring to [10] what paragraph in there?

[11] Q: Footnote 2 on page 5.

[12] A: Footnote 2.

[13] Q: You noted when the mandate was in [14] his case?

[15] A: Yes.

[16] Q: Then in paragraph 19 you stated [17] that after his conviction was affirmed he [18] filed a petition for rehearing which was [19] denied and the mandate issued; is that right, [20] paragraph 19?

[21] A: That's correct.

[22] Q: Then on the next page in that

Page 204

[1] same —

[2] A: Actually, if I — if I can [3] interject. I believe what — what happened [4] was that the opinion was issued — the [5] opinion was issued on January 6, 1997. [6] When — I believe when an appellant files a [7] petition for rehearing, they withhold filing [8] of the mandate until they rule on the [9] petition for rehearing. So that's what [10] occurred. The petition for rehearing was [11] denied on the 18th and a mandate was issued [12] on March 28th.

[13] Q: The opinion that you been looking [14] for on Westlaw, that had been issued the [15] prior January, January 6th, right?

[16] A: Yes.

[17] Q: I think you testified before that [18] you were interested in that, so you were [19] checking for it when it came out?

[20] A: I spent almost six — six years [21] working on that case, so I would have been — [22] I would have been interested in the outcome,

Page 205

[1] yes.

[2] Q: Back in paragraph 19 you say that [3] the co-defendants' conviction was affirmed a [4] few months before?

[5] A: I'm sorry.

[6] MR. SMORODIN: Objection.

[7] THE WITNESS: What paragraph?

[8] BY MS. YESNER:

[9] Q: Paragraph 19, the bottom of the [10] page 6, you're referring to Mr. Mathis' [11] conviction.

[12] MR. SMORODIN: My objection was [13] only because we've been referring to the [14] Jefferson defendants as the co-defendants and [15] Mr. Mathis otherwise and it seemed to me to [16] interject ambiguity.

[17] BY MS. YESNER:

[18] Q: I understand. You were referring [19] here to Mr. Mathis' conviction here as being [20] November of '96 and then you note that he [21] filed a Petition for Writ of Certiorari on [22] January 7th of '97?

Page 206

[1] A: That's correct, and that the [2] Solicitor General filed an opposition on [3] April 10th.

[4] Q: Did you continue to follow these [5] cases on appeal?

[6] A: As I said, I started work on this [7] case in early 1991 with the investigation, [8] trial, sentencings and other matters that [9] were ongoing up through this time. I had [10] devoted a substantial part of six years of my [11] life to this case. Certainly I was [12] interested in the outcome and I was following [13] it to find out what was going on with it.

[14] Q: Were you interested to know whether [15] after getting the 11th Circuit's opinion and [16] the mandate whether Mr. Jefferson also filed [17] a Petition for Writ of Certiorari?

[18] A: I believe I did inquire whether — [19] at some point I'm sure I did inquire whether [20] he had filed a Petition for Writ of [21] Certiorari.

[22] Q: Do you know if he did?

Page 207

[1] A: To the best of my knowledge he did [2] not.

[3] Q: He did not?

[4] A: He did not.

[5] Q: You say you inquired whether he [6] did?

[7] A: Yes, I did.

[8] Q: Who did you ask?

[9] A: I'm sure that I asked Kathy Peluso [10] or someone down in the appellate division [11] to determine whether he did that.

[12] Q: Did you ever check with the [12] court?

[13] A: I don't think I — no, I personally [14] did not check with the court, but if I would [15] have asked someone in the appellate division [16] to check, I would have expected that they [17] would have checked.

[18] Q: Did you ask someone to check?

[19] A: I inquired whether he had filed a [20] petition for writ. I'm sure I did.

[21] Q: But you didn't know how long he [22] had to do that?

Page 208

[1] A: Not off the top of my head, no. To [2] my knowledge he has not.

[3] Q: To your knowledge today he has [4] not filed a petition?

[5] A: To my knowledge I have never seen [6] anything to indicate that he filed a [7] Petition for Writ of Certiorari to the [8] Supreme Court.

[9] Q: I'll just show you a document and [10] ask you. What I've handed you are the first [11] few pages from the printed Petition for Writ [12] of Certiorari from Mr. Jefferson to the [13] Supreme Court. Have you ever seen this [14] document before?

OLLIE JEFFERSON v.
NET RENO et al

JEFFREY S. DOWNING
June 15, 1999

**A:** No, I haven't.

**Q:** Do you know if anyone in the [16] solicitor's office or from the court ever informed the Middle District of Florida, the [18] U.S. Attorneys' Office, that the writ had [19] been filed?

**A:** The stamp on this petition [21] indicates that it was received in the [22] appellate division in the Middle District

Page 209

Florida on June 18th of 1997. The initials [2] up there appear to be Kathy Peluso's and [3] Tamara Phipps' initials, and Tammy would be [4] the secretary.

**Q:** Ms. Peluso didn't tell you when she [5] received this?

**A:** No. I didn't — I did not — this [6] is first that I've learned that he filed [9] a petition for Writ of Certiorari. Although this — this does indicate to me that a [10] copy [11] was sent to the U.S. Attorneys' Office. I'd [12] certainly like to see a file stamp copy from [13] the Supreme Court of the United States. I — [14] because, as I said, this is the first that [15] I've learned of it. I'm not — I'm not [16] suggesting that he didn't file it, but I mean [17] it's news to me.

**MS. YESNER:** It's 5 after 4:00.

**MR. SMORODIN:** Can we go off the record for a second?

(Recess)

**BY MS. YESNER:**

Page 210

**Q:** Mr. Downing, a little while ago we [2] were talking about the circumstances [3] which Ms. Gay asked you to provide declaration, [4] and you told me that you had been asked to [5] review a document that [6] Willie Jefferson had [7] filed in court. Do you recall that [7] testimony?

**A:** Yes.

**Q:** I'm going to show you from our [10] files, pleading files, a document that Ollie [11] Jefferson filed in the court on March 12, 1997, and this was a [13] document that [13] was in opposition to government's motion [14] to dismiss in the alternative, for [15] summary judgment. Is this the document that [16] you were referring to?

**A:** I've never seen that document.

**Q:** So that's not the one you were [19] referring to?

**A:** Yeah, that's — that can't be, [21] though —

**Q:** Go ahead.

Page 211

**MR. SMORODIN:** Just for the record, and you can't read it because it's upside [3] down to you, but it's captioned, "Motion in [4] support of plaintiff's motion in opposition [5] to the defendants' motion to dismiss or, in the [6] alternative, for summary judgment."

[7] **THE WITNESS:** This is — this [8] appears to be — I think what I had was — [9] and the reason I'm saying this is not the [10] same thing, it was — I think mine was faxed [11] and it was — it was small, but this appears [12] to have the — I recall reading this [13] substance of this argument. Because I [14] believe that's what — what I was asked to [15] address in paragraph 6 — what I addressed in [16] paragraph 6 of my declaration.

[17] **BY MS. YESNER:**

[18] **Q:** Were you provided a copy of the [19] government's motion to dismiss or, in the [20] alternative, for summary judgment?

[21] **A:** No.

[22] **Q:** Now, when you signed your

Page 212

[1] declaration for submission under this [2] caption, did you understand it was going to [3] be submitted in court?

[4] **A:** I understood that it would be [5] submitted. I cannot tell you that I knew it [6] would be submitted in district court because [7] I, unfortunately, was not told how this [8] matter was proceeding and I was not told at [9] this time that this matter was in front of [10] the district judge.

[11] **Q:** You put captions on your own [12] pleadings, don't you?

[13] **A:** I do.

[14] **Q:** What's the purpose of putting the [15] caption on a document?

[16] **A:** Well, the caption is clearly to [17] indicate that there is an action ongoing. [18] There's no question about that.

[19] **Q:** Do you have an understanding of [20] when you signed your declaration that there [21] was a possibility that the declaration would [22] be submitted in the case you're captioned on

Page 213

[1] the document?

[2] **A:** I knew that there was a FOIA [3] request going on. I was not told anything [4] more than that about how the matter was [5] proceeding. I wish I would have ben, [6] but I wasn't.

[7] **Q:** Read a document that was filed by [8] Mr. Jefferson in court?

[9] **A:** Yes.

[10] **Q:** The subject of the document was [11] an issue concerning his FOIA request?

[12] **A:** Yes.

[13] **Q:** So you knew his FOIA request was [14] the subject of a district court case?

[15] **A:** I knew that he had filed something [16] in district court indicating that there were [17] some inconsistencies, I believe, in Ms. Gay's [18] declaration.

[19] **Q:** The subject matter of these papers [20] was his FOIA request?

[21] **A:** That's correct.

[22] **Q:** A FOIA request is for federal

Page 214

[1] government records; is it not?

[2] **A:** As far as I know, yes.

[3] **Q:** The subject of Mr. Jefferson's FOIA [4] request were records concerning his criminal [5] case? Was that your understanding?

[6] **A:** That was my understanding, yes.

[7] **Q:** Did you have any understanding that [8] Mr. Jefferson's criminal case was the subject [9] of district court litigation, civil [10] litigation?

[11] **A:** That his criminal case —

[12] **Q:** The records in his criminal case, [13] those documents were the subject of district [14] court litigation?

[15] **A:** What I — I don't know how to [16] answer that any other way than what I've [17] already done. No one ever explained — no [18] one ever explained to me the process other [19] than when I talked to Bonnie Gay, she told me [20] that, or at least led me to believe that this [21] was something that she was handling as part [22] of essentially an administrative request.

Page 215

[1] I wish I could tell you that there [2] was something else there that clicked to — [3] for me to say is this in district court. [4] If — if at that time or at any time prior to the [5] purging Bonnie or anyone else would have [6] said to me Jeff, this is in district court, [7] don't touch the file, we wouldn't be sitting [8] here. That's — that was never done. No — [9] little or no information was imparted to me [10] about the process generally or the process in [11] this — in this particular — in this [12] particular case.

[13] **Q:** When you were asked to put the [14] district court caption on the case, did you [15] ask Ms. Gay if she's going to file your [16] declaration?

[17] **A:** I don't know. My recollection of [18] that is that I said to her what should I put [19] on the top of this. That's the best I recall [20] sum and substance.

[21] **Q:** Why did you ask her that?

[22] **A:** Because I had never filed anything

Page 216

[1] like this and I didn't know where it was [2] going or what it was going to be [3] used for.

[3] Q: So when she told you what to put
on [4] the top of it, did you ask her if she
was [5] going to file it in court?

[6] A: No, I don't think we talked that [7]
long. She was very short with me and
didn't [8] provide me with much in-
formation.

[9] Q: Do you recall one of [10] Mr. Jef-
ferson's co-defendants named [11] Mr.
Burgess?

[12] A: Yes, I do.

[13] Q: He filed an appeal to the 11th [14]
Circuit, correct?

[15] A: Yes, I believe that was one of the
[16] consolidated appeals.

[17] Q: Do you know if he filed a petition
[18] for a rehearing?

[19] A: I don't know.

[20] Q: Do you know if anyone in the
Middle [21] District office of the U.S.
Attorneys' Office [22] opposed a request
from Mr. Burgess for more

---

Page 217

[1] time to file a rehearing?

[2] A: No, I don't.

[3] Q: Did Ms. Peluso ever tell you that [4]
Mr. Burgess was asking for more time to
file [5] a petition for rehearing?

[6] A: Not that — not that I remember.

[7] Q: Do you know if any of the other [8]
co-defendants of Mr. Jefferson filed [9]
Petitions for Writs of Certiorari to the [10]
Supreme Court? Did you ever learn if any
of [11] them did?

[12] A: Not — not that I recall. My [13]
concern, when I did inquire, was whe-
ther [14] the — you know, what the status
of the case [15] was obviously because I
wanted to know that [16] there was some
finality to the prosecution [17] and so at
least when I made the inquiry, I [18]
would have expected that if there would
have [19] been — there would have been
a Petition for [20] Writ of Certiorari filed
by someone else that [21] someone would
have told me, but — and I [22] should add
that I — I can't tell you that I

---

Page 218

[1] wasn't told, but I don't recall anyone [2]
specifically telling my about any other [3]
co-defendant filing a petition for writ.

[4] (Downing Deposition Exhibit [5] No.
11 was marked for [6] identification.)

[7] MS. YESNER: I'm going to show you
[8] a document I've marked as Exhibit 12.
Do you [9] recognize this document?

[10] (Downing Deposition Exhibit [11] No.
12 was marked for [12] identification.)

[13] THE WITNESS: Yes, I do.

[14] BY MS. YESNER:

[15] Q: This is a declaration that you [16]
signed on March 15, 1999?

---

[17] A: Yes.

[18] Q: Who asked you to provide this [19]
declaration?

[20] A: I believe that there was some [21]
question of whether I needed to file a [22]
declaration and the decision whether I
needed

---

Page 219

[1] to file another declaration was either
made [2] by Bonnie or by Mr. Smorodin.

[3] Q: Who approached you to provide a
[4] declaration?

[5] A: My recollection is that I got an [6] E-
mail indicating that I might need to do [7]
another declaration. I believe that came
[8] from Bonnie. Then I — I recall some E-
mails [9] going back and forth between
Ms. Gay and [10] Mr. Smorodin, one of
which indicated that I [11] should, in fact,
do another declaration.

[12] Q: Were you told there was a district
[13] court case at this point in time?

[14] A: Yes, I knew there was a district [15]
court case before this. I knew there was a
[16] district court case when Ms. Gay
called me [17] in — prior to the Sep-
tember 26, 1997, [18] declaration that I
did when she told me that [19] she
needed to do — she needed to go
through [20] the 36 boxes. It was at that
time that I [21] told her that the file had
been — had been [22] purged. That was
the first time that I was

---

Page 220

[1] told by anyone at EOUSA that there [2]
was anything pending in the district
court.

[3] Q: When you were asked back pre-
viously [4] in April of '97 to describe the
contents of [5] the files, did you have any
understanding as [6] to the purpose of
that request, what that [7] description
was for?

[8] A: I was told that the description [9] of —
well, what the description of the 36 [10]
boxes were for?

[11] Q: Yes.

[12] A: My recollection is that Bonnie Gay
[13] told me that, in sum and substance,
that they [14] needed to know what the
contents of the boxes [15] were. I believe
that's when she mentioned to [16] me a
Vaughn Index, but she said she didn't [17]
think that was necessary, that they
needed to [18] know what the content of
the boxes were.

[19] I assumed, based on what she was [20]
telling me about the documents that
were [21] requested without telling me
what — without [22] her telling me — her
telling me what they

---

Page 221

[1] were, that she wanted to know what
types of [2] documents were, in fact, in

---

the boxes.

[3] Q: Did she tell you that the court [4]
needed to know what types of doc-
uments were [5] in the boxes?

[6] A: No.

[7] Q: You could have told her what was
in [8] the boxes without giving her a
captioned [9] pleading; couldn't you?

[10] A: I absolutely could have. She told
[11] me she needed a declaration from
me. That [12] was — it was a relatively
brief phone call. [13] I was not told
anything about it. I assumed [14] now that
she assumed that I was fluent in [15]
familiar with FOIA litigation.

[16] Q: When you were asked for another
[17] declaration, were you surprised?

[18] A: In which —

[19] Q: '99.

[20] MR. SMORODIN: This is the third [21]
declaration you're talking about or the
[22] second?

---

Page 222

[1] BY MS. YESNER:

[2] Q: Well, I guess I'm a little [3] confused.
The declaration I had been talking [4]
about previously was from April of '97.

[5] A: Right.

[6] Q: Now what we've marked as Dep-
osition [7] Exhibit 12 is a declaration from
March [8] of '99.

[9] A: Right, that's the third [10] declar-
ation.

[11] Q: What is the —

[12] MR. SMORODIN: There's a middle
[13] declaration.

[14] MS. YESNER: I'm not sure I know [15]
which one you're talking about. I know
there [16] were two in April, one of which
was unsigned.

[17] MR. SMORODIN: Right, we're [18]
counting that as one.

[19] BY MS. YESNER:

[20] Q: What is the other declaration?

[21] A: There was a declaration I filed in
[22] September.

---

Page 223

[1] Q: Oh, that's right. I'm sorry.

[2] MR. SMORODIN: That's the one I was
[3] referring to as the middle one, which
was not [4] very artful.

[5] BY MS. YESNER:

[6] Q: Prior to signing the September [7]
declaration did Ms. Gay inform you that
there [8] was a court order requiring a
Vaughn Index or [9] a review of the
documents in Mr. Jefferson's [10] case
file?

[11] A: She —

[12] MR. SMORODIN: Just for the record,

---

**WILLIE JEFFERSON v.**
**JANET RENO et al**

**JEFFREY S. DOWNING**
**June 15, 1999**

[13] the September 26th declaration, 1997, was [14] filed in the court on October 1, 1997. Go [15] ahead, sir.

[16] THE WITNESS: Ms. Gay told me, when [17] she called me around — prior to September [18] of 1997 or near the date of this second [19] declaration, that she did — she did say that [20] the court had ordered — I don't know if she [21] specifically said Vaughn Index at that time [22] specifically, sum and substance, that they

**Page 224**

[1] needed to get a more detailed indication of [2] what was in the file beyond what I had set [3] out in my previous declaration.

[4] That was the — that was when I [5] told her — so she indicated to me that I [6] would have to go through the 36 boxes, and [7] she suggested that either I could do it or [8] Belinda could do it or perhaps Stephanie [9] Boucher could do it, and that's when I told [10] her that there were no — there were no [11] longer 36 boxes.

[12] BY MS. YESNER:

[13] Q: What was her reaction when you told [14] her that —

[15] A: I'm sorry.

[16] Q: Let me ask you this: Did you tell [17] her that you had purged the files?

[18] A: I did.

[19] Q: Did you tell her you had [20] destroyed 24 of the 36 boxes of material?

[21] A: I did not — I did not use the word [22] "destroyed." I told her exactly what

**Page 225**

[1] happened and I told her that the appeals had [2] been concluded and that I had — I had [3] checked with Belinda Brown and that she had [4] indicated to me that the file could be purged [5] when the appeal was over, that I had [6] subsequently learned from the appellate [7] division that the appeals were over and that [8] I had purged the file boxes of the drafts, et [9] cetera, as I set out in my declaration.

[10] Q: What did she tell you at that [11] point?

[12] A: I don't know what she told me at [13] that point. She was upset I think. Panicked [14] a little bit.

[15] Q: Did she ask you to try and recall [16] what documents had been purged from the [17] files?

[18] A: Yes, she did. She asked me — she [19] asked me if I knew what was in the files and [20] I told her that I did and that — she asked [21] me if I could attempt to recreate, if you [22] will, what was in, you know, what was in

[1] those 36 boxes or the boxes that had been [2] purged.

[3] At some point I know that — I [4] believe I sent a draft of at least part of my [5] declaration that indicated the summary of the [6] items that had been purged from the file or [7] discarded or shredded and I know that she had [8] inquired of me whether any of the documents [9] in there could be — existed somewhere else [10] or could be obtained to recreate and I [11] specifically recall telling her that I knew [12] that one of the files that I had returned to [13] St. Petersburg Police Department, which was [14] the homicide files of Benjamin Sanders, was [15] one that I thought could be recreated.

[16] Q: In your September 26, 1997, [17] declaration you have 13 categories of [18] documents described as being the contents of [19] boxes that were purged from the case file. [20] Are these same categories of documents that [21] are described in your March 1999 declaration?

[22] A: They are. This is — I think that

**Page 227**

[1] is — the second declaration is significantly [2] more detailed.

[3] Q: Can you tell me how the description [4] of the contents of the boxes differ between [5] the two declarations?

[6] MR. SMORODIN: You mean you want [7] him to go through category by category [8] and read them to you?

[9] BY MS. YESNER:

[10] Q: A number of categories are the [11] same; are they not?

[12] A: I don't know if they specifically [13] match up. When I went — when I went [14] through, for example, the first time, I went [15] through and did general categories. I think [16] that there are —

[17] Q: No, I'm not talking about the April [18] declaration. I'm talking about your [19] September declaration.

[20] A: Right.

[21] Q: Okay.

[22] A: I think that there's more detail in

**Page 228**

[1] that description regarding what some of those [2] things are and what type of materials similar [3] to what you were asking me about before.

[4] Q: I'm comparing your September '97 [5] declaration with your March '99 declaration.

[6] A: Uh-huh.

[7] MR. SMORODIN: Oh, the second and [8] third declaration, not the first and second.

[9] MS. YESNER: The second and third [10] declaration.

[11] THE WITNESS: Oh, I'm sorry. I [12] thought you were referring to the first [13] and second declaration.

[14] BY MS. YESNER:

[15] Q: No. It looked to me that the [16] description of the categories in your [17] September '97 declaration were substantially [18] the same.

[19] A: They are the same. They are [20] exactly the same. There would be no [21] difference.

[22] Q: Now, going back to the preparation

**Page 229**

[1] of the your September '97 declaration, [2] your second declaration, which you [3] provided after informing Ms. Gay that [4] the boxes had been [4] purged. How did you go about determining [5] what no longer existed in those files or I [6] should say what were in the boxes that were [7] discarded or shredded?

[8] A: The first thing I did was I sat [9] down in my office and from my recollection of [10] what I had purged, what I recalled purging I [11] wrote that down and noted that. Spent [12] several hours just thinking about the case [13] and thinking about what I had — what I [14] had — what I had purged in the boxes. [15] Then I went down — boxes may have [16] been moved at that time. I'm not sure [17] physically where I was when I went and looked [18] through the boxes. It may have been — may [19] have been in another room and I went through [20] the files that were there. As I went through [21] the files that were there, I then recalled [22] from that other — other items that I had

**Page 230**

[1] purged. Most of the stuff, if not all of [2] the stuff, that was purged — well, not all of [3] it, but most of it, was, in fact, drafts or [4] copies of items that still existed in the [5] file.

[6] Q: How did you determine these [7] categories of documents?

[8] MR. SMORODIN: These being?

[9] BY MS. YESNER:

[10] Q: You didn't have a table of contents [11] you were to go by?

[12] A: No, this is from — this is from my [13] recollection of —

[14] Q: Your memory?

[15] A: Of going through the boxes and [16] my recollection of what I had — what [17] I had actually purged from the file. [18] For example, I knew that there was an [19] original copy of the transcripts that [20] was in one of the boxes. I recalled [21] that not only was there a separate — [22] was there another full copy of the transcripts for each of the witnesses

**Page 231**

[1] that were called in the trial of the [2] co-defendants, who were going to be called or [3] who were called in the Mathis case, the [4] Mathis trial, there was Jencks material in [5] the form of previous trial transcripts. In [6] preparation for Mathis' trial the witness [7] folders for the witnesses who were going to [8] testify were — part of those witness folders [9] were the partial transcripts from the [10] previous trial of that individual's [11] testimony. The —.that was included in the [12] witness files. There was also another full [13] copy of the co-defendants' trial transcript [14] that was in another box that was [15] alphabetized, so that, for example, if I [16] wanted Mr. Culver's prior transcript, I could [17] pull Mr. Culver's witness file or I could go [18] to the box and look under the letter C and [19] Mr. Culver's transcript would be under there.

[20] Q: Did you cross reference your [21] April '97 declaration?

[22] MR. SMORODIN: Objection. With

**Page 232**

[1] what?

[2] BY MS. YESNER:

[3] Q: I should say when you were [4] preparing your September '97 declaration and [5] trying to recall exactly what had been purged [6] from the files, did you go back and look at [7] what you had written down in the 36 boxes [8] generally.

[9] A: Absolutely. I used anything that I [10] could look at or anything that I could [11] remember to try to accurately re-create a [12] list of what was in those boxes.

[13] Q: So where, for example, would be the [14] tax information that was shredded in your [15] September '97?

[16] A: The only thing I can think where [17] those were would have been — would have been [18] trial exhibits. I believe those were marked [19] as trial exhibits from Mr. Mathis' case, but [20] I did not refer to them specifically in here.

[21] Q: So you used all the tax information [22] at trial?

**Page 233**

[1] A: They were marked as exhibits. I do [2] not believe that they were offered into [3] evidence at the time, but they were marked [4] as — they were definitely marked as [5] exhibits.

[6] Q: How about the police internal [7] affairs information? Where is that?

[8] A: That probably — I'm looking for [9] the information on the arson. I thought I [10] referred to it somewhere here. That [11] would have been part of the file that

had the [12] information in it relating to the arson.

[13] "Copies of reciprocal discovery pro- [14] vided by Defendant Tucker relating to" — I [15] don't see any specifically listed here.

[16] Q: How about any material that was not [17] turned over under Rule 16, subpoenaed [18] documents or the affid- [19] avits with the Pen Registers, any [20] material that was not provided to the [21] defendants, the material you were [22] concerned about that would give an unfair advantage to Mr. Jefferson.

**Page 234**

[1] A: I'm not sure I understand your [2] question.

[3] Q: Well, you said that there was [4] material that, if it was disclosed and there [5] was a new trial, would give him [6] information [7] he wasn't entitled to under Rule 16.

[7] A: Well, when I was referring to that, [8] I was referring to what I said was I [9] didn't know, because it had not been [10] set out for me, what the specific [11] documents were that were [11] being requested and so the — the concern [12] that Mr. Jefferson would be in a better [13] situation than he would have been in at [14] his initial trial could have referred to [15] any number of documents; attorney [16] notes that were in the file, the [17] contents of witness folders from both [18] of those cases, any number of — [19] any number of other matters that were — [19] that were in the file, copies of law [20] enforcement investigative reports.

[21] Q: But where here in your descrip- [22] tion of the materials that were purged are

**Page 235**

[1] documents that were subpoenaed and not [2] provided under Rule 16?

[3] MR. SMORODIN: I'm going to object. [4] I think that assumes a fact that is not in [5] evidence and misstates Mr. Downing's [6] testimony.

[7] THE WITNESS: Well, I don't know — [8] I thought that we had cleared that up. [9] As far as documents that were sub- [10] poenaed, I thought that I told you that [11] most, if not all, of the documents that [12] were subpoenaed would have been [13] provided pursuant to Rule 16, I don't [13] recall any documents that weren't.

[14] BY MS. YESNER:

[15] Q: You also told me that the [16] affidavits with the Pen Registers would [17] not have been.

[18] A: The — I do not believe the [19] affidavits for the State Pen Registers [20] were provided pursuant to Rule 16 [21] and I think that's what we were [22] concerned about in the motion that

you had referred to before on the

**Page 236**

[1] Motion To Compel.

[2] Q: Are those documents included in [3] your list of material that was purged?

[4] A: I don't know if it's referred to [5] specifically in there. I can read through [6] it. I don't think it specifically is [7] referred to in here.

[8] Q: Let me ask you about what hap- [9] pened. You say in your declaration [9] that in late June [10] or early July you purged the files; is that [11] correct?

[12] A: That's correct.

[13] Q: What were the circumstances that [14] led you to do that?

[15] A: We had limited storage space in our [16] offices. There were a lot of large [17] investigations that were — that were [18] prosecuted and there was always — I [19] don't want to say nagging, but it was [20] not uncommon for the criminal [21] division chief's secretary to on a [21] regular basis inquire of the [22] secret- aries whether any of the boxes in

**Page 237**

[1] storage could be purged, could be [2] gotten rid of, use those terms, that's — [3] that would be what they would ask. [4] They were referring to the boxes that [4] were — similar to these that [5] were there that were taking up space.

[6] It was my usual practice not to, [7] you know, to move boxes that weren't need- [8] ed out of storage, either send them, [9] you know, send them somewhere if [9] they were being sent to the records [10] center so that we would, you know, [11] we would be able to accomplish that [12] and, frankly, so I wouldn't get nagged to [13] move boxes. The — I recall being [14] asked many occasions about these [14] boxes and other boxes.

[15] When the appeals were over in this [16] case, I had — it was — one of those [16] conversations I had had a — at some [17] point someone had asked me about [18] the boxes, can we move the boxes, [19] and I told them the stuff is on appeal. [20] A couple of months later what [21] about the boxes. The stuff is on appeal.

[22] Q: Would that have been Mr. Cooke,

**Page 238**

[1] Detective Cooke?

[2] A: No, I would have been — I'm sorry. [3] Let me just take a minute. I'm trying to — [4] what would happen in the office was [5] we had storage space. We had limited [5] storage space. The chief secretary [6] would be responsible for that storage [7] space. She was constantly being [8] asked about it. She would then talk to the [9] supervisory secretaries, who would talk [10] to the other secretaries. If I had stuff

WILLIE JEFFERSON  v.
JANET RENO et al

JEFFREY S. DOWNING
June 15, 1999

over [11] there, Cindy would be asked about it. What [12] about these boxes? Can we get rid of these [13] boxes? Sometimes Cindy would tell them the [14] stuff is on appeal, sometimes Cindy would [15] come in to me afterwards and she would say [16] they're asking about the boxes again. What [17] am I going to do? The stuff is on appeal. [18] We can't move it. They're asking.

[19] At some point I had — I believe [20] Cindy had come in and asked me or said [21] something to me about them asking about the [22] boxes again and that's when I was checking to

#### Page 239

[1] see what the status of the appeals were and [2] it was around that same time that I went up [3] to Belinda, because I knew that the FOIA [4] request had been pending, that I had gone up [5] to her to ask her, with respect to purging [6] the file, when that could be done.

[7] Q: When was this that you went to her?

[8] A: It would have been before Mathis' [9] appeal was final because when I talked to [10] her, there were still appeals pending. That [11] was the — that was the [12] this FOIA request [12] was the reason why I went up to Belinda to [13] ask her about this, because I was getting the [14] re-quest, if you will, to move these boxes [15] out. I went up to her specifically because [16] I knew she had handled this FOIA matter and I [17] asked her Belinda, when can I purge the file. [18] She told me when the appeal is over.

[19] Of course, after I found out — [20] after Bonnie called me — after Bonnie called [21] me in September and informed me that the [22] boxes should not have been purged, I knew at

#### Page 240

[1] that point that I had obviously mis-understood [2] what Belinda said. In fact, at that point I [3] went back to up Belinda and I asked her about [4] our previous conversation and that's when she [5] told me no, I meant when the FOIA appeal was [6] over.

[7] When she said when the appeal was [8] over, I — I never thought of what was going [9] on with the FOIA request as an appeal. I [10] would — it just — it never dawned on me to [11] consider it an appeal. To me it was a FOIA [12] request. When she said when the appeal was [13] over — to me an appeal for a criminal [14] prosecutor is when the appeal to the district [15] court is over. It just —

[16] MR. SMORODIN: To the district [17] court?

[18] THE WITNESS: Excuse me. To the [19] appellate court is over.

[20] BY MS. YESNER:

[21] Q: What about the Supreme Court?

[22] A: Well, I mean, sure, when the appeal

#### Page 241

[1] is over. When the — when the appellate [2] process is complete. That's — and she told [3] me — she told me that. I had in my head [4] when the appeal process is over, we can purge [5] the file. That would have been while the [6] appeals were still pending because at some [7] point after that conversation I found out [8] that the appeals were, in fact, complete to [9] the best of my knowledge. That was that [10] Mr. Mathis' petition for writ had been denied [11] and that Mr. Jefferson — Mr. Jefferson's [12] petition for rehearing had been denied and [13] that there was a mandate issued.

[14] At some point after that, probably [15] within, again, best of my recollection, a [16] couple of weeks I saw Paul Cooke up on the [17] fifth floor — my office is on the fourth [18] floor. I saw Paul Cooke up on the fifth [19] floor outside one of the attorney's offices [20] up there. He was working a case with one of [21] them. I said to him, Paul, I said, the [22] appeal — I may have said something to him

#### Page 242

[1] about Mathis' writ had been denied and I [2] said, you know, sometime when you get a [3] chance we need to get those boxes cleaned up. [4] Again, best of my recollection, he said call [5] me sometime next week and I did.

[6] Q: Why were you focusing on the [7] finality of Mathis' appeal?

[8] A: Well, because the thing had been [9] around for so long and the finality of — are [10] you talking about generally or as opposed to [11] someone else's?

[12] Q: Well, let me ask you this: You [13] said you said to Mr. Cooke Mathis' writ had [14] been denied.

[15] A: Right.

[16] Q: Now you could clean up the files.

[17] A: Right.

[18] Q: Why Mathis?

[19] A: Because it was my understanding at [20] that time that Mr. Jefferson's — [21] Mr. Jefferson's petition had been denied and [22] that a mandate had been issued, which I

#### Page 243

[1] believe was sometime in March. It was [2] before — before Mathis' petition.

[3] Q: What was the basis for your [4] understanding that Mr. Jefferson's pet-[5] ition [5] for a writ had been denied?

[6] MR. SMORODIN: Objection. I think [7] that misstates the witness' testimony.

[8] THE WITNESS: If I said petition [9] for

writ, I meant petition for rehearing. I [10] knew that he had filed a petition for [11] rehearing and I knew that a mandate had [12] been issued after that petition had been denied.

[13] BY MS. YESNER:

[14] Q: Inquired about Mr. Mathis' case?

[15] A: I inquired about Mr. Mathis' case [16] because at some point — at some point I had [17] asked — after the mandate had been issued on [18] Jef-ferson's case I had asked whether there [19] was any petition — any other — I recall —[20] I recall asking if he was going to request a [21] rehearing en banc. I thought that he had [22] requested a panel — a panel rehearing. I

#### Page 244

[1] don't know where I'm getting it from. That's [2] just what I seem to recall. But I was told [3] that there was no petition for cert to the [4] Supreme Court on Jef-ferson. So as far as I [5] knew —

[6] Q: By who?

[7] A: I can't tell you that — I can't [8] tell who told me that. It was someone in the [9] appellate division. It may have been Kathy, [10] it may have been someone who she asked to [11] check on it who told me that. I do not [12] remember who specifically told me that, but I [13] can tell you that when you showed me that [14] document today is the first time that I had [15] ever seen anything relating to Mr. Jefferson [16] filing a petition for cert in the Supreme [17] Court.

[18] Q: Did you check to see if the mand-ate [19] had been issued in Mr. Burgess' case?

[20] A: I'm sure that I did when I — when [21] I asked about the — about Jefferson because [22] I would have said — I don't think I would

#### Page 245

[1] have specifically been focusing on Jefferson [2] at that time. I think I was asking about all [3] of the co-defendants. Was there anything [4] pending in any of the appellate courts that [5] we need to be concerned about because — I [6] mean if — let's put it like this. If I [7] would have known that Jefferson had filed a [8] petition for writ in the Supreme Court and [9] the Supreme Court could have turned around [10] and said new trial, that wouldn't have — [11] that wouldn't have been anything that I would [12] have wanted to purge the file before it was [13] done. So there would have been — there [14] would have been no reason for me to even [15] think about purging the file before — before [16] his litigation was complete.

[17] Q: Were you told that the mandate had [18] been issued in Mr. Burgess' case?

[19] A: I don't recall specifically being [20] told that. I don't — I don't recall [21] specifically asking about Mr. Burgess.

[22] Q: Was he one of the co-defendants?

Page 246

[1] A: He was, and I probably asked — I [2] probably asked were there any appeals or [3] anything pending with respect to any of the [4] co-defendants.

[5] Q: No one told you about the petition [6] for rehearing for Mr. Burgess?

[7] A: I don't recall anyone telling me [8] that. They may have said something to me [9] about it, but I don't recall them saying [10] anything.

[11] Q: You say the conversation that you [12] had with Belinda Brown, the first one — you [13] said you had two conversations with her?

[14] A: I did.

[15] Q: The first one that you had when I [16] asked about it before, and I asked whether it [17] was before you had signed your April 1997 [18] declaration, you told me that you did not [19] believe that was correct?

[20] A: That is correct. It was — it was [21] after the declaration. It was after the [22] declaration, but before — it would have been

Page 247

[1] sometime between April 23rd of 1997 and [2] May 12th of 1997.

[3] Q: You say in your September 1997 [4] declaration, paragraph 15, that some- time in [5] late May of 1997 you checked with the [6] appellate division to deter- mine the status of [7] Mathis's petition. Is it your recollection [8] that you talked to Belinda Brown before that [9] point in time?

[10] A: Well, no, wait a minute. No, [11] that's — I'm sorry. Can you ask me that [12] again?

[13] Q: I'm just seeing if we can refresh [14] your recollection, pin down the time you [15] talked to her.

[16] A: It was — it was sometime — it was [17] sometime after April 23rd of 1997 but before [18] May 12 of 1997 because — well, hang on just [19] one second. To the best of my recollection, [20] that's what it would have been or before — let me [21] amend that. Sometime between [22] April 23rd and late May of 1997. It would

Page 248

[1] have been after the declaration but before I [2] learned of the conclusion of Mathis's writ of [3] certiorari. Even though that occurred on [4] May 12th, I don't — I learned about it after [5] it happened.

[6] Q: Do you recall any conversations [7]

with Belinda Brown in the spring of 1997 in [8] which she talked to you about something going [9] on in the Jefferson case?

[10] A: Spring of 1997?

[11] Q: Before you submitted your [12] declaration in April.

[13] A: Before the April declaration?

[14] Q: Uh-huh.

[15] A: No.

[16] MR. SMORODIN: When you say [17] Jefferson case, are you referring to the [18] FOIA —

[19] MS. YESNER: Just related to him at [20] all.

[21] THE WITNESS: Again, you know, I [22] don't — I don't remember. every time someone

Page 249

[1] talked to me about this case, but I remember [2] when I — when I talked to her, because when I [3] Bonnie Gay called me, my first reaction was [4] how could I have done something wrong here. So I [5] talked to Belinda before I did it and she [6] told me that I could do it, that I could [7] purge the file when the appeal was over. So [8] I know that I didn't talk to — I know that's [9] when I talked to Belinda. Now, after Bonnie [10] called me I talked to Belinda again.

[11] BY MS. YESNER:

[12] Q: Mr. Downing, have you ever pur- ged [13] one of your case files before Mr. Jefferson's [14] file?

[15] A: Had I ever purged —

[16] Q: Yes.

[17] A: Yes, yes, I had.

[18] Q: How many times had you done that?

[19] A: I don't know. This was — I can [20] tell you that this was a huge case as [21] compared to most of the other cases that, you [22] know, that were purged. So when you say —

Page 250

[1] when you say purged, as I — as I indicated [2] to you before, if you had the — if you took [3] the typical case and it was a box or even if [4] you had a case that was a couple of boxes, it [5] would have been something that my secretary [6] would have probably felt comfortable doing in [7] going through and taking — taking things out [8] that she thought should be removed from the [9] file when it was closed and bringing them in [10] to me and saying what should we do with [11] these — these matters.

[12] There is no way that Cindy could [13] have gone down to these 36 boxes and possibly [14] found her way around these things. She's a [15] very competent sec-

retary and she knew where [16] most of the stuff was, but the other thing [17] that was different about this case than from [18] most of the other cases that I handled was [19] that in most of the other cases that I [20] handled my files would have been up by my [21] office in a filing cabinet. They were not in [22] this case. They were — I was on the

Page 251

[1] second — I was on the fourth floor, that's [2] where my office was, and I was working this [3] case out of a war room on the second floor.

[4] There was so much going on in and [5] out of that war room with this case that my [6] secretary didn't even really get near the [7] room because she was getting in the way and [8] so the filing that was done, the way the [9] stuff was set up so that I could get to it [10] and the way I could use it I did it as [11] opposed to Cindy setting up — setting up the [12] thing and being familiar with where the stuff [13] was.

[14] She wasn't, for the most part, [15] doing any filing. When I say filing, I mean [16] putting items into the boxes. Things were [17] moving so quickly, there was such a volume of [18] it, that I was doing it. So for her to go [19] down and to look at something and to make a [20] deter- mination of what it was and what she [21] should do with it, with 36 boxes, would just [22] have been impossible or im- practical.

Page 252

[1] Q: The normal practice would be for [2] her to purge the files in preparation for [3] closing the case?

[4] A: She would have closed the file, [5] that's right. She would have purged to close [6] and what I did in this case was I went down, [7] basically, to take out the junk, the extra, [8] the stuff that — that I knew was going to be [9] stuff that she would purge out of — out of [10] the file and I was trying to reduce the file [11] to something that was manageable for her to [12] go through and look at and figure out what [13] she wanted to do. We — we had not had a [14] case of — with this many defendants with [15] these type of issues, particularly [16] death-penalty issues, before, so —

[17] Q: Is your normal practice with [18] respect to the law enforcement mate- rials [19] that came from outside of your office to [20] remove those from the file and return them to [21] the agency that provided them?

[22] A: No, my normal practice would be

Page 253

[1] if — my normal practice would be take [2] them out of the file and shred

**WILLIE JEFFERSON** v.
**JANET RENO et al**

**JEFFREY S. DOWNING**
June 15, 1999

them.

[3] Q: You would just do it yourself or [4] your secretary would do it?

[5] A: I would do it or my secretary would [6] do it.

[7] Q: So how many cases did you [8] personally go in and take documents out of [9] the files and shred them?

[10] A: I have no idea. If I knew a case [11] was going to be — I can't answer that. I [12] absolutely have no idea.

[13] If I knew that I case was going to [14] be closed and, as I said, if it was a smaller [15] case, it was more manageable, there probably [16] wasn't as much in it. Most of the time I [17] probably won't have any involvement at [18] all in closing the thing. If it was a bigger [19] file, Cindy might say to me I'm going to [20] close that file and I would go out and take [21] stuff out of it probably most of the time [22] without Cindy ever being involved in that

---

**Page 254**

[1] process at all. Research files, extra copies [2] of reports, drafts of transcripts, anything [3] that I knew was junk or when I say junk, I [4] mean extra stuff that wouldn't be categories [5] of those items that I knew were going into [6] the closing of a file. So, again, it would [7] depend on size of the file and it would [8] depend on what was in the file.

[9] Q: Now, had you ever invited a law [10] enforcement agent from outside of the office [11] of the U.S. Attorney to help you purge the [12] files before Mr. Jefferson's case?

[13] A: I'm not sure I had a case — United [14] States v. John Peoples and I — I believe [15] that I had one of the case agents come over [16] to go through some of those boxes to see what [17] was there. I know there's still — there's [18] still a file in another case that's a [19] relatively — relatively large case and I [20] asked — before I came up here I asked the [21] case agent in that case to come over and to [22] go through the boxes to, basically, do what

---

**Page 255**

[1] was done in this case, which is to take the [2] junk out of the boxes so that the case can be [3] closed and packed away.

[4] Q: So in this case you invited [5] Mr. Cooke in to the storage area in the U.S. [6] Attorneys' Office?

[7] A: I did.

[8] Q: Were there other cases there that [9] were boxes from other cases in that same [10] storage area?

[11] A: Oh, yes.

[12] Q: So he went in this general storage [13] area?

---

[14] A: Right.

[15] Q: Did he help you segregate doc- [16] uments for shredding?

[17] A: I had the boxes pulled out. They [18] were — they were set up like this. I opened [19] the boxes. We had a box or boxes down — [20] marked on the floor that were empty boxes. [21] As I went through, some of the — most of the [22] documents I looked at them and I made a

---

**Page 256**

[1] determination whether they should be purged [2] or not. Some of the documents — some of the [3] that stuff was taken out I asked Paul about. [4] The reports, there were extra sets of [5] photographs that — the homicide file. I [6] knew there — I knew there were things in [7] there that I didn't know if they wanted — [8] they wanted them back. They had — they had [9] actually done a series of hard-covered [10] folders, binders with all the reports in [11] them. I had — so I could condense — even [12] before any of this happened I had taken them [13] out of the folders and put them in there. I [14] didn't know if they wanted those back.

[15] The other thing was I had all the [16] boxes down there and I wanted to get them [17] somewhere where if I was taking stuff out [18] and, frankly, I needed someone to help me [19] carry some of the stuff around, so —

[20] Q: Did Mr. Cooke review documents in [21] the boxes with you that were other than [22] documents that came from the St. Petersburg

---

**Page 257**

[1] Police Department?

[2] A: I'm sure that — I'm sure that [3] there were. When you say review, I mean Paul [4] was standing there, but I was the one who was [5] going through the boxes. As I said, Paul was [6] kind of helping me put the stuff into the [7] boxes that were going to be shredded.

[8] We had a box — we had a box that [9] was stacked full of just back-to-back yellow [10] legal pads that were my trial notes for two [11] trials, a total of 22 weeks. Jim McConehay, [12] who was one of the case agents, had taken [13] some notes during the trial. Paul had taken [14] some notes during the trial.

[15] I can recall opening the box and [16] pulling things out and going through and just [17] looking at the tablets and seeing these were [18] my trial notes. I didn't need my trial [19] notes. You know, I got to Paul's and I said [20] are these your notes Paul and you, [21] know, he looked at them. Yeah. We don't [22] need these? No. Okay. So that's — so

---

**Page 258**

[1] that's the kind of thing that was going on [2] when we took this stuff out of the boxes, so [3] I don't know how you would characterize that.

[4] Q: Was he going through files too [5] saying what about this? What about this [6] document?

[7] A: I was the one who was going through [8] the boxes. Paul was — Paul was there. I [9] won't tell you he didn't, you know, he didn't [10] come over to look at the boxes or stick his [11] hand in a box or two, but I was primarily [12] doing the purging. Paul didn't throw [13] anything out — Paul didn't throw anything [14] out or make any decision on an item that [15] should be purged. I made those decisions.

[16] MS. YESNER: Let me show you a [17] document quickly. It will be 13.

[18] (Downing Deposition Exhibit [19] No. 13 was marked for [20] identification.)

[21] BY MS. YESNER:

[22] Q: This document that I've just shown

---

**Page 259**

[1] you. I realize it's in a redacted form. Do [2] you recognize this document?

[3] A: Yes.

[4] Q: Is this a document that you [5] generated?

[6] A: No.

[7] Q: Is this generated by the FBI?

[8] A: This probably would have been [9] generated by the FBI and the St. Peters- [10] burg Police Department.

[11] Q: It is an Organized Crime Drug [12] Enforcement Task Force. You were an attorney [13] in this area, correct?

[14] A: That's correct.

[15] Q: As I understand this document, you [16] were the prosecutor for this OCDETF case?

[17] A: That's correct.

[18] Q: Were you the one who requested that [19] the case be designated as such?

[20] A: No.

[21] Q: Who would determine whether to [22] call in the other agencies and make this a task

---

**Page 260**

[1] force case?

[2] A: It could have been anyone in- [3] volved in the investigation.

[4] Q: Now, this particular document I'm [5] showing you, this was not Mr. Jef- [6] ferson's case, was it? Can you tell from [7] the first page? Let me ask you this: Is [8] Mr. Jefferson's case called "Hat Trick"?

[9] A: Just I need a moment.

[10] (Witness conferred with counsel)

[11] BY MS. YESNER:

[12] Q: I'm not interested in the subject [13] of this particular investigation.

[14] MR. SMORODIN: That's been the [15] subject of Mr. Downing's and my con- versation. [16] We are concerned about waiving any [17] privileges. I understand the document has [18] been released in a redacted form, but we [19] don't want any answers to any of the [20] questions regarding this to be construed as, [21] first of all, waiving any of the privileges, [22] the FOIA privileges that have been asserted

Page 261

[1] on the document and, second, to be [2] waiving any privileges, attorney- /client or work [3] product or delibe- rative process privileges, [4] that may exist with respect to the underlying [5] subject matter of the document.

[6] BY MS. YESNER:

[7] Q: Well, Detective Cooke testified [8] that this was a related matter, if you will, [9] a spinoff matter, that this was not [10] Mr. Jefferson's case, this document, and [11] I'm [11] trying —

[12] MR. SMORODIN: I think what he said [13] was that it was not the matter which went to [14] trial in Mr. Jefferson's case.

[15] BY MS. YESNER:

[16] Q: That there was a prior initiation [17] form for Mr. Jefferson's case that went to [18] trial and my question to you is, are you [19] aware of a document like this that initiated [20] a task force matter for Mr. Jefferson's case?

[21] (Witness conferred with counsel)

[22] MR. SMORODIN: I'm going to object

Page 262

[1] to the question and instruct Mr. Downing not [2] to answer. My under- standing is that [3] Mr. Downing does not have the authority to [4] answer that question and that the answer to [5] that question may be barred, as this doc- ument [6] indicates, under the legal authority there of [7] National Security Information as a criminal [8] enforce- ment information, and so I can't have [9] Mr. Downing answer a question that he [10] believes he may be legally prohibited from [11] answering, so I'm instructing him not to [12] answer that question.

[13] MS. YESNER: I'm going to ask him [14] some questions and then you can just instruct [15] him not to answer, if you will, because we [16] may just have to deal with it.

[17] BY MS. YESNER:

[18] Q: I will tell you we got this [19] document from the FBI, it was in re- sponse to [20] Mr. Jefferson's FOIA re-

quest to the U.S. [21] Attorneys' office. We were told that this [22] was a document that came from the U.S.

Page 263

[1] Attorneys' office, but it was — it has not [2] been identified anywhere in anything I have [3] seen from the U.S. Attorneys' Office, not on [4] a Vaughn Index, not in any description of [5] what you said was in files that were purged.

[6] The first information that we [7] received about this document came from the [8] FBI. We are trying to deter- mine what was in [9] the contents of the documents that were [10] purged from Mr. Jefferson's case file in the [11] U.S. Attorneys' Office.

[12] If there are documents that cannot [13] be released that were in there, those are [14] identified in the Vaughn Index. We are [15] simply trying to identify what was there. [16] I'm trying to make that determination now.

[17] Mr. Cooke testified that there was [18] a prior document like this in Mr. Jef- ferson's [19] case and I'm trying to find out what happened [20] to that doc- ument.

[21] I also would like to know whether [22] that document had the same legend on it. I'm

Page 264

[1] going to ask you if know whether there was a [2] similar document to Deposition Exhibit 13 in [3] Mr. Jefferson's case file.

[4] MR. SMORODIN: First of all, before [5] I object I'm going to indicate that it has [6] not been established that Exhibit 13 or a [7] document similar to Exhibit 13, if such a [8] document exists, would be re- sponsive to [9] Mr. Jefferson's FOIA request, and I would [10] instruct Mr. Downing not to answer any [11] ques- tions regarding the creation of any such [12] documents.

[13] My understanding is a little bit [14] different from counsel's as to where this [15] document came from. My under- standing is it [16] was a referral to the FBI, but certainly that [17] is a matter of record and that can be [18] checked. But I am going to instruct him not [19] to answer. [20] My understanding is that [21] Mr. Downing may be prohibited from an- swering [22] that question by law and that I'm not going

Page 265

[1] to permit him to answer any questions that [2] may subject him to criminal liability under [3] the national security regulations.

[4] BY MS. YESNER:

[5] Q: I will just ask the question. [6] Mr. Downing, was there a document like [1]

Exhibit 13 in Mr. Jefferson's case file?

[8] MR. SMORODIN: Same objection. [9] Same instruction.

[10] BY MS. YESNER:

[11] Q: Was Mr. Jefferson's case file ever [12] classified as secret under 28 CFR Part 17?

[13] MR. SMORODIN: Is the question [14] whether his —

[15] MS. YESNER: The whole case file.

[16] MR. SMORODIN: Entire case file?

[17] MS. YESNER: Yes.

[18] MR. SMORODIN: You're asking [19] Mr. Downing for a legal conclusion as to [20] whether or not the criminal file in the U.S. [21] Attorneys' Office would have been classified [22] as secret?

Page 266

[1] MS. YESNER: Uh-huh.

[2] MR. SMORODIN: Can you answer that [3] question?

[4] THE WITNESS: I don't know if I can [5] answer that question. I don't — I don't [6] know. I don't know.

[7] BY MS. YESNER:

[8] Q: Were you ever asked to control any [9] documents in Mr. Jefferson's case file under [10] national security requir- ements?

[11] MR. SMORODIN: Are you asking him [12] whether they made any special arrangements in [13] this case because every criminal prosecutor [14] in every case controls documents —

[15] MS. YESNER: I'm not talking about [16] regular confidentiality issues. I'm talking [17] about national security rules.

[18] MR. SMORODIN: Well, every crimi- nal [19] prosecutor has national security rules in [20] every criminal prosecution. Are you asking [21] him whether there was something above and [22] beyond what a normal prosecutor would do?

Page 267

[1] MS. YESNER: I'm asking him if he [2] was required to maintain documents [3] under 28 CFR, Part 17.

[4] MR. SMORODIN: I'm going to object. [5] Mr. Downing, do you have any idea [6] how to answer that question.

[7] THE WITNESS: No, I don't.

[8] BY MS. YESNER:

[9] Q: Mr. Downing, do you have a [10] clearance for accessing national security [11] information?

[12] A: When you say national security [13] information, that information — nat- ional [14] security information is very broad. I think [15] we're getting into different levels of [16] information and I don't know — I mean I [17] have — I have

a clearance with respect to [18] information.

[19] For example, the document you're [20] referring to here refers to limited official [21] use. My understanding is that is — that is [22] a classification that is part of that CFR and

### Page 268

[1] my concern with answering your questions is [2] that I don't — I don't know whether I would [3] be violating the CFR for me to answer the [4] questions that you're asking me about this. [5] If I — if I knew I wasn't, I would — I [6] would gladly answer the question, but at this [7] point —

[8] BY MS. YESNER:

[9] Q: All I want to know is whether there [10] was information classified that needed to be [11] maintained in accordance with 28 CFR Part 17 [12] and whether that required particular [13] procedures, document control procedures in [14] this case.

[15] MR. SMORODIN: That's where my [16] objection comes in, counsel, because every [17] criminal prosecution has those. If you're [18] asking whether there was something beyond [19] what is in a normal criminal case in the [20] United States Attorneys' Offices across the [21] country, that's one thing, but if you're [22] asking Mr. Downing whether this was treated

### Page 269

[1] like every other criminal prosecution, that's [2] a separate question and so I would object to [3] the question because it's not clear, first of [4] all.

[5] BY MS. YESNER:

[6] Q: Is every criminal prosecution that [7] you had when you were in Tampa, was every one [8] of those subject to 20 CFR Part 17?

[9] MR. SMORODIN: 28 CFR.

[10] MS. YESNER: 28 CFR Part 17.

[11] MR. SMORODIN: Do you know the [12] answer to that?

[13] THE WITNESS: I don't know the [14] answer to that. What I know about this is [15] that this information has to be treated [16] — this information in this document has to be [17] treated with a certain level of security and [18] if this was produced to you by somebody who [19] had the authority to do that, then that is — [20] that is appropriate. But you're asking me — [21] you're asking me to answer a question that I [22] think is going to require me to make some

### Page 270

[1] disclosure. Even if I — even if I would [2] acknowledge the existence of a document, I [3] think I would be making a

disclosure that I [4] don't think — I don't think — I don't think [5] I have the authority to make to you.

[6] BY MS. YESNER:

[7] Q: You know what, in the interest of [8] time let's leave this open and try and get [9] this resolved.

[10] Mr. Downing, could you quickly look [11] at your third declaration? Did someone ask [12] you to prepare the declaration that you [13] signed in March of 1999?

[14] MR. SMORODIN: Objection. Asked [15] and answered. You can answer, sir.

[16] THE WITNESS: As I indicated [17] before, there was a series of E-mails [18] discussing or indicating that I should file [19] the declaration either between [20] Mr. Smorodin — between Mr. Smorodin and [21] Bonnie Gay.

[22] BY MS. YESNER:

### Page 271

[1] Q: Did Bonnie Gay ever ask you to help [2] reconstruct the case files?

[3] A: Did she ever ask me to help [4] reconstruct the case files? I think what she [5] asked me to do when she asked me to do the [6] second declaration was to, in fact, try to [7] reconstruct what was in the case files.

[8] Q: Did she ask you to help actually [9] physically reconstruct them so that we could [10] determine where the documents were?

[11] A: She may have asked me to call Paul [12] Cooke and to get the Benjamin Sanders' [13] homicide file back. I knew that was one of [14] the documents that there was not a copy of in [15] the file and that was not the type of [16] document that would have been purged. So to [17] that extent I think the answer to your [18] question would be yes.

[19] Q: I'm trying to reconstruct the file [20] in the sense of creating it as it was when [21] you purged it. Did she ask you to help [22] locate those files, the originals?

### Page 272

[1] A: I'm not sure — I'm sorry. I'm not [2] sure I understand what you're asking me.

[3] Q: Did she ask you to help her locate [4] where the original documents would be today?

[5] A: No. As I said, I think most of — [6] most of the items that were purged were [7] copies of documents that — or I shouldn't [8] say most of them. A good portion of them [9] were copies of documents, the originals of [10] which, in fact, are still in the file.

[11] Q: Let's go through these then. When [12] you're referring to the Culver trial [13] transcript, do you mean Mr. Jefferson's

case?

[14] A: Yes.

[15] Q: Where are, for instance, the extra [16] photocopied sets of documents provided to all [17] counsels discovery pursuant to Rule 16? [18] Where are the —

[19] A: I'm sorry. Where are you reading?

[20] Q: Number 4 on page 6.

[21] A: Uh-huh.

[22] Q: Where are photocopied sets of

### Page 273

[1] documents?

[2] A: As indicated to you before, I do [3] not believe that I — that I kept a copy of [4] that.

[5] Q: So where could we get them?

[6] MR. SMORODIN: Excuse me. Could [7] you let the witness answer the question?

[8] THE WITNESS: Well, there were 32 [9] defendants in the case. Each one of those [10] — each one of those defendants received a [11] photocopied set of documents and there — I [12] don't know whether they've kept them or not, [13] but there was an extra set of photocopied [14] a set of photocopied documents that was [15] provided to everybody, including [16] Mr. Jefferson's counsel.

[17] BY MS. YESNER:

[18] Q: Well, let me rephrase my question. [19] How can the U.S. Attorneys' Office get [20] another set of the documents?

[21] A: I don't know how they would do [22] that.

### Page 274

[1] Q: There isn't a set at the U.S. [2] Attorneys' office?

[3] A: I don't know whether I kept a set. [4] My recollection is I did not.

[5] Q: How about transcripts of recorded [6] telephone conversations?

[7] MR. SMORODIN: Object. I think [8] item five talks about drafts and duplicate [9] copies and it's unfair to be asking him a [10] portion of that.

[11] BY MS. YESNER:

[12] Q: My question to you is, did you [13] retain one set of the transcripts of recorded [14] telephone conversations in your files?

[15] A: I believe I did, yes.

[16] Q: Where would those transcripts be [17] today of all of the telephone calls?

[18] A: If I retained them, they would be [19] in the file.

[20] Q: So you only purged extra copies. [21] One set was retained?

[22] A: To the best of my recollection I

Page 275

[1] kept a set of the copies that were provided [2] to defense counsel and I believe all of those [3] documents were also admitted into evidence [4] and were court — court documents.

[5] Q: So the U.S. Attorneys' Office [6] either has them or there are copies in court?

[7] A: Or there were copies that were [8] trial exhibits. Those trial exhibits, I [9] don't know if they would have been kept or [10] not. They probably would have been returned [11] to me at the conclusion of the — conclusion [12] of the trial.

[13] Q: They were purged from the file?

[14] MR. SMORODIN: Objection. I don't [15] think that's what Mr. Downing said.

[16] THE WITNESS: I don't —

[17] BY MS. YESNER:

[18] Q: My question is, where can the U.S. [19] Attorneys' Office get a set of all of the [20] transcripts made from the recorded [21] telephone [21] conversations?

[22] A: My answer is — is I don't know

Page 276

[1] that there is not a copy in there. I [2] don't — without me sitting here — you're [3] talking about 12 boxes of documents. I don't [4] know every document that's in there now and [5] so I can only tell you what my recollection [6] is.

[7] My recollection with respect to the [8] recorded telephone conversations that we made [9] transcripts of, my recollection is that we [10] did keep at least one set of those [11] transcripts. We may have kept the originals [12] that were admitted into evidence at trial. I [13] don't know if they're in the box. My [14] recollection is that they are. But you're [15] asking me to tell you where you can find them [16] and I'm not sure that they're not in the box, [17] so I think your question assumes that they're [18] not in the box. So —

[19] Q: Yes, it does.

[20] A: So I'm not sure that they're not in [21] the box.

[22] Q: Did you look in the boxes of

Page 277

[1] materials that were left after you purged the [2] files?

[3] A: I did.

[4] Q: Do you recall seeing transcripts of [5] intercepted calls?

[6] A: I don't know.

[7] Q: What about skipping down to [8] Number 11 on page 8, "Photocopies of trial [9] documents, exhibits, Polaroid photographs of [10] all trial exhibits and work copies of trial [11] exhibits." My question is, was one set [12] retained in

the file?

[13] A: Again, I don't know. My [14] recollection of that is that I did keep a [15] copy of the trial exhibits, but I do not [16] know — I do not know that for sure.

[17] Q: Do you know —

[18] A: When I look at these, I know what [19] was — I know what was in there. When I say [20] there were photocopies of trial document [21] exhibits, those would have been — those [22] would have been — any of the documents that

Page 278

[1] I would have offered into evidence or would [2] have had prepared to offer into evidence, I [3] would have made copies of them and provided [4] them to counsel prior to trial.

[5] Q: That's not my question to you, [6] Mr. Downing.

[7] A: I understand. I'm sorry. But [8] what — whether I would have kept them would [9] have been based on whether I thought they [10] were a document that should have been kept in [11] the file and I don't know whether I would [12] have kept them because I don't know that [13] they would have had any legal or historical [14] significance to the case.

[15] Q: So you don't know if there were [16] originals maintained?

[17] A: I do not.

[18] Q: How about the law enforcement [19] investigative reports?

[20] MR. SMORODIN: Number 13 on page [21] 8?

[21] MS. YESNER: Number 13.

[22] MR. SMORODIN: Well, it depends on

Page 279

[1] which document you're looking at.

[2] THE WITNESS: Those law en- [3] forcement investigative reports, the [4] majority of them [4] were from the St. Petersburg Police [5] Department. I do not believe any of them [6] were retained in the file. I believe they [7] were shredded and — because Paul Cooke [8] indicated that he did not need the copies. [9] There may have been a number of DEA-6s which [10] is their report of investigation that were [11] prepared based on undercover — some [12] undercover purchases that were made in the [13] course of the investigation. Those would [14] have been shredded. There may have been a [15] number of — or were a number of FBI [16] investigative reports, 302s, that were [17] generated with respect to this case. They [18] would have been shredded as well.

[19] BY MS. YESNER:

[20] Q: FBI 302s?

[21] A: Yes.

Page 280

[22] Q: What is that?

[1] A: It's a report of investigation.

[2] Q: Mr. Downing, do you have any [3] recollection today as to exactly what [4] material of the material you described that [5] you purged remains in the U.S. Attorneys' [6] Office for duplication?

[7] MR. SMORODIN: I'm sorry. For [8] what?

[9] MS. YESNER: For duplication now.

[10] MR. SMORODIN: I would object to [11] the question only to the extent that —

[12] BY MS. YESNER:

[13] Q: It would be within the custody of [14] the United States Attorneys' Office.

[15] MR. SMORODIN: Fair enough. It may [16] have been moved.

[17] THE WITNESS: I can probably tell [18] you a lot of documents that are there, but [19] to — to go to sit here and to tell you [20] every document that is in 12 banker's [20] boxes would [21] be — would be impossible for me to do.

[22] BY MS. YESNER:

Page 281

[1] Q: Has anyone from the U.S. Attorney [2] asked you for help in trying to reproduce the [3] documents that you described in your [4] declaration for Mr. Jefferson under a court [5] order?

[6] A: No one has asked me to reproduce [7] anything in the file.

[8] Q: Not for you to reproduce it.

[9] A: Or to go — or to go — to go [10] through it. I understood that to be part of [11] the purpose of my declaration. My second [12] declaration and third dec- [13] laration listed — [13] to reconstruct to the best of my recollection [14] what was in — what was in the box. Not [15] what's still in the box, but what I was — [16] what I was asked to do was to do a general [17] summary of the items that were purged from [18] the boxes. So I did not — I did not go [19] through and make any kind of notes that I [20] could look at to refresh my recollection of [21] what is still in the box. What I have here [22] in my dec- [22] laration is an enumeration of what I

Page 282

[1] recall being purged from the boxes.

[2] Q: Has anyone shown you a doc- [3] ument called Appendix A or a Vaughn Index?

[4] A: No.

[5] Q: So you have never reviewed a [6] document listing all of the records in the [7] case so that you could compare your [8] recollection of what was purged to what still [9] remains?

[10] A: No.

**WILLIE JEFFERSON  v.**
**JANET RENO et al**

**JEFFREY S. DOWNING**
**June 15, 1999**

[11] Q: Has anyone ever asked you to come [12] and look at the documents in Ms. Gay's office [13] to see if you could compare your memory of [14] what was purged to what remains in the [15] documents?

[16] A: No.

[17] MS. YESNER: I know you have got a [18] plane to catch. I'm not sure what to do. I [19] might have a couple of follow-up questions. [20] I don't want Mr. Downing to miss his plane.

[21] MR. SMORODIN: We still have time. [22] His flight is at 7:30, and I thought that he

Page 283

[1] needed to leave here at 6:30. [2] It's 6:00 o'clock now.

[3] MS. YESNER: I would like to talk [4] to Mr. Jefferson for a couple of minutes.

[5] MR. SMORODIN: I have a few [6] questions and it might expedite things if I [7] ask my questions now. I know you're still [8] questioning, but if you want to go on [9] procedure, that's fine, but —

[10] MS. YESNER: No, go ahead.

[11] **EXAMINATION BY COUNSEL FOR DEFENDANTS**

[12] BY MR. SMORODIN:

[13] Q: Mr. Downing, you indicated in [14] response to a question from counsel that the [15] Culver trial referred to the trial in which [16] Mr. Jefferson was tried. Do you recall that [17] question and that answer?

[18] A: Yes.

[19] Q: You referred to the Culver trial in [20] your second and third declarations. Do you [21] recall doing that?

[22] A: Yes. I think I also referred to it

Page 284

[1] in my first declaration.

[2] Q: Why did you call it the Culver [3] trial?

[4] A: After Mathis was severed from [5] the 91-301 case the next defendant named in [6] the indictment was Willie Culver and so it [7] would have been inaccurate for us to refer to [8] the case as Mathis. We referred to it as the [9] Culver case.

[10] Q: Did Mr. Culver actually stand [11] trial?

[12] A: He did not.

[13] Q: Did he plea?

[14] A: Yes, he did.

[15] Q: Did he have a plea?

[16] A: He pled guilty. Actually I — I [17] think the exhibits at trial were — that may [18] have been the United States v. Sharvonne [19] McKinnon, but I'm not sure.

[20] Q: Ms. Yesner has been asking you a [21] lot of questions about purging the file. [22] First of all, do you remember Ms. Yesner

Page 285

[1] asking you a lot questions about purging the [2] file?

[3] A: Yes.

[4] Q: What do you mean by purging the [5] file?

[6] A: Well, as I indicated, purging to me [7] is a reduction of the file in some sense, to [8] some extent, if your — you have a file and [9] you're doing housekeeping matters on it while [10] it's still ongoing, you're cleaning it up, I [11] guess someone could refer to that as purging [12] the file.

[13] The most common reference to [14] purging of a file would be the final cleanup [15] of the file and putting that salmon colored [16] sheet on it, closing the file.

[17] When I refer to purging, I guess [18] I'm referring to any time that you would be [19] removing — removing something from the file [20] that was no longer necessary to be kept in [21] the file.

[22] Q: Did you ever close a file, and when

Page 286

[1] I mean close a file, I mean fill out the [2] salmon-colored sheet, put the documents [3] together and prepare to send them to the [4] docketing department in the U.S. Attorneys' [5] Office?

[6] A: No, that would have been — the [7] final — the final closing would have been [8] done by Cindy Cole.

[9] MR. SMORODIN: Those are my [10] questions. Counsel. Do you still want to [11] talk to your client?

[12] MS. YESNER: Yes, I've got a few [13] more questions, but I just thought —

[14] MR. SMORODIN: Okay. Do you want [15] to do that first?

[16] MS. YESNER: I just thought, you [17] know, that I would want to just talk with [18] him [18] for a few minutes before we wrapped up.

[19] (Recess)

[20] BY MS. YESNER:

[21] Q: Mr. Downing, did Ms. Gay send you a [22] copy of the court's order in the case from

Page 287

[1] February of 1999? Do you have a copy [2] of it?

[2] A: No, I got a — at some point she [3] sent me a copy of an order — an order or an [4] opinion that was written by Judge Kessler, [5] but it was not — it was not this order. [6] I've never seen that order.

[7] (Downing Deposition Exhibit [8] No.

14 was marked for [9] identification.)

[10] Q: Are you familiar with the St. [11] Petersburg Police Department computer system [12] referred to by initials as A-C-I-S-S?

[13] A: Yes, I am.

[14] Q: Is that the computer system in [15] which they kept electronic reports, police [16] reports?

[17] A: I believe that's — I believe [18] that's where they keep the reports, yes.

[19] Q: When you were prosecuting [20] Mr. Jefferson and the co-defendants, did you [21] obtain ACISS reports from the SPPD?

[22] A: When you say — you say the ACISS

Page 288

[1] reports, I believe that's just their computer [2] system. I believe most of their reports are [3] generated on the computer system, so the [4] reports that I got, I assume, were the [5] reports that were generated on there.

[6] I don't think they — I don't think [7] they type out reports any more. Everything [8] they do is on the computer and so that's just [9] a computer system.

[10] Q: So when you would get hard copy of [11] reports, they would be printouts from the [12] computer?

[13] A: I assume they were.

[14] Q: Did you have a complete set of all [15] of the investigative reports that were [16] generated by the SPPD?

[17] A: I did.

[18] Q: Were those documents shredded in [19] June or July of 1997?

[20] A: Yes, they were.

[21] Q: Have you ever seen a subject matter [22] index for those investigative reports from

Page 289

[1] the SPPD?

[2] A: I have — I have seen some subject [3] matter indexes. I don't know if I've seen [4] one on this case. I may have seen one on [5] this case. There may have been one — there [6] may have been one printed out on this case.

[7] Q: Was it with the file in the [8] binders?

[9] A: I don't recall. It probably was.

[10] Q: Do you recall Ms. Gay discussing a [11] list of computer files from the SPPD with [12] you?

[13] A: She did tell me that she had a list [14] of computer files that had been printed out, [15] yes.

[16] Q: Did you see that list?

[17] A: She sent me a partial copy of — or

---

**Page 290**

[18] what I assume was a partial copy. I think it [19] was only a couple of pages — and asked me if [20] I could tell her what documents on there had [21] privileged information or confidential [22] information in them and I told her that from

**Page 290**

[1] looking at the title of the report, there was [2] absolutely no way that I could tell her what [3] the content of the document was.

[4] Q: Is that the same as the subject [5] matter index that you had received [6] previously?

[7] A: It may have been. My understanding [8] is that you can print out — [9] you can print out reports by name, by [10] subject, by address. That was my [11] understanding of ACISS. So it [11] was in that same type of form or format.

[12] Q: It was a partial list of all of the [13] reports?

[14] A: Yeah, it was — I think it was only [15] a couple of pages and she — she sent it to [16] me and we had a brief conversation about it. [17] She had — she had something to me about [18] looking through it and I — I didn't know [19] what she — what she was referring to when [20] she said she was going to send it. When she [21] sent it, I called her back and talked to her [22] and told her that, you know, there was no way

**Page 291**

[1] I could tell her anything about the documents [2] just by looking at a brief description of the [3] document or the first couple — I think some [4] of those things print out the first couple of [5] words of the — of the report. I told her [6] there was no way I could go through it and [7] she said fine. I'm not sure what she said [8] after that. I shredded it.

[9] Q: Did she indicate to you where she [10] got it from?

[11] A: She may have said she got it from [12] Paul Cooke, but I don't recall specifically.

[13] Q: Do you recall what format it was [14] in? Were the documents sorted by [15] subject?

[15] A: No. I mean it was — it looked [16] like — it looked like the format of the St. [17] Petersburg Police Department report, but it [18] had, I believe, a numbering of — of what I [19] assumed were reports and, as I indicated [20] there — at the top of the report there would [21] be a [22] summary and I think it's probably the [22] first few words of the summary that indicate

**Page 292**

[1] the report and I told her that there was

no [2] way that I could get anything out of that.

[3] Q: I was just wondering how the [4] information about the reports on this list [5] was sorted, if it was by numerical order or [6] by subject matter —

[7] A: I don't — I don't recall.

[8] Q: Anything like that?

[9] A: I don't recall it being in any [10] particular order.

[11] Q: This is a document we did not get [12] from the U.S. Attorneys' office. We got this [13] from the St. Petersburg Police Department. I [14] just ask you is this the type of ACISS report [15] that you would have gotten a hard copy of [16] from SPPD?

[17] MR. SMORODIN: Not this specific [18] one, but is this the type of document?

[19] MS. YESNER: Yes.

[20] THE WITNESS: Yes, I would have [21] gotten in the form that have you it here. I [22] probably would have gotten a copy of it. In

**Page 293**

[1] other words, they — if they would have [2] generated an original, they would have kept [3] the original probably in most instances and [4] brought a copy to me.

[5] BY MS. YESNER:

[6] Q: But the original would actually be [7] just electronic?

[8] A: The original would just be a [9] printout is what it would be.

[10] Q: So is this the type of document [11] that you had in your files that would we call [12] investigative report? It says ACISS [13] Intelligence Supplement Report at the top.

[14] A: Yes.

[15] Q: Believed you had a complete set [16] of them?

[17] A: I did.

[18] Q: On the summary or the list that [19] Ms. Gay showed you, did it provide [20] information from the body of the report or [21] just some information about the report?

[22] A: No, and I think what it provides

**Page 294**

[1] is, to the best of my recollection, would be a [2] title like the first line of the area under [3] Synopsis, which would tell me nothing. For [4] example, I think it said something like, this [5] report will detail information gained while [6] monitoring, and that's what I was able to [7] see.

[8] Q: So that list itself would not [9] reveal anything about the contents?

[10] A: Unless there was — unless there [11] was something in the — unless there

**Page 295**

was [12] something in that first paragraph that — or [13] that first line that would give some [14] information about what the content of the [15] report was, but that's the extent of it.

[16] Q: Do you know if St. Petersburg [17] Police Department referred to confidential [18] informants as CIs in their reports or do that [19] they name them by name?

[20] A: They refer to them as CI and they [21] usually have a number.

[22] Q: Have you spoken to Mr. Cooke about

**Page 295**

[1] information that's been released by the St. [2] Petersburg Police Department to [3] Mr. Jefferson?

[4] A: No.

[5] Q: Do you have any knowledge about [6] whether the St. Petersburg Police Department [7] have released unredacted reports to [8] Mr. Jefferson?

[9] A: I knew at some point that [10] Mr. Jefferson was requesting documents from [11] the St. Petersburg Police Department. I [12] don't know how I learned that. It may have [13] been from Paul or from — that's Paul Cooke [14] or Jim McConehay. It may have been even been [15] from Sergeant Gary Walker I learned that he [16] was requesting documents from them, but that [17] was the extent of my knowledge.

[18] Q: When did you learn that?

[19] A: I couldn't begin to will tell you [20] when that was.

[21] Q: Mr. Downing, do you know what the [22] Privacy Act System of Records is within the

**Page 296**

[1] United States Attorneys' Office?

[2] A: I'm familiar with some privacy act [3] matters.

[4] Q: Do you know what that is, the [5] Privacy Act System of Records is?

[6] A: Privacy Act System of Records. I'm [7] not sure — I'm not sure exactly what all [8] that would entail.

[9] Q: Do you know if Mr. Jefferson's case [10] files were maintained within that system [11] within your office?

[12] A: I don't know.

[13] Q: I gather, then, that you have no [14] idea what that system requires in terms of [15] document control?

[16] A: I don't know specifically what that [17] would entail.

[18] Q: Now, when you were went down to [19] clean out the files, to purge the files, they [20] were in a storage area in the building?

---

WILLIE JEFFERSON  v.
JANET RENO et al

JEFFREY S. DOWNING
June 15, 1999

[21] A: They were in a storage area on the [22] first floor of the Timberlake Annex, which is

---

Page 297

[1] the building behind the Timberlake building.

[2] Q: They had been moved from the war [3] room?

[4] A: They had.

[5] Q: Did you go through the files before [6] they were packed up for storage?

[7] A: They had been moved out of the war [8] room because someone else was going in there [9] to use the war room. I would have — I would [10] have, you know, had some contact with the [11] files, obviously, while I was packing them up [12] to move them out of there.

[13] Q: Did you pack them up?

[14] A: I believe I did.

[15] Q: Did you take anything out of the [16] files or did you just seal up the boxes and [17] remove them?

[18] A: At that time — at that time I [19] don't think I took anything out of the boxes [20] because there was — there was a need for [21] someone else to get in there and I think that [22] it was packed up fairly quickly, which is one

---

Page 298

[1] of the reasons why there were probably so [2] many copies and extra copies of things in the [3] boxes when they got to the storage place. If [4] I would not have had to move out of there as [5] quickly, some of this stuff would have [6] been — would have been purged out of the [7] file to reduce the amount of boxes that would [8] have went into storage because, as I said, [9] that was a concern.

[10] Q: When the boxes were moved out of [11] the war room down to storage, were they [12] placed in an area called the vault? Does [13] that term mean anything to you?

[14] A: No, the vault doesn't mean anything [15] to me. They were — they were put in — they [16] were put in storage. We had storage areas on [17] the second floor of the Timberlake building. [18] We had — at one point we had storage on the [19] fifth floor of the Timberlake building within [20] our office space. We had storage later on, [21] on the first floor of the Timberlake II [22] building, which is where these boxes were

---

Page 299

[1] when I purged the materials from them. We [2] had storage at one point on the 11th floor. [3] As I indicated, we were always looking for [4] storage because we were always short of [5] storage and that was always a concern.

[6] Q: Were Mr. Jefferson's files placed [7] in a particular area that was indicated as a [8] privacy act area?

[9] MR. SMORODIN: Objection. I think [10] the witness testified he was not familiar [11] with that term, so lack of foundation to [12] the —

[13] THE WITNESS: Not that I know of.

[14] BY MS. YESNER:

[15] Q: Are you aware of whether [16] Mr. Jefferson's files were placed in any [17] special area for any particular reason?

[18] A: They were not placed in any [19] special area. They were in area that was used for the [20] storage of criminal files.

[21] Q: Are criminal files stored [22] separately from civil files?

---

Page 300

[1] A: Yes.

[2] Q: Do you know why?

[3] A: No, I don't know why. I know that [4] in our new — probably, if you really want to [5] know, probably because when the storage areas [6] are divvied up, the criminal people want all [7] of their space and the civil people want all [8] of their space. That's probably why it [9] happens. I don't think there's any — I [10] don't think there's any reason other than [11] that.

[12] Q: Mr. Downing, I'm going to ask you, [13] would it be possible for you to take your [14] recollection of the material that was purged [15] from the files and look at the material that [16] was retained and/or indexes describing that [17] material and determine where the U.S. [18] Attorneys' Office could obtain copies of [19] documents that were no longer in the material [20] that remained in the case file which, as I [21] understand, is in Ms. Gay's office?

[22] A: I could go back to the case file

---

Page 301

[1] and looking at the — obviously the [2] information that I put in my declaration when [3] it was fresher in my mind than it is now, but [4] I could — you kind of got a two-part [5] question.

[6] I could go back and try to tell you [7] what documents were — may not — may not [8] have a copy or an original still remaining in [9] the file. I may not be able to tell you how [10] to get a copy or originals of something that [11] there may not be a way to recreate it.

[12] Q: So you could look at what remains [13] and determine, based on your re-collection [14] of what was purged, and determine of the [15] materials that you described as purged what [16] remain in, you know, whether there is a copy [17] today in the material that's in the U.S. [18]

---

Attorneys' Office?

[19] A: Yes, I think I could. In other [20] words, I could go back and if, for example, I [21] purged the extra photocopied set of documents [22] provided to all counsel as discovery pursuant

---

Page 302

[1] to Rule 16, I could look at the documents and [2] I could tell you whether or not there is a [3] copy of the documents that were provided as [4] Rule 16. There may not be a way to recreate [5] that or to have another copy made from some [6] other source.

[7] Q: I understand. For some of these [8] things, trial transcripts, I can tell you we [9] have trial transcripts. Those are really [10] easy to tell that we got those and those are [11] in the remaining boxes.

[12] There are materials that have [13] simply been listed on the Vaughn Index which [14] were not provided to us that it's very [15] difficult to tell, for instance, from your [16] description of, say, witness files or other [17] material, whether that information is in [18] Ms. Gay's office or is simply identified on [19] a Vaughn Index, whether that's covered here. [20] In other words, whether material that you [21] described is duplicated and still exists in [22] Ms. Gay's file but has not been produced to

---

Page 303

[1] us because it's been withheld. I know that [2] was a long question. Let me try again.

[3] A: I'm not sure I understand that.

[4] Q: The government has produced a [5] Vaughn Index of material that's still exists [6] but that has been withheld under various FOIA [7] exemptions other than effect on law pending [8] the proceedings, for instance, if it's Grand [9] Jury material or if it identifies individuals [10] or if there are attorney/client mate-rials, [11] that sort of thing. That material is in [12] Ms. Gay's office, as I understand it, and has [13] been described in a Vaughn Index.

[14] I was wondering if you could look [15] at what you described as having been purged [16] and determine whether that material that was [17] shredded still exists in —

[18] A: Whether a copy of it still exists [19] or —

[20] Q: Exactly. Or an original was [21] retained, one copy was retained and is in [22] Ms. Gay's office.

---

Page 304

[1] A: If I look at boxes, I will be able [2] to tell that.

[3] Q: I was also wondering if you could [4] tell in looking at the material whether

---

one [5] set of information such as the photocopies or [6] Jencks material or witness files, anything of [7] that sort, that you described based on your [8] knowledge of your filing system, if that is [9] in the materials that still exist.

[10] A: I can — I can look at that, but [11] let me — let me just say this: You showed [12] me a document early on that indicated the [13] type of documents that would be retained in a [14] closed file. As I go down the list that I've [15] had here of purged items, for example, [16] attorney trial notes would not be kept in a [17] closed file. Copies of the trial transcript [18] would be kept because they are a document. [19] Pleadings, orders, plea agreements, those —[20] the pleadings would be kept. Draft motions [21] and responses would not be. An extra [21] photocopied set of Rule 16 discovery would

---

**Page 305**

[1] probably not be kept.

[2] Q: But my question is not whether you [3] would normally keep that once a file is [4] closed but whether because the file wasn't [5] closed at the time —

[6] A: Right. It was not — it was not [7] closed, but what — what I was doing was [8] essentially reducing the file to a manageable [9] size so that it could be closed. So when I [10] was — when I was going through the file, I [11] was going through the file and purging items [12] from the file with the idea that the next [13] thing that was going to happen was that my [14] secretary was going to look at those boxes [15] and she was going to close the file. So [16] there wouldn't be a mass of documents that [17] didn't belong to the file that didn't need to [18] be in the file.

[19] Q: I understand, but what I'm trying [20] to do now is to recreate the file that [21] existed at the time it was pending in the [22] district court for review by the court if the

---

**Page 306**

[1] court chose to review these documents, the [2] documents that were the subject of this [3] court's civil action. We are trying to [4] recreate the files that existed when the [5] case [5] began.

[6] A: I understand.

[7] Q: What I'm wondering is if you can [8] look at what still exists and tell us whether [9] there is a duplication in the existing files [10] of material that was purged. I can't tell.

[11] A: I think I can to a large extent.

[12] Q: Then my second question was, if [13] material that you purged in preparation for [14] closing is no longer in the custody of the [15] U.S. Attorneys Office

because it was a [16] duplicate of certain material that came from [17] the SPPD or from the FBI and you didn't [18] normally keep that material when you closed a [19] file, can you determine where the U.S. [20] Attorneys' office could go to get copies of [21] that material? For example, could they go to [22] court to get a complete set of photographs of

---

**Page 307**

[1] the trial exhibits if one doesn't exist in [2] the U.S. Attorneys' Office?

[3] A: I think I answered that when I said [4] I certainly can determine — if there is not [5] a copy of it, I can determine whether or not [6] there might be a place to find a copy of what [7] would have been purged, but I can't say that [8] that effort would be successful in every [9] instance because there may not be — there [10] may not be another place where the document [11] would exist.

[12] Q: But to date nobody has asked you to [13] review indexes or documents to make the first [14] determination as to whether any of the purged [15] documents still exist in the U.S. Attorneys' [16] Office?

[17] A: I have — I have — with the [18] exception of the one document that Bonnie Gay [19] sent to me that you referred to as an ACISS [20] summary, I have not been asked to review any [21] documents other than, for example, when —[22] not, for example — other than when Stephanie

---

**Page 308**

[1] Boucher came to Tampa after the files had [2] been purged to assist her in trying to [3] identify the documents and to essentially [4] tell her what they were.

[5] Q: I'm just going to close by asking [6] you a series of quick questions about a [7] document that we were discussing before we [8] had an issue about whether you could answer [9] and I just want to make a record for the [10] court.

[11] Are you aware of an executive order [12] that was signed in 1995 that changed the [13] scope of material that was subject to [14] classification?

[15] A: I'm familiar with it generally, [16] yes.

[17] Q: Are you aware that there was an [18] executive order signed in 1995 that affected [19] the way documents were to be classified in [20] criminal cases?

[21] A: Again, generally, I know that there [22] was something — that there was something,

---

**Page 309**

[1] you know, to that extent, but I couldn't [2] tell how it relates to that document.

[3] Q: By that document you're referring

[4] to Exhibit 13?

[5] A: I'm referring to Exhibit 13.

[6] Q: Did a point in time come in 1995 or [7] after that where you were told to declassify [8] documents that had previously been [9] classified?

[10] A: Me personally, no.

[11] Q: Are you aware of whether documents [12] were declassified after 1995 in response to [13] the executive order?

[14] A: I am not.

[15] Q: Do you know whether the document, [16] Exhibit 13, was declassified?

[17] A: I don't know whether it was [18] declassified. I know that the term " [19] official use" carries with it a prohibition [20] on dissemination of that information and I am [21] not in a position at this point to be able to [22] tell you with any level of comfort that I'm

---

**Page 310**

[1] able to provide any information about that [2] document or about a similar document or [3] whether a similar document exists. If [4] someone tells me that it's okay for me to do [5] it and I can lawfully do it, I would be happy [6] to do it.

[7] Q: Did anyone ever tell you that any [8] documents that carried a legend that said [9] that they were to have limited disseminated, [10] that that legend no longer applied?

[11] A: No.

[12] Q: Do you know if the document I'm [13] looking at, Exhibit 13, that this was [14] provided to Mr. Jefferson by the Executive [15] Office of the United States Attorney?

[16] A: Do I know if it was?

[17] MR. SMORODIN: I'm going to object [18] to that.

[19] MS. YESNER: Yes.

[20] MR. SMORODIN: Because I think that [21] misstates a fact.

[22] THE WITNESS: I don't know who

---

**Page 311**

[1] provided that document to you and I [2] don't know on what authority they provided that [3] document to you and, as in any situation, if [4] there's some authority for me to produce [5] something that's in my file or to reveal [6] something that's in my file and I'm lawfully [7] able to do it or required to do it, I will, [8] but I don't know any other way to answer your [9] question.

[10] BY MS. YESNER:

[11] Q: But at this point in time you are [12] not aware that documents in your file that [13] may have been previously classified were [14] declassified after 1995?

**WILLIE JEFFERSON  v.**
**JANET RENO et al**

**JEFFREY S. DOWNING**
**June 15, 1999**

[15] **A:** I am not aware of any documents [16] that were in my files specifically that were [17] classified that were declassified [17] after 1995.

[18] There may have been documents that [19] were — that had some sort of classification [20] or had some sort of restriction on [21] dissemination that I obtained at some point [22] during the course of my employment. At, you

---

Page 312

[1] know, at various times I had different [2] security clearances, some higher than — than [3] the normal clearance that's given to [4] Assistant U.S. Attorneys and, you know, so [5] I've had opportunity to review those [6] documents. Those documents could have been [7] declassified. I don't know.

[8] **Q:** Let me just ask you a quick series [9] of questions. Your attorney can object and [10] we can just say same objection to all of [11] them.

[12] Do you recognize Exhibit 13? Have [13] you ever seen it before?

[14] **A:** Yes, I've seen it before.

[15] **Q:** Exhibit 13 was marked as a [16] classified document; is that right?

[17] **A:** It carries on it a cover that [18] indicates limited official use.

[19] **Q:** Was this document in [20] Mr. Jefferson's files, your files pertaining [21] to Mr. Jefferson's case?

[22] **A:** I don't believe so, no.

---

Page 313

[1] **Q:** Did you have any documents that [2] were classified in Mr. Jefferson's files?

[3] **MR. SMORODIN:** Objection. I think [4] that's ambiguous. Do you mean were they [5] formally stamped with a classified stamp?

[6] **BY MS. YESNER:**

[7] **Q:** Yes. Were they classified with a [8] stamp that required limited access?

[9] **A:** There may have been a document in [10] there that had a limited official use [11] dissemination on it.

[12] **Q:** There may have been in your case [13] files?

[14] **A:** Yes. I don't know —

[15] (Witness conferred with counsel)

[16] **MR. SMORODIN:** I think that the [17] question is a conundrum, because if [18] Mr. Downing is to answer it, it answers other [19] questions to which I've instructed him not to [20] answer and so I'm going to instruct him not to [21] answer the question.

[22] **MS. YESNER:** Could you read back

---

Page 314

[1] the question?

[2] (The reporter read the record as [3]

requested.)

[4] **THE WITNESS:** I'm sorry. One more [5] time. Do you have any documents that were [6] classified in Mr. Jefferson's file?

[7] **BY MS. YESNER:**

[8] **Q:** That was my question. Did you have [9] any documents that carried a classified [10] legend in Mr. Jefferson's file?

[11] **MR. SMORODIN:** I'm instructing him [12] not to answer that question for the same [13] reasons I've already stated.

[14] **BY MS. YESNER:**

[15] **Q:** Did you have any investigation [16] initiation forms in Mr. Jefferson's case [17] files?

[18] **MR. SMORODIN:** Same objection as [19] previously stated.

[20] **BY MS. YESNER:**

[21] **Q:** Did you purge from Mr. Jefferson's [22] case file any classified documents?

---

Page 315

[1] **MR. SMORODIN:** Same objection as [2] previously stated.

[3] **BY MS. YESNER:**

[4] **Q:** Did you purge from Mr. Jefferson's [5] case file an investigation initiation [6] form?

[7] **MR. SMORODIN:** Same objection as [7] previously stated.

[8] **BY MS. YESNER:**

[9] **Q:** Did you have any documents in [10] Mr. Jefferson's case file that related to the [11] initiation of the case as an Organized [12] Crime Drug Enforcement Task Force case?

[13] **MR. SMORODIN:** Same objection as [14] previously stated.

[15] **BY MS. YESNER:**

[16] **Q:** Did you have any documents that [17] weren't classified?

[18] **A:** I'm sorry?

[19] **Q:** Did you have any documents [20] concerning the initiation of Mr. Jefferson's [21] case or the Mathis case as an Organized Crime [22] Drug Enforcement Task Force case that were

---

Page 316

[1] not classified?

[2] **MR. SMORODIN:** I'm going to object [3] to the question. I would interpret it as [4] confusing. You're asking were there any [5] classified documents that weren't classified [6] essentially. I —

[7] **MS. YESNER:** I'm not asking if [8] there were any classified documents that were [9] not classified. I'm asking if there were any [10] documents concerning the initiation of the [11] case as an Organized Crime Drug Enforcement [12] Tack Force case that were not classified

---

[13] documents.

[14] **MR. SMORODIN:** The problem is, is [15] that initiation of OCDETF cases are [16] classified, so I don't see how he could [17] answer that question and I would instruct him [18] not to answer.

[19] **MS. YESNER:** Are they always [20] classified?

[21] **MR. SMORODIN:** That's my [22] understanding.

---

Page 317

[1] **BY MS. YESNER:**

[2] **Q:** I'm not talking about just the [3] form, but any documents concerning the [4] initiation of the case. Are there any [5] documents that would relate to that [6] subject area that would not be classified?

[7] **MR. SMORODIN:** Like an indictment?

[8] I object to the question as confusing.

[9] **BY MS. YESNER:**

[10] **Q:** I don't know what goes into the [11] opening of an OCDETF case. I understand that [12] there's an investigation initiation form that [13] is supported by a number of materials behind [14] it, but — I would also like to refer you, [15] counsel, to the last page of this document, [16] which is the transmittal that came with the [17] document from Bonnie Gay.

[18] **MR. SMORODIN:** Which indicates that [19] the material is referred by the FBI and then [20] released in part by the Department of [21] Justice.

[22] **MS. YESNER:** I don't know if that

---

Page 318

[1] resolved your concern about where it came [2] from.

[3] **MR. SMORODIN:** No, I understand [4] that. I understand that.

[5] (Witness conferred with counsel)

[6] **MR. SMORODIN:** I think [7] Mr. Downing's concern is not on what [8] authority this document was disclosed but [9] whether or not he has authority to discuss [10] this document in any more sense or to discuss [11] other documents that may or may not exist and [12] while others may have the authority to make [13] that determination, Mr. Downing believes that [14] he does not and I cannot permit Mr. Downing [15] to risk violating an official classification [16] policy.

[17] **MS. YESNER:** I understand, but I [18] just needed to ask the questions because we [19] are trying to determine what documents were [20] in the case file. This document was not [21] described anywhere in any information we had [22] obtained either from the Vaughn Index or any

---

Page 319

[1] other description either from Mr.

---

Downing or [2] from Ms. Gay and so I'm trying to determine [3] whether there are documents that we don't [4] know about that were in the case file that [5] are no longer in the case file.

[6] **MR. SMORODIN:** My response to that [7] is that this document, Exhibit No. 13, my [8] understanding is that it was not in [9] Mr. Jefferson's case file but that it was [10] produced to you and that is a separate [11] question from the kinds of question that [12] Mr. Downing is being asked.

[13] **MS. YESNER:** Mr. Cooke testified [14] that there was a prior similar document and [15] I'm trying to determine whether that document [16] was in the case file and whether any other [17] documents were in the case file that have not [18] been identified.

[19] **MR. SMORODIN:** I don't represent [20] Mr. Cooke so I can't instruct him not to [21] answer questions, but I do represent [22] Mr. Downing and I'm instructing him, as

---

Page 320

[1] developed in this deposition.

[2] **MS. YESNER:** Well, I think I asked [3] the questions about whether there were any [4] other documents.

[5] **BY MS. YESNER:**

[6] **Q:** Let me just ask you this, one more [7] question. Are there any documents of which [8] you are aware that you did not describe in [9] your declaration as documents that were [10] purged from the case file?

[11] **A:** None that I'm aware of. I think [12] this summary was — it's a general summary of [13] the items that were purged from the file box. [14] This is — this is a general summary of the [15] items that were purged from the file boxes. [16] It is not a specific listing of every [17] document that was in the file.

[18] **Q:** Your description of the documents [19] does not include OCDETF-related documents, so [20] that's why my question is as to whether there [21] were documents in the file that were purged [22] that are not described in your declaration.

---

Page 321

[1] **A:** I don't know how I can answer that [2] question without indicating an existence or [3] nonexistence of a document which I don't know [4] whether I have the authority to tell you [5] exists or it does not exist.

[6] **Q:** I understand.

[7] **A:** So it — I think that's the basis [8] of the objection. If I could tell you — if [9] I had the authority to tell you, I would be [10] able to tell you what, if anything, was or is [11] in the case file. What I've indicated in my [12] declaration is what

was purged from the case [13] file.

[14] **Q:** Could not answer my questions about [15] whether you purged classified documents, so [16] we will leave this issue to be resolved, not [17] for you to worry about right now.

[18] **MR. SMORODIN:** Finished?

[19] **MS. YESNER:** We're finished.

[20] (Whereupon, at 7:00 p.m., the [21] deposition of JEFFREY S. DOWNING [22] was adjourned.)

WILLIE JEFFERSON  v.
JANET RENO et al

JEFFREY S. DOWNING
June 15, 1999

## 0

**03301** 7:11

## 1

**1** 44:22; 45:6, 17, 21; 111:6; 135:14; 165:19; 223:14
**10** 33:12; 39:1; 78:19; 102:17; 131:17; 136:20; 197:20, 22
**1040s** 184:17
**10th** 206:3
**11** 39:1; 105:7; 106:1; 148:15; 218:5; 277:8
**11th** 15:14, 21; 16:11, 16; 17:18; 19:20; 23:17; 24:7, 18; 95:4; 105:6; 133:4; 138:18; 140:5; 141:12; 143:17, 21; 157:10; 161:19; 206:15; 216:13; 299:2
**12** 33:12; 39:1; 78:19; 103:20; 104:8; 119:17; 127:8, 9; 137:13; 138:4; 210:12; 218:8, 11; 222:7; 247:18; 276:3; 280:20
**12/5/95** 150:20
**12th** 138:2; 139:13; 247:2; 248:4
**13** 226:17; 258:17, 19; 264:2, 6, 7; 265:7; 278:20, 21; 309:4, 5, 16; 310:13; 312:12, 15; 319:7
**13th** 87:21
**14** 141:9; 287:8
**15** 218:16; 247:4
**1503** 28:19
**15th** 9:17
**16** 161:6; 165:20; 180:8, 11; 181:15, 17, 21; 182:7, 9, 18; 183:3, 9, 12, 13, 14, 15; 184:2; 188:4; 192:7; 193:11; 195:12; 233:17; 234:6; 235:2, 12, 20; 272:17; 302:1, 4; 304:22
**16th** 165:14; 166:17, 19
**17** 156:22; 175:11; 176:14; 265:12; 267:3; 268:11; 269:8, 10
**17th** 136:15
**18** 28:18; 167:11; 169:2
**183582** 152:8
**18th** 204:11; 209:1
**19** 203:16, 20; 205:2, 9
**1979** 8:17
**1983** 8:19
**1985** 45:10
**1986** 8:22; 117:18; 118:6, 12
**1987** 9:17; 11:9; 61:21
**1989** 12:1; 87:20, 21

**1990** 17:8; 22:12
**1991** 46:12; 128:13; 206:7
**1992** 78:15; 129:13; 196:20
**1993** 135:20; 136:2; 142:15
**1994** 93:4; 135:14; 136:14, 15, 19, 20
**1995** 146:17, 21; 148:15; 150:8, 10; 153:21; 167:6; 308:12, 18; 309:6, 12; 311:14, 17
**1996** 137:13; 140:14; 148:6, 20; 153:22; 154:4, 18; 156:11, 12, 22; 165:20; 166:19
**1997** 105:7; 106:1; 137:6, 7; 138:1, 4; 142:22; 155:3; 165:8; 166:12; 167:2; 170:5; 171:6; 202:20; 203:7; 204:5; 209:1; 210:12; 219:17; 223:13, 14, 18; 226:16; 246:17; 247:1, 2, 3, 5, 17, 18, 22; 248:7, 10; 288:19
**1998** 9:21; 44:14; 61:22; 100:6; 102:17
**1999** 4:13; 218:16; 226:21; 270:13; 287:1
**1st** 136:14

## 2

**2** 46:5, 7; 50:20; 203:11, 12
**20** 269:8
**207** 49:4
**20th** 196:20
**22** 154:4; 257:11
**23** 136:2
**23rd** 9:21; 142:15; 200:16; 201:15, 16, 16; 202:8, 14; 203:4; 247:1, 17, 22
**24** 224:20
**25** 38:16
**26** 219:17; 226:16
**26th** 223:13
**27** 156:12
**2710.8A** 105:4
**28** 137:7; 203:7; 265:12; 268:11; 269:9, 10
**28CFR** 267:3
**28th** 204:12
**29** 167:6
**2:00** 144:19
**2:35** 145:2

## 3

**3** 76:9, 11; 100:6; 107:10; 156:16; 197:19
**3/10** 198:4

**30** 12:21; 26:11; 111:7; 165:8
**302s** 279:16, 20
**31** 46:12
**32** 127:3, 7; 273:8
**352** 7:10
**3582** 158:14, 19
**36** 219:20; 220:9; 224:6, 11, 20; 226:1; 232:7; 250:13; 251:21
**3rd** 136:18

## 4

**4** 76:18; 77:11; 78:3; 99:19, 21; 102:2; 272:20
**40** 15:1, 3, 8
**400** 199:3
**45** 26:11
**4:00** 209:18

## 5

**5** 101:15, 17; 102:13, 15; 150:10; 169:22; 203:11; 209:18
**55** 7:10

## 6

**6** 103:8, 14, 16, 19; 110:16; 137:6; 166:9; 204:5; 205:10; 211:15, 16; 272:20
**6(e** 179:8; 180:1
**6:00** 283:2
**6:30** 283:1
**6th** 166:12; 204:15

## 7

**7** 120:22; 121:15; 135:20; 156:14
**75** 131:16
**7:00** 321:20
**7:30** 282:22
**7th** 137:22; 205:22

## 8

**8** 48:15; 127:10; 165:3; 277:8; 278:20
**80** 131:16
**86** 9:2, 16
**87** 14:16; 18:18; 33:16; 39:1
**89** 89:18
**8th** 136:7

## 9

**9** 78:9; 79:1, 11, 12, 17; 117:18; 131:17; 188:14, 22; 189:10; 191:3
**91-299** 127:21
**91-300** 127:21
**91-301** 127:21; 284:5
**91301CRT17A** 157:13
**92** 128:19
**93** 102:7; 129:9; 143:11
**93-29988** 157:11
**94** 93:5; 102:7; 135:13; 136:13
**94-2766** 157:11
**95** 93:6; 145:18; 151:8
**96** 144:11; 205:20
**96-1284** 6:2
**97** 14:16; 33:17; 137:20; 143:10; 171:11; 201:7; 205:22; 220:4; 222:4; 228:4, 17; 229:1; 231:21; 232:4, 15
**98** 10:5
**99** 221:19; 222:8; 228:5
**9th** 118:12

## A

**A's** 72:13
**A-C-I-S-S** 287:12
**ab** 52:16
**ability** 74:2; 144:17
**able** 54:20; 55:5; 74:20; 75:14; 237:11; 294:6; 301:9; 304:1; 309:21; 310:1; 311:7; 321:10
**above** 115:1; 266:21
**Absolutely** 132:16, 16; 182:13; 185:19; 221:10; 232:9; 253:12; 290:2
**access** 41:17; 42:1; 43:20; 44:4; 144:5; 313:8
**accessing** 44:2; 267:10
**accident** 28:4
**accompanied** 51:7
**accomplish** 237:11
**accordance** 6:4; 268:11
**according** 75:15
**accurate** 35:17; 149:17, 20
**accurately** 232:11
**ACISS** 287:21, 22; 290:10; 292:14; 293:12; 307:19
**acknowledge** 270:2
**across** 268:20
**Act** 32:9; 33:22; 35:5, 10; 102:16, 19; 103:4, 4; 104:6, 7; 295:22; 296:2, 5, 6; 299:8
**Action** 6:1, 15; 145:15;

**171:20; 212:17; 306:3
**actions** 26:18
**active** 175:7
**actual** 102:5
**Actually** 10:6, 6; 33:12; 48:17; 74:20; 78:8, 19; 88:3, 4; 126:2; 129:13; 134:3; 142:13; 143:7; 158:3; 174:9; 204:2; 230:17; 256:9; 271:8; 284:10, 16; 293:6
**add** 217:22
**addition** 41:15; 52:3
**additional** 161:16
**address** 7:8, 10; 192:16; 211:15; 290:9
**addressed** 106:2; 211:15
**addressee** 126:5, 6
**adjourned** 321:22
**adjust** 66:4
**administration** 122:17
**administrative** 42:5; 46:13; 50:10; 52:1; 109:13; 124:19; 172:7; 214:22
**administrator** 64:19
**admitted** 275:3; 276:12
**advantage** 233:22
**advised** 22:1; 32:14; 36:17; 109:16; 140:3; 158:11
**advising** 108:1; 139:18
**affairs** 176:16; 177:3, 12, 21; 178:2, 8; 233:7
**affect** 122:12; 163:3
**affected** 152:10; 308:18
**affecting** 41:3
**affidavit** 190:11, 16; 191:1; 192:19; 193:4
**Affidavits** 184:10, 18, 18; 185:3; 193:9, 13; 233:18; 235:16, 19
**affirmance** 24:7
**affirmation** 26:7; 56:5
**affirmed** 16:11, 16; 17:18; 24:14; 89:12, 16; 90:2; 137:12; 140:6, 12; 203:6, 17; 205:3
**AFTERNOONSESSION** 145:1
**Afterwards** 181:3; 238:15
**again** 19:13; 34:6; 59:1, 13; 62:15; 68:11; 70:8; 81:6; 85:5; 86:10; 100:7; 117:6; 119:12, 14; 143:9; 154:19; 160:2; 169:3, 12; 195:2; 196:17; 238:16, 22; 241:15; 242:4; 247:12; 248:21; 249:10; 254:6; 277:13; 303:2; 308:21
**against** 29:10; 54:12; 92:10
**agencies** 259:22
**agency** 42:4; 252:21

**agent** 254:10, 21

**agents** 254:15; 257:12

**ago** 134:8; 167:13; 210:1

**agreed** 5:13; 163:6

**agreement** 96:4; 141:14; 199:7

**agreements** 127:16; 304:19

**ahead** 34:8; 161:3; 179:4; 210:22; 223:15; 283:10

**Albuquerque** 201:13; 202:1

**alleged** 166:7

**allegedly** 177:5

**Allegheny** 8:18; 12:17

**allow** 197:13

**allowed** 43:20; 191:20

**allowing** 187:11

**almost** 141:9; 193:3; 204:20

**along** 96:21; 108:10, 11; 188:2; 191:1, 1

**alphabetized** 231:15

**alternative** 210:14; 211:6, 20

**although** 61:10; 116:18; 157:21; 158:17; 187:20; 209:9; 210:21

**always** 20:14; 26:16; 236:18; 299:3, 4, 5; 316:19

**ambiguity** 205:16

**Ambiguous** 28:1; 83:5; 84:5; 313:4

**amend** 247:21

**amount** 25:13; 298:7

**ancillary** 152:6

**and/or** 59:20; 66:16; 300:16

**Anderson** 117:21; 118:1

**Annex** 170:20; 296:22

**answered** 76:1; 200:22; 270:15; 307:3

**apologize** 191:11

**appeal** 20:1, 3; 21:14; 22:11; 26:1; 36:1, 13; 53:10; 88:9; 89:13; 90:19; 93:9, 14, 17, 20, 22; 95:13, 22; 96:19; 97:1, 6, 7, 8, 9, 17, 20; 98:3, 6, 8, 9, 12; 132:1, 15; 134:19, 21; 135:3; 136:2, 5, 10, 19; 137:1, 3, 8, 10, 15; 138:22; 140:3, 12; 141:4, 11, 21; 142:15; 143:1, 5, 5, 10, 13; 151:14; 157:10, 12; 161:18; 171:7; 206:5; 216:13; 225:5; 237:20, 21; 238:14, 17; 239:9, 18; 240:5, 7, 9, 11, 12, 13, 14, 22; 241:4, 22; 242:7; 249:7

**appealed** 13:12; 16:15; 17:18; 19:20; 20:19; 21:9, 12; 88:1, 10, 11; 90:16; 93:12; 134:5; 135:21; 136:17; 137:14; 156:21

**appeals** 15:10, 10, 13; 17:11, 13; 18:5, 20; 20:15; 21:4; 25:16, 18; 88:2; 89:10; 130:2; 131:19; 133:1, 17; 134:9, 14; 136:6, 8, 22; 139:10; 141:20; 142:11, 12; 153:6, 9, 13; 156:21; 157:5; 158:16, 19; 160:13; 216:16; 225:1, 7; 237:15; 239:1, 10; 241:6, 8; 246:2

**appear** 209:2

**appeared** 55:1; 184:20

**appears** 101:7; 110:20; 157:9; 211:8, 11

**appellant** 204:6

**appellate** 12:14, 22; 13:1, 5; 17:9, 14; 18:3, 7, 14, 21; 19:10, 11, 15, 16, 21; 20:2, 10, 12; 21:20; 22:2, 13; 23:14, 16; 24:5, 8; 25:4, 10; 63:2, 6; 87:14; 94:1, 15, 19; 95:1; 96:2, 9, 15, 16, 18; 97:4; 98:13, 15; 99:5, 16; 124:10; 132:5, 7, 11; 138:17, 19; 139:18; 207:10, 15; 208:22; 225:6; 240:19; 241:1; 244:9; 245:4; 247:6

**Appendix** 45:21; 282:3

**application** 192:14; 194:7, 8

**applications** 187:1, 16; 188:2; 193:7

**applied** 310:10

**apprehended** 151:22

**approached** 219:3

**appropriate** 35:10; 269:20

**approval** 52:19; 176:14, 17; 177:1, 19

**approved** 176:20

**approximate** 15:9

**approximately** 9:3; 12:21; 15:8; 19:3

**April** 44:13; 105:6, 7; 106:1; 117:18; 118:12; 128:19, 19; 155:3; 164:20; 165:8; 167:2; 170:5; 171:6; 200:15; 201:7, 15, 16; 202:8, 10, 14, 20; 203:4; 206:3; 220:4; 222:4, 16; 227:17; 231:21; 242:16; 247:1, 17, 22; 248:12, 13

**Archives** 111:7

**area** 52:1; 170:22; 255:5, 10, 13; 259:13; 294:2; 296:20, 21; 298:12; 299:7, 8, 17, 19, 19; 317:6

**areas** 298:16; 300:5

**Arensburg** 9:4

**argued** 142:20; 143:8

**argument** 141:16; 211:13

**arise** 80:20

**arose** 80:3

**around** 17:8; 44:13; 65:21; 73:11; 80:19; 93:5; 106:8, 17; 128:19; 139:11; 155:3; 223:17; 239:2; 242:9; 245:9; 250:14; 256:19

**arraignment** 53:8; 55:2

**arrangements** 266:12

**arson** 177:11; 233:9, 12

**art's** 8:20

**artful** 223:4

**artfully** 167:12

**aside** 160:7

**asserted** 260:22

**assigned** 10:21; 12:2, 6, 19; 20:1, 12; 39:17; 49:14, 18; 96:11; 130:11, 17

**assist** 43:5; 130:12, 17; 131:11; 308:2

**assistance** 131:6; 173:7

**Assistant** 4:9; 11:13; 13:2; 19:3; 41:3; 49:18; 60:18, 18; 61:14; 62:7; 102:6; 106:3, 9; 111:15; 112:17; 114:9; 122:13; 123:4, 8; 124:6, 7; 125:7, 9; 157:1; 312:4

**assistants** 18:22; 19:8; 39:2; 51:21; 61:3; 102:9

**assume** 13:22; 23:8; 288:4, 13; 289:18

**assumed** 176:8; 220:19; 221:13, 14; 291:19

**assumes** 110:8; 235:4; 276:17

**assuming** 21:18; 23:13; 56:11; 77:3, 11

**assumption** 20:16

**assured** 4:20

**attached** 51:7; 102:17; 148:5, 17

**attain** 42:2

**attempt** 225:21

**attend** 7:5; 141:18

**attention** 111:10; 114:21; 156:14

**Attorney** 4:10; 6:19; 11:9, 12; 13:2; 17:17; 19:22; 20:2, 7, 13; 22:3, 6, 15; 23:18; 24:5, 9; 25:4, 10; 26:17; 31:10, 12, 13; 39:19; 46:11; 49:15; 52:9, 18; 57:14; 59:3; 60:4, 7, 8; 74:1; 93:13; 94:2; 95:1, 2; 96:3, 9, 11, 21; 99:1, 10; 107:22; 109:11, 16; 112:11; 114:10; 118:2, 7, 9, 12, 20; 123:14, 19; 124:1; 125:8, 9, 10; 130:10, 16; 157:1; 166:1; 197:13; 234:15; 254:11; 259:12; 281:1; 304:16; 310:15; 312:9

**attorney's** 241:19

**attorney/client** 195:22; 261:2; 303:10

**Attorneys** 9:11, 14, 19; 10:1, 17; 11:2, 14; 12:8, 17; 13:8, 11; 18:4, 6, 7; 19:4, 11; 23:5, 16; 26:20; 32:11; 33:20; 37:6; 38:4, 5; 39:6; 40:3, 12; 41:3, 4, 18; 42:2; 45:12, 14; 46:20; 49:19; 57:20; 61:21; 62:6; 66:22; 76:17, 19, 21; 77:7, 13; 78:6, 7, 13, 14, 18; 79:9, 22; 82:7; 83:10; 84:17; 85:1, 3, 10, 13, 14, 18, 21; 92:9; 95:11, 13; 100:5, 17, 19; 101:2, 4, 7, 10; 102:1, 3, 6, 7, 8; 106:3, 4, 9; 109:19; 111:16; 116:15; 122:3, 5, 13, 14, 16, 18; 123:5; 124:4; 142:18; 208:18; 209:11; 216:21; 255:6; 262:21; 263:1, 3, 11; 265:21; 268:20; 273:19; 274:2; 275:5, 19; 280:5, 14; 286:4; 292:12; 296:1; 300:18; 301:18; 306:15, 20; 307:2, 15; 312:4

**August** 136:2; 143:11

**authority** 262:3, 6; 269:19; 270:5; 311:2, 4; 318:8, 9, 12; 321:4, 9

**authorization** 176:15, 17; 177:1, 20

**authorize** 146:9

**automobile** 28:4

**available** 4:12; 5:14; 30:3; 77:8; 197:12; 199:17, 20, 22; 200:2

**average** 59:7, 9

**aware** 35:2; 36:12; 85:13; 105:17; 112:9, 17; 123:8; 261:19; 299:15; 308:11, 17; 309:11; 311:12, 15; 320:8, 11

**away** 255:3

**Azell** 89:1

---

## B

**B** 54:8, 11, 12, 22; 59:13, 17; 61:7

**bachelor** 8:20

**back** 21:16; 24:7; 25:5; 50:5; 66:15; 70:8; 80:2; 96:20; 98:17; 99:4, 8; 106:20; 117:13, 15; 129:13; 150:15; 161:20; 195:2; 205:2; 219:9; 220:3; 228:22; 232:6; 240:3; 256:8, 14; 271:13; 290:21; 300:22; 301:6, 20; 313:22

**back-to-back** 257:9

**background** 8:16

**banc** 24:19, 22; 243:21

**banker's** 51:16; 59:8; 280:20

**barred** 262:5

**base** 53:4; 54:19; 55:19

**based** 47:14; 117:4, 6; 152:8; 172:7; 220:19; 278:9; 279:11; 301:13; 304:7

**basically** 44:18; 116:20; 130:12; 163:2; 164:16; 252:7; 254:22

**basis** 85:9; 133:12; 159:8, 20; 169:16; 236:21; 243:3; 321:7

**became** 130:9; 180:7

**become** 112:17; 127:22

**began** 32:11; 33:19; 34:13; 37:5; 40:2, 17; 63:12; 78:6; 129:9; 135:9, 16, 22; 136:12, 14; 306:5

**begin** 4:7; 5:2; 142:9; 143:17; 295:19

**beginning** 60:12, 20; 129:5

**begins** 156:15, 16

**behind** 157:7; 158:4; 170:20; 297:1; 317:13

**belief** 102:4

**believes** 262:10; 318:13

**Belinda** 120:18; 201:10; 202:19; 224:8; 225:3; 239:3, 12, 17; 240:2, 3; 246:12; 247:8; 248:7; 249:5, 9, 10

**belong** 305:17

**ben** 213:5

**Benjamin** 226:14; 271:12

**best** 62:8; 94:8, 16; 200:12; 201:8; 207:1; 215:19; 241:9, 15; 242:4; 247:19; 274:22; 281:13; 294:1

**better** 168:13; 234:12

**beyond** 4:15; 5:16; 224:2; 266:22; 268:18

**big** 42:22; 59:2; 73:8; 77:1; 86:13

**bigger** 253:18

**binder** 103:18, 18, 21; 104:8, 20

**binders** 73:8; 76:22; 78:20; 256:10; 289:8

**bit** 133:5; 172:7; 225:14; 264:13

**blessing** 199:6

**blue** 52:6; 54:9

**Bobby** 92:11

**body** 293:20

**bond** 176:5

**Bonnie** 8:5; 148:5, 18; 153:21; 154:3, 9, 22; 155:7, 21; 160:6; 163:12, 22; 164:9; 166:1; 173:8; 174:2; 176:3; 200:18; 214:19; 215:5; 219:2, 8; 220:12; 239:20, 20; 249:3, 9; 270:21; 271:1; 307:18; 317:17

**book** 78:9; 104:14, 16,

WILLIE JEFFERSON  v.
JANET RENO et al

JEFFREY S. DOWNING
June 15, 1999

17, 19
**books** 78:12
**Boseker** 173:17, 18;
174:16
**boss** 123:22
**both** 67:14; 73:17;
151:13; 234:17
**bottom** 148:21; 149:7;
156:15; 198:3; 205:9
**Boucher** 176:6; 224:9;
308:1
**box** 51:8, 16, 18, 18; 59:9;
114:16; 115:1, 5; 147:22;
194:14; 231:14, 18; 250:3;
255:19; 257:8, 8, 15;
258:11; 276:13, 16, 18, 21;
281:14, 15, 21; 320:13
**boxes** 50:14; 170:8, 12,
17; 171:1; 175:13, 15, 18;
176:12; 183:14; 184:5;
186:9; 201:4; 219:20;
220:10, 14, 18; 221:2, 5, 8;
224:6, 11, 20; 225:8;
226:1, 1, 19; 227:4; 229:3,
6, 14, 15, 18; 230:15, 19;
232:7, 12; 236:22; 237:4,
7, 13, 14, 14, 18, 19, 21;
238:12, 13, 16, 22; 239:14,
22; 242:3; 250:4, 13;
251:16, 21; 254:16, 22;
255:2, 9, 17, 19, 19, 20;
256:16, 21; 257:5, 7;
258:2, 8, 10; 276:3, 22;
280:20; 281:18; 282:1;
297:16, 19; 298:3, 7, 10,
22; 302:11; 304:1; 305:14;
320:15
**Brady** 161:10
**branch** 52:10
**Brazel** 135:4
**Brazil** 135:4
**break** 6:22; 7:1; 87:7
**brief** 94:10, 10, 17;
221:12; 290:16; 291:2
**briefing** 142:16, 18
**briefly** 8:15
**briefs** 17:15; 19:10, 10;
94:7, 20; 132:19
**bring** 156:13
**bringing** 35:15; 176:19;
250:9
**broad** 267:14
**broke** 145:11
**brought** 21:5; 35:14;
56:10; 145:19; 146:5;
191:21; 192:22; 293:4
**Brown** 120:18; 201:11;
202:19; 225:3; 246:12;
247:8; 248:7
**building** 170:20, 21;
177:6; 296:20; 297:1, 1;
298:17, 19, 22
**bulky** 73:2
**Burgess** 216:11, 22;
217:4; 244:19; 245:18, 21;
246:6

**burned** 177:10
**busiest** 53:17; 61:18
**business** 7:9
**busy** 53:16; 65:10

## C

**C** 231:18
**cabinet** 250:21
**cabinets** 69:16
**calendar** 58:17, 18;
66:12
**call** 24:13; 25:9; 113:7;
117:8; 173:21; 198:14, 15;
199:12, 16; 221:12; 242:4;
259:21; 271:11; 284:2;
293:11
**called** 4:4; 48:12; 92:20;
100:18; 105:3; 113:4;
146:7; 154:10; 155:3;
163:22; 164:9; 166:4;
168:7; 219:16; 223:17;
231:1, 2, 3; 239:20, 20;
249:3, 10; 260:8; 282:3;
290:21; 298:12
**caller** 194:14
**Calloway** 92:11
**calls** 185:10; 194:4, 17,
19; 198:18, 20; 199:11;
274:17; 277:5
**came** 20:3; 22:2; 30:22;
33:8; 66:8; 78:17; 86:15;
88:3; 115:18; 116:10;
133:14; 140:9; 204:19;
219:7; 252:19; 254:20;
256:22; 262:22; 263:7;
264:15; 306:16; 308:1;
317:16; 318:1
**Can** 8:15; 14:16; 15:9;
16:2; 18:17; 25:1, 13; 30:2;
32:12; 43:14; 48:14;
51:12; 62:9; 67:20; 76:3;
81:19, 20; 83:4; 84:9, 10,
12; 91:3, 20, 20; 105:10,
13; 107:2; 115:18; 116:9,
12; 128:16, 16; 135:13;
138:3; 143:2; 146:19;
150:2, 2, 15; 157:21;
159:14; 165:9; 179:4;
180:20; 188:9, 10; 193:5;
198:13; 200:22; 204:2;
209:19; 227:3; 232:16;
236:5; 237:18; 238:12;
239:17; 241:4; 244:13;
247:11, 13; 249:19; 255:2;
257:15; 260:6; 262:14;
264:17; 266:2, 4; 270:15;
273:19; 275:18; 276:5, 15;
280:17; 290:8, 8; 302:8;
304:10, 10; 306:7, 11, 19;
307:4, 5; 310:5; 312:9, 10;
321:1
**capability** 42:1; 44:4
**capital** 120:2; 130:9, 13
**caption** 166:11; 171:2;
172:11; 174:19; 175:4, 9;
212:2, 15, 16; 215:14

**captioned** 211:3; 212:22;
221:8
**captions** 212:11
**career** 12:13
**carried** 310:8; 314:9
**carries** 309:19; 312:17
**carry** 256:19
**cart** 73:10
**case** 16:13; 19:15; 20:1,
11, 18; 23:17; 24:1; 25:11;
27:2, 6, 8, 9, 14, 20; 28:13,
16, 22; 29:1, 16; 32:16, 22;
33:9, 11; 34:2, 15, 19;
35:17, 22; 36:4, 6, 19, 20;
40:20; 42:8, 9, 10, 11, 16,
22; 43:1; 47:13, 15, 18;
48:9, 10; 49:11; 51:8, 9,
10; 52:5, 6, 16, 17, 22;
53:8, 14, 21; 54:2, 17, 17;
55:9, 16, 21; 56:7; 59:7, 7,
9; 60:5; 61:1; 64:3, 4;
67:15, 18; 68:3, 3, 5, 8, 16,
19, 22, 22; 69:7, 18; 73:5;
74:5; 80:4, 6, 9; 81:17;
82:9; 84:1, 7; 87:15, 19,
22; 88:1, 4, 8; 89:20, 21;
90:5, 13, 21, 22; 92:2, 7,
12, 13, 15, 17, 18, 19;
93:1, 8, 17; 94:13; 95:4, 8,
19, 22; 96:1, 10, 14, 20;
97:3, 12, 13; 98:4, 10, 18,
19, 20; 99:6, 15; 107:16,
17, 19; 108:2, 3, 6, 14, 15,
17; 109:8, 9, 14, 15, 22;
110:3, 11, 12, 19; 111:1, 8,
20; 112:4, 9, 18, 20, 20;
113:4, 5, 8, 10, 11, 13, 17,
21; 114:17, 19; 117:9;
118:21; 120:17; 121:7;
125:14; 126:16, 21; 127:5,
22; 128:1, 3; 129:8; 130:9,
9, 11, 19, 21; 131:3, 6, 8,
22; 134:11, 16; 135:9;
137:4, 11, 14; 138:10, 12;
139:6; 141:3, 3, 7, 12, 21;
142:19, 20; 143:1, 7;
148:19; 150:9; 151:11, 18,
18; 154:16; 157:13; 160:9;
161:20; 162:2; 163:3;
166:10; 169:20; 170:7;
171:2, 7; 172:2, 4; 175:8;
176:22; 183:2; 184:3;
190:12; 191:12, 14, 20;
192:13, 15, 21, 22; 196:12,
22; 200:3; 202:9, 15, 21;
203:3, 6, 14; 204:21;
206:7, 11; 212:22; 213:14;
214:5, 8, 11, 12; 215:12,
14; 217:14; 219:13, 15, 16;
223:10; 226:19; 229:12;
231:3; 232:19; 237:16;
241:20; 243:14, 15, 18;
244:19; 245:18; 248:9, 17;
249:1, 13, 20; 250:3, 4, 17,
22; 251:3, 5; 252:3, 6, 14;
253:10, 13, 15; 254:12, 13,
15, 18, 19, 21, 21; 255:1,
2, 4; 257:12; 259:16, 19;
260:1, 6, 8; 261:10, 14, 17,
20; 263:10, 19; 264:3;

265:7, 11, 15, 16; 266:9,
13, 14; 268:14, 19; 271:2,
4, 7; 272:13; 273:9;
278:14; 279:17; 282:7;
284:5, 8, 9; 286:22; 289:4,
5, 6; 296:9; 300:20, 22;
306:4; 312:21; 313:12;
314:16, 22; 315:5, 10, 11,
12, 21, 21, 22; 316:11, 12;
317:4, 11; 318:20; 319:4,
5, 9, 16, 17; 320:10;
321:11, 12
**case-specific** 124:20
**caseload** 66:4
**cases** 11:16; 12:19;
13:11, 14, 16, 17, 18; 14:1,
17; 15:2, 9, 20; 16:7, 11,
17, 22; 17:5, 17; 18:20;
19:8, 20, 21; 21:19; 27:13, 15;
28:11; 32:13; 43:5; 49:16,
17, 22; 50:1; 57:19, 21;
62:2, 7; 71:21; 74:6; 88:9,
11; 89:9, 10, 12; 90:2;
99:3; 107:20; 112:22;
113:1; 127:21; 128:2, 12;
132:15; 153:13; 206:5;
234:17; 249:21; 250:18,
19; 253:7; 255:8, 9;
308:20; 316:15
**catch** 282:18
**categorical** 171:14
**categories** 161:18;
169:17; 175:16; 197:5, 6;
226:17, 20; 227:10, 15;
228:16; 230:7; 254:4
**category** 52:11, 12;
147:8; 175:19; 186:10, 14;
227:7, 7
**cellular** 187:4; 195:8
**Center** 46:22; 47:2, 5;
51:6, 15; 237:10
**Centers** 46:15
**central** 195:4
**cert** 17:1; 23:1; 24:18, 22;
25:8; 138:2, 4; 139:14, 21;
140:18; 244:3, 16
**certain** 17:7; 37:12, 16;
106:21; 123:6; 124:12;
164:12; 169:3; 269:17;
306:16
**certainly** 28:8; 36:8;
57:8; 108:8, 8; 156:4;
167:22; 175:8; 206:11;
209:12; 264:16; 307:4
**certification** 106:14, 18;
107:7
**certified** 12:19
**certiorari** 16:19; 17:21;
137:18; 205:21; 206:17,
21; 208:7, 11; 209:9;
217:9, 20; 248:3
**cetera** 225:9
**CFR** 265:12; 267:22;
268:3, 11; 269:8, 9, 10
**chain** 123:14; 124:14;
125:11
**challenges** 152:7

**chance** 242:3
**change** 32:7; 38:17
**changed** 308:12
**Chapter** 76:18; 77:11, 12;
78:3, 9; 79:1, 11, 12, 17;
82:18; 103:20; 104:8;
116:1
**chapters** 79:19
**characterization** 123:2
**characterize** 258:3
**charge** 52:7, 8; 176:19;
180:4
**chart** 107:3
**check** 111:5, 8; 114:16;
115:8, 21; 142:6; 150:5;
207:12, 14, 16, 18; 244:11,
18
**checked** 111:11; 140:20;
144:13; 148:1; 207:17;
225:3; 247:5; 264:18
**checking** 133:11; 142:9;
143:3, 4, 17, 22; 144:8;
204:19; 238:22
**chief** 11:4, 4; 20:10;
58:13; 81:16; 107:22;
108:12; 109:10; 112:16,
16; 124:7, 8, 9, 10; 125:3,
5, 6; 126:1; 238:6
**chief's** 20:11; 236:20
**chose** 57:14; 59:3;
127:17; 306:1
**chronological** 58:5, 20;
73:17; 75:20
**CI** 294:20
**Cindy** 10:13; 65:7, 12;
238:11, 13, 14, 20; 250:12;
251:11; 253:19, 22; 286:8
**Circuit** 15:14, 16, 17, 21;
16:12, 16; 17:19; 19:20;
21:10, 17; 23:17; 24:8, 18;
26:14; 89:15; 94:22; 95:4;
98:15; 133:4; 138:18;
140:6; 141:13; 143:17, 21;
157:10; 161:19; 216:14
**Circuit's** 206:15
**circumstances** 210:2;
236:13
**Cls** 294:18
**Civil** 6:1, 5, 15; 10:19;
26:17; 27:10; 32:2; 38:9;
39:11, 18; 124:8; 145:15;
214:9; 299:22; 300:7;
306:3
**clarify** 18:17; 67:20;
68:21
**classification** 267:22;
308:14; 311:19; 318:15
**classified** 265:12, 21;
268:10; 308:19; 309:9;
311:13, 17; 312:16; 313:2,
5, 7; 314:6, 9, 22; 315:17;
316:1, 5, 5, 8, 9, 12, 20;
317:6; 321:15
**clean** 242:16; 296:19
**cleaned** 242:3
**cleaning** 285:10

cleanup 285:14

clear 269:3

clearance 267:10, 17; 312:3

clearances 312:2

cleared 235:8

clearinghouse 38:2

clearly 212:16

clerk's 56:20

clicked 215:2

client 286:11

close 47:18; 48:9; 50:8; 80:4; 81:20; 82:9; 99:4; 110:19; 111:1, 8; 113:20; 117:9; 139:19; 140:10; 252:5; 253:20; 285:22; 286:1; 305:15; 308:5

closed 40:20; 47:7, 8, 13, 17; 49:11; 50:3; 80:9; 81:13, 17; 82:2, 4, 16; 85:19; 86:2; 87:3; 99:7; 117:1, 7; 119:21; 250:9; 252:4; 253:14; 255:3; 304:14, 17; 305:4, 5, 7, 9; 306:18

closer 33:12; 150:3

closing 47:9, 19; 50:12; 62:20, 22; 63:8; 80:6, 22; 81:2, 4, 5; 83:13; 86:17; 108:19, 22; 111:2, 15; 115:8, 20; 117:20; 120:12; 252:3; 253:18; 254:6; 285:16; 286:7; 306:14

closure 117:8

clumsy 18:11

co-counsel 6:13; 129:22; 130:6, 20, 22; 199:9

co-defendant 161:11; 218:3

co-defendants 74:7; 128:10; 129:5, 9, 17; 130:1, 3; 132:4, 15; 133:16, 21; 134:2, 17, 20; 135:6, 19, 21; 136:8, 21; 137:3, 5, 8, 15; 139:5; 141:2; 150:9; 151:10, 13; 152:9; 156:17, 20; 166:10; 184:19; 187:6; 205:3, 14; 216:10; 217:8; 231:2, 13; 245:3, 22; 246:4; 287:20

cocaine 177:8

Cole 10:13; 114:15; 286:8

College 8:18

colored 48:15; 49:10; 110:22; 285:15

Columbia 6:3; 172:21

comfort 309:22

comfortable 58:13; 250:6

coming 6:9; 139:7

command 125:11

commitment 96:7

common 285:13

commonly 194:6

communications 41:16

compare 282:7, 13

compared 77:16; 249:21

comparing 23:14

Compel 74:11; 186:22; 188:6; 189:7; 236:1

competent 82:14; 250:15

complete 199:8; 241:2, 8; 245:16; 288:14; 293:15; 306:22

complex 43:2; 131:11

complexity 130:13

component 122:9

components 122:11; 123:1

compulsion 31:3

computer 41:6, 10; 43:10, 13, 20; 44:9, 11, 14; 54:3, 10, 15; 287:11, 14; 288:1, 3, 8, 9, 12; 289:11, 14

computers 41:9, 12, 16, 22; 42:8, 21; 43:4; 144:9

concept 28:6

concern 169:1; 217:13; 234:11; 268:1; 298:9; 299:5; 318:1, 7

concerned 36:3, 8, 9; 75:13; 155:21; 192:1; 233:21; 235:21; 245:5; 260:16

concerning 36:18; 46:13; 83:11; 102:16; 103:3; 138:15, 21; 154:15; 167:4; 189:13; 190:5; 202:21; 213:11; 214:4; 315:20; 316:10; 317:3

conclude 136:12

concluded 96:19; 99:17; 140:4; 151:15; 225:2

conclusion 42:16; 107:16; 132:3; 248:2; 265:19; 275:11, 11

Concord 7:11

condense 256:11

confer 7:4, 16

conference 201:22

conferences 48:22

conferred 184:1; 260:10; 261:21; 313:15; 318:5

confidential 162:19; 179:2, 8; 289:21; 294:17

confidentiality 178:20; 179:18; 266:16

confirm 153:7; 156:7

confirmed 153:8, 12

confused 22:3

confusing 316:4; 317:8

connection 53:20; 91:15; 120:12; 126:15; 132:18; 198:17

consider 98:4; 123:22; 240:11

considered 98:10; 107:18; 108:16; 110:12; 112:10; 306:20

consistent 119:18; 169:1

consolidated 127:18; 128:3; 134:19; 136:5, 9, 9, 22; 189:9; 216:16

constantly 238:7

constitutional 27:12

construed 260:20

consult 132:17

consulted 94:1, 14

contact 154:22; 297:10

Contacts 77:2; 104:1, 7

contain 120:8

contained 50:14; 83:10; 118:22; 119:1, 14; 169:19; 170:12

contains 119:10

contempt 31:3, 6

content 220:18; 290:3; 294:14

contents 170:6, 16; 175:13; 220:4, 14; 226:18; 227:4; 230:10; 234:16; 263:9; 294:9

context 29:15

continuance 92:22

continue 206:4

CONTINUED 145:9

control 62:13; 266:8; 268:13; 296:15

controls 266:14

conundrum 313:17

conversation 115:4; 153:2, 20; 154:2, 9, 12; 155:19; 159:6, 14, 16; 163:10, 11, 11, 19, 22; 164:4, 5; 201:10, 17; 202:6, 19; 240:4; 241:7; 246:11; 260:15; 290:16

conversations 155:7, 14; 237:17; 246:13; 248:6; 274:6, 14; 275:21; 276:8

convicted 14:20; 21:12; 31:22; 134:3; 136:3; 152:3

conviction 14:18; 15:7; 16:15; 26:1; 137:12; 140:6; 153:10; 203:7, 17; 205:3, 11, 19

convictions 21:9; 156:21

Cooke 8:3; 237:22; 238:1; 241:16, 18; 242:13; 255:5; 256:20; 261:7; 263:17; 271:12; 279:7; 291:12; 294:22; 295:13; 319:13, 20

coordinate 142:17

copied 106:7; 182:8; 199:19

copies 24:12; 67:9; 70:16; 72:1; 96:6, 17; 183:9, 15; 184:4; 187:15; 197:14; 230:4; 233:13; 234:19; 254:1; 272:7, 9; 274:9, 20; 275:1, 6, 7; 277:10; 278:3; 279:8; 298:2, 2; 300:18; 304:17; 306:20

copy 22:4; 41:8; 45:21; 48:1, 4; 57:8, 11; 59:21; 63:13; 66:1; 67:14; 70:22; 71:14; 72:10, 12; 73:12; 75:4, 18, 19; 76:16; 105:2; 106:10; 139:9; 144:3; 165:6; 178:6; 183:4, 6, 11; 184:6; 198:19; 199:1, 8, 22; 200:8, 9; 209:10, 12; 211:18; 230:18, 21; 231:13; 271:14; 273:3; 276:1; 277:15; 286:22; 287:1, 3; 288:10; 289:17, 18; 292:15, 22; 293:4; 301:8, 10, 16; 302:3, 5; 303:18, 21; 307:5, 6

copy's 4:13, 15; 5:10, 11; 199:6; 286:22; 306:3

court-appointed 184:21

courtesy 22:7; 24:12

courts 245:4

cover 100:14; 103:18; 104:4; 312:17

covered 31:16; 82:18; 180:1; 302:19

covers 79:2

crack 177:7

create 18:14

created 12:5; 18:3; 19:21; 21:20; 53:20; 66:7; 75:2

creating 271:20

creation 264:11

Crime 11:5, 8, 15; 28:4; 30:19, 19; 176:20; 259:11; 315:11, 21; 316:11

criminal 4:18; 10:18, 20; 11:3; 27:6, 10, 14; 30:4, 7, 9, 19; 32:5; 36:10, 16; 38:9, 10, 15; 39:2, 10, 18, 21; 42:9, 11; 54:8; 57:9, 12; 58:13; 78:10, 10; 79:2; 81:16; 95:18; 96:10, 12, 14, 20, 21; 98:19, 20; 99:15, 15; 108:1; 109:10; 112:16; 124:7, 9; 125:6, 6; 126:2, 15, 21; 146:2; 160:21; 161:7, 11; 162:2; 163:5; 169:8; 191:18; 192:7; 214:4, 8, 11, 12; 236:20; 240:13; 262:7; 265:2, 20; 266:13, 18, 20; 268:17, 19; 269:1, 6; 299:20, 21; 300:6; 308:20

criteria 111:20; 112:9, 13

cross 231:20

Culver 272:12; 283:15, 19; 284:2, 6, 9, 10

Culver's 231:16, 17, 19

currently 10:3

custodian 30:11; 179:21

custody 84:22; 280:13; 306:14

D

D 107:10; 176:13, 13

D.C 171:18

daily 85:9

data 53:4; 54:19; 55:18

date 54:21; 55:1; 78:16; 100:5; 132:9; 138:2; 139:13, 16; 150:18, 19; 223:18; 307:12

**dated** 45:10; 102:17; 105:5, 7; 106:1; 117:17; 148:15, 19; 165:20
**dates** 5:13; 138:15, 21, 22
**dawned** 240:10
**day** 9:20, 22; 10:3
**days** 14:12; 22:12; 26:3, 4, 11; 136:2, 3; 139:7
**DEA** 62:2
**DEA-6s** 279:9
**deal** 32:4; 49:21; 71:9; 122:11; 131:2; 262:16
**dealing** 72:7
**dealings** 37:14
**deals** 78:10
**death** 128:21; 129:14; 177:2
**death-penalty** 128:1; 252:16
**December** 11:9; 150:10; 151:8; 153:21; 167:6
**decide** 141:21; 142:3
**decided** 21:17; 143:5
**decision** 26:14; 56:11; 95:2; 98:14; 127:13; 128:6; 133:1; 137:10; 140:11; 143:16; 144:1; 218:22; 258:14
**decisions** 258:15
**declaration** 138:9, 14; 146:20; 148:5, 17, 19; 154:11; 155:4; 156:3, 11, 15; 157:20; 163:12, 14, 20; 164:2, 8, 11, 12, 17, 19, 20; 165:7, 15, 20; 166:5, 9, 21; 167:3; 168:8, 10; 170:1, 5; 171:10; 172:12, 18; 173:2; 174:1, 18; 175:12; 190:15; 192:2; 200:14, 19; 201:2, 7, 9; 202:20; 203:5; 210:3; 211:16; 212:1, 20, 21; 213:18; 215:16; 218:15, 19, 22; 219:1, 4, 7, 11, 18; 221:11, 17, 21; 222:3, 7, 10, 13, 20, 21; 223:7, 13, 19; 224:3; 225:9; 226:5, 17, 21; 227:1, 18, 19; 228:5, 5, 8, 10, 13, 17; 229:1, 2; 231:21; 232:4; 236:9; 246:18, 21, 22; 247:4; 248:1, 12, 13; 270:11, 12, 19; 271:6; 281:4, 11, 12, 12, 22; 284:1; 301:2; 320:9, 22; 321:12
**declarations** 138:11; 227:5; 283:20
**declassified** 309:12, 16, 18; 311:14, 17; 312:7
**declassify** 309:7
**declined** 54:12, 22
**defendant** 16:15, 18; 22:14; 26:1; 34:17; 54:20, 22; 55:6, 6; 57:10; 66:18; 72:13; 74:22; 81:18; 88:6,

18, 19; 89:6, 7; 97:22; 135:3; 161:5, 12; 162:2; 163:6; 192:2; 198:11; 199:2; 233:14; 284:5
**defendant's** 55:8; 56:16; 68:10, 13; 190:17; 192:9
**defendants** 15:5; 17:19; 21:5, 11; 52:7; 54:4; 68:12; 87:22; 88:5, 7, 10, 13, 14, 16, 17; 89:11; 90:15; 92:10; 93:8; 97:16; 127:2, 3, 5, 7, 8, 9, 10, 15, 17; 128:2, 7; 129:21; 147:17; 157:14, 15; 165:22; 166:2; 191:17; 205:14; 211:5; 233:20; 252:14; 273:9, 10; 283:11
**defense** 183:3; 199:7, 9, 13, 17; 275:2
**definitely** 106:12; 233:4
**degree** 8:20
**deliberative** 261:3
**denial** 167:6
**denied** 25:9; 137:20; 138:3, 4; 139:14; 168:9; 190:5, 10; 203:19; 204:11; 241:10, 12; 242:1, 14, 21; 243:5, 12
**deny** 159:18, 20; 169:16
**Department** 41:2, 17; 103:3; 105:18; 106:20; 122:9; 176:21; 178:4; 198:16; 226:13; 257:1; 259:10; 279:5; 286:4; 287:11; 291:17; 292:13; 294:17; 295:2, 6, 11; 317:20
**depend** 28:17, 21; 59:1, 2, 3; 98:22; 99:1, 2; 124:16; 254:7, 8
**Depending** 60:13; 68:11; 71:11; 87:4
**depends** 278:22
**deposed** 8:13
**deposition** 4:8; 5:2, 5, 22; 6:17, 21; 7:16; 8:2, 10; 45:5; 46:6; 50:20; 76:10; 99:20; 101:16; 102:1; 103:7, 14, 19; 120:21; 121:15; 165:2; 188:13; 189:9; 197:19, 20, 21; 218:4, 10; 222:6; 258:18; 264:2; 287:7; 320:1; 321:21
**deputy** 11:3; 124:2, 9
**Dequesne** 8:21
**describe** 62:10; 122:8; 170:6; 220:4; 320:8
**described** 40:9; 189:8; 226:18, 21; 280:4; 281:3; 301:15; 302:21; 303:13, 15; 304:7; 318:21; 320:22
**describing** 49:7; 186:9; 300:16
**description** 52:14; 171:15; 175:12; 176:9; 178:11; 180:9; 220:7, 8, 9;

227:3; 228:1, 16; 234:21; 263:4; 291:2; 302:16; 319:1; 320:18
**designated** 11:5, 7, 14; 259:19
**desk** 41:7; 44:16; 50:5; 66:11; 144:14
**destroyed** 28:14; 30:16; 86:4; 224:20, 22
**destroying** 29:11
**destruction** 30:4
**detail** 227:22; 294:5
**detailed** 10:8; 176:8; 224:1; 227:2
**detective** 177:4, 14; 238:1; 261:7
**determination** 22:20; 107:15; 108:6, 13; 109:7; 114:10; 129:16; 150:20; 153:16; 154:1; 157:19; 167:3, 8, 10; 168:5; 182:5, 15; 195:5; 251:20; 256:1; 263:16; 307:14; 318:13
**determine** 14:11; 49:2; 91:16; 149:16, 20; 164:15; 171:5; 207:11; 230:6; 247:6; 259:21; 263:8; 271:10; 300:17; 301:13, 14; 303:16; 306:19; 307:4, 5; 318:19; 319:2, 15
**determined** 110:2; 111:18; 154:5; 157:2; 182:13
**determining** 111:20; 229:4
**develop** 63:12
**developed** 320:1
**device** 194:3, 9, 13, 15
**devices** 187:2, 17; 193:21
**devoted** 206:10
**Dewey** 6:12
**differ** 227:4
**difference** 228:21
**different** 51:20; 61:15; 109:14; 119:17; 122:10, 22; 163:4; 167:16; 191:19; 250:17; 264:14; 267:15; 312:1
**differently** 124:21
**difficult** 14:5, 10; 124:22; 125:1; 302:15
**digital** 187:5; 195:8
**direct** 98:3
**Directly** 9:13; 125:17; 126:1; 157:18
**disarray** 61:15
**discarded** 226:7; 229:7
**disclose** 163:16; 180:2
**disclosed** 162:17; 234:4; 318:8
**disclosing** 163:15; 164:12
**disclosure** 153:16; 154:5; 155:15; 159:2;

162:3; 163:2; 167:14; 168:11, 16; 192:14; 270:1, 3
**disclosures** 157:2; 162:22; 191:9, 10
**discovery** 45:3; 48:2; 76:15; 77:12; 100:9; 121:12; 161:6; 169:6; 180:8, 11; 181:15, 17, 21; 182:7, 9, 18; 183:12, 13, 15, 16; 184:2; 188:5; 191:17; 193:12; 233:13; 272:17; 301:22; 304:22
**discuss** 174:13; 318:9, 10
**discussed** 160:14; 202:8
**discussing** 270:18; 289:10; 308:7
**Discussion** 39:8; 46:3; 102:11; 103:11; 126:11
**dismiss** 210:14; 211:5, 19
**dismissed** 13:19
**disposal** 83:22; 84:21
**disposed** 87:4
**disposing** 83:16, 18
**disposition** 45:13
**dispute** 113:15
**disseminated** 37:10; 310:9
**dissemination** 309:20; 311:21; 313:11
**distributed** 41:4; 106:8
**District** 6:3, 3; 9:12; 10:1, 7, 17; 12:17; 15:18; 19:2; 32:12; 46:12; 61:17; 74:6; 85:22; 109:20; 116:6, 11, 13; 118:5, 9, 10, 13; 122:5; 123:16, 20, 21, 22; 156:12; 157:4, 12; 158:13; 160:12; 171:18, 19; 172:1, 3, 15, 20, 20; 208:17, 22; 212:6, 10; 213:14, 16; 214:9, 13; 215:3, 6, 14; 216:21; 219:12, 14, 16; 220:2; 240:14, 16; 305:22
**districts** 53:17; 61:18
**division** 10:19, 19, 20; 11:3; 17:9; 18:4, 14, 21; 19:1, 12, 15, 21; 20:2, 10, 12; 21:20; 23:15; 38:13, 15; 39:10, 12, 18, 19, 21; 49:20; 63:3, 6; 64:15; 78:10, 11; 81:16; 94:19; 96:12, 15, 21; 97:4; 98:14, 16; 108:1, 12; 109:11; 112:16; 124:8, 8, 9, 10; 125:6, 7; 126:2; 132:7; 138:17, 20; 139:18; 146:3; 207:10, 15; 208:22; 225:7; 236:20; 244:9; 247:6
**divvied** 300:6
**docket** 191:12
**docketing** 47:2; 50:8, 11; 51:12, 13, 19; 52:2; 53:3, 4, 12, 18; 54:1, 19; 55:4, 12, 13; 56:3, 15, 19; 63:1;

109:22; 110:5; 286:4
**document** 44:21; 45:15, 16, 22; 46:10, 17; 48:7; 49:3, 4, 7; 51:5; 53:2; 58:3; 60:21, 22; 61:1; 62:13, 13; 66:8; 71:3, 14; 75:2, 4, 5; 76:7, 9, 14, 16, 18; 77:8; 99:19; 100:3, 8, 14, 21, 22; 101:15; 103:13, 15, 17; 105:2, 2, 8, 11; 106:1; 107:3, 4, 5; 110:17; 115:7, 9; 118:17, 21; 119:3, 3, 5, 6, 7, 8, 15; 120:1, 20; 121:4, 14, 18, 19; 138:6; 148:4, 8, 9, 13, 14; 149:12, 14; 152:12; 156:3, 8; 157:8, 22; 165:13; 167:11; 180:18; 183:7, 8; 190:8; 196:6; 197:18; 198:7, 10, 12; 208:8, 13; 210:5, 10, 12, 15, 17; 212:15; 213:1, 7, 10; 218:8, 9; 244:14; 258:6, 17, 22; 259:2, 4, 15; 260:4, 17; 261:1, 5, 10, 19; 262:5, 19, 22; 263:7, 18, 20, 22; 264:2, 7, 8, 15; 265:6; 267:19; 268:13; 269:16; 270:2; 271:16; 276:4; 277:20; 278:10; 279:1; 280:20; 282:2, 6; 290:3; 291:3; 292:11, 18; 293:10; 296:15; 304:12, 18; 307:10, 18; 308:7; 309:2, 3, 15; 310:2, 2, 3, 12; 311:1, 3; 312:16, 19; 313:9; 317:15, 17; 318:8, 10, 20; 319:7, 14, 15; 320:17; 321:3
**documents** 28:12, 15, 15; 29:5, 11; 30:5, 10, 12, 17; 31:1; 32:15; 34:16, 22; 36:4; 40:19; 42:5, 5; 44:18; 45:2; 47:1, 1; 51:6; 52:4; 53:19; 54:2; 55:20, 21; 56:21; 57:15; 60:5, 10; 75:14, 15; 76:22; 77:20; 84:1, 3, 7; 86:1, 2, 4; 91:16, 17; 92:1; 105:3, 19; 116:10, 21; 120:13; 147:7, 7, 8; 148:2; 152:14; 155:15; 156:5; 160:4, 6, 8, 17, 19; 161:8, 17; 162:11, 14, 16; 163:15; 167:15; 168:12, 17; 169:3, 4, 18; 171:15; 176:9; 177:17, 17, 21; 178:12, 15, 19; 179:9, 15, 18, 21, 22; 180:3, 6, 10, 11, 13; 181:1, 6, 10, 11, 12, 16, 19; 182:1, 4, 6, 10, 17, 19, 22; 183:5; 188:9; 189:7; 196:7, 21; 197:2, 5, 6; 202:15; 214:13; 220:20; 221:2, 4; 223:9; 225:16; 226:8, 18, 20; 230:7; 233:18; 234:10, 15; 235:1, 9, 11, 13; 236:2; 253:8; 255:15, 22; 256:2, 20, 22; 263:9, 12; 264:12; 266:9, 14; 267:2; 271:10, 14; 272:4, 7, 9, 16; 273:1, 11, 14, 20; 275:3, 4; 276:3;

277:9, 22; 280:18; 281:3;
282:12, 15; 286:2; 288:18;
289:20; 291:1, 14; 295:10,
16; 300:19; 301:7, 21;
302:1, 3; 304:13; 305:16;
306:1, 2; 307:13, 15, 21;
308:3, 19; 309:8, 11;
310:8; 311:12, 15, 18;
312:6, 6; 313:1; 314:5, 9,
22; 315:9, 16, 19; 316:5, 8,
10, 13; 317:3, 5; 318:11,
19; 319:3, 17; 320:4, 7, 9,
18, 19, 21; 321:15
**DOJ** 44:5; 52:10; 105:4;
176:14, 17; 177:19
**done** 22:22; 47:20; 50:1;
62:8, 18; 71:22, 22; 80:12,
13; 108:3; 116:21; 140:18;
167:15; 174:3; 192:12, 21;
214:17; 215:8; 239:6;
245:13; 249:4, 18; 251:8;
255:1; 256:9; 286:8
**Donna** 6:10
**doubt** 79:8; 185:22
**down** 6:9; 25:5; 54:9, 14;
55:4; 63:12; 66:12; 80:2,
17; 96:2, 15; 107:2;
174:22; 175:16; 207:10;
211:3; 229:9, 11, 15;
232:7; 247:14; 250:13;
251:19; 252:6; 255:19;
256:16; 277:7; 296:18;
298:11; 304:14
**DOWNING** 4:3, 9; 12:5, 5,
9, 13; 6:1, 7, 14; 7:9;
44:17; 45:5; 46:6; 76:10;
87:12; 99:20; 101:16, 22;
103:7; 110:15; 120:21;
121:17; 123:13; 126:13;
138:5; 145:4, 11; 157:1,
17; 165:2; 185:22; 188:13,
21; 197:21; 210:1; 218:4,
10; 249:12; 258:18; 262:1,
3, 9; 264:10, 21; 265:6, 19;
267:5, 9; 268:22; 270:10;
275:15; 278:6; 280:2;
282:20; 283:13; 286:21;
287:7; 295:21; 300:12;
313:18; 318:13, 14; 319:1,
12, 22; 321:21
**Downing's** 4:17; 235:5;
260:15; 318:7
**dozen** 76:2
**draft** 226:4; 304:20
**drafting** 174:11; 196:3
**drafts** 72:18; 225:8;
230:3; 254:2; 274:8
**drawer** 68:6; 97:11
**Drug** 11:5, 8, 15; 12:20;
49:14; 61:4; 62:1; 64:17;
125:4; 259:11; 315:12, 22;
316:11
**due** 58:16; 66:12
**duly** 4:5; 145:6
**duplicate** 22:4; 274:8;
306:16
**duplicated** 302:21
**duplicates** 68:15; 70:13

**duplication** 280:6, 9;
306:9
**during** 4:18; 10:10;
12:20, 22; 21:3; 36:16;
65:10; 75:5; 97:5, 6, 8, 9;
162:4; 180:15; 186:21;
188:4; 191:13; 257:13, 14;
311:22

---

# E

**E** 157:5, 7, 7
**E-mail** 8:12; 41:15;
154:14; 157:9; 219:6
**E-mailed** 41:11
**E-mails** 219:8; 270:17
**Earl** 88:22; 89:7, 19
**earlier** 17:3; 87:12;
100:22; 110:21
**early** 17:16; 22:12; 206:7;
236:10; 304:12
**easier** 73:12; 74:19, 19
**easy** 302:10
**Ecco** 73:8
**edited** 19:10
**educated** 26:10
**educational** 8:16
**effect** 16:6; 167:4;
194:15; 303:7
**efficient** 43:9
**effort** 187:7; 307:8
**eight** 6:5, 1, 14; 129:8;
133:15, 19, 22
**either** 25:8; 39:18; 41:1;
48:21; 49:19; 75:2;
106:19; 108:11; 118:12;
123:9; 138:17; 139:17;
149:15; 152:2; 153:9;
174:15; 196:9; 219:1;
224:7; 237:8; 270:19;
275:6; 318:22; 319:1
**electronic** 41:17; 185:6;
186:3, 10; 188:1; 190:19;
287:15; 293:7
**electronics** 194:13
**else** 7:21; 70:21; 76:8;
157:16; 168:3; 174:2, 3;
188:3; 215:2, 5; 217:20;
226:9; 297:8, 21
**else's** 242:11
**employed** 10:4
**employee** 106:14
**employees** 105:19
**employment** 311:22
**empty** 255:20
**En** 24:19, 22; 243:21
**end** 9:16; 10:5, 8, 9; 59:7;
63:11; 144:10
**ended** 174:10; 187:10
**Enforcement** 11:6, 8;
113:22; 114:8; 150:6;
152:22; 153:18; 154:7, 18;
155:17; 162:6; 167:4;
168:17, 20; 234:19;
252:18; 254:10; 259:12;

262:8; 278:18; 279:2;
315:12, 22; 316:11
**enough** 65:10; 280:15
**entail** 296:8, 17
**enter** 60:1; 127:16
**entire** 10:14; 19:2; 52:1;
59:8; 76:16, 20; 108:10;
265:16
**entitled** 107:10; 161:5, 8;
169:7; 191:17; 192:3;
234:6
**enumerates** 119:17
**enumeration** 281:22
**EOUSA** 107:10; 121:16,
21; 122:6, 7, 11; 123:1, 5,
7; 146:22; 155:2; 166:1;
167:20; 173:11; 220:1
**EOUSA's** 167:5; 168:5
**equipment** 194:10
**equivalent** 193:4
**essentially** 19:1; 116:22;
169:14; 214:22; 305:8;
308:3; 316:6
**established** 264:6
**estimate** 14:17; 32:13;
38:16
**et** 225:8
**Eugene** 89:8
**even** 33:9; 35:3, 13;
37:13; 56:13; 66:7; 72:12;
97:12; 245:14; 248:3;
250:3; 251:6; 253:17;
256:11; 270:1, 1; 295:14
**event** 169:9, 10
**events** 53:7
**eventually** 47:19
**everybody** 38:9; 41:9;
273:15
**Everyone** 152:2; 199:19
**evidence** 27:2, 3, 14;
110:8; 233:3; 235:5;
275:3; 276:12; 278:1, 2
**evidentiary** 56:15;
188:18; 189:12, 19, 22;
190:4
**ex** 190:22
**exact** 25:20; 132:9
**exactly** 11:22; 19:6; 86:6;
173:22; 176:4; 180:13;
181:22; 224:22; 228:20;
232:5; 280:3; 296:7;
303:20
**EXAMINATION** 5:20;
145:5, 8; 283:11
**examined** 4:5; 145:6
**example** 24:6, 17; 25:14;
30:9, 13; 43:18; 54:7;
55:19; 59:6, 13; 66:9; 72:3;
73:3; 74:5; 85:19; 86:11;
139:4, 12; 161:17; 179:20,
22; 227:14; 230:17;
231:15; 232:13; 267:19;
294:4; 301:20; 304:15;
306:21; 307:21, 22
**except** 21:2

**exception** 307:18
**exceptions** 162:21
**excerpt** 77:20
**excuse** 77:6; 89:8;
183:22; 240:18; 273:6
**executive** 42:1; 122:2,
15; 124:6; 308:11, 18;
309:13; 310:14
**exemptions** 162:21;
303:7
**exhausted** 144:17
**Exhibit** 44:22; 45:5, 17;
46:6; 50:20; 76:9, 10;
99:20; 101:16; 102:2, 13,
15; 103:7, 14, 16, 19;
107:10; 110:16; 120:21;
121:15; 157:5, 7, 7; 165:1,
2; 188:13, 22; 189:10;
191:3; 197:19, 21; 218:4,
8, 10; 222:7; 258:18;
264:2, 6, 7; 265:7; 287:7;
309:4, 5, 16; 310:13;
312:12, 15; 319:7
**exhibits** 96:7; 121:6, 10;
179:11, 12; 232:18, 19;
233:1, 5; 275:8, 8; 277:9,
10, 11, 15, 21; 284:17;
307:1
**exist** 196:21; 197:6;
261:4; 304:9; 307:1, 11,
15; 318:11; 321:5
**existed** 196:15; 226:9;
229:5; 230:4; 305:21;
306:4
**existence** 190:5; 196:11;
270:2; 321:2
**existing** 306:9
**exists** 264:8; 302:21;
303:5, 17, 18; 306:8;
310:3; 321:5
**expect** 6:20
**expected** 207:16; 217:18
**expecting** 141:6
**expedite** 283:6
**experience** 86:10, 22;
87:13, 14; 117:7; 131:10;
141:11
**expert** 194:12
**explain** 164:12
**explained** 162:8, 9;
214:17, 18
**explaining** 116:19
**extent** 84:9; 159:13;
161:13; 191:10; 271:17;
280:11; 285:8; 294:15;
295:17; 306:11; 309:1
**extra** 183:15; 184:4;
252:7; 254:1, 4; 256:4;
272:15; 273:13; 274:20;
298:2; 301:21; 304:21

---

# F

**F** 178:11
**fact** 63:4; 71:21; 110:8;
153:8, 13; 168:5; 172:14;

219:11; 221:2; 230:3;
235:4; 240:2; 241:8;
271:6; 272:10; 310:21
**failed** 31:13
**failing** 31:6
**fair** 123:2; 141:22; 196:2,
11; 280:15
**fairly** 73:16; 74:8; 123:5;
140:10; 297:22
**familiar** 25:12; 26:22;
27:12; 28:6; 32:1; 49:5;
60:22; 74:16; 78:22;
84:16, 20; 100:17; 106:13,
22; 126:13; 173:20;
221:15; 251:12; 287:10;
296:2; 299:10; 308:15
**familiarity** 145:13
**far** 16:10; 28:17; 30:21;
37:21, 22; 56:9; 57:18;
66:5; 83:13; 116:20;
121:10; 141:17; 155:21;
163:19; 164:7; 167:16;
196:1; 214:2; 235:9; 244:4
**fatter** 77:1
**favorite** 32:8
**faxed** 211:10
**FBI** 259:7, 9; 262:19;
263:8; 264:16; 279:15, 20;
306:17; 317:19
**February** 4:13; 129:9;
135:13, 14; 136:14; 287:1
**Federal** 6:4; 32:2; 46:15,
21; 47:2, 5; 51:6, 15;
102:18, 21; 131:11;
160:21; 161:6, 14, 14;
169:7; 191:18; 192:4, 7,
13; 213:22
**felt** 58:13; 80:21; 250:6
**few** 18:22; 107:2; 167:13;
205:4; 208:10; 283:5;
286:12, 18; 291:22
**fifth** 147:17, 18; 298:19
**figure** 43:11; 77:18;
252:12
**figures** 52:21
**file** 17:19; 20:8, 9; 22:20;
23:11; 25:5, 14; 47:7, 8,
11, 17, 19, 21; 48:9, 19;
50:5, 6, 11; 51:14; 52:15;
53:5; 54:3, 8, 18; 55:21;
57:9, 12, 13, 18; 58:2;
59:2, 8, 11, 12, 15, 20;
60:5, 12, 13, 17, 19, 20,
21; 61:6, 12, 16; 63:1, 7, 9,
14, 17; 64:2, 3, 4; 66:14,
18; 67:4; 68:5, 6, 8, 16, 19,
22; 69:1, 6, 7, 16, 18, 19,
19; 70:3, 10; 71:3, 10, 16;
72:2, 4, 7, 8, 9, 12, 15;
73:17, 18; 74:9; 75:4, 10,
11, 19; 81:8, 10, 13, 15,
15; 82:3, 16; 83:13; 85:19;
86:2, 5, 12, 13; 87:3; 90:5;
95:15, 18, 19; 96:1, 10, 14,
16, 18, 18, 20; 97:10;
98:20; 99:5, 8, 15, 15;
109:3; 110:19; 111:1, 2, 2,
14; 113:20; 115:8, 20;

117:2, 9, 10, 11; 119:20;
120:5, 14, 18; 154:17;
160:9, 11, 12; 162:18;
163:13; 164:14, 15;
169:20; 170:7; 177:18, 20;
181:13; 183:13; 190:15,
22; 196:7, 22; 202:9, 16;
203:3; 209:12, 16; 215:7,
15; 216:5; 217:1, 4;
218:21; 219:1, 21; 223:10;
224:2; 225:4, 8; 226:6, 19;
230:5, 17; 231:17; 233:11;
234:16, 19; 239:6, 17;
241:5; 243:10; 245:12, 15;
249:7, 14; 250:9; 252:4,
10, 10, 20; 253:2, 19, 20;
254:6, 7, 8, 18; 256:5;
263:10; 264:3; 265:7, 11,
15, 16, 20; 266:9; 270:18;
271:13, 15, 19; 272:10;
274:19; 275:13; 277:12;
278:11; 279:6; 281:7;
284:21; 285:2, 5, 7, 8, 12,
14, 15, 16, 19, 21, 22;
286:1; 289:7; 298:7;
300:20, 22; 301:9; 302:22;
304:14, 17; 305:3, 4, 8, 10,
11, 12, 15, 17, 18, 20;
306:19; 311:5, 6, 12;
314:6, 10, 22; 315:5, 10;
318:20; 319:4, 5, 9, 16, 17;
320:10, 13, 15, 17, 21;
321:11, 13

**filed** 20:20; 22:14, 18;
23:3, 6; 55:20; 56:4, 21;
57:1, 3, 10; 58:1, 3, 4;
59:18; 61:1; 63:14; 66:9;
71:1; 74:15; 128:20;
129:1, 2, 3, 14; 133:16;
136:1, 19; 137:1, 2, 17, 22;
138:10, 12; 139:20, 21, 22;
140:2; 142:12, 13, 14;
143:11, 13; 148:6, 18, 18;
153:4; 156:11; 158:20;
163:12; 164:2; 165:7, 12;
166:6, 13; 172:19; 175:1;
188:7, 17; 190:1, 9, 9;
191:13; 193:10; 196:18;
203:18; 205:21; 206:2, 16,
20; 207:19; 208:4, 6, 19;
209:8; 210:6, 11; 213:7,
15; 215:22; 216:13, 17;
217:8, 20; 222:21; 223:14;
245:7

**files** 32:16; 40:16; 48:10;
49:11; 51:15; 62:21;
63:13; 64:1; 67:15, 18;
68:3, 4, 12; 69:5; 70:14;
71:19; 72:22; 74:14, 22;
81:2, 4, 5, 7; 82:1, 19;
84:1, 7; 86:14; 97:2, 3;
98:16; 99:9; 118:21;
120:8, 12, 13; 177:13;
183:17; 187:17; 192:9;
202:21; 204:6; 210:10, 10;
220:5; 224:17; 225:17, 19;
226:12, 14; 229:5, 20, 21;
231:12; 232:6; 236:10;
242:16; 249:13; 250:20;
252:2; 253:9; 254:1, 12;
258:4; 263:5; 271:2, 4, 7,

22; 274:14; 277:2; 289:11,
14; 293:11; 296:10, 19, 19;
297:5, 11, 16; 299:6, 16,
20, 21, 22; 300:15; 302:16;
304:6; 306:4, 9; 308:1;
311:16; 312:20, 20; 313:2,
13; 314:17

**filing** 49:16; 59:4; 62:8;
71:5; 97:20; 98:3; 140:17;
163:6; 190:3, 11; 196:1;
202:20; 204:7; 218:3;
244:16; 250:21; 251:8, 15,
15; 304:8

**filings** 55:14; 61:20

**fill** 125:13; 286:1

**filled** 53:11; 54:9; 115:12;
184:19

**filling** 55:3; 59:5; 113:19

**final** 22:10; 47:19; 50:12;
62:22; 102:18; 239:9;
285:14; 286:7, 7

**finality** 217:16; 242:7, 9

**Financial** 184:10, 17, 18;
185:3

**find** 54:16; 58:21; 74:3,
15; 80:18; 105:10, 14;
196:13; 206:13; 263:19;
276:15; 307:6

**fine** 283:9; 291:7

**finish** 19:17; 161:3

**finished** 110:15; 321:18,
19

**firm** 6:12; 9:5

**first** 4:4; 34:15; 38:21, 22;
42:21; 44:21; 50:22; 51:2;
73:8; 80:3, 8, 10; 86:14;
88:18; 103:19; 106:3;
115:5; 124:6; 125:7, 8;
128:8; 145:16, 17; 148:21;
154:11; 155:4; 157:12;
164:17, 19; 170:19;
198:11; 208:9; 209:8, 14;
219:22; 227:14; 228:8, 12;
229:8; 244:14; 246:12, 15;
249:3; 260:6, 21; 263:6;
264:4; 269:3; 284:1, 22;
286:15; 291:3, 4, 22;
294:2, 12, 13; 296:22;
298:21; 307:13

**fist** 88:21

**fit** 59:8

**fits** 77:18

**five** 38:21; 61:22; 74:7;
88:5, 12, 13, 14, 16, 17;
136:2, 3; 274:8

**flight** 282:22

**floor** 170:19; 171:3;
241:17, 18, 19; 251:1, 3;
255:20; 296:22; 298:17,
19, 21; 299:2

**Florida** 10:18; 32:12;
46:12, 19; 61:18; 85:22;
116:11; 118:13; 123:16;
191:21; 192:18; 193:5;
208:17; 209:1

**fluent** 221:14

**flying** 65:21

**focusing** 242:6; 245:1

**FOIA** 4:19; 32:15; 34:4;
35:13; 37:3, 8, 18; 38:2;
42:10; 77:1; 87:14; 90:4, 9,
18; 91:15; 102:16; 103:22;
120:14; 126:14; 145:13,
20; 146:8, 11, 13; 152:15;
159:9, 19, 21, 22; 163:6;
167:20; 168:5; 171:20;
172:5, 5; 201:12, 21;
202:4; 213:2, 11, 13, 20,
22; 214:3; 221:15; 239:3,
11, 16; 240:5, 9, 11;
248:18; 260:22; 262:20;
264:9; 303:6

**FOIA/PA** 120:5

**fold** 172:13

**folder** 57:13; 59:15, 16;
67:1, 3; 69:19; 70:4, 5;
73:13; 99:16; 183:13

**folders** 60:6; 65:17;
68:10, 14; 69:7; 73:1;
231:7, 8; 234:16; 256:10,
13

**follow** 206:4

**follow-up** 282:19

**followed** 82:22; 83:12

**following** 10:2; 65:4;
206:12

**follows** 4:6; 145:7;
154:20

**footnote** 165:15, 17, 19;
203:5, 11, 12

**Force** 11:6, 9, 12; 259:12;
260:1; 261:20; 315:12, 22;
316:12

**forfeiture** 52:17

**form** 33:9; 48:8, 10; 49:4,
7, 11; 55:3, 13; 113:20;
115:11, 14, 18, 20; 116:5,
12, 13; 147:1, 10, 13, 14,
15; 148:21; 150:1; 151:9;
154:20; 173:7; 198:5;
231:5; 259:1; 260:18;
261:17; 290:11; 292:21;
315:5; 317:3, 12

**formal** 126:8, 9

**formally** 41:10; 313:5

**format** 290:11; 291:13,
16

**formed** 17:10; 18:21

**forms** 117:8; 146:10, 11,
13; 314:16

**forth** 219:9

**Forty** 15:3; 62:4

**forward** 56:12

**forwarded** 54:14; 146:22

**found** 140:17; 239:19;
241:7; 250:14

**foundation** 185:15;
299:11

**four** 88:17; 89:2; 157:5;
158:15

**fourth** 241:17; 251:1

**frankly** 113:13; 120:16;

133:3; 237:12; 256:18

**Freedom** 32:8; 33:21;
35:5, 9; 102:19; 103:4;
104:6

**fresher** 301:3

**front** 80:2; 92:21; 117:15;
212:9

**fugitive** 88:7; 89:6, 22;
92:2, 3; 97:14

**fugitives** 151:20

**full** 49:16; 78:13; 79:4, 9;
230:21; 231:12; 257:9

**further** 24:16; 145:7

---

### G

**gained** 294:5

**game** 196:2

**Gary** 295:15

**gather** 84:19; 185:9;
191:19; 296:13

**gathered** 87:1; 181:2, 6

**gave** 48:8, 21; 50:1;
200:14

**Gay** 8:5; 148:6, 18;
153:21; 154:4, 9; 155:1, 7,
21; 157:18; 160:6; 163:12;
164:9; 166:1, 14; 168:7;
171:9; 172:9, 17; 173:8;
174:2, 13; 176:3; 200:18;
210:3; 214:19; 215:15;
219:9, 16; 220:12; 223:7,
16; 229:3; 249:3; 270:21;
271:1; 286:21; 289:10;
293:19; 307:18; 317:17;
319:2

**Gay's** 156:10; 213:17;
282:12; 300:21; 302:18,
22; 303:12, 22

**Gene** 117:21; 118:1

**General** 22:19; 23:11;
105:17; 123:19; 147:16;
162:3, 15; 175:19; 176:11;
206:2; 227:15; 255:12;
281:16; 320:12, 14

**Generally** 22:1, 18; 25:1;
27:11; 35:3; 41:20; 47:6,
16, 21; 59:19; 82:3; 95:20;
114:3; 142:19; 159:5, 5,
16; 160:11; 171:5; 215:10;
232:8; 242:10; 308:15, 21

**generate** 96:16

**generated** 259:5, 7, 9;
279:17; 288:3, 5, 16; 293:2

**gentleman** 155:1; 173:10

**given** 40:8; 312:3

**giving** 4:18; 221:8

**GK** 6:2

**gladly** 268:6

**goes** 7:4; 47:9; 106:14;
317:10

**Good** 6:7, 8; 14:22;
30:13; 82:14; 272:8

**governed** 83:22

**government** 7:19, 21;

20:14; 28:2; 121:6;
128:20; 190:21, 21; 214:1;
303:4

**government's** 56:17;
189:8; 191:4; 210:13;
211:19

**grab** 74:13

**Graduated** 8:17, 18, 21;
9:2

**Grand** 30:12, 18, 22;
31:18; 57:7; 178:16, 18;
179:1, 6, 7, 16, 17; 180:5;
181:3, 10; 303:8

**grant** 92:22

**group** 62:2; 89:3

**Grubbs** 89:5, 20

**guess** 26:10; 31:4;
122:19; 123:18; 131:7;
143:15; 159:14; 222:2;
285:11, 17

**guidance** 80:21; 120:7

**guidelines** 16:4, 6;
117:19

**guilty** 53:9; 133:22;
152:2; 284:16

**Guzman** 145:22

---

### H

**half** 143:12

**hall** 24:14

**Hampshire** 4:11; 7:11;
10:2, 7

**hand** 66:3; 258:11

**handed** 45:9; 208:9

**handing** 165:6

**handle** 17:11, 13, 13;
50:10; 141:16

**handled** 13:15; 19:16;
37:12, 16, 18; 51:11;
57:19, 21; 81:8; 92:16, 17;
93:14, 20; 126:20; 130:2;
131:19; 132:1; 172:6;
239:16; 250:18, 20

**handling** 18:19; 35:9;
37:8; 62:1; 109:14;
113:17; 214:21

**hands** 60:9; 74:2; 75:15

**hang** 247:18

**happen** 22:17; 24:6;
47:8; 53:11; 54:6; 59:19;
66:10; 96:13; 97:19; 98:2;
238:4; 305:13

**happened** 24:3, 15; 25:2;
50:4; 60:6, 17; 65:3, 4;
67:1; 75:7, 7; 133:13;
139:11; 177:16; 181:9, 16;
184:22; 189:6; 190:10;
199:15, 16; 204:3; 225:1;
236:8; 248:5; 256:12;
263:19

**happening** 25:7; 67:2

**happens** 95:3, 20; 97:18;
300:9

**happy** 310:5

hard 41:8; 73:9; 106:10;
139:9; 288:10; 292:15
hard-covered 256:9
harm 160:12; 168:17
Hat 260:8
head 208:1; 241:3
hear 143:20
heard 99:11; 104:22;
143:16; 176:5
hearing 31:3; 188:18;
189:13, 18, 20; 190:4
hearings 189:22
held 31:6
help 158:10; 170:6;
174:10; 254:11; 255:15;
256:18; 271:1, 3, 8, 21;
272:3; 281:2
helpful 79:21
helping 257:6
here's 86:16, 17; 126:10
hey 24:14
high 8:17
higher 312:2
highest 61:19
himself 188:7
historical 278:13
Hoffman 48:22
hold 31:2
home 70:18
homicide 226:14; 256:5;
271:13
honestly 154:8; 184:5
hope 87:5
Horrox 187:11; 191:8
hour 7:4
hours 65:13, 14; 229:12
house 184:17
housekeeping 285:9
huge 249:20
hundred 19:3; 191:13
hundreds 85:6; 102:8

**I**

I.D 194:14
idea 39:5; 118:1; 159:19;
174:7; 253:10, 12; 267:5;
296:14; 305:12
identification 45:7; 46:8;
76:12; 99:22; 101:18;
103:9; 121:1; 165:4;
188:15; 198:1; 218:6, 12;
258:20; 287:9
identified 263:2, 14;
302:18; 319:18
identifies 303:9
identify 263:15; 308:3
II 298:21
immediate 125:4
immunity 178:13
impact 111:10; 113:21;
114:7, 17; 154:16; 155:17

imparted 215:9
impeachment 161:10
implication 98:8
imposed 47:15
impossible 251:22;
280:21
impractical 251:22
in-box 69:11
inaccurate 284:7
inches 86:15
include 32:21; 96:3;
185:9, 12; 320:19
included 181:17; 186:13,
15; 231:11; 236:2
Including 128:4; 151:19;
185:7; 273:15
incoming 67:15; 194:5
inconsistencies 213:17
inconsistency 166:8
index 53:19; 170:15;
176:5; 220:16; 223:8, 21;
263:4, 14; 282:3; 288:22;
290:5; 302:13, 19; 303:5,
13; 318:22
indexes 289:3; 300:16;
307:13
indicate 47:12; 52:7, 11,
13, 15; 55:19; 84:3; 85:15;
108:16; 150:1; 163:14;
167:10; 208:6; 209:10;
212:17; 264:5; 291:9, 22
indicated 65:5; 68:7;
95:21; 109:10; 112:14;
147:16; 148:2; 169:11;
176:7; 199:15; 219:10;
224:5; 225:4; 226:5;
250:1; 270:16; 273:2;
279:8; 283:13; 285:6;
291:19; 299:3, 7; 304:12;
321:11
indicates 208:21; 262:6;
312:18; 317:18
indicating 51:8; 168:11;
213:16; 219:6; 270:18;
321:2
indication 110:1; 147:20;
148:1; 224:1
indict 94:4
indicted 54:21; 87:20;
89:4; 92:12, 13; 151:17
indictment 53:8; 54:11;
56:5, 10; 57:7, 9; 59:14;
88:20; 96:3; 127:9, 10, 11;
128:11, 12, 14, 18; 179:11;
180:4, 22; 284:6; 317:7
indictments 61:20;
89:18; 199:5, 10
indirectly 157:18
individual 30:22; 89:4
individual's 231:10
individuals 28:3; 303:9
infancy 192:22
inform 23:18; 132:22;
172:18; 223:7
informants 294:18

information 27:20, 21;
31:7; 32:9; 33:22; 35:5, 10,
16; 40:4, 19; 42:3; 53:4;
54:13; 55:22; 56:2; 82:21;
102:19; 103:4; 104:6;
109:9; 118:22; 119:11;
138:13; 147:16; 149:19;
157:18; 159:22; 162:19;
172:8; 176:16; 177:3;
178:2; 184:10, 12, 14;
185:1, 2, 7; 186:4, 11;
187:22; 188:3, 7; 192:3, 5;
193:3, 15; 195:22; 201:21;
215:9; 216:8; 232:14, 21;
233:7, 9, 12; 234:5; 262:7,
8; 263:6; 267:11, 13, 13,
14, 16, 18; 268:10; 269:15,
16; 289:21, 22; 292:4;
293:20, 21; 294:5, 14;
295:1; 301:2; 302:17;
304:5; 309:20; 310:1;
318:21
informed 95:1; 112:12;
133:2, 3; 208:17; 239:21
informing 229:3
initial 145:19; 234:14
initially 18:22; 127:5;
187:10
initials 209:1, 3; 287:12
initiated 261:19
initiation 261:16; 314:16;
315:5, 11, 20; 316:10, 15;
317:4, 12
input 53:3
inquire 206:18, 19;
217:13; 236:21
inquired 207:5, 19;
226:8; 243:14, 15
inquiring 139:17, 17
inquiry 217:17
instance 21:2; 56:4; 72:9;
272:15; 302:15; 303:8;
307:9
instances 24:9; 293:3
instituted 62:12; 64:12;
65:15
instruct 195:20; 262:1,
14; 264:10, 18; 313:20;
316:17; 319:20
instructed 313:19
instructing 262:11;
314:11; 319:22
instruction 265:9
instructions 5:11
intelligence 293:13
intent 4:21
intention 128:21; 129:14
intentionally 30:16
intercepted 185:10;
198:20; 199:11, 12; 277:5
interception 198:17
interest 177:5; 270:7
interested 58:22; 133:9;
204:18, 22; 206:12, 14;
260:12
interfere 148:3; 152:21;

153:17; 154:6; 157:3;
162:5; 163:15
interfered 159:3; 162:14
interference 160:22;
161:21
interject 165:9; 204:3;
205:16
interlocutory 20:20, 22;
21:3
internal 42:4; 52:12;
107:21; 176:15; 177:3, 12,
21; 178:2, 8; 233:6
Internet 43:21; 44:2, 3, 5,
6
interpret 316:3
interpreted 165:22
into 4:17; 9:13; 10:18;
16:6; 30:22; 35:15; 44:12;
47:16, 21; 53:4; 54:2;
57:13; 65:22; 66:22; 67:3,
3; 69:10; 81:12; 82:3, 15;
86:1; 117:1; 128:3;
133:22; 182:3; 195:21;
233:2; 251:16; 254:5;
257:6; 267:15; 275:3;
276:12; 278:1, 2; 298:8;
317:10
introduced 37:6
investigate 180:17
investigating 180:5
investigation 54:5;
91:10; 96:8; 108:11;
130:14; 180:16; 192:18;
193:1; 194:22; 206:7;
260:3, 13; 279:10, 13;
280:1; 314:15; 315:5;
317:12
investigations 236:17
investigative 234:20;
278:19; 279:3, 16; 288:15,
22; 293:12
investigators 62:3, 5
invited 254:9; 255:4
involved 12:10; 29:7;
52:21; 114:3; 122:16;
124:18; 253:22; 260:2
involvement 93:16, 21;
253:17
issue 16:3; 20:18, 22;
21:3; 29:6; 72:3; 133:10;
142:5; 189:13; 195:4;
213:11; 308:8; 321:16
issued 41:1; 137:5, 6, 13;
143:10, 14; 203:7, 19;
204:4, 5, 11, 14; 241:13;
242:22; 243:12, 17;
244:19; 245:18
issues 56:15; 94:2, 15;
124:19, 20; 131:2; 141:10;
194:19; 252:15, 16;
266:16
issuing 142:2
item 258:14; 274:8
items 41:10; 56:21;
57:17; 78:22; 87:1, 2, 3;
106:17; 119:17; 194:20;
226:6; 229:22; 230:4;

251:16; 254:5; 272:6;
281:17; 304:15; 305:11;
320:13, 15

**J**

J 184:9
jacket 20:9; 54:18; 58:6;
69:1; 96:1
January 87:21; 89:18;
137:6, 22; 143:10; 204:5,
15, 15; 205:22
Jed 89:8
Jeff 164:10; 215:6
Jefferson 6:11; 7:5;
126:14; 127:1; 128:4;
131:8; 136:1; 142:14;
145:14; 147:2; 155:16;
161:4; 166:6; 167:16;
168:12; 169:5; 172:19;
175:1, 3; 186:22; 188:6,
17; 189:6; 190:1; 205:14;
206:16; 208:11; 210:5, 11;
213:8; 217:8; 233:22;
234:12; 241:11; 244:4, 15,
21; 245:1, 7; 248:9, 17;
281:4; 283:4, 16; 287:20;
295:3, 8, 10; 310:14
Jefferson's 32:21; 34:4;
42:8; 43:1; 110:11;
126:21; 129:8; 134:11;
136:4; 141:3, 21; 143:4;
150:9; 151:11; 152:15;
154:16; 160:9; 167:6;
195:17; 196:22; 197:13;
198:21; 200:1; 202:9;
203:6; 214:3, 8; 216:10;
223:9; 241:11; 242:20, 21;
243:4, 18; 249:13; 254:12;
260:5, 8; 261:10, 14, 17,
20; 262:20; 263:10, 18;
264:3, 9; 265:7, 11; 266:9;
272:13; 273:16; 296:9;
299:6, 16; 312:20, 21;
313:2; 314:6, 10, 16, 21;
315:4, 10, 20; 319:9
JEFFREY 4:3, 9; 5:22;
7:9; 89:7, 8, 22; 92:12;
145:4; 156:22; 321:21
Jencks 161:10; 231:4;
304:6
Jim 257:11; 295:14
jog 43:12
jogged 77:11
John 173:15; 254:14
Johnny 89:5, 20
joined 45:11; 118:10
jot 66:11
judge 31:2; 92:21;
129:15; 212:10; 287:4
judgment 81:21; 96:7;
210:15; 211:6, 20
July 78:15; 148:6, 19;
153:21; 154:4, 18; 156:11,
12, 22; 165:13, 14, 20;
166:17, 19; 236:10;
288:19

**June** 100:6; 102:17;
136:18, 20; 209:1; 236:9;
288:19

**junior** 17:17; 130:16

**junk** 252:7; 254:3, 3;
255:2

**jury** 12:21; 14:3, 7, 18;
30:12, 18, 22; 31:18; 57:8;
134:3; 135:18; 178:16, 18;
179:1, 7, 7, 16, 17; 180:5;
181:3, 10; 303:9

**justice** 28:7, 9, 10, 14, 19;
31:22; 41:2, 18; 103:3;
122:10; 176:22; 317:21

# K

**K** 185:6

**Kathy** 92:18, 22; 93:19;
129:21; 130:15; 138:17;
140:8; 149:4; 207:9;
209:2; 244:9

**keep** 53:19; 54:1, 3;
56:15, 22; 57:3, 6, 14;
58:2, 15; 63:20; 64:2; 67:8,
10, 14; 73:9; 86:20; 97:5,
9, 10; 98:20; 109:15;
112:11; 158:5, 6; 183:4,
11; 276:10; 277:14;
287:18; 305:3; 306:18

**keeping** 55:13; 58:19;
99:3

**kept** 56:20; 58:5; 65:14;
71:3; 72:22; 75:4, 20;
179:2; 183:6, 8; 184:6;
198:15, 15; 273:3, 12;
274:3; 275:1, 9; 276:11;
278:8, 10, 12; 285:20;
287:15; 293:2; 304:16, 18,
20; 305:1

**Kessler** 287:4

**kind** 27:8, 9; 40:15; 66:3;
84:3; 169:4; 190:19;
257:6; 258:1; 281:19;
301:4

**kinds** 123:6; 319:11

**Knew** 21:13; 25:2; 28:22;
37:17, 20; 47:6, 16, 21;
49:3; 57:20; 81:22; 82:2;
113:10; 140:2; 147:6;
212:5; 213:2, 13, 15;
219:14, 15; 225:19;
226:11; 230:18; 239:3, 16,
22; 243:10, 11; 244:5;
250:15; 252:8; 253:10, 13;
254:3, 5; 256:6, 6; 268:5;
271:13; 295:9

**knowing** 28:15; 162:15;
169:4

**knowledge** 47:3; 101:2;
109:7; 159:21; 207:1;
208:2, 3, 5; 241:9; 295:5,
17; 304:8

**known** 114:22; 139:1;
245:7

**knows** 123:10

# L

**labeled** 108:15; 109:2

**lack** 299:11

**language** 165:21

**large** 21:8; 82:17; 100:22;
103:17; 236:16; 254:19;
306:11

**larger** 103:16

**Larry** 89:1

**last** 9:20, 22; 43:15; 58:8;
185:5; 198:11; 317:15

**lasted** 14:12, 13

**late** 145:18; 146:21;
236:9; 247:5, 22

**later** 166:22; 176:6;
237:20; 298:20

**Law** 8:22; 9:2, 5; 12:16;
13:5; 113:22; 114:8;
150:5; 152:21; 153:17;
154:7, 17; 155:17; 161:15;
162:5; 167:4; 168:17, 20;
191:21; 192:13, 19;
234:19; 252:18; 254:9;
264:22; 278:18; 279:2;
303:7

**lawfully** 310:5; 311:6

**lawsuit** 172:19

**lawyer** 13:10; 65:9

**lawyers** 65:9

**lead** 135:3

**learn** 145:16; 217:10;
295:18

**learned** 37:11; 139:4, 6,
10, 16; 145:17; 201:21;
209:8, 15; 225:6; 248:2, 4;
295:12, 15

**least** 16:2; 20:9; 36:7, 11;
57:18; 61:3; 65:9; 76:22;
109:6; 121:9; 177:8;
214:20; 217:17; 226:4;
276:10

**leave** 270:8; 283:1;
321:16

**leaving** 105:19

**led** 214:20; 236:14

**Lee** 87:16; 88:22; 89:1, 8,
19, 21, 22; 92:3, 10, 11

**left** 9:9, 20; 44:10; 47:10;
60:19; 61:22; 62:4, 11;
124:5; 277:1

**Legal** 48:9; 110:19;
117:9; 257:10; 262:6;
265:19; 278:13

**legally** 262:10

**legend** 263:22; 310:8, 10;
314:10

**length** 47:14

**lengthy** 133:6, 8; 142:17

**less** 62:6, 6

**letter** 70:17; 231:18

**letters** 120:2

**level** 66:5; 157:4; 158:13;
269:17; 309:22

**levels** 267:15

**liability** 265:2

**liberal** 182:8, 15

**libraries** 77:9

**library** 79:7

**life** 93:11; 206:11

**likelihood** 61:2; 181:14;
182:10; 185:4

**limitation** 4:16

**limitations** 5:6, 8

**limited** 236:15; 238:5;
267:20; 309:18; 310:9;
312:18; 313:8, 10

**line** 123:8; 156:14; 294:2,
13

**lines** 124:11

**Lisa** 6:12

**list** 57:22; 115:8, 21;
150:5; 115:14; 232:11;
236:3; 289:11, 13, 16;
290:12; 292:4; 293:18;
294:8; 304:14

**listed** 233:15; 281:12;
302:13

**listing** 51:8; 120:3; 282:6;
320:16

**lists** 50:13; 157:14

**litigants** 51:9

**litigated** 52:8

**litigating** 52:10

**litigation** 26:21; 43:3;
92:4; 99:16; 114:4;
130:13; 147:18; 152:12;
168:1; 175:7, 10; 214:9,
10, 14; 221:15; 245:16

**little** 113:3; 150:2; 172:7;
210:1; 215:9; 222:2;
225:14; 264:13

**local** 114:20

**locate** 271:22; 272:3

**located** 32:15, 16; 170:18

**lock** 52:16

**log** 198:14, 15; 199:16

**logs** 185:7; 186:17;
200:8, 9

**long** 9:18; 14:11; 19:6;
34:12; 44:14; 47:13; 87:8;
98:15, 19; 142:2; 202:14;
207:21; 216:7; 242:9;
303:2

**longer** 224:11; 229:5;
285:20; 300:19; 306:14;
310:10; 319:5

**look** 46:16; 57:22; 69:11;
79:22; 81:10; 101:20;
119:18; 148:11; 150:2;
157:6, 21; 158:21; 164:14;
165:14; 166:14; 175:11;
187:12; 188:10; 195:17;
200:10; 231:18; 232:6, 10;
251:19; 252:12; 258:10;
270:10; 276:22; 277:18;
281:20; 282:12; 300:15;
301:12; 302:1; 303:14;
304:1, 10; 305:14; 306:8

**looked** 86:16; 106:19;

**looking** 48:7, 19; 73:10;
74:10; 82:1; 117:10;
148:12; 149:14, 21;
150:18; 186:8; 188:21;
204:13; 233:8; 257:17;
279:1; 290:1, 18; 291:2;
299:3; 301:1; 304:4;
310:13

**looks** 106:13, 22; 111:1;
148:9, 13; 149:3, 3; 150:19

**looseleaf** 76:22; 77:17

**lot** 13:22; 40:12; 49:17;
56:14; 59:1; 73:11; 74:18,
19, 19; 97:11, 11, 13; 99:2;
111:9; 114:20; 167:19, 21;
181:1; 194:22; 236:16;
280:18; 284:21; 285:1

**lunch** 87:9

**Luncheon** 144:20

# M

**Macon** 89:1

**mail** 66:8; 67:5, 6

**mailbox** 41:8

**maintain** 267:2

**maintained** 56:1; 69:17;
268:11; 278:16; 296:10

**maintenance** 62:14;
105:3

**majority** 16:10; 279:3

**making** 4:12; 175:18;
182:5; 191:9; 270:3

**manageable** 252:11;
253:15; 305:8

**management** 82:19;
83:11; 84:17

**mandate** 22:5; 99:6;
137:6, 13; 203:5, 13, 19;
204:8, 11; 206:16; 241:13;
242:22; 243:11, 17;
244:18; 245:17

**Manual** 76:17, 19, 21;
77:2, 7, 13; 78:6, 13, 15,
19; 79:5, 9, 14, 15, 22;
80:5, 7; 82:7; 83:11; 85:3,
10, 13, 14, 18; 100:4, 16,
17, 18; 101:2, 3, 6, 10, 12;
102:2; 104:1, 7; 116:2;
121:16

**manuals** 40:8; 79:11

**many** 13:14; 14:17, 19,
20; 15:10; 32:13; 38:4, 20;
39:3, 6; 60:17; 68:11;
79:15; 112:21; 131:16;
133:15; 237:13; 249:18;
252:14; 253:7; 298:2

**Marbury** 6:13

**March** 9:17; 14:16, 16;
45:10; 136:15; 137:7;
155:3; 166:12; 171:11;
201:16; 203:7; 204:12;
210:6, 12; 218:16; 222:7;
226:21; 228:5; 243:1;

270:13

**mark** 44:22; 46:4; 76:9;
99:19; 101:15; 164:22;
188:11; 197:20

**marked** 45:6; 46:7;
76:11; 99:21; 101:17;
103:8, 14, 16; 120:22;
121:15, 15; 165:3; 188:14;
197:18, 22; 218:5, 8, 11;
222:6; 232:18; 233:1, 3, 4;
255:20; 258:19; 287:8;
312:15

**marking** 198:3

**mass** 305:16

**match** 227:13

**material** 68:14; 78:2, 4;
82:17; 97:3; 161:10;
169:19; 177:18; 179:1;
182:14; 183:1; 195:11;
197:12; 224:20; 231:4;
233:16, 19, 20; 234:4;
236:3; 280:4, 4; 300:14,
15, 17, 19; 301:17; 302:17,
20; 303:5, 9, 11, 16; 304:4,
6; 306:10, 13, 16, 18, 21;
308:13; 317:19

**materiality** 29:5; 194:21;
195:3

**Materials** 119:15, 19;
120:3; 179:8; 228:2;
234:22; 252:18; 277:1;
299:1; 301:15; 302:12;
303:10; 304:9; 317:13

**Mathis** 17:1; 127:4, 13,
22; 128:7; 129:3, 16, 19;
130:7, 20; 131:3, 22;
134:16; 135:9, 16, 22;
136:11, 16; 137:1, 2, 11,
12, 14, 17; 139:13, 20;
140:11; 143:5, 16; 151:14,
19; 177:6, 7, 10; 184:16;
198:18; 205:10, 15, 19;
231:3, 4, 6; 232:19; 239:8;
241:10; 242:1, 7, 13, 18;
243:2, 14, 15; 247:7;
284:4, 8; 315:21

**Mathis's** 248:2

**matter** 73:18; 92:4;
112:11; 124:16; 162:3, 15;
212:8, 9; 213:4, 19;
239:16; 261:5, 8, 9, 13, 20;
264:17; 288:21; 289:3;
290:5; 292:6

**matters** 29:7; 78:11;
122:12; 124:12, 18, 21;
131:12; 164:13; 177:14;
178:12; 206:8; 234:18;
250:11; 285:9; 296:3

**may** 5:14; 14:8; 28:3;
37:14; 48:4; 62:18, 19;
70:15, 15, 21; 72:3, 10, 15;
78:11; 85:15; 86:14; 90:6,
6, 12; 91:5, 6; 93:4; 94:9;
96:17, 17; 97:14; 105:1, 8;
112:18; 114:5; 116:5, 13,
14; 119:16; 120:4; 123:7;
131:17; 135:20; 137:20;
138:2, 4; 139:13; 144:8;
147:22; 149:18, 18; 152:4,

JEFFREY S. DOWNING  Case 1:07-cv-01305-CKK   Document 20-3   Filed 12/03/2007   Page 98 of 115
June 15, 1999                                                                WILLIE JEFFERSON v.
                                                                            JANET RENO et al.

5; 159:16; 164:5; 173:21;
174:1, 3, 21; 190:19;
201:17; 229:15, 18, 18;
241:22; 244:9, 10; 246:8;
247:2, 5, 18, 22; 248:4;
261:4; 262:5, 10, 16;
264:21; 265:2; 271:11;
276:11; 279:9, 14; 280:15;
284:17; 289:4, 5, 6; 290:7;
291:11; 295:12, 14; 301:7,
7, 9, 11; 302:4; 307:9, 10;
311:13, 18; 313:9, 12;
318:11, 11, 12

Maybe 17:6, 6; 18:17;
39:1; 47:10; 102:9;
128:14; 152:6; 188:11

McConehay 257:11;
295:14

McKinnon 284:19

Meadville 8:19

mean 11:10; 30:18; 37:2,
12; 43:15; 60:16; 61:11;
70:7; 72:18; 73:1; 74:4;
75:9, 10; 76:1; 81:18;
85:11; 109:2; 111:16, 22;
113:9; 114:1; 122:9, 19,
20; 123:3, 20; 125:17;
129:12; 132:20; 143:9;
150:14, 22; 151:18; 166:1;
178:22; 179:4; 196:1;
200:4, 5; 209:16; 227:6;
240:22; 245:6; 251:15;
254:4; 257:3; 267:16;
272:13; 285:4; 286:1, 1;
291:15; 298:13, 14; 313:4

meaning 29:13

meant 240:5; 243:9

media 111:9; 114:21

medium-sized 9:5

memo 40:15; 63:5;
107:21; 126:9; 177:1

memoranda 40:9; 41:1

memorandum 100:3, 15;
102:15; 117:14, 17;
118:14, 16; 126:8

memory 17:12; 43:12;
158:10; 230:14; 282:13

memos 40:14, 22;
176:15, 17, 18; 177:20

mental 4:17

mention 176:2, 2

mentioned 38:1; 63:11;
91:8; 220:15

Mexico 201:13; 202:1

Michaels 146:1

mid 129:13

Middle 9:12; 10:17;
15:17; 32:12; 46:11;
61:17; 85:22; 109:20;
116:6, 11; 118:9, 10, 13;
120:2; 123:16; 208:17, 22;
216:20; 222:12; 223:3

might 83:9; 141:13;
162:7; 192:2; 219:6;
253:19; 282:19; 283:6;
307:6

mind 29:8; 301:3

mine 211:10

minimal 192:14

minute 238:3; 247:10

minutes 167:13; 283:4;
286:18

miss 282:20

missed 97:19; 98:2, 7

misstates 68:18; 91:3;
112:6; 235:5; 243:7;
310:21

mistaken 164:3

misunderstanding 68:2

misunderstood 131:7;
240:1

model 174:5

moment 134:8; 138:3;
260:9

monitoring 294:6

months 9:4, 7, 8; 14:13;
26:19; 113:1, 2; 205:4;
237:20

more 62:5, 5, 6, 7; 64:11;
65:17, 19; 66:7; 76:7;
87:22; 107:2; 109:5, 5, 15;
116:16; 117:13; 120:20;
124:19; 160:10; 169:6;
213:4; 216:22; 217:4;
224:1; 227:2, 22; 253:15;
286:13; 288:7; 314:4;
318:10; 320:6

morning 6:7, 8; 87:12;
90:10

most 15:12; 12:11; 24:9;
41:10; 43:7; 57:19; 61:3;
65:10; 66:21; 69:10;
71:11; 78:22; 92:17; 94:4;
179:6, 7; 181:6, 14; 230:1,
3; 235:10; 249:21; 250:16,
18, 19; 251:14; 253:16, 21;
255:21; 272:5, 6, 8;
285:13; 288:2; 293:3

Motion 57:10; 58:21;
59:18; 66:2, 9, 11; 71:1, 8,
9; 72:4, 10, 10, 11, 14, 16;
73:3, 6, 12, 14; 74:10, 11;
128:22; 129:1, 3; 166:6,
12; 174:21, 22; 175:2, 3;
188:7, 17; 189:19; 190:1,
3, 17, 18, 20; 195:17;
210:13; 211:3, 4, 5, 19;
235:22; 236:1

motions 56:14, 16, 17,
18; 59:17, 17; 61:7, 7;
66:17; 67:6; 68:10; 69:5;
70:5; 72:13; 191:13;
304:20

mouth 86:8, 9

move 132:4; 237:7, 13,
19; 238:18; 239:14;
297:12; 298:4

moved 44:12; 229:16;
280:16; 297:2, 7; 298:10

moving 251:17

much 25:22; 26:6, 12;
62:22; 73:19; 131:9;
174:10; 216:8; 251:4;
253:16

multi-defendant 89:20

must 51:7

myself 101:22; 144:8

N

Nadiak 35:6; 37:19, 20;
155:10, 12, 13; 157:10

nagged 237:12

nagging 236:19

name 6:10; 7:8; 55:6, 8;
89:5, 7; 94:9; 104:7;
146:10; 149:1, 4, 10;
150:21; 151:2, 9; 155:2,
11; 173:10, 13, 16; 290:9;
294:19, 19

named 216:10; 284:5

names 51:9

naming 109:13

narcotics 11:19; 12:6, 11

National 111:7; 114:20;
262:7; 265:3; 266:10, 17,
19; 267:10, 12, 13

nature 6:15; 160:17;
195:9

near 164:2; 223:18; 251:6

necessarily 180:6

necessary 116:7, 10;
220:17; 285:20

need 6:20; 157:15;
164:10, 11; 219:6; 242:3;
245:5; 257:18, 22; 260:9;
279:8; 297:20; 305:17

needed 50:7; 69:12;
72:20; 80:4, 21; 94:3;
131:2, 12; 168:10, 10;
176:10; 202:15; 218:21,
22; 219:19, 19; 220:14, 17;
221:4, 11; 224:1; 237:7;
256:18; 268:10; 283:1;
318:18

needs 75:16

negative 155:17

neither 101:22

net 44:5

New 4:11; 7:11; 10:2, 7;
15:22; 16:1; 44:12; 46:14;
153:11; 161:20; 169:9, 10;
201:13; 202:1; 234:5;
245:10; 300:4

news 209:17

next 42:22; 46:4; 50:3;
107:5; 154:22; 156:17;
178:10; 203:22; 242:5;
284:5; 305:12

nine 133:22

nobody 307:12

nonattorneys 39:16

none 202:22; 320:11

nonexistence 321:3

nor 161:22; 160:5

normal 108:4; 252:1, 17,
22; 253:1; 266:22; 268:19;
312:3

normally 48:19; 66:10;

95:3; 107:20; 113:14;
305:3; 306:18

notations 51:17

note 101:21; 205:20

noted 203:13; 229:11

notes 72:18; 170:11;
175:18; 234:15; 257:10,
13, 14, 18, 19, 20; 281:19;
304:16

notice 20:1, 3; 21:13;
30:15; 48:9; 53:9; 90:9;
95:22; 102:18; 110:19;
117:9; 128:20; 129:13;
136:1, 19; 138:5; 143:12

noticed 8:1, 9

November 10:9; 128:13;
137:13; 196:20; 205:20

Number 6:2; 15:4, 5;
25:4, 5; 27:15; 28:10; 29:6;
51:8, 9; 54:17, 18; 61:19;
76:3; 81:7; 111:6, 19;
122:10, 21, 21, 22; 141:9,
10; 147:17; 157:12;
158:20; 166:10; 177:8;
184:4, 15; 187:19; 189:21;
192:16, 17; 194:22;
227:10; 234:15, 17, 18;
272:20; 277:8; 278:20, 21;
279:9, 15, 19; 294:21;
317:13

numbering 291:18

numbers 15:6; 157:10;
194:5

numerical 292:5

numerous 132:21;
180:16, 16

O

o'clock 283:2

object 4:8, 14, 14; 5:15;
84:2; 110:7; 111:22;
179:3; 185:14; 188:20;
235:3; 261:22; 264:5;
267:4; 269:2; 274:7;
280:10; 310:17; 312:9;
316:2; 317:8

objecting 5:4

objection 4:21; 5:15; 8:8;
18:8, 13; 27:22; 34:7;
50:16; 68:17; 75:22; 83:2;
84:8; 91:2; 185:21;
195:19; 196:8; 200:21;
205:6, 12; 231:22; 243:6;
265:8; 268:16; 270:14;
275:14; 299:9; 312:10;
313:3; 314:18; 315:1, 6,
13; 321:8

obligation 27:17

observing 131:10

obstructing 28:14

obstruction 28:7, 9, 10,
19; 29:8; 31:22

obtain 287:21; 300:18

obtained 179:16; 182:20;
183:8; 187:3; 226:10;

311:21; 318:22

obtaining 184:20

obviously 36:12; 105:18;
133:9; 166:13, 17; 217:15;
240:1; 297:11; 301:1

occasion 13:12; 33:7, 11;
65:21; 70:15, 16; 79:13,
18, 21; 80:3, 20

occasionally 25:9;
51:13; 81:14; 97:18;
106:17

occasions 5:12; 72:1;
86:18; 132:21; 237:14

occur 128:8

occurred 16:5; 17:6;
135:2; 139:2; 164:4;
201:11; 204:10; 248:3

occurrence 23:22;
190:14

OCDETF 11:8; 12:2,
8; 49:15; 52:16; 61:21;
259:16; 316:15; 317:11

OCDETF-related 320:19

October 46:12; 136:7;
142:15; 148:15; 150:7, 12,
13; 223:14

off 39:8; 46:1, 3; 47:5;
50:14; 102:10, 11; 103:10,
11; 111:9, 11; 126:11;
171:1; 174:21; 208:1;
209:19

offense 52:13

offer 278:2

offered 233:2; 278:1

office 9:12, 14, 19; 10:1,
9, 17; 11:2, 18; 12:5, 17;
13:11; 17:10; 18:5; 22:8;
23:4, 5, 16, 18; 26:20;
32:11; 33:20; 35:4, 11, 15;
36:18; 37:6, 13; 38:5; 40:3,
12; 41:3, 18; 42:1; 44:10;
45:12; 46:20; 49:14, 20;
52:2; 56:20, 22; 57:20;
58:9; 62:11; 64:16, 18;
66:1; 70:20; 75:3; 78:7;
79:5, 7, 10, 10; 80:11, 19;
82:12, 19; 83:21; 84:17;
85:1, 22; 92:9, 9; 95:11,
13; 99:11; 106:9, 21;
107:19; 108:5; 109:18;
112:10, 19, 20; 117:19;
122:2, 5, 15; 124:5;
130:16; 201:11; 208:16,
18; 209:11; 216:21, 21;
229:9; 238:4; 241:17;
250:21; 251:2; 252:19;
254:10; 255:6; 262:21;
263:1, 3, 11; 265:21;
273:19; 274:2; 275:5, 19;
280:6, 14; 282:12; 286:5;
292:12; 296:1, 11; 298:20;
300:18, 21; 301:18;
302:18; 303:12, 22;
306:15, 20; 307:2, 16;
310:15

Officers 46:13; 52:20;
180:17

offices 44:13; 122:18;

236:16; 241:19; 268:20
**official** 9:22; 71:15; 75:3, 19, 20; 267:20; 309:19; 312:18; 313:10; 318:15
**officials** 52:20
**often** 104:12
**old** 49:17
**once** 23:14; 47:8; 56:9; 99:6, 6; 120:4; 305:3
**one** 14:10; 16:2; 19:19; 20:18; 25:4; 33:2, 2; 37:17; 43:15; 45:20; 46:5; 48:18, 22; 50:1; 53:16; 58:7; 59:20; 61:18, 19, 22; 62:2; 63:5; 65:5, 9, 17; 72:21, 21; 73:7, 21; 75:4; 76:6, 22; 77:1, 12; 78:18; 88:4, 5, 5, 6, 18, 19; 90:7, 15; 94:10; 101:15; 105:5; 107:6, 8; 111:19; 120:19; 122:20; 123:3; 124:13; 126:17; 127:1, 3, 4, 8, 18; 128:3; 133:20, 20; 138:3; 141:12; 147:19; 153:9; 161:17; 169:13; 171:4; 175:10; 183:18; 191:11, 12; 194:19; 199:8, 9, 9; 210:18; 214:17, 18; 216:9, 15; 219:10; 222:15, 16, 18; 223:2, 3; 226:12, 15; 230:19; 237:16; 241:19, 20; 245:22; 246:5, 12, 15; 247:19; 249:13; 254:15; 257:4, 12; 258:7; 259:18; 268:21; 269:7; 271:13; 273:9, 10; 274:13, 21; 276:10; 277:11; 281:6; 289:4, 4, 5, 6; 292:18; 297:22; 298:18; 299:2; 303:21; 304:4; 307:1, 18; 314:4; 320:6
**one-page** 35:16; 48:1; 146:8
**ongoing** 29:16; 36:13; 206:9; 212:17; 285:10
**only** 5:5; 23:8; 25:1; 33:5, 6; 35:1, 12; 55:15; 62:9; 67:14; 80:13; 134:2; 168:22; 182:11; 193:5; 205:13; 230:20; 232:16; 274:20; 276:5; 280:11; 289:19; 290:14
**open** 5:11; 34:19; 35:22; 36:5, 7; 52:6; 53:5; 73:9; 74:14; 270:8
**opened** 47:18; 52:5; 54:7; 127:5; 255:18
**opening** 257:15; 317:11
**opinion** 22:4; 24:11; 133:5, 6, 8, 10, 14; 134:8, 15, 18; 135:5; 137:3, 4; 138:18; 139:5; 140:9; 141:2, 6, 13; 142:2, 5, 21; 143:9, 14; 160:22; 161:21; 204:4, 5, 13; 206:15; 287:4
**opinions** 134:13
**opportunity** 312:5
**oppose** 188:8; 193:7
**opposed** 30:6; 102:6; 112:19; 124:20; 187:9, 10; 190:4; 191:7; 216:22; 242:10; 251:11
**opposing** 53:15; 190:22; 195:16
**opposition** 191:5; 206:2; 210:13; 211:4
**oral** 141:14
**orange** 47:9; 48:3, 10, 14, 18; 49:10; 50:5; 80:14; 110:21
**order** 4:13, 15; 5:10; 22:5; 24:10; 45:9; 47:4; 58:4, 5, 20; 67:9; 96:7; 105:4; 170:6; 171:11, 16; 200:20; 223:8; 281:5; 286:22; 287:3, 3, 5, 6; 292:5, 10; 308:11, 18; 309:13
**ordered** 201:3; 223:20
**orders** 59:18; 61:8; 67:7; 70:6; 187:1, 3, 16; 304:19
**organization** 11:15
**organize** 75:14
**Organized** 11:5, 8, 15, 18; 176:20; 259:11; 315:11, 21; 316:11
**Orientation** 100:4, 16, 18; 101:3, 6, 12; 102:2
**original** 66:15, 17; 67:2, 9; 71:2; 72:14; 128:12; 230:18; 272:4; 293:2, 3, 6, 8; 301:8; 303:20
**originals** 178:1; 271:22; 272:9; 276:11; 278:16; 301:10
**Orlando** 35:6
**others** 318:12
**otherwise** 189:1; 205:15
**out** 22:2; 53:11; 54:9, 16; 55:3; 62:20; 63:5; 72:2, 10, 20; 77:18; 78:17; 80:7; 81:19; 82:22; 85:9; 86:19; 88:3, 20; 89:3; 90:13; 91:10; 99:4; 103:16; 113:19; 115:12; 116:20; 119:20; 125:13; 133:14; 138:18; 139:7; 140:9, 17; 142:7, 21; 156:17; 169:2; 174:11; 177:8; 183:10, 12; 184:16, 19; 196:13; 204:19; 206:13; 224:3; 225:9; 234:9; 237:8; 239:15, 19; 241:7; 250:7; 251:3, 5; 252:7, 9, 9, 12; 253:2, 8, 20, 21; 255:2, 17; 256:3, 13, 17; 257:16; 258:2, 13, 14; 263:19; 286:1; 288:7; 289:6, 14; 290:8, 9; 291:4; 292:2; 296:19; 297:7, 12, 15, 19; 298:4, 6, 10
**out-box** 69:14
**outcome** 204:22; 206:12
**outgoing** 67:15; 194:4, 18
**outlined** 5:17
**outside** 241:19; 252:19; 254:10
**Over** 14:15; 19:15; 32:10; 38:17; 65:19; 98:4, 10, 13; 132:5; 170:22, 22; 182:12, 18; 183:3; 192:22; 193:8, 11, 14, 16, 20; 195:6, 11; 225:5, 7; 233:17; 237:15; 238:10; 239:18; 240:6, 8, 13, 15, 19; 241:1, 4; 249:7; 254:15, 21; 258:10
**overturned** 49:9
**own** 17:11; 39:11; 42:4; 43:17; 63:22; 75:16, 18; 212:11

**P**

**P.C** 9:4
**p.m** 144:19; 145:2; 321:20
**pack** 297:13
**packed** 255:3; 297:6, 22
**packing** 297:11
**pads** 257:10
**page** 51:1, 2; 103:19; 107:7; 118:19; 148:11; 149:6, 22; 150:1; 156:16, 17, 16; 169:22; 178:10; 203:11, 22; 205:10; 260:7; 272:20; 277:8; 278:20; 317:15
**pagers** 187:5; 195:9
**pages** 77:20; 107:2; 115:7, 17; 117:13, 16; 208:10; 289:19; 290:15
**panel** 24:21; 243:22, 22
**Panicked** 225:13
**paper** 35:21; 56:9; 60:2; 144:3
**papers** 70:3; 71:4; 72:7; 182:22; 213:19
**paperwork** 65:20; 66:7
**paragraph** 50:21; 113:3; 120:3; 156:14; 166:9; 167:11; 169:2; 175:11; 176:13, 14; 185:5, 6; 203:10, 16, 20; 205:2, 7, 9; 211:15, 16; 247:4; 294:12
**paralegal** 33:8; 35:8, 14; 39:20; 131:5; 145:19; 146:2
**paralegals** 37:18; 39:4; 104:22
**Pardon** 31:11
**parole** 93:12
**part** 27:18; 41:10; 52:1; 69:7, 18; 70:19; 75:11; 78:21; 116:1; 123:1; 177:17; 180:7; 181:15; 206:10; 214:21; 226:4; 231:8; 233:11; 251:14; 265:12; 267:3, 22; 268:11; 269:8, 10; 281:10; 317:20
**parte** 191:1
**partial** 231:9; 289:17, 18;
290:12
**participate** 23:2
**particular** 6:15; 16:22; 37:15, 21; 53:20; 58:21; 60:9; 76:17; 102:20; 106:1; 116:9; 159:20; 174:19; 182:3; 196:14; 215:11, 12; 260:4, 13; 268:12; 292:10; 299:7, 17
**particularly** 156:13; 252:15
**parties** 27:18, 19
**parts** 78:12
**party** 25:13; 26:12
**Pat** 35:6; 37:19, 20; 155:10, 12; 157:9
**Paul** 8:2; 241:16, 18, 21; 256:3; 257:3, 5, 13, 20; 258:8, 8, 12, 13; 271:11; 279:7; 291:12; 295:13, 13
**Paul's** 257:19
**Peluso** 92:18; 93:1, 20; 129:22; 130:2; 131:9; 132:4; 138:17; 141:16; 207:9; 209:5; 217:3
**Peluso's** 149:4; 209:2
**Pen** 185:12, 18; 186:6, 14, 15; 187:1, 16, 19; 192:12, 15, 20; 193:1, 10; 194:1, 2, 4, 8, 16, 18; 233:18; 235:16, 19
**penalty** 128:21; 129:14; 177:2
**pending** 36:1, 10, 19, 21; 90:19; 92:4; 136:22; 137:4; 147:18, 21; 148:3; 150:5, 8, 11; 151:10, 12; 152:12; 153:5, 13; 156:9, 22; 157:3, 5; 158:12, 15; 159:4, 8, 10, 11, 18; 161:1, 19; 163:18; 169:15; 171:20; 220:2; 239:4, 10; 241:6; 245:4; 246:3; 303:7; 305:21
**Pennsylvania** 8:19; 9:6
**people** 11:4; 27:19, 21; 37:12, 16; 39:3; 43:15; 62:3; 89:2, 4; 110:5; 151:17; 177:9; 180:19; 300:6, 7
**Peoples** 254:14
**per** 62:7
**percentage** 21:8
**perhaps** 19:7; 94:14; 224:8
**period** 10:11; 19:5; 23:10; 25:20; 33:14, 18; 129:11
**periodically** 125:14; 142:6
**permanent** 111:6
**permit** 265:1; 318:14
**permitted** 161:12, 13
**person** 32:14; 124:13
**personal** 39:17; 72:6; 79:10
**personally** 50:15; 207:13; 253:8; 309:10
**personnel** 39:15, 16; 138:19
**pertained** 187:6
**pertaining** 312:20
**Petersburg** 177:4; 178:4; 198:16; 226:13; 256:22; 259:9; 279:4; 287:11; 291:17; 292:13; 294:16; 295:2, 6, 11
**petition** 16:18; 22:11, 14, 18; 21:3, 3, 5, 19; 24:2, 16, 17, 18, 20, 21, 22; 25:14; 26:7, 13; 99:12; 137:17; 139:20; 140:18, 21; 203:18; 204:7, 9, 10; 205:21; 206:17, 20; 207:20; 208:4, 6, 10, 20; 209:9; 216:17; 217:5, 19; 218:3; 241:10, 12; 242:21; 243:2, 4, 8, 9, 10, 12, 19; 244:3, 16; 245:8; 246:5; 247:7
**petitioned** 17:1; 24:1
**petitions** 17:20; 217:9
**Phipps** 209:3
**phone** 186:22; 187:3; 192:16, 17; 194:5; 195:7; 197:7, 9; 198:17; 221:12
**phones** 187:21
**photocopied** 41:7; 272:16, 22; 273:11, 13, 14; 301:21; 304:22
**Photocopies** 277:8, 20; 304:5
**photocopy** 67:8
**photographs** 96:6; 256:5; 277:9; 306:22
**phrased** 5:14; 125:1
**phrasing** 18:9
**physically** 229:17; 271:9
**picked** 97:15
**piece** 60:1; 175:7
**pin** 247:14
**Piper** 6:12
**Pittsburgh** 9:5; 12:18
**place** 64:14; 71:10; 298:3; 307:6, 10
**placed** 51:16; 63:14, 15, 16; 298:12; 299:6, 16, 18
**PLAINTIFF** 5:20; 6:11; 145:8
**plaintiff's** 211:4
**plane** 282:18, 20
**plea** 53:8; 96:4; 127:16; 284:13, 15; 304:19
**pleaded** 152:2
**pleading** 71:19; 210:10; 221:9
**pleadings** 57:13, 13; 58:2, 19; 63:13; 64:2; 65:16; 67:4; 71:15; 72:22; 74:8, 13; 75:9, 21; 146:12; 212:12; 304:19, 20

pleas 14:1
Pleasant 7:10
please 6:21; 23:13
pled 133:21; 284:16
point 11:17; 17:7; 19:13, 14; 20:7; 23:2; 40:18; 41:20; 43:19; 49:9, 22; 58:7; 63:5; 71:18; 78:18; 93:22; 95:21; 98:10, 11; 108:5, 10; 127:12; 130:11; 131:5; 136:4; 140:22; 143:18; 169:1; 186:21; 191:8; 196:14; 199:13, 17, 20; 203:2; 206:19; 219:13; 225:11, 13; 226:3; 237:17; 238:19; 240:1, 2; 241:7, 14; 243:16, 16; 247:9; 268:7; 287:2; 295:9; 298:18; 299:2; 309:6, 21; 311:11, 21
Polaroid 277:9
police 52:20; 176:15; 177:3, 4; 178:2, 4; 198:16; 226:13; 233:6; 257:1; 259:10; 279:4; 287:11, 15; 291:17; 292:13; 294:17; 295:2, 6, 11
policies 40:5, 13; 41:19; 83:21
policy 36:18; 37:1; 58:10; 64:11; 85:14; 105:18; 113:22; 114:9; 318:16
Political 8:20
poorly 5:15
portion 272:8; 274:10
portions 198:14
position 132:11; 162:1; 163:4; 167:17; 180:2; 309:21
possibility 29:3; 98:6; 162:7; 212:21
possible 62:21; 91:11; 93:19, 19; 106:7; 156:1; 158:11; 300:13
possibly 250:13
post-verdict 21:4
potential 52:8, 17
potentially 31:2
practice 9:13; 22:8; 35:4; 46:19; 58:11; 64:6, 12; 65:1, 16; 66:21, 21; 69:21; 71:7, 19; 85:21; 86:21; 237:6; 252:1, 17, 22; 253:1
practices 40:5; 41:18; 84:20; 85:6
pre-sentence 96:8
precede 34:3
precedent 113:17; 114:18
preceding 120:3
precluded 75:17
predecessor 103:2
preference 71:12; 74:1
preferences 75:16
preparation 7:22; 75:6; 132:18; 183:2; 228:22;

231:6; 252:2; 306:13
prepare 20:8; 50:13; 96:1; 113:2; 270:12; 286:3
prepared 33:8; 111:15; 117:12; 175:14; 176:18; 278:2; 279:11
preparing 7:15; 43:5; 50:11; 52:4; 173:7; 174:17; 201:9; 232:4
present 7:8; 57:7
preservation 27:1; 83:22; 84:21
preserve 4:22; 27:13, 21
preserved 202:15
Preston 87:15; 88:22; 90:3, 14; 91:8, 21
presumably 158:18
presume 35:7
pretrial 56:14
pretty 17:17; 18:11; 62:22; 114:3
prevent 75:1
previous 17:12; 35:13; 224:3; 231:5, 10; 240:4
previously 4:20; 145:6; 197:18; 220:3; 222:4; 290:6; 309:8; 311:13; 314:19; 315:2, 7, 14
primarily 19:9; 122:16; 131:6, 8; 258:11
primary 18:19
print 149:1; 290:8, 8; 291:4
printed 208:10; 289:6, 14
printout 293:9
printouts 288:11
prior 12:3; 13:19; 17:2, 10, 13; 22:12; 58:20; 108:7, 19, 22; 112:2; 129:4; 154:4, 18; 155:8, 9; 167:5; 180:21; 201:9, 15; 202:7, 10, 14, 19; 204:15; 215:4; 219:17; 223:6, 17; 231:16; 261:16; 263:18; 278:4; 319:14
prison 93:11
Privacy 102:16; 103:4; 104:7; 295:22; 296:2, 5, 6; 299:8
private 9:13
privileged 289:21
privileges 260:17, 21, 22; 261:2, 3
probably 14:7; 15:1, 12; 17:8; 23:21; 24:5; 26:10; 36:11; 39:1; 43:6, 15; 50:6; 59:8; 61:15; 73:22; 80:10, 15; 99:1, 14; 111:12; 123:2; 139:3, 6, 14, 15; 140:8; 144:9; 145:18; 160:3; 184:7; 191:12; 195:4; 233:8; 241:14; 246:1, 2; 250:6; 253:15, 17, 21; 259:8; 275:10; 280:17; 289:9; 291:21; 292:22; 293:3; 298:1;

300:4, 5, 8; 305:1
problem 16:5; 163:16; 164:13; 197:1; 316:14
problems 72:21; 123:4
procedural 124:19
Procedure 6:5; 30:4; 32:2, 5; 160:21; 161:7; 169:8; 191:19; 192:8; 283:9
Procedures 46:14; 62:19; 80:6; 82:21; 83:21; 108:4; 268:13, 13
proceed 168:2
proceeding 29:2; 30:6; 56:11; 154:18; 169:15; 212:8; 213:5
PROCEEDINGS 4:1; 147:22; 148:3; 150:6; 152:6, 22; 153:5, 18; 154:7; 155:18; 156:9; 157:4; 158:13, 14; 159:4, 8, 10, 11, 12, 18; 160:13; 161:1, 22; 162:6; 163:17; 167:5; 168:18, 20, 21, 21; 303:8
process 114:4; 214:18; 215:10, 10; 241:2, 4; 254:1; 261:3
processes 4:18
produce 30:11, 17; 31:1, 7, 13; 34:21; 159:9; 311:4
produced 5:9; 45:2; 48:1, 5, 18; 76:15; 77:2, 17; 100:8; 121:6, 12; 160:20; 161:9; 169:5; 181:5, 7; 183:5; 269:18; 302:22; 303:4; 319:10
producing 148:2
product 195:22; 261:3
production 189:7
program 52:11, 12; 84:17
progress 53:14; 54:4; 109:16
prohibited 262:10; 264:21
prohibition 309:19
prominent 52:14
prongs 69:20; 70:3
pronounce 155:11
proposition 168:16
prosecute 56:12; 92:15
prosecuted 18:20; 28:10; 31:21; 92:8; 126:16; 236:18
prosecuting 28:13; 29:18, 19; 97:15; 287:19
prosecution 30:7, 20; 36:10, 16; 53:7; 54:12, 22; 94:5; 95:7; 217:16; 266:20; 268:17; 269:1, 6
prosecutions 79:2; 109:17
prosecutor 10:11; 12:13; 21:14; 26:16; 30:10; 98:17; 126:20; 129:18, 20; 190:15; 240:14; 259:16;

266:13, 19, 22
provide 6:16; 33:20; 157:17; 173:6; 192:6; 198:19; 210:3; 216:8; 218:18; 219:3; 293:19; 310:1
provided 40:3, 18; 45:20; 138:14; 172:8; 173:20; 177:13; 178:5; 188:2, 3; 199:8; 211:18; 229:2; 233:13, 19; 235:2, 12, 20; 252:21; 272:16; 273:15; 275:1; 278:3; 301:22; 302:3, 14; 310:14; 311:1, 2
provides 293:22
providing 138:6
proximity 128:8
public 52:20; 77:9
publication 101:9
publicly-available 77:8
published 102:21; 133:7
pull 72:20; 231:17
pulled 171:1; 255:17
pulling 257:16
purchases 279:12
purge 239:17; 241:4; 245:12; 249:7; 252:2, 9; 254:11; 296:19; 314:21; 315:4
purged 119:16, 20; 120:4, 6, 14, 18; 177:18, 21; 183:17; 219:22; 224:17; 225:4, 8, 16; 226:2, 6, 19; 229:4, 10, 14; 230:1, 2, 17; 232:5; 234:22; 236:3, 10; 237:1; 239:22; 249:12, 15, 22; 250:1; 252:5; 256:1; 258:15; 263:5, 10; 271:16, 21; 272:6; 274:20; 275:13; 277:1; 280:5; 281:17; 282:1, 8, 14; 298:6; 299:1; 300:14; 301:14, 15, 21; 303:15; 304:15; 306:10, 13; 307:7, 14; 308:2; 320:10, 13, 15, 21; 321:12, 15
purging 117:19; 118:20; 119:9; 120:8, 13; 202:9, 21; 203:3; 215:5; 229:10; 239:5; 245:15; 258:12; 284:21; 285:1, 4, 6, 11, 14, 17; 305:11
purpose 163:14; 212:14; 220:6; 281:11
pursuant 4:13; 5:10, 10; 160:20; 187:3; 235:12, 20; 272:17; 301:22
put 41:8; 49:10; 54:10; 58:17; 60:5, 9; 63:5; 66:2, 11, 17, 22; 69:13, 15, 20; 70:3, 4; 71:2, 4, 15; 72:17; 74:2; 94:9; 96:18; 149:4; 161:22; 166:20; 168:12; 171:3; 174:8, 18; 193:2; 212:11; 215:13, 18; 216:3; 245:6; 256:13; 257:6; 286:2; 298:15, 16; 301:2

putting 94:12; 122:20; 167:16; 172:11; 212:14; 251:16; 285:15

Q

quick 76:7; 308:6; 312:8
quicker 144:3
quickly 3:9; 74:3; 251:17; 258:17; 270:10; 297:22; 298:5
quite 133:4; 167:12

R

racketeering 176:19, 21
raised 141:11
Ralph 135:4
rare 21:2; 65:21
rather 73:2; 133:6; 142:16
Raymond 92:10
reaction 224:13; 249:3
read 69:11; 78:4; 80:2; 83:3; 85:12; 116:22; 119:14; 156:18; 211:2; 213:7; 227:8; 236:5; 313:22; 314:2
readily 60:9
reading 211:12; 272:19
realize 259:1
really 6:20; 36:14; 37:11; 42:18; 43:6; 44:15; 113:14; 142:11; 251:6; 300:4; 302:9
reason 33:5, 6; 52:14; 73:15, 22; 120:17; 159:18; 179:9; 182:12; 193:7; 203:1; 211:9; 239:12; 245:14; 299:17; 300:10
reasons 65:5; 73:22; 76:3; 182:3; 298:1; 314:13
recall 5:12; 16:2; 17:5; 18:1; 20:17; 32:17; 33:6, 7, 7, 10; 34:10, 11; 35:20; 36:13, 14; 37:10, 22; 40:15; 41:14; 42:6; 64:22; 78:12; 81:19; 87:15; 90:3, 14; 91:13; 92:6; 93:18; 106:15; 115:3, 3; 116:3; 128:11, 22; 146:14; 149:11, 17; 153:1; 155:13, 19; 156:4; 159:14; 164:7, 8, 9; 166:14; 170:21; 172:22; 173:22; 174:9; 175:22; 176:3; 180:22; 181:1; 182:2, 4, 16; 184:17; 186:5, 6; 187:7, 12; 189:17, 18; 190:2, 3, 7, 11; 191:10, 15; 192:21; 197:7, 9, 15, 16; 198:22; 199:3, 14; 200:17; 202:22; 210:6; 211:12; 215:19; 216:9; 217:12; 218:1; 219:8; 225:15; 226:11; 232:5; 235:13; 237:13;

WILLIE JEFFERSON  v.
JANET RENO et al

JEFFREY S. DOWNING
June 15, 1999

243:19, 20; 244:2; 245:19, 20; 246:7, 9; 248:6; 257:15; 277:4; 282:1; 283:16, 21; 289:9, 10; 291:12, 13; 292:7, 9
**recalled** 145:5; 229:10, 21; 230:20
**receive** 78:5
**received** 8:11; 30:14; 40:21; 46:11; 75:3; 77:12, 21; 78:8; 91:1; 101:11; 111:9; 114:20; 162:4; 198:10; 208:21; 209:6; 263:7; 273:10; 290:5
**receiving** 90:9
**recently** 73:16
**Recess** 87:10; 144:20; 209:21; 286:19
**reciprocal** 233:13
**recited** 138:15
**recognize** 78:2; 110:19; 115:14; 121:3, 18, 19; 148:7; 198:4, 7; 218:9; 259:2; 312:12
**recognized** 110:17
**recollection** 35:12; 91:7, 9, 19; 94:8, 16; 105:16; 106:6, 11; 129:2, 10; 135:1; 139:8; 147:12, 14; 151:1, 3; 154:19, 21; 155:5, 6, 22; 159:6; 160:2, 5; 163:9; 164:1; 166:16; 168:6; 181:8; 184:14; 187:18; 188:22; 191:4, 6, 7; 192:11; 200:12; 201:8; 202:18; 215:17; 219:5; 220:12; 229:9; 230:13, 16; 241:15; 242:4; 247:7, 14, 19; 274:4, 22; 276:5, 7, 9, 14; 277:14; 280:3; 281:13, 20; 282:8; 294:1; 300:14; 301:13
**Recommends** 111:6
**reconstruct** 201:4; 271:2, 4, 7, 9, 19; 281:13
**record** 4:8; 7:8; 14:22; 20:5; 22:15; 23:17; 39:8; 46:1, 3; 47:22; 48:5; 55:14; 56:16, 22; 77:6; 83:11; 96:4; 101:22; 102:10, 11; 103:10, 11; 104:11; 121:20; 126:11; 185:21; 209:20; 211:1; 223:12; 264:17; 308:9; 314:2
**recorded** 274:5, 13; 275:20; 276:8
**recorder** 199:4
**records** 30:11; 32:16; 36:19, 20; 40:4, 6, 10; 45:14; 46:14, 15, 21, 21; 47:1, 2, 4, 5; 51:6, 7, 15; 80:22; 82:19; 83:16, 19; 84:17, 22; 85:20; 90:4; 95:3, 5, 6, 7, 10; 98:13; 126:15; 152:21; 153:16; 154:6, 17; 157:3; 158:21, 22; 159:3, 9; 160:9, 11; 179:21; 180:19; 187:1, 2,

4; 192:6; 194:4, 5, 16, 18; 195:7, 9, 10, 14; 196:12, 14; 197:8, 10; 214:1, 4, 12; 237:10; 282:6; 295:22; 296:5, 6
**recreate** 225:21; 226:10; 232:11; 301:11; 302:4; 305:20; 306:4
**recreated** 226:15
**redacted** 259:1; 260:18
**reduce** 252:10; 298:7
**reduced** 78:21
**reducing** 305:8
**reduction** 285:7
**refer** 79:14; 80:5; 82:6; 115:6; 128:16; 232:20; 284:7; 285:11, 17; 294:20; 317:14
**reference** 231:20; 285:13
**referenced** 196:21; 197:3
**referral** 49:3; 264:16
**referred** 79:15, 19; 101:1; 104:12, 22; 157:22; 176:5; 177:4; 233:10; 234:14; 235:22; 236:4, 7; 283:15, 19, 22; 284:8; 287:12; 294:17; 307:19; 317:19
**referring** 21:19; 38:8; 68:22; 83:18; 88:21; 90:7; 105:12; 107:5, 6; 134:7; 138:6; 148:14; 154:21; 165:21; 166:8; 169:21; 171:17; 192:10; 203:9; 205:10, 13, 18; 210:16, 19; 223:3; 228:12; 234:7, 8; 237:3; 248:17; 267:20; 272:12; 285:18; 290:19; 309:3, 5
**refers** 100:15; 102:2, 5; 267:20
**refresh** 158:10; 188:22; 247:13; 281:20
**refuse** 31:1
**regarding** 192:15; 228:1; 260:20; 264:11
**regional** 114:20
**Register** 102:18, 22; 185:18; 192:15; 194:2, 2, 4, 8, 16, 18
**Registers** 185:13; 186:7, 14, 16; 187:2, 16, 19; 192:12, 20; 193:2, 10; 233:19; 235:16, 19
**regular** 133:12; 236:21; 266:16
**regulation** 102:21; 113:22; 114:8
**Regulations** 102:16; 103:5; 265:3
**rehearing** 24:16, 17, 21, 22; 25:14; 26:8; 203:18; 204:7, 9, 10; 216:18; 217:1, 5; 241:12; 243:9, 11, 21, 22; 246:6
**relate** 29:5; 317:5

**related** 16:3, 4; 95:7; 248:19; 261:8; 315:10
**relates** 309:2
**relating** 72:19; 178:12; 187:4; 195:7; 233:12, 14; 244:15
**relationship** 28:22; 122:4; 123:5
**relatively** 23:9, 10; 59:6; 123:2; 130:15; 221:12; 254:19, 19
**release** 36:18, 20; 37:2, 2; 154:16; 160:8, 11
**released** 36:4; 91:17; 260:18; 263:13; 295:1, 7; 317:20
**relevant** 27:20; 28:13, 16
**relied** 82:11, 15; 83:4
**rely** 82:20; 83:8
**relying** 50:9
**remain** 179:8, 13; 301:16
**remainder** 96:10; 103:20
**remained** 300:20
**remaining** 127:15, 17; 128:2; 166:2; 301:8; 302:11
**remains** 280:5; 282:9, 14; 301:12
**remand** 15:22
**remanded** 16:3
**remember** 16:21; 34:12; 36:2; 42:7, 15; 44:1, 8; 64:6; 80:15; 87:18; 89:15; 90:1, 18; 92:7; 93:2; 133:13; 135:8; 145:21; 146:5; 147:19; 149:12, 14; 154:8, 12; 155:2; 163:18; 166:4; 173:10, 16; 180:13; 183:19, 20; 187:20; 195:2, 13; 201:20; 202:3, 6, 13; 217:6; 232:11; 244:12; 248:22; 249:1; 284:22
**Removal** 105:3
**remove** 252:19; 297:17
**removed** 250:8
**removing** 285:19, 19
**render** 133:5
**reorganization** 12:3
**repeat** 84:12
**repeating** 145:12
**rephrase** 98:7; 273:18
**report** 96:8; 108:14; 113:5; 123:13, 18; 124:13, 14, 21; 125:3, 7, 9; 279:10; 280:1; 290:1; 291:5, 17, 20; 292:1, 14; 293:12, 13, 20, 21; 294:5, 15
**reported** 11:3; 109:9
**reporter** 314:2
**reporting** 124:11
**reports** 125:13; 234:20; 254:2; 256:4, 10; 278:19; 279:3, 16; 287:15, 16, 18, 21; 288:1, 2, 4, 5, 7, 11, 15, 22; 290:9, 13; 291:19;

292:4; 294:18; 295:7
**represent** 103:15; 104:11; 198:9; 319:19, 21
**represented** 7:12
**representing** 6:11
**represents** 198:13
**reproduce** 281:2, 6, 8
**request** 4:19; 32:15; 33:4; 34:4; 35:2, 5, 7, 10, 13; 37:21; 90:4, 9, 18; 91:15, 18, 22; 120:5, 15; 126:14, 18, 19; 145:14, 16, 20; 146:8; 152:15; 153:3; 159:19, 21; 167:7; 168:2, 9; 169:16; 172:6; 213:3, 11, 13, 20, 22; 214:4, 22; 216:22; 220:6; 239:4, 11, 14; 240:9, 12; 243:20; 262:20; 264:9
**requested** 23:12; 34:16; 152:20; 154:6; 155:16; 157:2; 158:22; 160:18, 19; 167:14; 189:22; 194:6; 220:21; 234:11; 243:22; 259:18; 314:3
**requester** 37:3
**requesting** 147:6, 8, 9; 162:11; 177:1; 295:10, 16
**requests** 33:22; 37:8, 18; 38:3
**require** 27:1, 13; 52:18; 67:4; 106:18; 178:20; 179:18; 269:22
**required** 44:4; 52:19; 66:19; 82:8; 87:2; 192:19; 193:2; 200:20; 267:2; 268:12; 311:7; 313:8
**requirements** 50:10; 83:9; 266:10
**requires** 190:20; 296:14
**requiring** 223:8
**research** 72:18; 254:1
**resisted** 43:16
**resolved** 270:9; 318:1; 321:16
**Resource** 121:16
**respect** 22:10; 69:12; 84:21; 86:1; 129:21; 130:18; 139:12; 180:4; 191:3; 194:20; 201:6; 239:5; 246:3; 252:18; 261:4; 267:17; 276:7; 279:17
**respond** 66:13; 70:17; 166:15; 174:8
**respondent** 20:15
**responding** 153:4; 190:22
**response** 22:21; 23:11, 12; 33:9; 58:22; 66:2, 14, 14; 73:14; 145:19; 146:8, 22; 147:15; 189:9; 190:9, 16; 191:2, 4; 196:3, 19, 21; 262:19; 283:14; 309:12; 319:6
**responses** 56:17; 58:16; 59:17, 17; 61:7, 7; 68:11;

69:5; 70:5; 72:13; 304:21
**responsibility** 18:19; 21:21; 52:9
**responsible** 18:5; 19:2, 9; 35:9; 37:7; 55:12, 15; 98:17; 238:6
**responsive** 264:8
**rest** 128:7, 9
**restriction** 311:20
**result** 15:22; 22:2; 31:20
**resulted** 15:10; 89:10; 153:11
**retain** 40:10, 19; 97:2; 98:16; 99:9, 14; 178:6; 180:6; 183:18; 274:13
**retained** 47:14; 85:20; 86:3; 274:18, 21; 277:12; 279:6; 300:16; 303:21, 21; 304:13
**retention** 40:4, 5, 16; 111:7
**retired** 48:10
**retrial** 162:7
**retrieve** 51:14
**return** 179:11; 180:21; 252:20
**returned** 54:11; 89:18; 136:15; 180:3; 201:12; 226:12; 275:10
**returns** 184:16
**reveal** 294:9; 311:5
**reversed** 153:10
**review** 81:16; 91:16; 92:1, 6; 146:20; 149:16; 152:13; 153:6; 160:4; 174:13, 22; 210:5; 223:9; 256:20; 257:3; 305:22; 306:1; 307:13, 20; 312:5
**reviewed** 35:17; 149:19, 19; 152:11; 154:20; 156:5; 160:6, 10; 175:2; 282:5
**reviewing** 35:21; 105:16; 156:2; 160:7
**RICO** 177:11
**rid** 237:1; 238:12
**Right** 12:4, 12; 13:9; 15:5; 20:6; 22:16; 23:20; 26:18; 27:6; 47:10; 48:20; 55:17; 63:18; 69:21; 70:11; 71:7, 13; 75:13; 86:6; 104:15; 106:5; 109:21; 113:9; 115:8; 123:11, 16; 126:21; 130:4; 137:21; 140:15; 141:5; 148:16; 152:7; 153:14; 164:21; 170:17; 186:19; 189:11; 203:8, 19; 204:15; 222:5, 9, 17; 223:1; 227:20; 242:15, 17; 252:5; 255:14; 305:6; 312:16; 321:17
**rise** 4:19
**risk** 318:15
**road** 104:19
**Robert** 87:16; 88:22; 89:19; 133:21
**Ronald** 17:1

**Min-U-Script®**

**Room** 7:10; 70:20; 144:18; 229:19; 251:3, 5, 7; 297:3, 8, 9; 298:11
**roughly** 12:1; 33:18; 34:13
**routinely** 119:16; 120:4
**Roy** 89:1
**rule** 15:21; 102:18; 103:2; 113:21; 114:8; 142:4; 161:6; 179:8; 180:1, 8, 11; 181:15, 17, 21; 182:7, 9, 18; 183:3, 9, 12, 13, 14, 15; 184:2; 188:4; 192:7; 193:11; 195:12; 204:8; 233:17; 234:6; 235:2, 12, 20; 272:17; 302:1, 4; 304:22
**Rules** 6:4; 25:13; 27:1; 30:3; 32:2, 4; 94:22; 95:4; 160:21; 161:6, 14; 169:8; 191:18; 192:4, 7; 266:17, 19
**runs** 98:8

## S

**S** 4:3; 6:1; 7:9; 145:4; 321:21
**salmon** 48:3, 15; 110:22; 285:15
**salmon-colored** 286:2
**same** 101:3; 110:21; 119:11; 120:1; 194:1, 1, 3, 6, 10; 204:1; 211:10; 226:20; 227:11; 228:18, 19, 20; 239:2; 255:9; 263:22; 265:8, 9; 290:4, 11; 312:10; 314:12, 18; 315:1, 6, 13
**sanction** 30:5; 31:4
**sanctions** 29:10, 13, 18; 30:3, 21
**Sanders** 226:14; 271:12
**sandwiches** 144:18
**sat** 229:8
**Saturday** 65:13
**saw** 106:22; 241:16, 18
**saying** 63:6; 70:2; 74:18; 81:19; 86:8; 173:1; 211:9; 246:9; 250:10; 258:5
**schedule** 142:16, 18
**schedules** 45:13
**school** 8:17, 22; 9:2; 12:16
**Science** 8:21
**scope** 4:15; 5:16; 308:13
**seal** 188:8; 190:12, 16; 297:16
**second** 13:1; 46:2, 16; 88:18; 89:3; 148:11; 149:6, 22, 22; 150:16; 201:2; 209:20; 221:22; 223:18; 227:1; 228:7, 8, 9, 13; 229:2; 247:19; 251:1, 3; 261:1; 271:6; 281:11; 283:20; 298:17; 306:12

**secrecy** 180:7
**secret** 179:13; 265:12, 22
**secretaries** 39:4; 51:20; 63:20; 64:19; 71:20; 73:19; 114:2; 236:22; 238:9, 10
**secretary** 10:10; 20:8, 11; 47:20; 50:2, 9; 53:12; 55:3; 58:13; 59:12, 20; 64:2, 12; 65:7, 11, 18; 66:16; 68:3; 69:15, 17; 70:12; 71:2; 80:12; 81:14, 20; 82:11, 20; 83:8; 85:7; 86:11; 96:1; 111:12; 113:19; 114:1, 13, 15, 21; 117:11; 126:3; 131:4; 173:4; 209:4; 236:20; 238:6; 250:5, 15; 251:6; 253:4, 5; 305:14
**section** 10:22; 11:7, 19; 12:6, 7, 9, 20; 28:19; 38:11; 49:15, 19; 53:18; 61:4; 64:13, 15, 17; 103:17; 112:16; 125:4; 132:5; 176:21
**sections** 11:2
**Security** 262:7; 265:3; 266:10, 17, 19; 267:10, 12, 14; 269:17; 312:2
**seeing** 106:6; 116:4; 117:10; 247:13; 257:17; 277:4
**seek** 128:21; 129:14; 177:2
**seem** 149:17; 153:1; 244:2
**seemed** 62:5; 205:15
**segregate** 255:15
**segregated** 70:2
**segregating** 182:4
**seized** 184:16
**selling** 177:7
**send** 25:5; 35:8; 47:4; 50:8; 51:5; 63:7; 237:8, 9; 286:3, 21; 290:20
**sending** 22:3, 5; 24:12; 46:21; 98:16; 174:11
**sense** 30:8; 55:12; 58:3; 112:1; 166:17; 271:20; 285:7; 318:10
**sent** 20:5; 47:1; 50:14; 54:9; 60:19; 86:5; 96:22; 97:3; 98:13; 106:8; 161:19; 166:13; 174:22; 183:10, 12; 209:11; 226:4; 237:9; 287:3; 289:17; 290:15, 21; 307:19
**sentence** 47:14
**sentenced** 81:18; 93:11; 136:18
**sentences** 152:8
**sentencing** 16:3, 4; 53:9; 92:17; 159:12
**sentencings** 206:8
**separate** 30:6; 39:11; 59:16; 67:1; 68:9, 12; 69:19; 72:4; 74:21, 21;

75:12; 88:14; 101:8, 8; 230:21; 269:2; 319:10
**separately** 127:13; 299:22
**September** 9:21; 10:5, 8; 219:17; 222:22; 223:6, 13, 17; 226:16; 227:19; 228:4, 17; 229:1; 232:4, 15; 239:21; 247:3
**Sergeant** 295:15
**series** 16:22; 44:18; 256:9; 270:17; 308:6; 312:8
**served** 30:15; 57:11
**set** 59:4, 10, 11, 12, 15; 60:4, 15; 61:4; 62:19; 78:13; 79:4, 9; 80:6, 17; 85:9; 113:17; 114:17; 116:20; 129:10, 12; 169:2; 174:6; 183:18; 224:2; 225:9; 234:9; 251:9; 255:18; 273:11, 13, 14, 20; 274:1, 3, 13, 21; 275:1, 19; 276:10; 277:11; 288:14; 293:15; 301:21; 304:5, 22; 306:22
**sets** 256:4; 272:16, 22
**setting** 251:11, 11
**setup** 68:7
**seven** 14:7; 133:18, 19; 134:2, 5, 20; 142:18
**several** 76:21; 88:8; 127:1; 191:13; 229:12
**severe** 128:6; 129:1
**severed** 128:1; 284:4
**share** 192:8
**Sharvonne** 284:18
**sheet** 35:16, 21; 47:9; 48:2, 15; 50:6; 52:6; 53:11; 54:9; 80:14; 86:17; 100:14; 103:18; 110:22; 111:3; 285:16; 286:2
**shelves** 171:2
**short** 19:5; 23:10; 52:13; 216:7; 299:4
**shorten** 143:2
**shortly** 128:19; 132:8
**show** 44:17, 22; 76:6, 8; 99:18; 101:14; 105:9; 120:19; 148:4; 156:10; 197:17; 208:8; 210:9; 218:7; 258:16
**showed** 244:13; 293:19; 304:11
**showing** 46:10; 103:13; 190:8; 260:5
**shown** 121:14; 179:15, 17; 258:22; 282:2
**shred** 253:2, 9
**shredded** 177:22; 185:3, 4; 226:7; 229:7; 232:14; 257:7; 279:7, 14, 18; 288:18; 291:8; 303:17
**shredding** 255:16
**shut** 5:1
**side** 47:10, 11; 51:17

**sign** 35:18; 50:7; 53:1; 80:14, 17; 86:17; 91:1; 145:20; 146:6, 10; 147:5; 149:9, 15
**signature** 111:16; 148:20; 149:7
**signed** 12:9; 147:1; 150:20, 21; 151:9; 170:5; 200:15; 211:22; 212:20; 218:16; 246:17; 270:13; 308:12, 18
**significance** 278:14
**significant** 43:2; 53:7; 107:17, 19, 20; 108:2, 7, 14, 17; 109:8, 17; 110:2, 12; 111:21; 112:1, 4, 10, 18, 22; 113:1, 4, 11, 13; 116:16; 125:14; 142:22
**significantly** 227:1
**signing** 106:15; 117:7; 147:10; 149:12, 17; 223:6
**similar** 47:12; 61:5; 70:2; 118:17; 174:3; 228:2; 237:4; 264:2, 7; 310:2, 3; 319:14
**simply** 124:14; 179:15; 263:15; 302:13, 18
**single** 178:6; 183:4
**sit** 80:1; 144:17; 280:19
**site** 42:2; 47:5; 50:15
**sitting** 5:1; 215:7; 276:2
**situation** 109:6; 114:6; 168:13; 174:3; 234:13; 311:3
**situations** 86:11
**six** 9:3, 7, 8; 14:7; 26:19; 61:21; 89:11; 113:2; 204:20, 20; 206:10
**size** 254:7; 305:9
**skewed** 123:6
**skipping** 277:7
**small** 211:11
**smaller** 78:21; 198:12; 253:14
**SMORODIN** 4:7; 5:7, 19; 7:13; 8:7; 13:16, 21; 17:21; 18:8, 13; 25:15; 27:5, 8, 22; 29:12, 17; 34:7; 38:8; 42:9; 45:1, 17; 46:1; 47:22; 48:17; 50:16, 22; 51:3; 68:17; 75:22; 76:20; 77:5, 15, 22; 81:2; 83:2; 84:2, 8; 87:8; 91:2; 95:9; 100:7; 101:21; 103:10, 22; 104:3, 10, 15, 18, 21; 105:5, 9; 108:19; 110:7, 14; 111:22; 112:5; 116:14; 119:2, 7; 121:5, 9; 123:3, 11; 125:17, 20; 135:10; 146:11; 158:2, 5, 7; 165:17; 171:12, 16; 173:12, 17; 179:3; 183:22; 185:14, 20; 188:20; 195:19; 196:8, 16; 197:1; 200:21; 205:6, 12; 209:19; 211:1; 219:2, 10; 221:20; 222:12, 17; 223:2, 12;

227:6; 228:7; 230:8; 231:22; 235:3; 240:16; 243:6; 248:16; 260:14; 261:12, 22; 264:4; 265:8, 13, 16, 18; 266:2, 11, 18; 267:4; 268:15; 269:9, 11; 270:14, 20, 20; 273:6; 274:7; 275:14; 278:20, 22; 280:7, 10, 15; 282:21; 283:5, 12; 286:9, 14; 292:17; 299:9; 310:17, 20; 313:3, 16; 314:11, 18; 315:1, 6, 13; 316:2, 14, 21; 317:7, 18; 318:3, 6; 319:6, 19; 321:18
**solely** 39:20
**Solicitor** 22:19; 23:11; 206:2
**Solicitor's** 23:4, 18; 99:11; 208:16
**somebody** 113:12; 158:12; 173:9; 269:18
**someone** 31:6; 34:15; 37:22, 22; 49:9; 54:15; 66:9; 85:15; 94:12; 97:19; 149:1, 9; 150:21; 151:8; 156:2; 159:17; 174:1, 2; 207:10, 15, 18; 217:20, 21; 237:18; 242:11; 244:8, 10; 248:22; 256:18; 270:11; 285:11; 297:8, 21; 310:4
**someone's** 65:22
**Sometime** 87:20; 129:12; 132:8; 135:13; 140:20; 145:18; 201:16; 242:2, 5; 243:1; 247:1, 4, 16, 17, 21
**Sometimes** 24:13; 62:8; 73:1; 238:13, 14
**somewhat** 61:5
**somewhere** 85:10; 118:2, 7; 226:9; 233:10; 237:9; 256:17
**soon** 23:3
**sorry** 11:11; 34:2; 44:6; 114:12; 145:12; 151:7; 161:2; 171:12; 189:2; 191:14; 197:15; 201:14; 203:9; 205:5; 223:1; 224:15; 228:11; 238:2; 247:11; 272:1, 19; 278:7; 280:7; 314:4; 315:18
**sort** 68:1; 303:11; 304:7; 311:19, 20
**sorted** 291:14; 292:5
**sought** 29:10; 31:5; 153:17; 186:22; 188:6; 189:6, 12
**sounds** 48:13; 93:6, 6; 173:19
**source** 302:6
**space** 44:15; 184:5; 236:15; 237:5; 238:5, 5, 7; 298:20; 300:7, 8
**speak** 7:21
**speaking** 191:8
**special** 10:21; 199:4; 266:12; 299:17, 18

**Min-U-Script®**    Beta Reporting (202) 638-2400

**specific** 159:3; 162:14; 169:13, 14; 197:2; 201:19; 234:10; 292:17; 320:16
**specifically** 4:16; 11:14; 17:5; 19:14; 26:9; 37:9; 128:22; 153:19; 168:20; 187:20; 190:7, 13; 191:15; 218:2; 223:21, 22; 226:11; 227:12; 232:20; 233:15; 236:5, 6; 239:15; 244:12; 245:1, 19, 21; 291:12; 296:16; 311:16
**specifics** 16:21
**spelled** 82:22
**spent** 204:20; 229:11
**spinoff** 261:9
**spoke** 7:18; 156:1
**spoken** 8:2, 5; 156:1; 294:22
**SPPD** 287:21; 288:16; 289:1, 11; 292:16; 306:17
**spring** 248:7, 10
**St** 177:4; 178:4; 198:16; 226:13; 256:22; 259:9; 279:4; 287:10; 291:16; 292:13; 294:16; 295:1, 6, 11
**stack** 67:6; 110:15
**stacked** 257:9
**staff** 37:7; 39:3, 11, 14; 51:19, 20; 62:20; 65:7; 85:8
**stage** 22:11; 29:1; 36:14
**stages** 138:22
**stamp** 208:20; 209:12; 313:5, 8
**stamped** 46:11; 313:5
**stand** 122:1; 284:10
**standard** 40:4; 84:20
**standardization** 62:12, 16
**standing** 257:4
**stands** 84:8; 122:2
**Stanley** 92:11
**start** 19:16; 43:16; 60:12, 20; 64:19; 143:3
**started** 9:17, 22; 11:1; 18:18; 40:11; 43:13; 44:2; 49:13, 21; 58:9, 12, 19; 61:20; 62:2; 64:7, 16; 71:18; 206:6
**starting** 65:1
**state** 7:7; 29:8; 61:15; 77:5; 191:21; 193:1, 10; 235:19
**stated** 192:1; 203:16; 314:13, 19; 315:2, 7, 14
**statement** 120:9; 141:22
**States** 4:10; 6:2; 27:14; 45:13; 51:5; 76:17, 19; 77:7; 78:5, 7; 82:7; 83:10; 84:16; 100:5, 16, 19; 101:1, 4, 6, 9; 102:1, 3, 5, 7, 8; 106:2, 4; 109:15, 19; 118:2, 7, 8, 11, 20; 122:3, 5, 12, 13, 16, 17; 123:14;

124:1, 4; 125:8, 9, 10; 135:4; 157:1, 20; 171:17, 19; 172:20; 209:13; 254:14; 268:20; 280:14; 284:18; 296:1; 310:15
**stating** 147:11
**status** 48:22; 53:13; 54:16; 55:7, 9, 15; 56:7; 108:1; 109:17; 113:3; 140:21; 143:4; 217:14; 239:1; 247:6
**statute** 113:21; 114:8
**stay** 96:11; 132:14
**Stephanie** 176:6; 224:8; 307:22
**stick** 258:10
**still** 10:8; 19:8; 34:19; 35:22; 36:5, 6, 10; 72:15; 75:9; 80:18; 92:3; 97:10; 136:22; 137:4; 161:18; 176:4; 188:21; 230:4; 239:10; 241:6; 254:17, 18; 272:10; 281:15, 21; 282:8, 21; 283:7; 285:10; 286:10; 301:8; 302:21; 303:5, 17, 18; 304:9; 306:8; 307:15
**stint** 63:12
**stop** 7:3
**storage** 52:4; 86:5; 97:4; 170:22; 171:1; 236:15; 237:1, 8; 238:5, 5, 7; 255:5, 10, 12; 296:20, 21; 297:6; 298:3, 8, 11, 16, 16, 18, 20; 299:2, 4, 5, 20; 300:5
**stored** 299:21
**Street** 7:10
**stress** 66:5
**strictly** 32:4
**student** 13:6
**stuff** 43:7; 61:4, 9; 66:20; 74:21; 86:19; 96:9; 99:4; 175:20; 178:8; 183:9; 230:1, 2; 237:19, 21; 238:10, 14, 17; 250:16; 251:9, 12; 252:8, 9; 253:21; 254:4; 256:3, 17, 19; 257:6; 258:2; 298:5
**subject** 5:5, 7; 32:8; 37:15; 40:22; 45:12; 73:18; 91:18; 100:4; 105:22; 145:15; 152:14; 177:10; 180:11; 192:18; 213:10, 14, 19; 214:3, 8, 13; 260:12, 15; 261:5; 265:2; 269:8; 288:21; 289:2; 290:4, 9; 291:14; 292:6; 306:2; 308:13; 317:5
**subjects** 32:7; 54:5, 10
**submission** 212:1
**submit** 172:12
**submitted** 32:14; 90:4; 126:14; 143:8; 145:14; 196:5; 212:3, 5, 6, 22; 248:11
**subparagraph** 176:13;

178:10; 184:9
**subpoena** 30:16; 31:16; 179:16, 20; 180:21; 181:3, 4, 7; 183:5, 7
**subpoenaed** 30:10, 11; 31:7; 178:11, 16, 17, 18, 19; 180:10; 181:9, 11, 12; 182:19, 20; 233:17; 235:1, 9, 11
**subscriber** 192:17
**Subsequent** 136:16; 140:17
**subsequently** 165:22; 179:10; 225:6
**substance** 65:19; 153:3; 164:16; 211:13; 215:20; 220:13; 223:22
**substantial** 65:6; 72:3; 74:8; 206:10
**substantially** 114:3; 119:11; 228:17
**substitute** 60:7, 8
**successful** 307:8
**suggest** 113:12; 173:13
**suggested** 130:10; 224:7
**suggesting** 209:16
**sum** 153:2; 215:20; 220:13; 223:22
**summarize** 8:15; 169:19
**summary** 176:11; 185:10; 186:17; 198:20; 210:15; 211:6, 20; 226:5; 281:17; 291:21, 22; 293:18; 307:20; 320:12, 12, 14
**Sunday** 65:14
**superseding** 128:14, 18
**supervision** 13:8
**supervisor** 53:2; 62:1; 125:5
**supervisory** 238:9
**Supplement** 293:13
**support** 39:14, 16, 17; 62:20; 65:6; 85:8; 131:1; 138:19; 168:4, 15; 193:10; 211:4
**supported** 317:13
**supposed** 35:18; 62:17; 63:1, 2, 15, 16; 71:20
**Suppress** 57:10; 66:9; 71:1; 72:5, 11, 11, 16; 73:4, 7; 190:2
**Supreme** 16:18; 22:11; 23:19; 24:2; 26:13; 208:7, 12; 209:13; 217:10; 240:21; 244:4, 16; 245:8, 9
**supression** 20:18
**sure** 5:3; 16:20; 20:4; 21:22; 29:21; 30:8; 36:7, 15; 38:16; 39:13; 42:20; 43:16; 48:2; 50:17; 57:5; 62:15; 67:17; 79:6, 18; 81:9; 82:7, 20; 83:3, 9, 17; 84:11, 12; 85:5; 90:11; 91:5, 11; 93:10, 12, 22; 110:14; 122:7, 8, 8; 125:2;

126:18; 131:4; 132:6, 20; 133:2; 139:3; 140:13; 142:16; 143:19, 20; 160:14, 15; 172:10, 16; 174:15; 175:5; 178:3, 3, 21; 180:12; 187:14; 189:5; 195:3; 206:19; 207:9, 20; 222:14; 229:16; 234:1; 240:22; 244:20; 254:13; 257:2, 2; 272:1, 2; 276:16, 20; 277:16; 282:18; 284:19; 291:7; 296:7, 7; 303:3
**surprised** 221:17
**surveillance** 185:6; 186:3, 10; 188:1, 18; 189:14, 15; 190:6, 19
**sworn** 4:5; 6:6; 145:6
**synopsis** 126:10; 294:3
**system** 59:4, 5; 71:5; 74:16; 287:11, 14; 288:2, 3, 9; 295:22; 296:5, 6, 10, 14; 304:8

**T**

**tab** 74:16
**table** 5:1; 170:15; 230:10
**tablets** 257:17
**Tack** 316:12
**talk** 32:7; 61:12; 94:3; 120:17; 203:2; 238:8, 9; 249:8; 283:3; 286:11, 17
**talked** 112:1; 160:3; 165:11; 166:18; 214:19; 216:6; 239:9; 247:8, 15; 248:8; 249:1, 2, 5, 9, 10; 290:21
**talking** 27:5; 28:1, 2, 18; 33:16; 34:3; 39:14; 62:16; 64:22; 81:3; 84:4; 85:3; 87:9, 13; 90:8; 95:9, 14, 15; 100:22; 119:8; 125:12; 148:10; 152:13; 164:19; 165:1; 166:16; 184:13; 201:20; 210:2; 221:21; 222:3, 15; 227:17, 18; 242:10; 266:15, 16; 276:3; 317:2
**talks** 119:9; 274:8
**Tamara** 209:3
**Tammy** 209:3
**Tampa** 4:10; 9:12, 19; 10:9, 12; 38:6, 7; 41:13; 44:10; 46:20; 62:12; 63:12; 92:10; 124:5; 269:7; 308:1
**tape** 199:4
**tapes** 186:18; 198:12; 199:3, 8, 11, 12
**taps** 189:16
**Task** 11:6, 8, 12; 51:10; 259:12, 22; 261:20; 315:12, 22
**Tax** 184:9, 14, 15; 185:2; 232:14, 21

telephone 7:6; 187:4; 195:8; 198:18; 274:6, 14, 17; 275:20; 276:8
**telephones** 187:5; 195:8
**telling** 8:12; 159:15; 160:5; 164:18; 169:12; 202:3, 13; 218:2; 220:20, 21, 22, 22; 226:11; 246:7
**tells** 310:4
**ten** 14:15; 26:3, 4; 32:10; 62:3, 3; 74:7
**Tennessee** 92:21
**term** 298:13; 299:11; 309:18
**terms** 63:14; 72:10; 186:6; 237:2; 296:14
**Terry** 133:21
**testified** 4:5; 76:1; 145:7; 204:17; 261:7; 263:17; 299:10; 319:13
**testify** 231:8
**testimony** 21:7; 68:18; 91:3; 112:6; 113:6; 170:14; 210:7; 231:11; 235:6; 243:7
**thick** 86:15
**thinking** 33:14; 48:21; 229:12, 13
**third** 12:18, 22; 50:21; 88:19; 89:5; 118:19; 127:10; 221:20; 222:9; 228:8, 9; 270:11; 281:12; 283:20
**though** 37:14; 72:12; 97:12; 248:3
**thought** 141:12; 226:15; 228:12; 233:9; 235:8, 10; 240:8; 243:21; 250:8; 278:9; 282:22; 286:13, 16
**thousands** 102:9
**three** 14:12, 13; 88:4, 9, 10, 11, 14, 20; 89:9, 10; 93:10; 113:1; 117:13, 16; 127:20; 128:2, 12; 138:11; 143:11; 156:16, 18, 20; 157:3; 158:12; 165:21; 166:2; 199:5
**throw** 59:20; 72:2; 258:12, 13
**thrown** 61:9
**Timberlake** 170:19; 296:22; 297:1; 298:17, 19, 21
**times** 44:7; 60:17; 65:8; 76:2; 79:16; 97:11, 11, 14; 180:17; 249:18; 312:1
**Title** 28:18; 290:1
**today** 7:12, 15; 208:3; 244:14; 272:4; 274:17; 280:3; 301:17
**together** 286:3
**told** 25:8; 35:18; 49:12; 50:2, 7; 85:15; 112:22; 113:7; 133:13, 14; 140:5, 8, 11; 153:22; 155:22; 159:2, 17; 160:1; 162:10; 163:2, 8; 167:18, 19, 22;

168:8; 169:13; 175:10, 22;
200:8; 201:1; 210:4;
212:7, 8; 213:3; 214:19;
216:3; 217:21; 218:1;
219:12, 18, 21; 220:1, 8,
13; 221:7, 10, 13; 223:16;
224:5, 9, 13, 22; 225:1, 12,
20; 235:10, 15; 237:19;
239:18; 240:5; 241:2, 3;
244:2, 8, 11, 12; 245:17,
20; 246:5, 18; 249:6;
262:21; 289:22; 290:22;
291:5; 292:1; 309:7
**toll** 186:22; 187:3; 188:3;
195:7; 197:8, 9
**Tomasa** 145:22; 153:2;
159:6; 160:3
**took** 14:17; 19:15; 44:15;
73:12, 19; 86:19; 103:15;
133:4; 141:20; 142:1, 3, 4;
184:4; 250:2; 258:2;
297:19
**top** 47:11; 50:6; 51:18;
76:18; 118:20; 121:16;
208:1; 215:19; 216:4;
291:20; 293:13
**total** 257:11
**touch** 132:14; 215:7
**towards** 63:11; 117:15
**trace** 187:2, 17; 193:18,
21; 194:3, 5, 9, 13, 14
**track** 57:3, 6; 58:15
**trafficking** 64:17; 125:4
**trails** 12:21
**training** 33:21; 201:12,
22; 202:4
**transcript** 231:13, 16, 19;
272:13; 304:17
**transcripts** 96:6; 185:7;
186:17, 18; 230:19, 22;
231:5, 9; 254:2; 274:5, 13,
16; 275:20; 276:9, 11;
277:4; 302:8, 9
**Transfer** 46:14
**transferred** 60:18
**transmittal** 317:16
**trap** 187:2, 17; 193:18;
21; 194:2, 4, 8, 13, 14
**treated** 268:22; 269:15,
17
**trial** 13:10, 17, 19, 20;
14:2, 11, 15:22; 16:1;
19:22; 20:7; 21:4; 22:6;
56:13, 13; 75:6; 88:5, 6,
18, 19, 19, 22; 89:2, 3, 9;
92:19, 20; 94:22; 95:6;
96:4, 5; 97:17; 99:10;
108:7, 9; 127:18, 19;
128:3, 8, 9; 129:5, 7, 7, 22;
130:3, 7; 131:11; 132:4;
133:16, 22; 135:10, 11, 16,
19, 22; 136:9, 11; 141:8;
151:2, 4; 153:11; 161:20;
162:5; 168:21; 169:9, 10;
178:18; 179:10; 181:4, 7;
183:2; 186:21; 189:6;
206:8; 231:1, 4, 5, 6, 10,
13; 232:18, 19, 22; 234:5,

14; 245:10; 257:10, 13, 14,
18, 18; 261:14, 18; 272:12;
275:8, 8, 12; 276:12;
277:8, 10, 10, 15, 20;
278:4; 283:15, 15, 19;
284:3, 11, 17; 302:8, 9;
304:16, 17; 307:1
**trials** 4:18; 14:8, 12, 13;
15:3, 4, 6; 88:15; 150:8,
11; 151:10, 12, 15; 257:11
**Trick** 260:8
**tried** 12:20; 14:7, 9, 20;
16:14; 77:17; 87:15, 18;
88:4, 8; 89:19; 92:18, 20;
93:1, 21; 129:17; 166:3;
167:12; 283:16
**trigger** 52:16
**true** 20:17; 83:15
**try** 12:19; 43:12; 67:19;
70:8; 92:16; 127:13;
129:16; 169:18; 188:22;
201:3; 225:15; 232:11;
270:8; 271:6; 301:6; 303:2
**trying** 11:9; 19:8; 43:11;
49:2; 68:21; 80:18;
142:17; 180:12; 181:18,
18; 182:2; 186:1, 5, 6;
195:2; 196:13; 232:5;
238:3; 252:10; 261:11;
263:8, 15, 16, 19; 271:19;
281:2; 305:19; 306:3;
308:2; 318:19; 319:2, 15
**Tucker** 9:4; 133:21;
233:14
**turned** 182:12, 17; 183:3;
193:8, 11, 14, 16, 20;
195:6, 11; 233:17; 245:9
**two** 14:9, 10; 19:7; 25:5;
32:18, 19; 37:17; 45:11;
65:9; 78:11, 12; 87:22;
88:2, 4; 153:9; 158:8;
177:9; 198:11, 12; 203:5;
222:16; 227:5; 246:13;
257:10; 258:11
**two-part** 301:4
**type** 43:10; 52:13; 53:6;
54:1, 18; 55:8; 61:8; 67:7;
109:13, 13, 14; 124:21;
126:9; 152:6; 167:14;
173:4; 184:12; 189:15;
190:20; 228:2; 252:15;
271:15; 288:7; 290:11;
292:14, 18; 293:10;
304:13
**types** 87:1; 221:1, 4
**typical** 112:20; 250:3
**typically** 81:12
**typing** 43:18

**U**

**U.S** 9:11, 14, 18; 10:1, 16;
11:1, 13; 13:2, 11; 19:3;
23:4, 15; 26:20; 32:11;
33:19; 37:5; 38:5; 40:2, 11;
41:2, 3, 18; 42:2; 45:11;
46:11, 20; 49:18; 52:9, 18;

76:20; 77:13; 78:13, 14,
18; 79:9, 22; 84:22; 85:2,
9, 12, 14, 17, 21; 92:9;
95:11, 12; 106:9; 107:22;
109:11; 111:15; 112:11;
114:10; 123:4; 208:18;
209:11; 216:21; 254:11;
255:5; 262:20, 22; 263:3,
11; 265:20; 273:19; 274:1;
275:5, 18; 280:5; 281:1;
286:4; 292:12; 300:17;
301:17; 306:15, 19; 307:2,
15; 312:4
**ultimately** 123:13, 17, 18;
125:21
**unauthorized** 190:6, 18
**uncommon** 236:19
**Under** 13:8; 30:3; 37:2;
124:2; 159:9; 161:6, 14,
14; 169:7; 178:10; 179:8;
180:1; 183:5; 188:8;
190:12, 16; 191:18, 21;
192:4, 6, 11, 13, 18; 212:1;
231:18, 19; 233:17; 234:6;
235:2; 262:6; 265:2, 12;
266:9; 267:3; 281:4;
294:2; 303:6
**undercover** 279:11, 12
**underlying** 261:4
**understood** 5:18; 21:7;
212:4; 281:10
**undertook** 85:7
**undisposed** 165:21
**unfair** 233:21; 274:9
**unfortunately** 212:7
**unique** 116:10
**United** 4:9; 6:2; 27:14;
45:13; 76:16, 18; 77:7;
78:5, 7; 82:6; 83:10; 84:16;
100:5, 16, 18; 101:1, 4, 6,
9; 102:1, 3, 5, 6, 8; 106:2,
3; 109:15, 19; 118:2, 6, 8,
11, 20; 122:3, 5, 12, 13,
16, 17; 123:14; 124:1, 4;
125:8, 9, 10; 135:4; 157:1;
171:17, 19; 172:20;
209:13; 254:13; 268:20;
280:14; 284:18; 296:1;
310:15
**University** 8:21
**unless** 84:3; 135:1;
179:9; 294:10, 10, 11
**unredacted** 295:7
**unsigned** 222:16
**unusual** 74:6
**up** 5:1; 20:5; 21:16; 22:4;
24:12; 44:15; 53:5; 54:7;
59:4, 10, 11, 12, 15; 60:4,
15; 61:4; 65:14; 67:10;
70:8; 71:17; 74:14; 88:9;
97:15, 17; 99:3; 114:9;
117:13, 15; 123:14;
124:14; 150:15; 174:6, 10;
184:4; 187:11; 206:9;
209:2; 227:13; 235:8;
237:5; 239:2, 4, 12, 15;
240:3; 241:16, 18, 20;
242:3, 16; 250:20; 251:9,

11, 11; 254:20; 255:18;
285:10; 286:18; 297:6, 11,
13, 16, 22; 300:6
**update** 53:13; 54:14;
107:21
**updated** 55:2; 78:17
**updating** 100:15
**upset** 225:13
**upside** 211:2
**USA-207** 48:8, 13; 49:8;
111:3
**usable** 71:11
**USAO** 54:18
**use** 43:10; 70:13; 75:9, 9,
18; 174:5, 6; 224:21;
237:2; 251:10; 267:21;
297:9; 309:19; 312:18;
313:10
**used** 110:22; 116:5, 13,
15; 179:10; 194:11; 198:5;
216:2; 232:9, 21; 299:19
**using** 43:13, 16; 59:13;
75:5; 181:7
**usual** 69:21; 75:21;
190:14; 237:6
**usually** 20:10, 17; 24:6,
11; 25:6; 68:6; 71:6, 6;
99:7; 108:12; 125:16;
126:1; 144:4; 294:21

**V**

**v** 27:15; 135:4; 254:14;
284:18
**various** 40:14; 65:8;
122:12; 138:22; 303:6;
312:1
**Vaughn** 220:16; 223:8,
21; 263:4, 14; 282:3;
302:13, 19; 303:5, 13;
318:22
**vault** 298:12, 14
**verdict** 14:4; 42:17;
136:15
**verdicts** 135:18
**view** 197:14
**violating** 268:3; 318:15
**violation** 28:18
**virtually** 21:8
**visiting** 92:21
**volume** 43:8; 251:17
**voluminous** 184:3

**W**

**wait** 247:10
**waiting** 133:4; 141:2;
143:20
**waiving** 260:16, 21;
261:1
**walked** 65:22
**Walker** 295:15
**war** 70:20; 251:3, 5;
297:2, 7, 9; 298:11

**warrant** 193:4
**watching** 131:10
**way** 35:1; 43:11; 51:14;
57:18, 19; 58:12, 18;
59:10, 10, 11; 61:5; 62:8,
9, 17; 66:4; 67:10, 19;
74:12; 75:20; 80:18;
85:10; 87:4; 108:15;
112:8; 122:20; 125:1;
159:1, 1; 161:1; 162:9, 9,
10, 12, 13; 163:3; 172:13;
174:6; 181:2; 182:16, 20;
183:1; 195:2; 214:16;
250:12, 14; 251:7, 8, 10;
290:2, 22; 291:6; 292:2;
301:11; 302:4; 308:19;
311:8
**Web** 42:2
**week** 242:5
**weekends** 65:13
**weeks** 80:11; 133:22;
141:9; 241:16; 257:11
**weren't** 235:13; 237:7;
316:5
**Westlaw** 133:12; 139:8;
143:22; 144:6, 14; 204:14
**what's** 25:10; 116:19;
118:22; 212:14; 281:15
**whenever** 53:10; 146:19,
19
**whereas** 73:11
**Whereupon** 4:2; 144:19;
145:3; 321:20
**whole** 40:12; 72:8; 73:11;
79:5; 130:14; 167:19;
265:15
**whose** 155:1
**willful** 29:8
**Williams** 87:16; 88:22;
90:3, 15; 91:8, 14, 21
**Willie** 6:11; 210:5, 10;
284:6
**Willie's** 157:11
**winter** 136:13
**Wire** 189:16
**wise** 43:10
**wish** 213:5; 215:1
**withdrew** 191:5
**withheld** 303:1, 6
**withhold** 204:7
**within** 18:4; 30:5; 51:16;
58:5; 68:7; 80:10; 105:2;
106:20; 107:19; 112:18;
123:20, 21, 21; 139:6;
241:15; 280:13; 295:22;
296:10, 11; 298:19
**without** 4:16; 79:8; 93:11;
160:9; 162:15; 163:6;
169:12; 220:21, 21; 221:8;
253:22; 276:2; 321:2
**witness** 4:4; 6:5; 8:11;
14:5; 18:1, 15; 25:19;
27:11; 28:3; 29:21; 42:12;
50:17; 68:20; 81:3, 6;
84:11; 91:3, 5; 95:14;
100:11; 102:12; 105:1, 7,

11, 15; 110:9, 18; 116:17;
119:12; 123:9; 125:22;
135:12; 146:14; 165:19;
171:21; 173:19; 178:12;
179:6; 184:1, 2; 186:1;
189:2; 195:20; 201:1;
205:7; 211:7; 218:13;
223:16; 228:11; 231:6, 8,
12, 17; 234:16; 235:7;
240:18; 243:7, 8; 248:21;
260:10; 261:21; 266:4;
267:7; 269:13; 270:16;
273:7, 8; 275:16; 279:2;
280:17; 292:20; 299:10,
13; 302:16; 304:6; 310:22;
313:15; 314:4; 318:5
**witnesses** 27:18; 131:13,
17; 230:22; 231:7
**wondered** 115:2
**wondering** 292:3;
303:14; 304:3; 306:7
**word** 86:8, 9; 152:7;
224:21
**words** 77:19; 194:7;
291:5, 22; 293:1; 301:20;
302:20
**work** 9:1; 11:7, 15; 12:14,
22; 13:1, 4, 5; 19:16;
39:20; 44:2; 65:15; 70:18;
74:20; 96:22; 124:12;
195:21; 206:6; 261:2;
277:10
**worked** 9:3; 12:16; 26:19;
65:12, 13; 67:11; 82:12;
94:13
**workers** 177:7
**working** 10:6; 34:13;
37:5; 49:13; 64:1; 65:8;
70:14; 72:6, 8; 73:18; 78:6;
80:11; 112:17; 177:9;
204:21; 241:20; 251:2
**workload** 65:6; 66:5
**worry** 321:17
**wrapped** 286:18
**writ** 22:14; 205:21;
206:17, 20; 207:20; 208:7,
10, 18; 209:9; 217:20;
218:3; 241:10; 242:1, 13;
243:5, 9; 245:8; 248:2
**write** 94:16; 141:13;
142:5; 173:2
**writing** 19:9; 94:19;
175:15
**writs** 17:20, 21; 217:9
**written** 17:14; 151:3;
232:7; 287:4
**wrong** 23:14; 166:21;
249:4
**wrote** 52:14; 133:8;
229:11

# X

**x11** 48:15
**Xerox** 48:4

# Y

**year** 12:18, 22; 13:2, 15;
19:7; 34:6; 89:16, 21; 93:2;
164:6
**years** 14:6, 8, 15; 17:16;
32:10; 33:12, 13; 38:21;
45:11; 58:8; 64:8; 88:8;
111:7; 143:12; 204:20;
206:10
**yellow** 53:11; 104:12, 14,
16, 17, 18, 20; 257:9
**Yesner** 4:22; 5:3, 18, 21;
6:10; 8:9, 14; 13:18; 14:3,
14; 17:22; 18:2, 10; 19:18;
25:17, 21; 27:7, 9, 16;
28:5; 29:14, 19; 30:1; 34:9;
38:10, 12; 39:9; 42:11, 14;
45:4, 8, 18, 19; 46:4, 9;
48:6; 49:1; 50:19; 51:2, 4;
67:12; 69:2; 76:5, 6, 13;
77:3, 10, 19; 78:1; 81:5;
82:5; 83:7; 84:6, 14; 87:7,
11; 91:12; 95:12, 16;
99:18; 100:1, 10, 13;
101:14, 19; 102:10, 14;
103:12; 104:2, 5, 14, 16,
20; 105:13, 21; 108:21;
110:10; 111:4; 112:3, 7;
117:3; 119:5, 10, 22;
120:19; 121:2, 8, 11, 13;
123:9, 12; 125:18; 126:4,
12; 135:11, 15; 144:16;
145:10; 146:13, 16; 158:4,
6, 9; 164:22; 165:5; 167:1;
171:13, 19, 22; 173:15, 18;
174:4; 179:14; 184:8;
185:17; 186:2; 188:11, 16;
189:4; 196:4, 10, 18;
197:4, 17; 198:2; 201:5;
205:8, 17; 209:18, 22;
211:17; 218:7, 14; 222:1,
14, 19; 223:5; 224:12;
227:9; 228:9, 14; 230:9;
232:2; 235:14; 240:20;
243:13; 248:19; 249:11;
258:16, 21; 260:11; 261:6,
15; 262:13, 17; 265:4, 10,
15, 17; 266:1, 7, 15; 267:1,
8; 268:8; 269:5, 10; 270:6,
22; 273:17; 274:11;
275:17; 278:21; 279:19;
280:9, 12, 22; 282:17;
283:3, 10; 284:20, 22;
286:12, 16, 20; 292:19;
293:5; 299:14; 310:19;
311:10; 313:6, 22; 314:7,
14, 20; 315:3, 8, 15; 316:7,
19; 317:1, 9, 22; 318:17;
319:13; 320:2, 5; 321:19
**Youngblood** 27:15

**Lawyer's Notes**

**Lawyer's Notes**

Notice: This opinion is subject to formal revision before publication in the
Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify
the Clerk of any formal errors in order that corrections may be made
before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 15, 2002          Decided April 2, 2002

No. 00–5449

WILLIE JEFFERSON,
APPELLANT

v.

DEPARTMENT OF JUSTICE,
OFFICE OF PROFESSIONAL RESPONSIBILITY,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 00cv01489)

*Brian G. Friel*, appointed by the court, argued the cause
for *amicus curiae* on the side of appellant. With him on the
briefs were *Michael N. Levy*.

*Willie Jefferson*, appearing *pro se*, was on the brief for
appellant.

Bills of costs must be filed within 14 days after entry of judgment.
The court looks with disfavor upon motions to file bills of costs out
of time.

Vincent H. Cohen, Jr., Assistant U.S. Attorney, argued the cause for appellee. On the brief were Roscoe C. Howard Jr., U.S. Attorney, R. Craig Lawrence and Meredith Manning, Assistant U.S. Attorneys.

Before: HENDERSON, RANDOLPH and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

Dissenting opinion filed by Circuit Judge RANDOLPH.

ROGERS, Circuit Judge: Willie Jefferson appeals the grant of summary judgment to the Justice Department on his request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(a) (1996 & West Supp. 2001), for "any and all records created by and/or received by the ... Office of Professional Responsibility ("OPR") in regards to Assistant United States Attorney ("AUSA") Jeffrey Scott Downing." Previously, this court affirmed the grant of summary judgment insofar as Jefferson did not challenge the district court's segregability determination or the government's reliance on 5 U.S.C. § 552(b)(2) ("Exemption 2") and § 552(b)(5) ("Exemption 5") to redact certain material. Order, May 14, 2001. Thus, the only question now before the court is whether the government properly relied on § 552(b)(7)(C) ("Exemption 7(C)") in redacting certain other documents that it released to Jefferson, and in refusing "to confirm or deny the existence of any additional responsive records," the so-called Glomar response. Id. We hold, on de novo review, that the district court correctly concluded that OPR compiled the files that it released to Jefferson for law enforcement purposes, and that the redacted information in these files falls within Exemption 7(C). However, because OPR was not entitled to make a Glomar response as to all of its files in the absence of an evidentiary showing to support that response, we remand the case to the district court to determine whether OPR had non-law enforcement files regarding AUSA Downing as of December 2, 1999, the date of OPR's response to Jefferson's FOIA request. See Bonner v. Dep't of State, 928 F.2d 1148, 1152 (D.C. Cir. 1991).

## I.

Following his conviction for drug offenses and his sentence to life imprisonment without parole in the Middle District of Florida, Jefferson filed several FOIA requests to obtain records from the OPR. The first FOIA request of August 8, 1995, sought his complete criminal file and was denied under FOIA Exemption 5 because his criminal appeal was pending. See Jefferson v. Dep't of Justice, 123 F. Supp. 2d 1, 2 (D.D.C. 2000). While his FOIA appeal was pending, but after his conviction had been affirmed on direct appeal, the government informed the district court that on October 1, 1997, AUSA Downing, the trial prosecutor, had "purged" the criminal case files. See id. at 2-3. While file reconstruction was going on pursuant to the district court's order, Jefferson moved for sanctions against the Justice Department and AUSA Downing. See id. at 2-3. In March 2000, the district court referred AUSA Downing to OPR so that it could "investigate whether he violated the law or engaged in professional misconduct." Id. at 6. After the Justice Department released additional documents relating to his criminal trial files, see id. at 5, and the court conducted a limited in camera review of eleven disputed documents, the district court entered a final judgment on August 27, 2001.

Jefferson's FOIA request at issue in the instant appeal followed a period of correspondence between Jefferson and OPR that eventually led to the release of redacted portions of "certain records pertaining to a complaint filed by" Jefferson against AUSA Downing, see id. at 5, but not such other files as OPR may have regarding AUSA Downing. After filing his first FOIA request on August 8, 1995, Jefferson wrote a letter to OPR in October 1995, charging AUSA Downing with prosecutorial misconduct before the Grand Jury and alleging the deliberate withholding and concealing of exculpatory evidence and the presentation of perjured and manufactured evidence at his trial. Jefferson further alleged that AUSA Downing had conspired with a confidential informant to give false testimony at trial and had violated Fed. R. Crim. P. 48(a). OPR responded that it found no basis on which action by OPR would be warranted. After Jefferson wrote two

additional letters, again alleging prosecutorial misconduct, OPR advised Jefferson that the proper forum for his complaint was the court and that OPR found no allegation upon which action by OPR would be warranted. Jefferson responded by letter of August 2, 1996, that: "In order for me to document your office's assistance in this matter would you please forward to me a copy of the investigative report your office completed."

On September 15, 1998, Jefferson filed another complaint with OPR, captioned "RE: 'Request for the initiation of criminal charges against [AUSA] Downing,'" alleging violations of Title 18 of the United States Code for obstruction of justice and deprivation of constitutional rights, as well as a privacy claim under Title 28 of the Code of Federal Regulations for giving unauthorized access to his criminal file for the purpose of destroying those records. OPR responded that it found no basis for any action based on Jefferson's allegations. Jefferson, responding to OPR's statement that it would further review the matter if he could supply more details, submitted two declarations and repeated his allegations that his criminal trial records were "improperly accessed and destroyed" by AUSA Downing. OPR advised Jefferson on May 3, 1999, that it found no allegation of misconduct on which OPR action would be warranted.

Jefferson filed the FOIA request at issue on August 3, 1998, prior to the time the district court referred AUSA Downing for an investigation by OPR. This time Jefferson sought "copies of any and all records created and/or received by . . . [OPR] . . . in regard to" AUSA Downing, and "an index of any files maintained by OPR in regards to" AUSA Downing. The OPR responded by letter of December 2, 1999, that "[i]t is the policy of this Office when responding to FOIA requests from third-party individuals to refuse to confirm or deny the existence of records concerning Department of Justice employees," absent their consent or "an overriding public interest," citing FOIA Exemption 7(C). Nevertheless, OPR stated that it had identified 28 documents responsive to Jefferson's request "pertaining to a complaint filed by you," and released eleven in their entirety and seventeen in part.

OPR withheld the remaining information pursuant to FOIA Exemptions 2, 5, and 7(C).

Following denial of his administrative appeal, Jefferson filed suit challenging OPR's FOIA determination. The government moved for summary judgment and submitted a declaration by Dale K. Hall, an OPR employee and FOIA specialist, stating that "[a]ll records relating to OPR's investigations are compiled for law enforcement purposes and, therefore, are deemed to be law enforcement files" within Exemption 7(C). In addition, Hall stated that "all non-exempt information contained in the 17 [redacted] documents was reasonably segregated for release" to Jefferson, and that pursuant to Exemption 7(C), "OPR [w]ould neither confirm nor deny any other records that may or may not exist" on AUSA Downing. The district court granted the government's motion for summary judgment. The court ruled that because OPR's investigation related to allegations of criminal misconduct, the records were prepared for law enforcement purposes within the meaning of Exemption 7(C). The court also ruled that Jefferson had failed to show that OPR was engaged in illegal activity, thereby confirming the appropriateness of the redactions in the released materials. The court rejected Jefferson's challenge to OPR's claim that all segregable portions of the records had been disclosed. Of particular significance, the district court further ruled that OPR's *Glomar* response refusing to confirm or deny whether it possessed any other files on AUSA Downing was proper because such records would not shed light on the agency's conduct and Jefferson "seeks information in law enforcement files related to an individual who has not waived his rights to privacy with respect to any such records."

II.

On appeal, Jefferson, assisted by amicus, contends that the district court erred as a matter of law in allowing the government to make a *Glomar* response with respect to any other files that OPR may possess on AUSA Downing. Because OPR conducts both law enforcement and non-law en-

6

forcement activities, and Jefferson's FOIA request asked for "all records" relating to AUSA Downing, not simply those compiled for law enforcement purposes. Jefferson maintains that OPR had to identify the records at issue and establish with particularity that they were compiled for law enforcement purposes. Alternatively, Jefferson contends that even if OPR could properly issue a *Glomar* response under Exemption 7(C) in some circumstances, there was no evidence showing that all of OPR's files relating to AUSA Downing were compiled for law enforcement purposes. Jefferson also contends that the district court erred in failing both to review whether the 17 redacted documents were compiled for law enforcement purposes, and to determine the segregability of the non-law enforcement documents. Finally, Jefferson contends that the district court erred in finding that AUSA Downing's privacy interest outweighed the public interest in disclosure of the records even if they were compiled for law enforcement purposes.

Our review of the grant of summary judgment is *de novo*. *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). The court must "determine, from inspection of the agency affidavits submitted, whether the agency's explanation was full and specific enough to afford the FOIA requester a meaningful opportunity to contest, and the district court an adequate foundation to review, the soundness of the withholding." *King v. Dep't of Justice*, 830 F.2d 210, 217-18 (D.C. Cir. 1987).

Under FOIA Exemption 7(C), the requirement that "each agency shall make available to the public information" does not apply to matters that are:

   records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ... (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy.

5 U.S.C. § 552(b)(7)(C). In assessing whether records are compiled for law enforcement purposes, this circuit has long emphasized that the focus is on how and under what circum-

7

stances the requested files were compiled, *see Weisberg v. United States Dep't of Justice*, 489 F.2d 1195, 1202 (D.C. Cir. 1973), and "whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding." *Aspin v. Dep't of Defense*, 491 F.2d 24, 27 (D.C. Cir. 1973). In *Rural Housing Alliance v. Dep't of Agriculture*, 498 F.2d 73 (D.C. Cir. 1974), the court identified two types of investigatory files that government agencies compile: (1) files in connection with government oversight of the performance of duties by its employees, and (2) files in connection with investigations that focus directly on specific alleged illegal acts which could result in civil or criminal sanctions. *Id.* at 81. Again, the court emphasized that the purpose of the investigatory files "is the critical factor." *Id.* at 82. Thus, if the investigation is for a possible violation of law, then the inquiry is for law enforcement purposes, as distinct from customary surveillance of the performance of duties by government employees. *Id.* Then, in *Pratt v. Webster*, 673 F.2d 408 (D.C. Cir. 1982), the court set forth a two-part test whereby the government can show that its records are law enforcement records: the investigatory activity that gave rise to the documents is "related to the enforcement of federal laws," and there is a rational nexus between the investigation at issue and the agency's law enforcement duties. *Id.* at 420, 421. The court again distinguished the need "to establish that the agency acted within its principal function of law enforcement, rather than merely engaging in a general monitoring of private individuals' activities." *Id.* at 420.

The court applied these principles in *Kimberlin v. Dep't of Justice*, 139 F.3d 944 (D.C. Cir. 1998). In that case, the requester asked for "all papers, documents and things pertaining to the OPR investigation" of another AUSA. *Id.* at 947. Applying the distinction between law enforcement records and internal agency investigations set forth in *Rural Housing*, 498 F.2d at 81, the court stated that "[m]aterial compiled in the course of ... internal agency monitoring does not come within Exemption 7(C) even though it 'might reveal evidence that later could give rise to a law enforcement

8

investigation,'" *Kimberlin*, 139 F.3d at 947. Concluding, however, that "the OPR investigation here at issue was conducted in response to and focused upon a specific, potentially illegal release of information by a particular, identified official," *id.* at 947, the court held that the information in the OPR files was compiled for law enforcement purposes. *Id.*

Consistent with the plain language of his FOIA request of August 3, 1993, Jefferson states in his *pro se* brief that he sought any and all records maintained by OPR pertaining to AUSA Downing "after OPR continued to refuse to investigate AUSA Downing in light of the overwhelming evidence demonstrating that an investigation of AUSA Downing was warranted." As the Justice Department sees it, Jefferson is concerned with OPR's failure to conduct an investigation based on allegations that could lead to civil or criminal sanctions, and is not seeking records maintained in the course of general oversight of government employees. *See* Appellee's Br. at 14. If so, then it would appear that the district court properly ruled that the OPR files requested by Jefferson satisfied Exemption 7(C)'s threshold requirement. However, Jefferson points out in his *pro se* brief that his request extends to records that OPR maintains as "an internal affairs unit acting as [an] employer simply supervising its employees."

The Justice Department regulations provide, in relevant part, that OPR "shall ... [r]eceive and review any information or allegation concerning conduct by a Department employee that may be in violation of law, regulations or orders, or of applicable standards of conduct...." 28 C.F.R. § 0.39a(a) (2001). In addition, OPR is required to:

Refer any matter that appears to warrant examination in the following manner:

(1) If the matter appears to involve a violation of law, to the head of the investigative agency having jurisdiction to investigate such violations;

(2) If the matter appears not to involve a violation of law, to the head of the office, division, bureau or board to which the employee is assigned, or to the head of its internal inspection unit....

9

*Id.* § 0.39a(d). Among the information that OPR may receive are "[r]eports containing the findings of any investigation undertaken upon matters [that appear not to involve a violation of law] ... and the administrative sanction to be imposed, if any sanction is warranted." *Id.* § 0.39a(e). Consistent with the distinction drawn in *Pratt*, 673 F.2d at 419-21, and *Rural Housing*, 498 F.2d at 81, the regulations contemplate that OPR may secure reports, as distinct from compiling them, that arise as a result of internal agency monitoring and review allegations of non-law violations by Department attorneys for internal disciplinary purposes. OPR's internal guidelines reflect a similar distinction, providing that "OPR reviews allegations of attorney misconduct involving violations of any standard imposed by law, applicable rules or professional conduct, or Departmental policy." *www.usdoj.gov/opr/index.html* (last visited March 27, 2002). Thus, as in *Kimberlin*, 139 F.3d at 947, and *Beck*, 997 F.2d at 1492, we decline to hold as a matter of law that all OPR records are necessarily law enforcement records.

Because the Department had the burden, under the two-part test of *Pratt*, 673 F.2d at 420-21; *see also United States Dep't of State v. Ray*, 502 U.S. 164, 173 (1991), to establish as a threshold matter that its records are law enforcement records, the district court had to determine whether all of OPR's records relating to AUSA Downing were law enforcement records before turning to a consideration of whether the public interest in disclosure of any law enforcement records was outweighed by AUSA Downing's privacy interests. *See* 5 U.S.C. § 552(b)(7)(C). The district court relied on Hall's declaration that "[a]ll records relating to OPR's investigations are compiled for law enforcement purposes, and, therefore, are deemed to be law enforcement files." That may well be true, for this court has recognized that Exemption 7(C) "covers investigatory files related to enforcement of all kinds of laws," including those involving "adjudicative proceedings." *Rural Housing*, 498 F.2d at 81 n.46. Depending on the purpose of the investigation, records obtained by OPR regarding ethical violations by AUSA Downing of the Attorney General's Code of Conduct, *see* 28 C.F.R. § 77.1-5; 28 U.S.C.

RANDOLPH, *Circuit Judge*, dissenting: I believe all of the files of the Office of Professional Responsibility (OPR) in the Department of Justice relating to the investigation of an individual are "compiled for law enforcement purposes" within the meaning of exemption 7(C) of the Freedom of Information Act, 5 U.S.C. § 552(b)(7)(C). OPR therefore properly refused to confirm or deny the existence of other investigations of Assistant United States Attorney Downing.

Exemption 7(C) shields law enforcement files from disclosure when release of the records would constitute "an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). So-called "Glomar" responses, named after the ship involved in *Phillippi v. CIA*, 546 F.2d 1006 (D.C. Cir. 1976), are permissible answers to FOIA requests if the agency's acknowledgment that it has investigatory files about an individual would constitute an unwarranted invasion of the individual's privacy. If Jefferson sought law enforcement files, our decision in *Beck v. Dep't of Justice*, 997 F.2d 1489 (D.C. Cir. 1993), justified OPR's Glomar response, a point about which we all agree.

We may also agree that "[i]nternal agency investigations . . . in which an agency, acting as the employer, simply supervises its own employees" are not law enforcement investigations. *Stern v. FBI*, 737 F.2d 84, 89 (D.C. Cir. 1984). But ever since its founding by Attorney General Levi in 1975, OPR has lacked general supervisory authority over DOJ attorneys. Its task has always been much narrower. OPR is a reactive agency within the Justice Department, receiving complaints and investigating "allegations of professional misconduct by Department of Justice attorneys that pertain to the exercise of their authority to investigate, litigate or provide legal advice." OFFICE OF PROFESSIONAL RESPONSIBILITY, FISCAL YEAR 1999 ANNUAL REPORT 1, http://www.usdoj.gov/opr/99AR-Final.htm (last visited Mar. 18, 2002).

By contrast, OPR is charged with the duty of investigating the conduct of Justice Department attorneys, "that may be in violation of law, regulations or orders, or of applicable standards of conduct or may constitute mismanagement, gross waste of funds, abuse of authority, or a substantial and specific danger to public health or safety." 28 C.F.R.

§ 0.39a(a) (2002). Recognizing the potential overlap with the investigative authority of the Justice Department's Office of the Inspector General, which "conducts and supervises audits, inspections and investigations relating to the programs and operations of the Department," 28 C.F.R. § 0.29a(a) (2002), the Attorney General has circumscribed OPR's authority. OPR "shall have jurisdiction to investigate allegations of misconduct by Department attorneys that relate to the exercise of their authority to investigate, litigate or provide legal advice." *Jurisdiction for Investigation of Allegations of Misconduct by Department of Justice Employees*, Order No. 1931–94 (Nov. 8, 1994). The Inspector General has exclusive authority to investigate any other allegations.

When OPR receives a complaint, it conducts a preliminary inquiry. 28 C.F.R. § 0.39a(c) (2002). When OPR determines that the matter warrants further investigation, OPR refers it for investigation:

(1) If the matter appears to involve a violation of law, to the head of the investigative agency having jurisdiction to investigate such violations;

(2) If the matter appears not to involve a violation of law, to the head of the office, division, bureau or board to which the employee is assigned, or to the head of its internal inspection unit;

28 C.F.R. § 0.39a(d)(1) & (2) (2002).

Two points about the quoted subsections need stressing. First, the regulations treat violations of "law" as violations of statutory law and violations of regulations, standards of conduct and so forth as something else. But for FOIA purposes, "law"—as in "compiled for law enforcement purposes"—includes violations of regulations and standards of conduct and court orders and so forth. All of these sources are also law, although they are not legislation.* This is why "[i]nvestiga-

---

* When a government attorney is found to have engaged in intentional misconduct, OPR notifies the state bar association in which has licensed that attorney. *See* GENERAL ACCOUNTING OFFICE, FOLLOW-UP INFORMATION ON THE OPERATIONS OF THE DEPARTMENT OF

3

tions which focus directly on specific alleged illegal acts, illegal acts of particular identified officials, acts which could, if proved, result in civil or criminal sanctions" are investigations for law enforcement purposes within the meaning of exemption 7(C). *Rural Housing Alliance v. United States Dep't of Agric.*, 498 F.2d 73, 81 & n.46 (D.C. Cir. 1974).

Second, after the employee's office conducts an investigation of his alleged non-statutory violation pursuant to § 0.39a(d)(2), it must file the investigative report with OPR, together with a description of the sanction imposed. It is the possibility that OPR possesses such a (d)(2) report relating to Assistant United States Attorney Downing that leads my colleagues to the conclusion that OPR may possess non-law enforcement files outside exemption 7(C)'s protection. This strikes me as doubly mistaken.

It wrongly assumes that any (d)(2) investigation by the head of the department would be unrelated to a law violation, an assumption that rests on a misreading of the regulations. And it also wrongly assumes that OPR receives the report for other than law enforcement purposes. What other purposes might these be? Surely not as an "employer simply supervising its employees." Maj. op. at 8. To repeat, OPR is not a supervising agency within the Justice Department; and it does no have general oversight responsibility. Instead OPR receives the report of the (d)(2) investigation so that it may decide whether to pursue its law enforcement functions further. "When warranted, OPR conducts full investigations of such allegations, and reports its findings and conclusions to the Attorney General and other appropriate Departmental officials." http://www.usdoj.gov/opr/index.html. That OPR might close the file at this stage, or earlier, does not mean that the records it compiles are for other than law enforcement purposes. Not every complaint will be credible. Not every investigation will conclude that the target engaged in

JUSTICE'S OFFICE OF PROFESSIONAL RESPONSIBILITY 2 (2001). The ethical rules for lawyers contain enforceable standards and violations carry civil if not criminal sanctions. Also, attorneys who violate court rules can be sanctioned for contempt of court.

4

misconduct. And as with any agency conducting law enforcement investigations, not every piece of information in OPR's file will constitute evidence of illegal activity. In the course of investigating someone for committing a crime, the FBI for instance might have its agents conduct investigations into the individual's friends and associates, his lifestyle, his spending habits and so forth. None of these inquiries will necessarily reveal criminal activity, but there can be no doubt that the records thus compiled are for law enforcement purposes within exemption 7(C). For these reasons, I would credit the affidavit of the government attorney that "[a]ll record's relating to OPR's investigations are compiled for law enforcement purposes and, therefore, are deemed to be law enforcement files." Declaration of Dale K. Hall, at 2. My colleagues label the sworn statement, a "bare assertion," maj. op. at 1t, which has nothing to do with what should concern us—namely, whether it is true. I am convinced that it is. The majority offers no good reason for disbelieving it.

One should not be misled by the majority's statement that our court has "decline[d] to hold as a matter of law that all OPR records are necessarily law enforcement records." Maj. op. at 9. The most to be said of the cases cited for this proposition—*Kimberlin v. Dep't of Justice*, 139 F.3d 944, 947 (D.C. Cir. 1998), and *Beck v. Dep't of Justice*, 997 F.2d 1489, 1492 (D.C. Cir. 1993)—is that the court had no occasion to discuss, or to reach, the issue. This is the first case to do so, and I believe the result it reaches is mistaken.

Because OPR conducts law enforcement investigations, and has no other function within the Department of Justice, its records come within exemption 7(C) and a remand is unwarranted. I therefore dissent.

The Tampa Tribune, April 27 2001

# JUDGE / Attorney disposed of records

## blasts lawyer's conduct

**◄ From Page 1**

Kessler asked the department to investigate Downing in a ruling issued March 29, 2000.

The order was not widely circulated and came to light only recently.

The case involves Willie Jefferson, who was convicted of drug offenses by a jury in Tampa in 1993 and is now serving a lengthy term at a federal prison in Atlanta.

As part of an attempt to appeal, Jefferson sued then-Attorney General Janet Reno and others in 1996 for access to his criminal file. The government responded in October 1997, disclosing that Downing had "purged" the case file just months before — while the lawsuit was still pending.

That led a federal judge to appoint a lawyer from the prominent Washington firm of Piper & Marbury to investigate on Jefferson's behalf.

Downing destroyed 24 out of 36 boxes of records in the case, Jefferson wrote in court documents.

The net effect was to deny Jefferson the records on which to base his appeal.

Downing said in a sworn statement that he destroyed the records after his legal assistant told

him he could. He called it a "regrettable mistake."

"At the very least, Mr. Downing's actions demonstrate a dangerous and reckless disregard for his agency's statutory duty ... At worst, Mr. Downing may have perjured himself," Kessler wrote.

"[The scenario offered by Mr. Downing, an experienced government prosecutor, casts the gravest doubt about his excuse for the destruction."

Kessler asked the Office of Professional Responsibility, the Justice Department's watchdog arm, to investigate.

She also fined the Executive Office for U.S. Attorneys, which handled the government's defense of Jefferson's lawsuit, $10,000. The money was paid to organizations that provide legal aid to the poor and imprisoned.

This ruling comes to light after other prosecutors have been reprimanded by federal judges — two cases in the past three months.

On March 16, a three-judge panel of the 11th U.S. Circuit Court of Appeals found that Assistant U.S. Attorney Michael Rubinstein lied to a grand jury, rushed the panel and pressured it to "rubber stamp" indictments in the high-profile prosecution of a local seafood company, Sigma International Inc.

Sigma and two of its executives had been convicted of selling millions of dollars' worth of tainted shrimp. The judges took the rare step of throwing out the convictions.

Like Downing, Rubinstein is under investigation by the Office of Professional Responsibility.

On Feb. 13, another big federal case was suspended because of misconduct when U.S. Magistrate Mark Pizzo handed down an order killing the government's prosecution of Steve and Marlene Aisenberg.

The couple were accused of lying to investigators in the 1997 disappearance of their 5-month-old daughter, Sabrina. Pizzo said detectives built their case by lying and distorting the facts about scores of taped conversations between the Aisenbergs. By extension, his ruling also challenged the behavior of the prosecutors in the case, who had vouched for the audiotapes in court.

Pizzo's order was so scathing that it prompted Gov. Jeb Bush to appoint a special prosecutor to investigate. The inquiry continues.

*Paula Christian covers federal courts and can be reached at (813) 259-7615 or pchristian@tampatrib.com*

**By PAULA CHRISTIAN**
Of The Tampa Tribune

TAMPA — The prosecutor's explanation for his behavior casts "the gravest doubt" on his truthfulness, a judge says.

Yet another federal judge has accused a prosecutor in the U.S. attorney's office in Tampa of misconduct, saying he showed "dangerous and reckless disregard" for the law.

The prosecutor, Assistant U.S. Attorney Jeffrey Downing, destroyed records in a criminal case and might have perjured himself, said Judge Gladys Kessler, who sits on the U.S. District Court bench in Washington, D.C.

It is the third time in about a year that a judge — either directly or by implication — has blasted the conduct of federal prosecutors here.

In an interview Thursday, U.S. Attorney Donna Bucella declined to discuss the latest case but praised her staff for its ethics.

"I think we have some of the finest prosecutors here, very ethical people," she said "We have a lot less problems than in other districts."

She acknowledged that sometimes prosecutors make mistakes. But she said even federal judges can incorrectly allege misconduct, and it is up to the Justice Department's Office of Professional Responsibility to make the final determination.

Casey Stavropoulos, a department spokesman, was unable to say Thursday whether the investigation into Downing was ongoing or had been concluded.

Downing, a veteran prosecutor in the office who mostly handles drug cases, declined to comment.

**See JUDGE, Page 10 ►**

MOVANT'S ATTACHMENT #2